**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr., *pro hac vice forthcoming*
  tboutrous@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

**WATANABE ING LLP**
Melvyn M. Miyagi #1624-0
  mmiyagi@wik.com
Ross T. Shinyama  #8830-0
  rshinyama@wik.com
Joyce W.Y. Tam-Sugiyama #10325-0
  jtam@wik.com
999 Bishop Street, Suite 1250
Honolulu, HI 96813
Telephone: 808.544.8300
Facsimile: 808.544.8399

Attorneys for Defendants
CHEVRON CORPORATION
and CHEVRON U.S.A., INC.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| CITY AND COUNTY OF HONOLULU,<br><br>              Plaintiff,<br><br>       v.<br><br>SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; SHELL OIL | CASE NO.:<br><br>**NOTICE OF REMOVAL BY DEFENDANTS CHEVRON CORPORATION AND CHEVRON U.S.A., INC.; DECLARATION OF MELVYN M. MIYAGI; EXHIBITS "A" – "F"; CERTIFICATE OF SERVICE**<br><br>[Removal from Circuit Court of the First Circuit, State of Hawai'i] |

PRODUCTS COMPANY LLC;
CHEVRON CORP; CHEVRON USA
INC.; BHP GROUP LIMITED; BHP
GROUP PLC; BHP HAWAII INC.; BP
PLC; BP AMERICA INC.; MARATHON
PETROLEUM CORP.;
CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY;
PHILLIPS 66; PHILLIPS 66 COMPANY;
AND DOES 1 through 100, inclusive,

Action Filed: March 9, 2020

Defendants.

---

## NOTICE OF REMOVAL BY DEFENDANTS
## CHEVRON CORPORATION AND CHEVRON U.S.A., INC.

**TO: THE CLERK OF THE ABOVE-TITLED COURT, AND TO
PLAINTIFF THE CITY AND COUNTY OF HONOLULU
AND ITS COUNSEL OF RECORD**

PLEASE TAKE NOTICE THAT Defendants Chevron Corp. and Chevron
U.S.A., Inc. (collectively, "the Chevron Parties"), remove this action—with
reservation of all defenses and rights—from the Circuit Court of the First Circuit,
State of Hawai'i, Case No. 1CCV-20-0000380, to the United States District Court for
the District of Hawaii, pursuant to 28 U.S.C. §§ 1331, 1334, 1441(a), 1442, 1446,
1452, and 1367(a), and 43 U.S.C. § 1349(b).  All other defendants that have been
properly joined and served (collectively, "Defendants") have consented to this Notice
of Removal.

This Court has original federal question jurisdiction under 28 U.S.C. § 1331
because the Complaint arises under federal laws and treaties, and presents substantial

federal questions as well as claims that are completely preempted by federal law. Removal is also proper pursuant to the federal officer removal statute, 28 U.S.C. § 1442, as well as 28 U.S.C. §§ 1334, 1441(a), 1446, and 1452, and 43 U.S.C. § 1349(b). This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims over which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction.

This case is about *global* greenhouse gas emissions, the regulation of which is necessarily governed by federal law. Plaintiff, the City and County of Honolulu ("Plaintiff") alleges that the worldwide use of fossil fuels "plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution," which "is the main driver of the gravely dangerous changes occurring to the global climate." Compl. ¶ 4. Plaintiff does not limit its claims to harms caused by fossil fuels extracted, sold, marketed, or used in Hawaiʻi. Instead, Plaintiff's claims depend on Defendants' nationwide and global activities, as well as the activities of billions of fossil fuel consumers, including not only entities such as the U.S. government and military, but also hospitals, schools, manufacturing facilities, and individual households. Indeed, Plaintiff is itself a prodigious consumer and user of fossil fuels. As the Ninth Circuit has noted, "any effective plan [to reduce fossil fuel emissions] would necessarily require a host of complex policy decisions entrusted . . . to the

wisdom and discretion of the executive and legislative branches" of the federal government. *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020).

Plaintiff's Complaint seeks to hold Defendants liable for the consequences of longstanding decisions by the federal government regarding, among other things, national security, national energy policy, environmental protection, the maintenance of a national strategic petroleum reserve program, development of outer continental shelf lands, mineral extraction on federal lands (which have produced billions of dollars for the federal government), and the negotiation of international agreements bearing on the development and use of fossil fuels.  Many of the Defendants have leases and contracts with the federal government to develop and extract minerals from federal lands, and have acted under the direction of federal officers to produce and sell fuel and associated products to the federal government for the nation's defense. The gravamen of the Complaint seeks to hold Defendants liable—in the form of compensatory, punitive, and profit disgorgement damages—for policy decisions by governments, actions of Defendants under the direction of federal officers for or related to the needs of the federal government in pursuit of federal government policies to develop fossil fuel resources and secure the national defense, and practical consumer decisions made by billions of others, including Plaintiff.

Plaintiff's Complaint improperly attempts to employ state law to interstate and, indeed, international activity.  And the activity at issue—Defendants' production of

a dependable, affordable supply of fossil fuels—is the backbone of the American economy. Defendants' products power our national defense and military; drive production and innovation; keep our homes, offices, hospitals and other essential facilities illuminated, powered, heated, and ventilated; transport workers and tourists across the nation; and form the materials from which innumerable consumer, technological, and medical devices are fashioned. Though Plaintiff ostensibly asserts its claims under state law, the Complaint implicates long-established federal policy, statutory, regulatory, and constitutional standards, issues and frameworks. On three separate occasions, the Supreme Court has held that an interstate action for air or water pollution arises under federal law and belongs in federal court. *See Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410 (2011) ("*AEP*") (interstate and international effects of greenhouse gas emissions); *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ("*Milwaukee II*") (interstate water pollution); *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*") (same). Two federal district courts have followed these precedents and held that lawsuits legally indistinguishable from Plaintiff's arise under federal common law. *City of New York v. B.P. p.l.c.*, 325 F. Supp. 3d 466, 471 (S.D.N.Y. 2018); *City of Oakland v. BP p.l.c.*, 325 F. Supp. 3d 1017, 1024 (N.D. Cal. 2018). Plaintiff seeks to hold a small number of oil and gas companies—representing a mere fraction of global oil and gas production—liable for the alleged effects of *global* climate change that Plaintiff's Complaint admits are

caused by cumulative greenhouse gas emissions from countless nonparties. Domestically, these lawsuits would require balancing the costs and benefits of the use of fossil fuels in a state court under state public nuisance law.  These suits thus constitute a collateral attack on the regulation of the emission of greenhouse gases from both mobile and stationary sources by the Environmental Protection Agency ("EPA") under the Clean Air Act.  They also seek to regulate the production and sale of oil and gas abroad, raising federal issues under the foreign affairs power and the Foreign Commerce Clause.  The policy decisions surrounding the use of fossil fuels and the threat of global warming "require consideration of competing social, political, and economic forces," as well as "economic [and] defense considerations." *Juliana*, 947 F.3d at 1172 (internal quotation marks omitted).

This lawsuit thus implicates bedrock divisions of federal-state responsibility. Plaintiff seeks to usurp, through a set of state law claims, the direction of federal policy in core spheres of national security, nationwide economic development, and international relations.  Reflecting the substantial and uniquely federal interests posed by greenhouse gas claims like these, the United States Supreme Court, the Ninth Circuit, and multiple federal district courts have recognized that causes of action of the type asserted here are governed *only* by federal common law or statute.

In sum, the Complaint is inconsistent with, and directly conflicts with, the attempts of both the legislative and executive branches of the federal government to

address important issues of national and international policy.  Accordingly, Plaintiff's Complaint should be heard in this federal forum.

## I.      TIMELINESS OF REMOVAL

1.      Plaintiff, the City and County of Honolulu, filed a Complaint against the Chevron Parties and other named Defendants in the Circuit Court of the First Circuit, State of Hawai'i, Case No. 1CCV-20-0000380, on March 9, 2020.  A copy of all process, pleadings, or orders in the possession of the Chevron Parties is attached as Exhibit A to the Declaration of Melvyn M. Miyagi ("Miyagi Decl."), filed concurrently herewith.

2.      This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed less than 30 days after service.  28 U.S.C. § 1446(b).  The Chevron Parties have not yet been served as of this date.  *See* Miyagi Decl. ¶ 2.  The consent of the other Defendants is not required because removal does not proceed "solely under 28 U.S.C. § 1441."  28 U.S.C. § 1446(b)(2)(A).  The Chevron Parties remove this action to federal court on several bases, including, for example, 28 U.S.C. § 1442(a)(1) and 28 U.S.C. § 1452.  Nevertheless, all properly served Defendants have consented to removal.  Miyagi Decl. ¶ 3.  Consent is not required from any Defendant that has not been served.  *See* 28 U.S.C. § 1446(b)(2)(A).[1]

---

[1]      In filing this Notice of Removal, the Chevron Parties, and all other Defendants, do not waive, and expressly preserve, any right, defense, affirmative defense, or objection, including, without limitation, personal jurisdiction, insufficient

## II.   SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

3.     Plaintiff is the City and County of Honolulu, Hawaiʻi.  Plaintiff brings claims against Defendants for alleged injuries relating to global climate change, including damages and injunctive relief from injuries suffered from "climate crisis-related impacts," such as sea level rise, extreme weather and other natural phenomena. *See, e.g.*, Compl. ¶¶ 9, 10.  Plaintiff asserts the following claims:  public nuisance, private nuisance, strict liability for failure to warn, negligent failure to warn, and trespass.  In addition to compensatory and punitive damages, in its Prayer for Relief, Plaintiff seeks the "disgorgement of profits," as well as "[e]quitable relief, including abatement of the nuisances complained of" in the Complaint.  Compl. at 113.

4.     The Chevron Parties deny that any Hawaiʻi court has personal jurisdiction over them and will further deny any liability as to Plaintiff's claims.  The Chevron Parties expressly reserve all rights in this regard.  For purposes of meeting

---

process, and/or insufficient service of process.  A number of Defendants contend that personal jurisdiction in Hawaiʻi is lacking over them, and these Defendants intend to preserve that defense and intend to move to dismiss for lack of personal jurisdiction at the appropriate time. *See, e.g.*, *Carter v. Bldg. Material & Constr. Teamsters' Union Local 216*, 928 F. Supp. 997, 1001 (N.D. Cal. 1996) ("A petition for removal affects only the forum in which the action will be heard; it does not affect personal jurisdiction.") (citing *Morris & Co. v. Skandinavia Ins. Co.,* 279 U.S. 405, 409 (1929) (removal to federal court does not waive right to object to personal jurisdiction)).

the jurisdictional requirements for removal only, however, the Chevron Parties submit that removal is proper on at least eight independent and alternative grounds.

5. **First**, the action is removable under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims directly concern important federal interests and are interstate in nature such that they cannot be resolved by the law of any one state. Under Supreme Court and Ninth Circuit precedent, they must be governed by federal common law. *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985) ("*National Farmers*"); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) ("*Kivalina*"). Federal common law applies in those few areas of the law that so implicate uniquely federal interests that application of state law is inappropriate. *AEP*, 564 U.S. 410, 424 ("[B]orrowing the law of a particular State would be inappropriate."); *Milwaukee I*, 406 U.S. at 99 ("[P]ollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. § 1331]."). Because Plaintiff's claims necessarily arise under federal common law—no matter how they are pleaded—they are properly removed to this Court under its federal question jurisdiction. *See United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 42 (1st Cir. 1999) ("*Swiss American*") ("We begin with bedrock: a case in which the rule of decision must be drawn from federal common law presents a uniquely federal question, and, thus, comes within

the original subject matter jurisdiction of the federal courts.") (citing *National Farmers*, 471 U.S. at 850).

6.     ***Second***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because the action necessarily raises disputed and substantial federal questions that a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) ("*Grable*"). The public and private nuisance claims, for example, require the balancing of national security and national economic health against the utility of reducing greenhouse gas emissions. This necessarily raises federal questions under the Clean Air Act, EPA and other federal regulations and international treaties on climate change to which the United States is a party. Moreover, the causes of action as alleged in the Complaint attack federal policy decisions and threaten to upset long-standing federal-state relations, second-guess policy decisions made by Congress and the executive branch, and skew divisions of responsibility set forth in federal statutes and the United States Constitution. Additionally, the action necessarily raises disputed and substantial federal questions that implicate the federal regulatory scheme for protecting and preserving the "navigable waters of the United States." *See* 33 U.S.C. § 403; 33 U.S.C. § 426i; *see also Grable*, 545 U.S. at 314.

7.      *Third*, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), because—despite Plaintiff's purported disclaimer, *see* Compl. ¶¶ 14, 16 n.9—the Complaint makes clear that this action "aris[es] out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).  A significant portion of oil and gas exploration and production occurs on the Outer Continental Shelf and Plaintiff's claims necessarily arise out of this production because, as Plaintiff concedes, "it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere."  Compl. ¶ 170.

8.      *Fourth*, Defendants are authorized to remove this action under 28 U.S.C. § 1442(a)(1) because—despite Plaintiff's purported disclaimer, *see* Compl. ¶¶ 14, 16 n.9—multiple Defendants were "acting under" a federal officer, they assert colorable federal defenses, and the claims against them relate to acts under color of federal office.  *See Goncalves By & Through Goncalves v. Rady Children's Hosp.*

*San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017); *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014).   A significant portion of oil and gas exploration and production during the relevant time period took place under the direction of a federal officer to support critical national security, military, and other core federal government operations.   But for the work of many Defendants, the federal government and federal officers would have had to undertake these critical projects on their own.   Defendants have acted under federal officers in a multitude of circumstances, starting no later than World War II and continuing to the present.   These activities include the exploration for and extraction of fossil fuels, the promotion of fossil fuel production to support federal interests, the formulation and development of products for uniquely federal uses, and the supply of fossil fuel products for federal use.

9.     ***Fifth***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because—despite Plaintiff's purported disclaimer, *see* Compl. ¶¶ 14, 16 n.9— the Complaint makes clear that Plaintiff's claims are based on alleged injuries to and/or conduct on federal enclaves.   As such, Plaintiff's claims are removable to this Court under federal-question jurisdiction.   *See* U.S. Const. art. I, § 8, cl. 17; *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'") (citation omitted); *Lake v. Ohana Military Cmtys., LLC*, No. 16-cv-00555, 2017 WL 11515424, at *13 (D. Haw. Mar. 15, 2017) (Kobayashi, J.) (denying plaintiffs'

motion to remand because "there is federal enclave jurisdiction over Plaintiffs' state law claims in this case").

10.     *Sixth*, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are completely preempted by the Clean Air Act and other federal statutes, treaties and international agreements, and the United States Constitution, which provide the exclusive federal remedy for addressing interstate greenhouse gas emissions that are the but-for cause of Plaintiff's alleged injuries.

11.     *Seventh*, removal is authorized under 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b) because Plaintiff's state law claims are related to cases under Title 11 of the United States Code.  Plaintiff alleges that Defendants (improperly defined by Plaintiff to include the conduct of Defendants' respective subsidiaries and affiliates, *see, e.g.*, Compl. ¶¶ 22(b)-(g), 96), engaged in conduct constituting a public nuisance over many decades.  Because Plaintiff's claims are predicated on historical activities of Defendants, including predecessor companies and companies that they may have acquired or with which they may have merged, and because there are hundreds, if not thousands, of non-joined necessary and indispensable parties, there are many other Title 11 cases that may be related.  *See PDG Arcos, LLC v. Adams*, 436 F. App'x 739 (9th Cir. 2011).

12.   *Eighth*, Plaintiff's claims fall within the Court's original admiralty jurisdiction under 28 U.S.C. § 1333, and are removable under 28 U.S.C. § 1441(a). *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).

13.   For the convenience of the Court and all parties, Defendants will address each of these grounds in additional detail.  Should Plaintiff challenge this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds and will not be limited to the specific articulations in this Notice.  *Cf., e.g.*, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014-16 (7th Cir. 2018).

### III.   THIS COURT HAS FEDERAL-QUESTION JURISDICTION BECAUSE PLAINTIFF'S CLAIMS NECESSARILY ARISE UNDER FEDERAL COMMON LAW

14.   This action is removable because federal common law necessarily governs Plaintiff's claims, and the issue is so distinctively federal in nature that application of state law to the issue would risk impairing uniquely federal interests. Under 28 U.S.C. § 1331, federal courts have original jurisdiction over "claims founded upon federal common law as well as those of a statutory origin." *National Farmers*, 471 U.S. at 850 (quoting *Milwaukee I*, 406 U.S. at 100).  As the Ninth Circuit explained in holding that similar claims for injuries caused by global climate change are governed by federal common law, even "[p]ost-*Erie*, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Kivalina*, 696 F.3d at 855.  Because Plaintiff's

claims arise under federal common law, this Court has federal-question jurisdiction and removal is proper. This ground for removal is separate and independent from the complete preemption ground for removal discussed below at section VIII. As explained below, the Court must conduct a choice-of-law analysis at the outset to determine whether federal or state law applies, which leads to the conclusion that federal law necessarily governs Plaintiff's claims. This analysis does not implicate preemption principles or standards.

15.     Though "[t]here is no federal *general* common law," *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (emphasis added), federal common law continues to exist, and to govern, in a few subject areas in which there are uniquely federal interests, *See AEP*, 564 U.S. at 421; *Milwaukee I*, 406 U.S. at 103; *see generally* Henry J. Friendly, *In Praise of* Erie—*And of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383 (1964). Such uniquely federal interests will require the application of federal common law where, for example, the issue is one that by its nature, is "within national legislative power" and there is "a demonstrated need for a federal rule of decision" with respect to that issue. *AEP*, 564 U.S. at 421-22 (citation omitted). Federal common law therefore applies, in the post-*Erie* era, in those discrete areas in which application of state law would be inappropriate and would contravene federal interests, such as interstate pollution and issues surrounding federal lands. *Id.* at 421; *Milwaukee I*, 406 U.S. at 103 ("When we deal with air and

water in their ambient or interstate aspects, there is a federal common law."); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593 (1973).  Indeed, the decision that federal common law applies to a particular issue inherently reflects a determination that state law does *not* apply.  *Milwaukee II*, 451 U.S. at 312 n.7 ("[I]f federal common law exists, it is because state law cannot be used.").

16.    Both the United States Supreme Court and Ninth Circuit have found that interstate and international pollution and emission torts arise under federal common law.  For example, it is well established that federal common law governs cases concerning "air and water in their ambient or interstate aspects."  *Milwaukee I*, 406 U.S. at 103; *see also AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area . . . in which federal courts may . . . 'fashion federal law.'") (citations omitted); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987) ("[I]nterstate water pollution is a matter of federal, not state, law.").  Specifically, federal common law governs any "transboundary pollution suit[]" brought by one state to address pollution emanating from another state.  *Kivalina*, 696 F.3d at 855.  "[S]uch claims have been adjudicated in federal courts" under federal common law "for over a century." *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 331 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410; *Ouellette*, 479 U.S. at 487; *see, e.g.*, *Missouri v. Illinois*, 200 U.S. 496 (1906) (applying federal common law to interstate pollution dispute).  Even after *Erie*, the Supreme Court affirmed the view that interstate pollution "is a matter

of federal, not state, law," and "should be resolved by reference to federal common law." *Ouellette*, 479 U.S. at 488 (citing *Milwaukee I*, 406 U.S. at 102 n.3, 107 n.9).

17.     Moreover, two district courts addressing nearly identical claims have held that these claims arise under federal common law. *California v. BP P.L.C.*, No. 17-cv-06011, No. 17-cv-06012, 2018 WL 1064293, at *2 (N.D. Cal. Feb. 27, 2018) ("*California*") (holding that "Plaintiffs' nuisance claims—which address the national and international geophysical phenomenon of global warming—are necessarily governed by federal common law"), *appeal argued*, No. 18-16663 (9th Cir. Feb. 5, 2020); *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 472 ("*City of New York*") (S.D.N.Y. 2018) ("[T]he City's claims are ultimately based on the 'transboundary' emission of greenhouse gases, indicating that these claims arise under federal common law."), *appeal argued*, No. 18-2188 (2d Cir. Nov. 22, 2019).

18.     The conclusion that federal common law governs an issue rests not on a discretionary choice between federal law and state law, but on a determination that the issue is so distinctively federal in nature that application of state law to the issue would risk impairing uniquely federal interests. *See, e.g.*, *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159-60 (9th Cir. 2016) (holding that liability of defense contractor to third party under government contract for weapons systems implicated "uniquely federal interests" in national security that would be impaired if disparate state law rules were applied).   In *California*, Judge Alsup

addressed nearly identical claims and held that "[i]f ever a problem cried out for a uniform and comprehensive solution, it is the geophysical problem described by the complaints, a problem centuries in the making (and studying) with causes ranging from volcanoes, to wildfires, to deforestation to stimulation of other greenhouse gases—and, most pertinent here, to the combustion of fossil fuels."  2018 WL 1064293, at *3; *see also City of New York*, 325 F. Supp. 3d at 472 ("[C]laims . . . based on the 'transboundary' emission of greenhouse gases . . . require a uniform standard of decision.").

19.    Although Plaintiff purports to style its nuisance and other common law claims as arising under state law, as set forth in *Erie* and its progeny, it is federal *choice-of-law* principles that determine whether a particular claim is controlled by federal common law rather than state law.  It is well settled that, in determining whether a case arises under federal law and is properly removable, the plaintiff's proffered position on a question of law is not entitled to any deference but is instead subject to the court's independent and *de novo* review.  *See, e.g.*, *United States v. California*, 932 F.2d 1346, 1349 (9th Cir. 1991) ("The issue of whether state or federal [common] law governs is a question of law and is reviewable de novo.").

20.    The Supreme Court's decision in *Standard Oil* established a two-step approach for analyzing this choice-of-law question:  First, courts must determine whether the source of law is federal or state based on the nature of the issues at stake,

and second, if federal law is the source, courts must determine the substance of that law and whether plaintiff has stated a viable claim. *Swiss American*, 191 F.3d at 42-45 (citing *United States v. Standard Oil Co.*, 332 U.S. 301 (1947)). Adhering to the "two-part approach" articulated in *Standard Oil*, the First Circuit in *Swiss American* likewise recognized the difference between the "source question and the substance question." 191 F.3d at 43, 45. The Court explained that the "source question" asks whether "the source of the controlling law [should] be federal or state," while the substance question, "which comes into play only if the source question is answered in favor of a federal solution," asks whether the governing rule should be borrowed from state law or instead be a "uniform federal rule." *Id.* at 43. Whether a claim "arises under" federal law thus "turns on the resolution of the source question." *Id.* at 44. Only the first question—what law applies—is relevant in addressing whether removal is proper and must be resolved by a federal court. As the Supreme Court explained, this "choice-of-law task is a federal task for federal courts." *Milwaukee II*, 451 U.S. at 349 (quoting *Little Lake Misere Land Co.*, 412 U.S. at 592); *see also* Erwin Chemerinsky, Federal Jurisdiction § 6.2.1 (7th ed. 2016) ("First, the Court considers whether the matter justifies creating federal law. Second, if federal law is to be developed, the Court decides its content.")

21. The Ninth Circuit has followed the same choice-of-law analysis. In *New SD, Inc. v. Rockwell International Corporation*, the plaintiff filed a state law contract

claim, which the defendant removed on the ground that "contracts connected with the national security[] are governed by federal law."  79 F.3d 953, 954 (9th Cir. 1996). In affirming the order denying remand, the court held that "the federal interest" implicated by the claim "requires that 'the rule [of decision] must be uniform throughout the country.'"  *Id.* at 955 (quoting *Am. Pipe & Steel Corp. v. Firestone Tire & Rubber Co.*, 292 F.2d 640, 643 (9th Cir. 1961)).  Thus, the claim was not a state law breach of contract claim, and jurisdiction existed under § 1331 because "the question arises under federal law, and federal question jurisdiction exists." *Id.* at 955; *see also Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928-29 (5th Cir. 1997) (removal of state law claims was proper because federal common law governed liability of air carriers).

22.     Because Plaintiff alleges that climate change occurs as the result of the undifferentiated accumulated emissions of all emitters in the world over an extended period of time, *see, e.g.*, Compl. ¶¶ 170, 182, any judgment as to the reasonableness of particular emissions, or as to their causal contribution to the overall phenomenon of climate change, inherently requires an evaluation at an interstate and, indeed, international level.  *See AEP*, 564 U.S. at 422 (noting that "[g]reenhouse gases once emitted become well mixed in the atmosphere") (quotation marks omitted).  Thus, even assuming that state tort law may properly address local source emissions within a specific state, that is unquestionably not the nature or theory of Plaintiff's claim,

nor could it be.  Plaintiff seeks to impose tort liability for Defendants' alleged contributions to *global* climate change, based on *global* production, and would require an overarching consideration of *all* of the emissions traceable to the extraction and sale of Defendants' products in each of the states, and, in fact, in the approximately 195 countries of the world.  Plaintiff does not seek damages from Defendants as a result of *intra*state activity.  Indeed, Plaintiff did not even attempt to disclaim fossil fuel sales and their attendant emissions to the extent they occurred outside Hawai'i or internationally.  Nor could it.  Just as with its failed attempt to exclude emissions resulting from sale to the federal government and the military, there is no method by which to distinguish emissions originating inside or outside the forum.  Therefore, given the federal government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, tort claims concerning climate change directly implicate uniquely federal interests, and a "patchwork of fifty different answers to the same fundamental global issue would be unworkable."  *California*, 2018 WL 1064293, at *3; *see also City of New York*, 325 F. Supp. 3d at 475 ("[T]he immense and complicated problem of global warming requires a comprehensive solution that weighs the global benefits of fossil fuel use with the gravity of the impending harms.").  As the Ninth Circuit has noted, "any effective plan [to reduce fossil fuel emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the

executive and legislative branches" of the federal government. *Juliana*, 947 F.3d at 1171. In cases like this, "borrowing the law of a particular State would be inappropriate." *AEP*, 564 U.S. at 422. Such climate change-related tort claims are governed by federal common law. *Kivalina*, 696 F.3d at 855-56; *California*, 2018 WL 1064293, at *3; *City of New York*, 325 F. Supp. 3d at 475.

23. While Plaintiff attempts to avoid federal jurisdiction by framing the cause of the alleged harm as an alleged "campaign of deception," Compl. ¶ 3, the gravamen of Plaintiff's claims is that "pollution from Defendants' fossil fuel products plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution," which "is the main driver of the gravely dangerous changes occurring to the global climate." Compl. ¶ 4; *see, e.g.*, *id.* ¶¶ 5, 33-39, 52-53, 123-24. In fact, Plaintiff alleges that "*greenhouse gas pollution*, primarily in the form of $CO_2$, *is far and away the dominant cause of global warming*," *id.* ¶ 5 (emphasis added), as well as other natural phenomena, such as drought, extreme precipitation, and heat waves, *id.* ¶¶ 10, 87. And Plaintiff's Complaint alleges that "Defendants' conduct caused a substantial portion of global atmospheric greenhouse gas concentrations," *id.* ¶ 46, and that greenhouse gas emissions are "produced from combusting fossil fuel products, including Defendants' products," *id.* ¶ 37. Thus, Plaintiff's causes of action, which all require some showing of harm or injury, are squarely based on the production, sale and use of fossil fuels.

24.     As is evident from Plaintiff's use of the term "global warming," both the causes and the injuries Plaintiff identifies are not constrained to particular sources, cities, counties, or even states, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes. *See id.* ¶ 37 (depicting $CO_2$ emissions from various sources); ¶ 41 n.18 ($CO_2$ emissions cause "*global* mean sea level rise") (emphasis added); *see, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 509, 523-24 (2007) (describing Senate rejection of the Kyoto Protocol because emissions-reduction targets did not apply to "heavily polluting nations such as China and India," and EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427-29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *see also* Remarks Announcing United States Withdrawal From the United Nations Framework Convention on Climate Change Paris Agreement, 2017 Daily Comp. Pres. Doc. 373 (June 1, 2017) (statement by President Trump announcing United States withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on China's emissions).

25.     The Complaint itself demonstrates that the unbounded nature of greenhouse gas emissions, diversity of sources, and magnitude of the attendant consequences have catalyzed myriad federal and international efforts to understand

and address such emissions.  *See, e.g.*, Compl. ¶ 89.  "The appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum:  as with other questions of national or international policy, informed assessment of competing interests is required.  Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance."  *AEP*, 564 U.S. at 427.  As a "question[] of national or international policy," the question of how to address greenhouse gas emissions that underlies the requested relief at the heart of Plaintiff's claims implicates inherently federal concerns and is therefore necessarily governed by federal common law.  *See id.*  Put simply, "[w]hen we deal with air and water in their ambient or interstate aspects, there is a federal common law."  *Milwaukee I*, 406 U.S. at 103.  This Court therefore has original jurisdiction over this action.

## IV.   THE ACTION IS REMOVABLE BECAUSE IT RAISES DISPUTED AND SUBSTANTIAL FEDERAL ISSUES

26.    "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  Federal district courts, in turn, "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The Supreme Court has held that suits alleging, on their face, only

state law causes of action nevertheless "arise under" federal law if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. Applying this test "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue." *Id.* at 313 (quotation marks omitted, alteration in original).

27. Plaintiff's Complaint attempts to undermine and supplant federal regulation of greenhouse gas emissions and hold an international industry responsible for the alleged consequences of rising ocean levels and hydrologic cycle disruptions such as drought, extreme precipitation, heat waves, and wildfires that are allegedly caused by global climate change. There is no question that Plaintiff's claims raise "federal issue[s], actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314.

28. The issues of greenhouse gas emissions, global climate change, hydrologic cycle disruption, and sea level rise are not unique to Honolulu, the State of Hawaiʻi, or even the United States. Yet the Complaint attempts to supplant decades of national energy, economic, and environmental policies by prompting a Hawaiʻi state court to take control over an entire industry and its interstate

commercial activities, and impose massive damages and injunctive relief contrary to long-standing federal regulatory schemes and systems.

29.     Collectively, as well as individually, Plaintiff's causes of action depend on the interpretation and application of federal statutes, federal regulations, and international treaties.  For example, domestically, the EPA regulates greenhouse gas emissions under the Clean Air Act and its rules for both stationary and mobile source emissions.  And, on the international front, the United States is party to the United Nations Framework Convention on Climate Change, May 9, 1992, 1771 U.N.T.S. 107.  Any attempt by a state court to balance the costs and benefits of the use of fossil fuels will constitute a collateral attack on the balance already struck under the laws and treaties of the United States.  It is well settled that a collateral attack on a federal regulatory regime—an attempt to substitute state law for existing federal standards—presents a substantial federal question.  *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

30.     The Complaint's first and second causes of action both seek relief for an alleged nuisance.  Plaintiff alleges that Defendants, through their national and, indeed, global activities, "created, contributed to, and/or assisted, and/or were a substantial contributing factor in the creation of the public nuisance by, *inter alia*[,] . . . caus[ing] or exacerbat[ing] global warming and related consequences, including, but not limited to, sea level rise, drought, extreme precipitation events, extreme heat

events, and ocean acidification." Compl. ¶ 157. Plaintiff alleges that "[t]he seriousness of rising sea levels, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, restricted availability of fresh drinking water, and the associated consequences of those physical and environmental changes, is extremely grave and outweighs the social utility of Defendants' conduct." *Id.* ¶¶ 160, 168.

31. Under Hawaiʻi law, were it to apply, nuisance claims require a plaintiff to prove that the defendant's conduct is "unreasonable," which depends upon whether "the gravity of the harm outweighs the utility of the actor's conduct." *Ching v. Dung*, 446 P.3d 1016, 1032 (Haw. Ct. App. 2019) (quoting Restatement (Second) of Torts § 822 (1979)). But under federal law, federal agencies must "assess both the costs and the benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." Exec. Order No 12,866, 58 Fed. Reg. 51735 (Oct. 4, 1993). In fact, Congress has directed a number of federal agencies to regulate Defendants' conduct, and thus to engage in the same analysis of benefits and costs that Plaintiff would have the state court undertake. Federal agencies have performed, and continue to perform, these cost-benefit analyses. *See, e.g.*, Final Carbon Pollution Standards for New, Modified and Reconstructed Power Plants, 80 Fed. Reg. 64510, 64683-84 (Oct. 23, 2015) (EPA

considering the impacts of "wildfire" and "extreme precipitation events," such as "droughts, floods, hurricanes, and major storms").  The alleged effects of Defendants' operations are broadly distributed throughout the nation, to all residents as well as all state and government entities.  Given this diffuse and broad impact, Congress has acted through a variety of federal statutes—primarily, but not exclusively, the Clean Air Act—to strike the balance between energy extraction and production and environmental protections.  *See* Clean Air Act, 42 U.S.C. § 7401(c) (Congressional statement that the goal of the Clean Air Act is "to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution prevention"); *see also, e.g.*, Energy Reorganization Act of 1974, 42 U.S.C. § 5801(a) (Congressional purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while "restoring, protecting, and enhancing environmental quality"); Mining and Minerals Policy Act, 30 U.S.C. § 21a (Congressional purpose to encourage "economic development of domestic mineral resources" balanced with "environmental needs"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201(b), (k) (Congressional findings that coal mining operations are "essential to the national interest" but must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental effects").

32.    The question of whether the federal agencies charged by Congress to balance energy and environmental needs for the entire Nation have struck an

appropriate balance is "inherently federal in character" and gives rise to federal question jurisdiction. *Buckman Co.*, 531 U.S. at 347; *see also Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (finding federal removal under *Grable* appropriate where claims were "a collateral attack on" agency action under a highly reticulated regulatory scheme). Adjudicating these claims in federal court is appropriate because the relief sought by Plaintiff would necessarily alter the regulatory regime Congress designed, affecting residents of the nation far outside the state court's jurisdiction. *See, e.g.*, *Grable*, 545 U.S. at 312 (stating that claims that turn on substantial federal questions "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues"); *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007) (stating that removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation"). Regulation of greenhouse gas emissions, including carbon dioxide, is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528-29, and EPA has regulated these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air

quality permitting program); 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards, 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2, 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and vehicles).  Put simply, "emissions have been extensively regulated nationwide" by the federal government under the Clean Air Act.  *N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 298 (4th Cir. 2010).

33.    The Complaint also calls into question federal government decisions to contract with Defendants for the extraction, development, and sale of oil and gas resources on federal lands.  Such national policy decisions have expanded fossil fuel production and use, and produced billions of dollars in revenue to the federal Treasury.  Reliable, affordable energy is fundamental to economic growth and prosperity generally, as well as to national security and other issues that have long been the domain of the federal government.  Yet Plaintiff's claims require a determination that the complained-of conduct—the lawful activity of placing fossil fuels into the stream of interstate and foreign commerce—is unreasonable, and that determination raises a policy question that, under the U.S. Constitution and applicable federal statutes, treaties, and regulations, is a federal question.  *See Trawick v. Tri-*

*Star Rest. Group, LLC*, No. 17-cv-00456, 2018 WL 2337285, at *6 (D. Haw. May 23, 2018) (holding that removal was appropriate where plaintiffs' state law claims "'necessarily raise [] stated federal issue[s]' that will be 'actually disputed' in this case, and that are 'substantial'") (quoting *Grable*, 545 U.S. at 314) (alteration in original).  The cost-benefit analysis required by Plaintiff's claims would thus necessarily entail the state court's usurping the federal regulatory structure of an essential, national industry.  "The validity of [Plaintiff's] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law."  *Bd. of Comm'rs v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017) ("*Levee Board*"); *see also Bader Farms, Inc. v. Monsanto Co.*, No. 1:16-cv-299, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of APHIS's decision to deregulate the new seeds."); *Bennett*, 484 F.3d at 909 (holding that federal removal is proper under *Grable* "when the state proceeding amounted to a collateral attack on a federal agency's action").  Indeed, the "inevitable result of such suits," if successful, is that Defendants "would have to change" their federally regulated "methods of doing business and controlling pollution to avoid the threat of ongoing liability."  *Ouellette*, 479 U.S. at 495.

34.    Plaintiff's claims also necessarily implicate substantial federal questions by seeking to hold Defendants liable for compensatory and punitive damages, as well

as injunctive relief, based on allegations that Defendants have waged a "campaign to obscure the science of climate change" and "disseminat[ed] and fund[ed] the dissemination of information intended to mislead . . . regulators," which Plaintiff alleges defrauded and interfered with federal decision-making, thereby "delay[ing] efforts to curb anthropogenic greenhouse gas emissions."  Compl. ¶¶ 124-125, 157; *see also id.* ¶¶ 127, 136, 139.

35.    It is well settled that claims that a defendant has engaged in fraud on a federal agency arise under federal law.  "Claims of fraud on a federal agency arise exclusively under federal law." *Buckman Co.*, 531 U.S. at 347 ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."); *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 235 (6th Cir. 2000) ("[C]laims alleging fraud on federal agencies have never come within the 'historic police powers of the States.'")(quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996)).

36.    Plaintiff alleges a causation theory that depends on proof that federal policymakers were misled *and* would have adopted different energy and climate policies absent the alleged misrepresentations.  Such a liability determination would require a court to construe federal decision-making standards, and determine how federal policymakers would have applied those standards under counterfactual circumstances.  *See, e.g.*, Compl. ¶ 107 (alleging that Global Climate Coalition "on

behalf of Defendants" sought to "prevent[] U.S. adoption of the Kyoto Protocol"). As an example, under its theory, Plaintiff would need to show that the unanimously passed (95-0) Byrd-Hagel Resolution in the Senate, which put limitations on entering into international treaties aimed at reducing greenhouse gas emissions, would have been rejected but for the alleged actions of Defendants.  Plaintiff's Complaint also necessarily implicates numerous other disputed and substantial federal issues. Beyond the strictly jurisdictional character of the points addressed above and herein, it is notable that this litigation places at issue multiple significant federal issues, including but not limited to:  (1) whether Defendants can be held liable consistent with the First Amendment for alleged "roles in denialist campaigns to misinform and confuse the public" *id*. ¶ 9; (2) whether a state court may hold Defendants liable for conduct that was global in scale (production of fossil fuels), that allegedly produced effects that are global in scale (increased $CO_2$ levels and rising sea levels), and on that basis, order Defendants to modify their conduct on a global scale (abating the alleged effects of rising sea levels), consistent with the constitutional principles limiting the jurisdictional and geographic reach of state law and guaranteeing due process; (3) whether oil and gas *producers* may be held liable, consistent with the Due Process Clause, for climate change when it is the combustion of fossil fuels— including by Plaintiff and the people of Hawaiʻi themselves, who decide what types of fuel to use and how much—that leads to the release of greenhouse gases into the

atmosphere; (4) whether liability may be imposed under state common law when the Supreme Court has held that the very same *federal* common law claims are displaced by federal statute, and notwithstanding the commonsense principle that "[i]f a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived *in any form*," *Kivalina*, 696 F.3d at 857 (emphasis added); (5) whether a state court may regulate and burden on a global scale the sale and use of what federal policy has deemed an essential resource, consistent with the United States Constitution's Commerce Clause and foreign affairs doctrine, as well as other constitutional principles; (6) whether a state court may review and assess the validity of acts of foreign states in enacting and enforcing their own regulatory frameworks; and (7) whether a state court may determine the ability to sue based on alleged damages to land, such as coastal property and interstate highways, *see* Compl. ¶ 149, which depends on the interpretation of federal laws relating to the ownership and control of property.

37.    Plaintiff's Complaint also raises substantial federal issues because the asserted claims intrude upon both foreign policy and carefully balanced regulatory considerations at the international level, including the foreign affairs doctrine. Plaintiff seeks to govern extraterritorial conduct and encroach on the foreign policy prerogative of the federal government's executive branch as to climate change and energy security treaties.  "There is, of course, no question that at some point an

exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 413 (2003). Yet this is the precise nature of Plaintiff's action brought in state court. *See United States v. Belmont*, 301 U.S. 324, 331 (1937) ("[T]he external powers of the United States are to be exercised without regard to state laws or policies. . . . [I]n respect of our foreign relations generally, state lines disappear."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . requires that federal power in the field affecting foreign relations be left entirely free from local interference."). Indeed, Plaintiff's Complaint takes issue with multiple federal decisions, threatening to upend the federal government's long-standing energy and environmental policies and "compromis[ing] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" on the issues of climate change and energy security. *Garamendi*, 539 U.S. at 424 (quoting *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 381 (2000)).

38.    Through its action, Plaintiff seeks to regulate greenhouse gas emissions worldwide, far beyond the borders of the United States. This is premised in part, according to Plaintiff, on Defendants' purported campaign to undermine national and

international efforts, like the Kyoto Protocol, to rein in greenhouse gas emissions. Compl. ¶¶ 104, 107. In addition, the remedy Plaintiff seeks—massive damages backed up by an injunction that, functionally, would halt or drastically reduce fossil fuel production, *see id.* at 112-13, Prayer for Relief—contravenes and threatens to undermine U.S. energy security policy, including through international trade policy and treaties. For example, in 1959, President Dwight D. Eisenhower invoked statutory authority to proclaim quotas on imports of petroleum and petroleum-based products into the United States "to avoid discouragement of and decrease in domestic oil production, exploration and development to the detriment of national security." Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, as amended by Pub. L. 85-686, 72 Stat. 678, § 8(a) (Aug. 20, 1958). The import system was "mandatory" and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States" and to regulate "patterns of international trade." Statement by President Dwight D. Eisenhower Upon Signing Proclamation Governing Petroleum Products, 1 Pub. Papers 240, § 51 (Mar. 10, 1959). President Eisenhower further explained United States foreign and domestic policy: "Petroleum, wherever it may be produced in the free world, is important to the security, not only of ourselves, but also of the free people of the world everywhere." *Id.* After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to

hold emergency oil stocks—through government stocks or industry obligated stocks—equivalent to at least 90 days of net oil imports. *See* Agreement on an International Energy Program art. 2, Nov. 18, 1974, 1040 U.N.T.S. 271. The United States meets part of its obligation through government-owned stocks held in the U.S. Strategic Petroleum Reserve. *See, e.g.*, 42 U.S.C. § 6231(b); National Energy Policy Development Group, National Energy Policy 8-17, (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf. Plaintiff's claims infringe on the federal government's environmental, trade, and energy policies that require the United States to speak with one voice in coordinating with other nations.

39.    "No State can rewrite our foreign policy to conform to its own domestic policies. Power over external affairs is not shared by the States; it is vested in the national government exclusively. It need not be so exercised as to conform to state laws or state policies whether they be expressed in constitutions, statutes, or judicial decrees." *United States v. Pink*, 315 U.S. 203, 234 (1942). States have no authority to impose remedial schemes or regulations to address what are matters of foreign affairs. *Ginergy v. City of Glendale*, 831 F.3d 1222, 1228-29 (9th Cir. 2016) ("It is well established that the federal government holds the exclusive authority to administer foreign affairs."). Yet Plaintiff seeks to replace international negotiations and Congressional and Executive decisions with its own preferred foreign policy, using the ill-suited tools of Hawaiʻi common law and private litigation in a state court.

Even when *states* (as opposed to the *City and County* of Honolulu here) have made similar efforts, by enacting laws seeking to supplant or supplement foreign policy, the Supreme Court has held that state law can play no such role. *See Crosby*, 530 U.S. at 375-81; *Garamendi*, 539 U.S. at 420-24.

40.   Plaintiff's claims also depend on the resolution of substantial, disputed federal questions relating to rising levels of navigable waters of the United States. Among other assertions, Plaintiff claims the sea level rise will affect the waterfront of Honolulu, which is navigable waters of the United States. *See* Compl. ¶ 149. These claims raise federal questions as Congress has given the Army Corps of Engineers ("the Corps"), which has a District office in Honolulu, jurisdiction to regulate navigable waters of the United States. *See* 33 U.S.C. § 403; *see also, e.g.*, 33 U.S.C. § 426i. To adjudicate Plaintiff's claims, the Court will need to evaluate whether a rise in levels of "navigable waters" can amount to a legal injury and whether the remedy Plaintiff seeks is consistent with federal law. This in turn will require interpretation of an extensive web of federal statutes and regulations. *See, e.g.*, 33 C.F.R. § 320.4(a)(1)-(2); 33 U.S.C. § 408(a).

41.   The Court would also need to evaluate whether the federal government exercised its authority over navigable waters reasonably over the past several decades. For example, the Corps has considered potential impacts of sea-level change in its planning activities since 1989. *See, e.g.*, U.S. Army Corps of Engineers,

Eng'g Circular 1105-2-186, Planning Guidance on the Incorporation of Sea Level Rise Possibilities in Feasibility Studies (Apr. 21, 1989); U.S. Army Corps of Engineers, Technical Letter 1100-2-1, Procedures to Evaluate Sea Level Change: Impacts, Responses and Adaptation (June 30, 2014).  And, to reduce the likelihood and consequences of flooding, the Corps is currently negotiating with Honolulu and the State of Hawaiʻi regarding a flood risk management project of Ala Wai Canal. *See, e.g.*, Ala Wai Flood Risk Management Project, U.S. Army Corps of Engineers, https://www.poh.usace.army.mil/Missions/Civil-Works/Civil-Works-Projects/Ala-Wai-Flood-Risk-Management-Project/ (last visited April 13, 2020).

42.    Plaintiff's nuisance claims are grounded on alleged past and future "sea level rise," which Plaintiff alleges endangers its property and infrastructure, causing coastal flooding of low-lying areas, damage or destruction of assets and roads located within the Sea Level Rise Exposure area, corrosion of freshwater supply, erosion, and storm surges.  Compl. ¶ 149(b).  Because Plaintiff alleges that the comprehensive regulatory scheme Congress established to address these very issues failed to prevent its injuries, its Complaint challenges—and necessarily requires evaluation of—a federal regulatory scheme and the adequacy of past federal decision-making under that scheme.  This gives rise to federal question jurisdiction.  *Levee Board*, 850 F.3d at 724 (finding that, in the context of a comprehensive regulatory scheme, nuisance claims amount to "a collateral attack . . . premised on the notion that the scheme

provides inadequate protection") (alteration omitted); *Pet Quarters, Inc.*, 559 F.3d at 779 (holding complaint "presents a substantial federal question because it directly implicates actions taken by" a federal agency); *McKay v. City and Cty. of San Francisco*, No. 16-cv-03561, No. 16-cv-03564, 2016 WL 7425927, at *4 (N.D. Cal. Dec. 23, 2016) (denying remand and ruling that federal jurisdiction lies under *Grable* because state law claims were "tantamount to asking the Court to second guess the validity of the FAA's decision"); *Bader Farms, Inc.*, 2017 WL 633815, at *3 (denying remand and ruling that federal jurisdiction lies under *Grable* because "the outcome . . . necessarily depends on the interpretation and application of the federal regulatory process.").

## V.   THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

43.   This Court also has original jurisdiction pursuant to the OCSLA.  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155.  OCSLA grants federal courts original jurisdiction over all actions "arising out of, or in connection with . . .  any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) ("[T]h[e] language [of § 1349(b)(1)] [i]s straightforward and broad.").  The outer continental shelf ("OCS") includes all submerged lands that belong to the United States but are

not part of any State.  43 U.S.C. §§ 1301, 1331.  As noted below, Defendants and their affiliates operate a large share of the more than 5,000 active oil and gas leases on nearly 27 million OCS acres administered by the U.S. Department of the Interior under OCSLA and in some years have produced as much as *one-third* of domestic oil and gas from the OCS.  Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016. Plaintiff's claims encompass *all* of Defendants' worldwide "exploration, development, extraction . . . and . . . production" of fossil fuels.  Comp. ¶ 19a, *see also id.* ¶¶ 20g, 21a, 23b, 24a, 26a, Therefore, Plaintiff's claims necessarily encompass all such activities by Defendants on the OCS and fall within the "broad . . . jurisdictional grant of section 1349." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).

44.    The breadth of federal jurisdiction granted by OCSLA reflects the Act's "expansive substantive reach." *See id.* at 569.  Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources." *Id*. at 566.  "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary purpose for OCSLA." *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Indeed, OCSLA declares it "to be the policy of the United States that . . . the [OCS]. . . should be made

available for expeditious and orderly development." 43 U.S.C. § 1332(3). The statute further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf." *Id.* § 1332(4) (emphasis added).

45.    Consistent with Congress's intent, courts repeatedly have found OCSLA jurisdiction where the claims involved conduct that occurred on the OCS or resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS. *See, e.g.*, *EP Operating*, 26 F.3d at 569-70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

46.    OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims. *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163. And although it appears that the Complaint attempts to "disclaim[] injuries arising on federal property," *see* Compl. ¶¶ 14, 16 n.9, Plaintiff's claims and injuries necessarily implicate and are connected with production and exploration on the OCS. As Plaintiff concedes elsewhere in its Complaint, fossil fuel emissions cannot be traced to their source and Plaintiff's alleged injuries are caused by "greenhouse gas

pollution." *Id.* ¶ 1.  Indeed, the Complaint explains that "it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere." *Id.* ¶ 170.

47.    Under OCSLA, the U.S. Department of the Interior administers an extensive federal leasing program aiming to develop and exploit the oil and gas resources of the federal OCS.  43 U.S.C. § 1334 *et seq.*  Under this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production." Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.[2]    In 2019, OCS leases supplied more than 690 million barrels of oil, a figure that has risen

---

[2]    The Court may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists.  *See, e.g.*, *Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011 A.M.C. 2624, 2640 (D. Del. 2011) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

substantially in each of the last six years, together with 1.034 trillion cubic feet of natural gas. Bureau of Safety and Environmental Enforcement, https://www.data.bsee.gov/Production/OCSProduction/Default.aspx.

48. Certain Defendants (or their predecessors, subsidiaries, or affiliates) participate very substantially in the federal OCS leasing program. For example, from 1947 to 1995, Chevron U.S.A., Inc. produced 1.9 billion barrels of crude oil and 11 billion barrels of natural gas from the federal OCS in the Gulf of Mexico alone. U.S. Dep't of Int., Minerals Mgmt. Serv., Gulf of Mex. Region, Prod. by Operator Ranked by Vol. (1947-1995), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%201947%20-%201995.pdf. In 2016, Chevron U.S.A. produced over 49 million barrels of crude oil and 50 million barrels of natural gas from the OCS in the Gulf of Mexico. U.S. Dep't of Int., Bureau of Safety & Envtl. Enf't, Gulf of Mex. Region, Prod. by Operator Ranked by Vol. (2016), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%202016.pdf. Numerous other Defendants conduct, and have for decades conducted, similar oil and gas operations on the federal OCS; indeed, Defendants and their affiliated companies presently hold, in whole or in part, approximately 22.1% of all OCS leases. *See* Bureau of Ocean Energy

Management, Lease Owner Information, https://www.data.boem.gov/Leasing/ LeaseOwner/Default.aspx.[3]

49.     The Complaint itself makes clear that a substantial part of Plaintiff's claims "arise[] out of, or in connection with," Defendants' "operation[s] conducted on the outer Continental Shelf" that involve "the exploration and production of minerals." *In re Deepwater Horizon*, 745 F.3d at 163.  Plaintiff, in fact, challenges *all of* Defendants' "extraction . . . of oil, coal, and natural gas" activities.  Compl. ¶ 2; *see also id.* ¶¶ 6, 19a, 21a, 23b, 26a, 142.  And a substantial quantum of those activities arise from OCS operations.  *See* Ranking Operator by Oil, Bureau of Ocean Energy Mgmt., https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil (documenting Chevron's oil and natural gas production on the federal OCS from 1947 to 2017).  Plaintiff alleges that emissions have risen due to increased OCS extraction technologies.  *See, e.g.*, *id.* ¶¶ 117-18 (discussing arctic offshore drilling equipment and patents potentially relevant to conduct near Alaskan OCS).  And while Plaintiff identifies certain additional energy projects that occurred in Canadian waters, *id.* ¶¶ 81, 84, Defendants conduct similar activity in American waters.

---

[3]     The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this notice of removal only, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that the Plaintiff's Complaint, as pleaded, can and should be removed to federal court.

50.   Even if Plaintiff's claims were based solely on alleged deceptive promotion of oil and gas by Defendants, that does not prevent removal based on OCSLA.  For example Plaintiff contends, Defendants funded "think tanks," which allegedly had the effect of "evad[ing] regulation" of fossil fuel products by "deceiv[ing]" policymakers "about the role of fossil fuel products in causing global warming," and funded "lobbyist[s]" to influence legislation and legislative priorities. *Id.* ¶¶ 112-16.  Even if true, Plaintiff's claims are removable under OCSLA as under Plaintiff's theory, this alleged conduct would have had the effect of convincing policy makers to continue production on the OCS.

51.   The *relief* sought also arises in connection with and affects OCS extraction and development.  *See, e.g.*, Compl. at 112-13 (Prayer for Relief seeking equitable relief that would inevitably affect exploration and production on the OCS).  And "any dispute that alters the progress of production activities on the OCS threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS.  Congress intended such a dispute to be within the grant of federal jurisdiction contained in § 1349." *Amoco Prod. Co.*, 844 F.2d at 1210.

52.   Moreover, the OCSLA makes clear that oil and gas activities on the OCS can only be governed by federal law.  As the Supreme Court recently confirmed, "the OCSLA defines the body of law that governs the OCS." *Parker Drilling*

*Management Services, Ltd. v. Newton*, 139 S. Ct. 1881, 1887 (2019).  In particular, the OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States" to the OCS.  43 U.S.C. § 1333(a)(1).  Federal law applies "to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State."  *Id.*  Disputes under OCSLA may borrow from the law of adjacent states, but such claims remain creatures of federal law.  "[T]he civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the [OCS]."  *Id.* at § 1333(a)(2)(A).

53.     Thus, as *Parker Drilling* explains, the choice-of-law "question under the OCSLA" is not one of "ordinary" preemption.  139 S. Ct. at 1889.  "The OCSLA makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law."  *Id.*  (quotation marks omitted, alteration in original).  Thus, the courts have affirmed removal jurisdiction where plaintiff's claims, "though ostensibly premised on [state] law, arise under the 'law of the United States' under [43 U.S.C.] § 1333(a)(2)" such that "[a] federal question . . . appears on the face of [plaintiff's] well-pleaded complaint."  *Ten Taxpayer Citizens Grp. v. Cape Wind Assoc.*, LLC, 373 F.3d 183, 193 (1st Cir. 2004).  Accordingly, Plaintiff's claims are removable under OCSLA.

## VI.   THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

54.     The Federal Officer Removal statute allows removal of an action against

"any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  A party seeking removal under section 1442 must show that:  (1) it is a "person" within the meaning of the statute; (2) plaintiff's claims are "for or relating to" an act under color of federal office; and (3) it raises a colorable federal defense. *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia* ("*Commonwealth of Pennsylvania*"), 790 F.3d 457, 466 (3d Cir. 2015); *Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1243 (9th Cir. 2017).  All elements are satisfied here for the Chevron Parties and many other Defendants, which have engaged in activities pursuant to the directions of federal officers that, assuming the truth of Plaintiff's allegations, relate to Plaintiff's claims.   Among other things, Defendants have acted pursuant to government mandates, leases, and contracts, performed critical and necessary functions for the U.S. military, and engaged in activities on federal lands pursuant to federal direction, oversight, and control.  And "in the absence of [] contract[s] with [] private firm[s], the Government itself would have had to perform" these essential tasks itself.  *Watson v. Philip Morris Cos.*, 551 U.S. 142, 154 (2007).

55. First, Defendants are "persons" within the meaning of the statute.[4] The Complaint alleges that Defendants are corporations, Compl. ¶¶ 20-26, which the Ninth Circuit has held qualify as "persons" under the statute. *See Leite*, 749 F.3d at 1122 n.4.

56. Second, Defendants "acted under" a federal officer because the government exerted some subjection, guidance, or control over Defendants' actions and because Defendants engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152. The Supreme Court has emphasized that "the statute must be liberally construed" and, in particular, "[t]he words 'acting under' are broad." *Id.* at 147.

57. Assuming the truth of Plaintiff's allegations, Defendants' alleged actions, taken under a federal officer's direction, relate to Plaintiff's claims. To meet this prong, a defendant's conduct need only "relat[e] to any act under color" of a federal office. 28 U.S.C. § 1442(a)(1). As the Ninth Circuit explained, this is a "low bar." *Goncalves*, 865 F.3d at 1245; *see also id.* at 1244 (explaining that the "hurdle

---

[4] The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this Notice of Removal only, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that the Plaintiff's Complaint, as pleaded, seeks to impose liability for conduct undertaken on federal enclaves and at the direction of federal officers.

erected" by this requirement is "quite low"). And when Congress in the Removal Clarification Act of 2011 inserted the words "or relating to" into the statute, it "broaden[ed] the universe of acts that enable Federal officers to remove to Federal court," even further. *Id.* at 1250 (quoting *Commonwealth of Pennsylvania*, 790 F.3d at 467) (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425). Congress thus "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais v. Huntington Ingals, Inc.*, 951 F.3d 286, 292 (5th Cir. Feb. 24, 2020) (en banc).

58. Importantly, the United States government is one of the largest consumers of fossil fuel products in the world. Indeed, the United States Department of Defense ("DOD") alone is the world's largest institutional user of petroleum fuels. There is thus far more than an incidental relationship between the United States' fuel needs (that have driven the federal government to mandate exploration and production of fossil fuels) and the alleged impacts about which Plaintiff complains here. The government relies heavily on Defendants and other industry members to meet these needs. This reliance is particularly acute with respect to matters of national security and defense. Starting at least as early as World War II, officers of the federal government were authorized to direct, and have directed, Defendants to conduct their production, extraction, and development of fossil fuel products as

required to meet the unprecedented demands generated by the nation's military.  The

federal government directed these activities to support the domestic development of

fossil fuel sources to further the Nation's military, security, geopolitical, and

economic development requirements.

59.    As just one example,[5] during World War II, the federal government

asserted substantial control over development and production of high-octane aviation

fuels ("avgas").[6]  Avgas was "the most critically needed refinery product during

World War II and was essential to the United States' war effort."  *Shell Oil Co. v.*

*United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) (internal quotations and citations

omitted).

> Because avgas was critical to the war effort, the United States
> government exercised significant control over the means of its
> production during World War II.   In 1942, President Roosevelt
> established several agencies to oversee war-time production.  Among
> those with authority over petroleum production were the War
> Production Board ('WPB') and the Petroleum Administration for War
> ('PAW').  The WPB established a nationwide priority ranking system to
> identify scarce goods, prioritize their use, and facilitate their production;
> it also limited the production of nonessential goods.   The PAW
> centralized the government's petroleum-related activities.   It made
> policy determinations regarding the construction of new facilities and

---

[5]     The examples provided in this section, and other sections, of this
Notice of Removal are meant only to provide illustrative examples.  These
examples are by no means an exhaustive collection of the factual bases that support
the grounds for removal asserted herein.  Defendants expressly reserve all rights to
include additional support for any and all grounds for removal in any further
briefing should Plaintiff challenge removal.

[6]     During the war, more than 80% of the 7 billion barrels of crude oil
needed to support the U.S. war effort was produced in this country.  John W. Frey
& H. Chandler Ide, *A History of the Petroleum Administration for War* 1, 169
(1946).

allocation of raw materials, and had the authority to issue production orders to refineries.

*United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002).  The "PAW told the refiners what to make, how much of it to make, and what quality." *Shell Oil Co. v. United States*, 751 F.3d at 1286 (quoting John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War* 219 (1946)).  "Days after Pearl Harbor, the Government recognized the need to quickly mobilize avgas production, with the [Office of the Petroleum Coordinator for National Defense ('OPC')] stating: 'It is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*." *Id.* (quoting OPC Recommendation No. 16) (emphasis added).  The federal government entered into contracts with predecessors or affiliates of Chevron and Defendant Shell Oil Company (Shell Oil Company, Inc., The Texas Company, Union Oil Company, and Union Oil Company of California) "to sell vast quantities of avgas." *Id.*  For example, the government's contract with Shell Oil Company's predecessor or affiliate specified that it "*shall* use its best efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943." J.A. at JA001, JA027, *Shell Oil Co. v. United States*, No. 1:06-cv-00141-SGB (Nov. 20, 2012), ECF No. 106-1 (emphases added) (contract between Defense Supplies Corporation and Shell Oil Company, Inc., dated April 10, 1942).  And to maximize production of this critical product, "[t]he Government directed

[those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts." *Shell Oil Co. v. United States*, 751 F.3d at 1287.  At the direction of the federal government, the oil companies, which include certain Defendants here, increased avgas production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied success in the war." *Id.*

60.    During the Korean War, the Defense Production Act of 1950, Pub. L. 81–774 ("DPA"), gave the federal government broad powers to issue production orders to private companies to prioritize military procurement requirements.  On September 9, 1950, President Truman issued Executive Order 10161 establishing the Petroleum Administration for Defense ("PAD"), which had the authority to issue orders under the DPA requiring private companies to operate refineries to ensure sufficient petroleum production for the military.  The PAD issued production orders to oil and gas companies, including Defendants.  For example, PAD issued orders to ensure adequate quantities of avgas for military use.  See Fourth Annual Report on the Activities of the Joint Committee on Defense Production, 84th Cong. 1st Session, House Report No. 1 (Jan. 5, 1955) at 122.  When supplying the federal government with fuels required to support the country's military, Defendants again were "acting

under" federal officers "to *assist*, or help *carry out*, the duties or tasks" of the federal superior vital to national security. *Watson*, 551 U.S. at 152.

61.    During the Cold War, Shell Oil Company (or a predecessor or affiliate) developed and produced specialized jet fuel for the federal government to meet the unique performance requirements of the U-2 spy plane (known as LF-1A) and later the SR-71 Blackbird (known as JP-7, PF-1 or MIL-T-38219). *See* Gregory W. Pedlow & Donald E. Welzenbach, *The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954-1974* 61-62 (1992), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-doc01.pdf; Ben Rich & Leo Janis, *Skunk Works* 73, 113 (1996).

62.    Certain Defendants continue to produce special military fuels to meet the United States' need to power planes, ships and other vehicles, and to satisfy other national defense requirements. Historically, Defendants Shell Oil Company, BP, and ExxonMobil (or their predecessors or affiliates) have been three of the top four suppliers of fossil fuel products to the United States military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC"). *See* Anthony Andrews, Cong. Research Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009). DESC procures a range of military-unique petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, and JP-5 fuel (MIL-DTL-5624 U) for the

U.S. Navy, and a variety of other alternative fuels.  In fiscal year 2008, for example, the DESC purchased 134.9 million barrels of fuel products in compliance with military specifications, totaling $17.9 billion in procurement actions.  *See id.* at 2, 5. In fact, "[t]he U.S. military services and the North Atlantic Treaty Organization forces use an estimated 5 billion gallons of JP-8 [jet fuel] each year."  National Research Council (US) Subcommittee on Jet-Propulsion Fuel 8, Toxicologic Assessment         of         Jet-Propulsion         Fuel         8         (2003), https://www.ncbi.nlm.nih.gov/books/NBK207616/; s*ee also Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1341 (Fed. Cir. 2005) (noting that between 1983 and 1999, Tesoro Hawaii Corporation and Tesoro Alaska Company "entered into thirty-six contracts with DESC to supply the government with military jet fuel").

63.    Certain Defendants have also engaged in the exploration and production of oil and gas pursuant to agreements with federal agencies.  Such exploration and production were conducted at the direction of federal officers.  For example, in June 1944, the Standard Oil Company (a Chevron predecessor) and the U.S. Navy entered into a contract "to govern the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve," a strategic petroleum reserve maintained by the Navy.  *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014).  "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during

national emergencies." GAO Fact Sheet, Naval Petroleum Reserves – Oil Sales Procedures and Prices at Elk Hills, April Through December 1986 (Jan. 1987) ("GAO Fact Sheet") 3, http://www.gao.gov/assets/90/87497.pdf. During World War II, Standard Oil operated the reserve at the direction of the Navy to support the war effort. Miyagi Decl., Ex. F (NPR-1 operational documents from World War II providing production information and describing why Standard Oil was selected as the operator for the U.S. Navy, with the Navy "express[ing] its appreciation of the patriotism of the Standard Oil Company in undertaking such a project at cost with no profit to be received by the Company").

64.     In response to the OPEC oil embargo in 1973-74, Congress enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (Apr. 5, 1976), which reopened the Elk Hills Reserve and "authorized and directed that [the Reserve] be produced at the maximum efficient rate for 6 years." *Id.*; *see also* Steven Rattner, *Long-Inactive Oilfield is Open—for Now*, New York Times (Oct. 31, 1977); Robert Lindsey, *Elk Hills Reserve Oil Will Flow Again*, New York Times (July 3, 1976). Congress directed production at Elk Hills to be significant. Indeed, Commander Roger Martin, the naval officer in charge of the facility explained: "We expect to reach a level of about 100,000 barrels daily in a few months, and 300,000 by the end of" the 1970s. Robert Lindsey, *Elk Hills Reserve Oil Will Flow Again*, New York Times (July 3, 1976). Production of 100,000 barrels would amount to 5%

of then-current imports and result in a cost saving to the federal government of approximately $1 billion annually. *Id.* In 1977, Congress transferred the Navy's interests and management obligations to the Department of Energy, and Chevron continued its interest in the joint operation until 1997. Lindsey, *Elk Hills Reserve Oil Will Flow Again*, *supra*.

65.    As an example, the Elk Hills contract shows the federal government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the reserve:

- The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom*." Miyagi Decl., Ex. D, Recitals § 6(d)(i) (emphases added).

- "[The] Navy shall, subject to the provisions hereof, have the *exclusive control* over the exploration, prospecting development and operation of the Reserve." Miyagi Decl., Ex. D § 3(a) (emphasis added).

- "[The] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires." Miyagi Decl., Ex. D § 4(a) (emphasis added).

- "[A]ll exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve." Miyagi Decl., Ex. D § 3(b). In the event of disagreement, "such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard." Miyagi Decl., Ex. D § 9(a).

- The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard was entitled to receive, or increase the rate of production. Miyagi Decl., Ex. D §§ 4(b), 5(d)(1).

And although Chevron conducted the exploration and drilling activities on the Reserve, "Chevron and the government share[d] production, revenues, and expenses in proportion to their ownership shares." U.S. General Accounting Office, *Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986*, 3 (Jan. 29, 1987); *see also United States v. Standard Oil Co.*, 545 F.2d 624, 636-37 (9th Cir. 1976) (noting dispute over Navy's payment of its share of costs). From 1976 to 1998, the Reserve generated over $17 billion for the United States Treasury. *See* Department of Energy, Naval Petroleum Reserves,

https://www.energy.gov/fe/services/petroleum-reserves/naval-petroleum-reserves.

Accordingly, the Elk Hills contract demonstrates that Defendants' activities under federal officers went far beyond simple compliance with the law or participation in a regulated industry.

66.    Further, the Chevron Parties and other Defendants have long explored for and produced oil, gas, and other minerals on federal lands, including pursuant to leases governed by the OCSLA, as described above, and the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.* ("MLA").  *E.g.*, Miyagi Decl., Exs. B, C, E.  The unique and controlling provisions of these statutes and leases demonstrate that when producing federal minerals, those Defendants were "'acting under' a federal 'official'" within the meaning of Section 1442(a)(1).  *Watson*, 551 U.S. at 152.  To fulfill their statutory responsibilities, Interior officials maintain and administer the federal leasing programs, under which parties such as Defendants are required to conduct exploration, development, and production activities that, "in the absence of a contract with a private firm, the Government itself would have had to perform."  *Id.* at 154.

67.    In particular, in enacting OCSLA and its amendments, Congress directed the Interior Department to take prompt and effective actions to develop the vitally important oil and gas resources of the OCS by enlisting oil and gas industry members to conduct the required exploration, development, and production activities

under close supervision by federal officials. When enacting OCSLA in 1953, "Congress was most concerned with establishing federal control over resources on the [OCS]," including the vast oil and gas deposits located there. *Laredo Offshore Constructors, Inc.*, 754 F.2d at 1227. Congress made clear that it intended the statutory leasing program "to meet the urgent need for further exploration and development of the oil and gas deposits . . . of the [OCS]." 43 U.S.C. § 1337(i). Later, spurred by "the Arab oil embargo of 1973, which dramatically underscored the nation's dependence on foreign sources of oil," Congress adopted the Outer Continental Shelf Lands Act Amendments of 1978, which revised and strengthened the Act in two key respects. *California ex rel. Brown v. Watt*, 668 F.2d 1290, 1295 (D.C. Cir. 1981).

68.    First, Congress established further, and more detailed, "policies and procedures for managing the oil and natural gas resources" of the OCS, which were "intended to result in *expedited exploration and development* of the Outer Continental Shelf in order *to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources*, and maintain a favorable balance of payments." *Id.* at 1296 (quoting 43 U.S.C. § 1802) (emphases added). Through this language, Congress confirmed the Act's "objective—the expeditious development of OCS resources" which the Interior Secretary is called upon to implement. *Id.* at 1316-17; *CBD v. U.S. Dept. of Interior*, 563 F.3d 466, 472-73 (D.C. Cir. 2009) (OCSLA

directs the Interior Department to ensure "the expeditious but orderly development of OCS resources"); *see* H.R. Rep. No. 95-590, at 53 (1977) ("The basic purpose" of the OCSLA statute as amended is "to promote the swift, orderly and efficient exploitation of our almost untapped domestic oil and gas resources" on the OCS). Second, the 1978 Amendments adopted "both a procedural framework and a set of substantive requirements" that create a detailed "structure for every conceivable step to be taken" when an OCS leasing site is developed. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 594 (D.C. Cir. 2015) (quoting H.R. Rep. No. 95-590, at 54). Under these requirements, OCS lessees are subject to exacting oversight by Interior's Bureau of Ocean Energy Management ("BOEM") and Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property. *E.g.*, 30 C.F.R. §§ 250.101-115, §§ 250.130-146, §§ 250.168-295, §§ 250.400-463 (BSEE) & §§ 550.101-147 (BOEM). At all stages—from exploration, to preparation to develop and produce oil and gas reserves that have been discovered, to actual drilling and production—OCS lessees must submit exhaustive operational plans demonstrating how they will comply with the complex and detailed technical requirements imposed by these agencies, which plans must then be found complete and approved by the relevant agency before any such work can begin. BSEE then carefully monitors compliance with the approved plan, and must approve any significant modification thereof.

69.   The federal government supervises and controls the oil and gas development and production activities of its lessees, like Defendants, in myriad and extensive ways.   Many of these requirements and reserved authorities are for the purpose of assisting the federal government in furthering public purposes.

• OCS leases obligate lessees like Defendants to "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities approved by Interior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area." Miyagi Decl., Ex. C § 10; *see* 30 C.F.R. § 250.1150 ("[Lessees] must produce wells and reservoirs at rates that provide for economic development while maximizing ultimate recovery without adversely affecting correlative rights."). Indeed, for decades, Defendants' OCSLA leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions, and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."   Miyagi Decl., Ex. B § 10 (emphases added).   All drilling takes place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or

development operations coordination document (DOCD) [as well as] approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which further must conform to "diligence" and "sound conservation practices."   Miyagi Decl., Ex. C §§ 9, 10; *see* Miyagi Decl., Ex. E (MLA leases grant rights subject to terms and conditions of the lease, federal laws, and the Interior Secretary's orders).

- The federal government retains the right to control a lessee's rate of production from its lease.  *See* Miyagi Decl., Ex. B § 10; 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law.").  In particular, BSEE, within the Interior Department, 4-1 may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir.  30 C.F.R. § 250.1159.  This requirement has existed since 1974, *see* 39 Fed. Reg. 15885 (May 6, 1974) (approving OCS Order No. 11), and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises," 75 Fed. Reg. 20271, 20272 (Apr. 19, 2010), a public policy purpose distinct from the conservation factors that typically motivate lessors regarding production rates. For onshore operations, the Interior Department's Bureau of Land

Management ("BLM") leases similarly provide that the United States "reserves the right to specify rates of development and production in the *public interest*." Miyagi Decl., Ex. E § 4 (emphasis added).

- The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. For example, the government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe." Miyagi Decl., Ex. B § 14; Miyagi Decl., Ex. C § 15(d); *see* 43 U.S.C. § 1341(b). The government also reserves the right to purchase up to 16⅔% of lease production, less any royalty share taken in-kind. 43 U.S.C. § 1353(a)(2). The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve). 43 U.S.C. § 1353(a)(3). For onshore leases, the Secretary may take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States." 30 U.S.C. § 192. BLM leases also provide that "Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly." Miyagi Decl., Ex. E § 10. In addition, the Secretary may compel a lessee to offer a percentage of lease production "to small or

independent refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners).  Miyagi Decl., Ex. C § 15(c); *see* 43 U.S.C. § 1337(b)(7) (OCS leases); 30 U.S.C. § 192 (onshore leases).

- The federal government also uniquely reserves the authority to determine the value of production for purposes of determining how much royalty a lessee owes.  *See* Miyagi Decl., Ex. C § 6(b) ("The value of production for purposes of computing royalty shall be the reasonable value of the production *as determined by the Lessor*.") (emphasis added); Miyagi Decl., Ex. B § 5.  The standard BLM lease for onshore minerals in effect for decades has a similar provision.  *See* Miyagi Decl., Ex. E § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products . . . .").  A typical commercial private (i.e., fee) lease would never reserve similar unilateral authority to one contracting party to control a material economic term of the lease contract; this would be akin to an apartment rental lease providing that the landlord has sole discretion to specify the rent owed.

- Through federal leases, the government balances economic development with environmental considerations.  The Secretary may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.  43 U.S.C. § 1337(a)(3) ("The

Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.") (OCS leases); 43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (MLA leases). The Secretary may also suspend production from an OCS lease "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."  43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons); Miyagi Decl., Ex. C § 13 (offshore lease provision governing suspension or cancellation).  For onshore federal leases, the Secretary may similarly direct or grant suspensions of operations.  *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.  The standard BLM onshore lease also requires the lessee to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest.  Miyagi Decl., Ex. E § 6.

- Through federal leases, the government retains supervision and control over the use of federal property.  The mineral leasing laws, including OCSLA and the MLA, are an exercise of Congress's power under the Property Clause of

the Constitution.   U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").   The government issues onshore and offshore leases for a primary term of five to 10 years, with a habendum clause under which the lessee retains the lease for so long after the primary term as the lease produces oil and gas in paying quantities.   30 U.S.C. § 226(e) (onshore); 43 U.S.C. § 1337(b)(2) (OCS); Miyagi Decl., Ex. C § 3.   But when the lease terminates, the property interest reverts to the United States; the lessee cannot acquire fee title interest.   Nor may a federal lessee assign its lease to another person without express government approval.   30 U.S.C. § 187; 43 C.F.R. 3106 (onshore leases); 30 C.F.R. §§ 556.701(a), 556.800 (OCS leases).

- The United States controls federal mineral lessees like Defendants in other ways.   An OCS lessee does not have an absolute right to develop and produce; rather, it has only an exclusive right to seek approval from the United States to develop and produce under the lease.   *See Sec'y of the Interior v. California*, 464 U.S. 312, 337-39 (1984); *Vill. of False Pass v. Clark*, 733 F.2d 605, 614-16 (9th Cir. 1984).   The MLA limits the onshore federal oil and gas lease acreage that may be held by any one person, enforceable by an action in federal court. 30 U.S.C. § 184(d), (h).   The government has the right to obtain "prompt

access" to facilities and records.  *See* Miyagi Decl., Ex. B § 11, Miyagi Decl., Ex. C § 12; 30 U.S.C. § 1713.  And the United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit.  *See* 43 U.S.C. § 1341(f); Miyagi Decl., Ex. C § 6(a) (OCS leases); 30 U.S.C. § 181 (onshore leases).

As the above statutory and lease provisions demonstrate, a federal oil and gas lease is a contract to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives.  These are activities that the federal government would itself have to undertake unless the Defendants did it for the government through the obligations of federal leases on federal lands.  Under *Watson*, this is not run of the mill regulation; rather it is the kind of "special relationship" that supports federal officer removal.  *Watson*, 551 U.S. at 157.

70.  In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department was nearly 1 billion barrels.  Historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production.  *See* Cong. Research Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated

Oct. 23, 2018). The federal government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands in the form of royalty regimes that have resulted in billions of dollars of revenue to the federal government.

71.   As another example, several Defendants also "acted under" federal officers in producing oil for the Strategic Petroleum Reserve. Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United States under any oil and gas lease [under OCSLA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas." *See* Miyagi Decl., Ex. C § 6. For example, after the September 11 attacks, President George W. Bush ordered that the Strategic Petroleum Reserve, "an important element of our Nation's energy security," "will be filled . . . principally through royalty-in-kind transfers to be implemented by the Department of Energy and the Department of the Interior." Statement by President George W. Bush on the Strategic Petroleum Reserve, 1 Pub. Papers 1406 (Nov. 13, 2001). From 1999 to December 2009, the U.S. government's "primary means of acquiring oil for the [Strategic Petroleum Reserve]" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called RIK program. U.S. Department of Energy, *Filling the Strategic Petroleum Reserve*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited Apr. 6, 2020). During that

time, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion.  U.S. Department of Energy, Strategic Petroleum Reserve Annual Report to Congress for Calendar Year 2010 18 (2011) ("SPR 2010 Report"); *see id.* at 39 (Table 13).   The federal government required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations.  *See, e.g.*, Dear Operator Letter from L. Denett (Associate Director for Royalty Management, United States Department of Interior Minerals Management                Service)               (Dec.                14,                1999), https://www.onrr.gov/ReportPay/PDFDocs/991214.pdf   (invoking   OCSLA   and royalty provisions in federal leases operated by certain Defendants, and/or their predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").  Defendants thus "help[ed] the Government to produce an item that it needs."  *Watson*, 551 U.S. at 153.

72.     The federal government also contracted with certain Defendants (and/or their predecessors, subsidiaries, or affiliates) to deliver millions of barrels of oil to the Strategic Petroleum Reserve as part of the RIK program.  *See, e.g.*, U.S. Department of the Interior, Minerals Management Service, MMS RIK Program to Help      Fill      Strategic      Petroleum      Reserve      (May      31,      2007),

https://www.onrr.gov/PDFDOCS/20070531.pdf (describing such contracts "to transport Royalty in Kind (RIK) crude oil that will be used to resume filling the nation's Strategic Petroleum Reserve (SPR)"); S. Prt. 108-18, Minority Staff of the Perm. Subcomm. on Investigations of the Comm. on Governmental Affairs, 108th Cong., Report on the U.S. Strategic Petroleum Reserve 19 (Mar. 5, 2003) (describing government contract with a predecessor affiliate of Defendant Shell Oil Company (Equiva Trading Company) to deliver nearly 19 million barrels of oil to the Strategic Petroleum Reserve as part of the RIK program). Defendants thus engaged in "an effort to *assist*, or to help *carry out*," the federal government's task in ensuring energy security. *Watson*, 551 U.S. at 152.

73. In addition, certain Defendants acted under federal officers within the meaning of 28 U.S.C. § 1442 as operators and lessees of Strategic Petroleum Reserve infrastructure. For example, from 1997 to 2019, the Department of Energy leased to affiliates of Defendant Shell Oil Company (Equilon Enterprises LLC dba Shell Oil Products US and Shell Pipe Line Corporation) the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana. *See* SPR 2010 Report, at 34. "The St. James terminal [wa]s leased to Shell Oil Products US under a long-term lease agreement. Under the lease agreement, Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s required to support the Strategic Petroleum Reserve as a sales and distribution point in the event of a

drawdown." *Id.* at 16 (emphasis added). Beginning in January 2020, the Department of Energy leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company). *See* U.S. Department of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil. And the Department has leased to the same ExxonMobil affiliate two government-owned pipelines that are part of the Strategic Petroleum Reserve near Freeport, TX. *See* SPR 2010 Report, at 34; U.S. Department of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html. The Department of Energy's leases enable the affiliates of Defendants Shell Oil Company and ExxonMobil to use the facilities for their commercial purposes, subject to the federal government's supervision and control in the event of the President's call for an emergency drawdown. *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under the international energy program."). The United States has exercised this control, including through the President's orders to draw down the reserve in

response to Hurricane Katrina in 2005 and disruptions to oil supply in Libya in 2011, emergency actions taken in coordination with the International Energy Agency. *See* U.S. Department of Energy, *History of SPR Releases*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last accessed Apr. 6, 2020). Thus, the hundreds of millions of barrels of oil flowing through these facilities were subject to federal government control and supervision.

74.    The federal government continues the active promotion of domestic production of fossil fuels through a variety of lease programs, grants, loan guarantees, tax provisions, and contracts. For example, the Office of Fossil Energy states that the government seeks American energy dominance, which "promotes U.S. domestic homegrown energy development to achieve energy security and jobs in energy and technology around the world." U.S. Department of Energy, Office of Fossil Energy, 2018-2022 Strategic Vision (Dec. 20, 2019, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf).

75.    These and other federal activities are encompassed in Plaintiff's Complaint and relate to Plaintiff's causes of action. *See supra* ¶¶ 46–51. Plaintiff alleges that Defendants' drilling operations and other activities led to the sale of fossil fuels—including by the federal government—which led to the combustion of that fuel and the release of greenhouse gases by end-users—also including the federal

government. Furthermore, the oil and gas that Plaintiff alleges is a "defective" product giving rise to strict liability is the very same oil and gas that Defendants extracted and produced under the control and supervision of the federal government and which the federal government (i) reserved the right to buy in total in the event of a time of war or whenever the President so prescribed; (ii) directed the development of unique products for military operations and purchased those products; and (iii) has promoted through its leasing and other subsidy programs. Accordingly, Plaintiff seeks to hold Defendants liable for the very activities Defendants performed under the control of a federal official, and thus the nexus element has been satisfied.

76. Finally, Defendants intend to raise numerous meritorious federal defenses, including the government contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Gertz v. Boeing*, 654 F.3d 852 (9th Cir. 2011), preemption, *see Goncalves*, 865 F.3d at 1250, and others. In addition, Plaintiff's claims are barred by the United States Constitution, including the Interstate and Foreign Commerce Clauses and Due Process clauses, as well as the First Amendment and the foreign affairs doctrine. These and other federal defenses are more than colorable. *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (defendant invoking section 1442(a)(1) "need not win his case before he can have it removed"). Accordingly, removal under Section 1442 is proper.

77.     Plaintiff attempts to disclaim "injuries arising on federal property and those that arose from Defendants' provision of fossil fuel products to the federal government for military and national defense purposes."   Compl. ¶ 14.   This disclaimer is a transparent—and ineffective—attempt to plead around removal. Indeed, Plaintiff concedes (1) its alleged injuries are purportedly caused from "anthropogenic greenhouse gas pollution" and emissions, which are "the dominant cause of global warming," *id.* ¶ 5, and (2) "it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources."  *Id.* ¶ 182.  Indeed, the Supreme Court has recognized this same impossibility of tracing greenhouse gases to one particular source in one particular jurisdiction.   *AEP*, 564 U.S. at 422 ("Greenhouse gases once emitted become well mixed in the atmosphere").  Plaintiff's claims thus are based on *global* emissions that are impossible to trace to any particular source.  Accordingly, Plaintiff has no basis on which to carve out fuel extraction and production on federal lands and at the direction of the federal government, or anywhere else for that matter.

## VII.   THE ACTION IS REMOVABLE BECAUSE THIS CASE ARISES FROM ACTS ON MULTIPLE FEDERAL ENCLAVES

78.     This Court also has original jurisdiction under the federal enclave doctrine.  The Constitution authorizes Congress to "exercise exclusive legislation in all cases whatsoever" over all places purchased with the consent of a state "for the

erection of forts, magazines, arsenals, dock-yards, and other needful buildings." U.S. Const., art. I, § 8, cl. 17. "[F]ederal enclave jurisdiction can also be obtained when the federal government reserves jurisdiction over portions of a state when the state enters the Union." *Lake*, 2017 WL 11515424, at *10 (internal quotations and citations omitted). "A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331." *Jones v. John Crane-Houdaille, Inc.*, No. 11-2374, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012). "The key factor in determining whether federal enclave jurisdiction exists is the location of the plaintiff's injury or where the specific cause of action arose." *Sparling v. Doyle*, No. 13-cv-00323, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014); *see also Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) ("Failure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status."); *Bd. of Comm'rs v. Tenn. Gas Pipeline Co.*, 29 F. Supp. 3d 808, 831 (E.D. La. 2014) (noting that defendants' "conduct" or "the damage complained of" must occur on a federal enclave). Federal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave. *See Durham*, 445 F.3d at 1250 (finding defendant was permitted "to remove to federal court" because "some of [plaintiff's] claims arose on federal enclaves"); *Holliday v. Etex*, No. 05-cv-00194,

2005 WL 2158488, *3 (D. Haw. July 6, 2005) ("[F]ederal courts have jurisdiction over litigation arising from federal enclaves.").

79.     Three requirements exist for land to constitute a federal enclave:  (1) the United States must have acquired the land from a state; (2) the state legislature must have consented to the jurisdiction of the federal government; and (3) the United States must have accepted jurisdiction.  *See Wood v. Am. Crescent Elevator Corp.*, No. 11-cv-397, 2011 WL 1870218, at *2 (E.D. La. May 16, 2011).

80.     On information and belief, Defendants maintain or maintained oil and gas operations on military bases or other federal enclaves such that the Complaint, which bases the claims on the "introduction of fossil fuel products into the stream of commerce," Compl. ¶ 12, arises under federal law.  *See, e.g.*, *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 372-74 (1964) (noting that the United States exercises exclusive jurisdiction over certain oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Mississippi River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States").  Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.  *See* GAO, *U.S. Fish and Wildlife Service: Information on Oil and Gas Activities in the National Wildlife Refuge System* (Oct.

31, 2001), http://www.gao.gov/new.items/d0264r.pdf.  Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department—pursuant to a joint operating agreement with the Navy.  *See Chevron U.S.A.*, 116 Fed. Cl. at 205.  Under that agreement, Standard Oil "operat[ed] the lands of Navy and Standard in the Reserve."  Miyagi Decl., Ex. D at 4.

81.     In addition, the Complaint relies upon conduct occurring in the District of Columbia, which is itself a federal enclave.  *See, e.g.*, *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 20 n.8 (D.D.C. 2014); *Hobson v. Hansen*, 265 F. Supp. 902, 929 n.42 (D.D.C. 1967).  Plaintiffs claim that the Defendants, and certain industry trade associations, including American Petroleum Institute who Plaintiff concedes is "based in the District of Columbia," Compl. ¶ 27, misled federal regulators and caused them to adopt policies that did not adequately curtail the production and use of fossil fuels, *id.* ¶¶ 87-116.  This alleged lobbying activity, the misleading of federal regulators, and the resulting "under-regulation" of fossil fuels, could *only* occur in the District of Columbia, where the EPA, the Department of the Interior, the Department of Energy, the Department of Transportation, among others, are located.

82.     In addition, Plaintiff complains that Defendants' supposedly wrongful conduct included their memberships in various "trade association[s]," and providing

funding to "think tanks," which allegedly had the effect of "evad[ing] regulation" of fossil fuel products by "deceiv[ing]" policymakers about "the role of fossil fuel products in causing global warming." Compl. ¶¶ 112-16. The Complaint also points to Defendants' purported funding of "lobbyist[s]" to influence legislation and legislative priorities. *Id.* Here, too, "some of the[] locations" giving rise to Plaintiff's claims "are federal enclaves," further underscoring the presence of federal jurisdiction. *Bell v. Arvin Meritor, Inc.*, No. 12-cv-00131, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012). As the Ninth Circuit has contemplated, free speech placed at issue in a federal enclave falls under the jurisdiction of the federal courts. *Jacobsen v. U.S. Postal Serv.*, 993 F.2d 649, 657 (9th Cir. 1992) (observing that newspaper vendors were required to obtain permits pursuant to a federal statute to sell newspapers in front of U.S. post office locations, which the Court deemed to be "within the federal enclave"). Because Plaintiff claims that Defendants' speech within the federal enclave of the District of Columbia was, among other alleged causes, the basis of its injury, and because Plaintiff complains of damages allegedly occurring on federal enclaves, this Court is the appropriate forum to adjudicate the merits of this dispute.

83. Additionally and/or alternatively, the exercise of federal enclave jurisdiction is also proper because: (1) Plaintiff's claims allegedly occurred on a federal enclave in Hawai'i, *i.e.*, military bases and reservations in Hawai'i that were

acquired by declaration of taking, Presidential executive order, purchase, or otherwise for military purposes; (2) the United States has broad concurrent jurisdiction with the State of Hawaiʻi over the enclaves pursuant to the Admission Act of 1959; and (3) Plaintiff's claims involve substantial federal interests such that a federal question is presented. *Lake*, 2017 WL 11515424, at *13.

84.    Plaintiff alleges, for instance, that Defendant Marathon Petroleum Corporation is "successor-in-interest" to a Tesoro entity that owned and operated one of the two refineries in Hawaiʻi. Compl. ¶ 25(g).[7] This refinery supplied a significant portion of the United States military's fuel requirements in Hawaiʻi pursuant to indefinite delivery contracts. On information and belief, much of that fuel was transported via underground pipeline to the Red Hill Bulk Fuel Storage Facility ("Red Hill Facility"), where it was stored and/or distributed for military operations originating on Oahu. The Red Hill Facility has historically played a crucial role in the nation's defense, including by supplying fuel for the military's Pacific fleet.

85.    The facility has 20 underground fuel tanks, each of which is the size of a 20-story building and can hold 12.5 million gallons of fuel. As Major General Susan A. Davidson of the United States Army's Indo-Pacific Command stated:

> The Red Hill facility holds a significant percentage of petroleum war reserves required to defend national security interests in the Indo-Pacific region. As our strategic reserve, it supports all U.S. military forces

---

[7]    Defendant Marathon Petroleum Corporation does not concede the veracity of this allegation in the Complaint and reserves all rights to contest it in this litigation.

> throughout the theater, including those stationed in and transiting through Hawaiʻi.  It also supports the Hawaiʻi Army and Air National Guard and is available to support civilian authorities, should circumstances dictate.  Its hardened, underground, cyber-protected, gravity-fed system to Joint Base Pearl Harbor-Hickam is unique, and there is no comparable U.S. owned facility anywhere from India to mainland USA.

Testimony on Resolution 19-270.CD1 Reaffirming the Council's Position as set forth in Resolution 18-266.CD1, adopted on March 8, 2019, Relating to the Red Hill Bulk Fuel Storage Facility Upgrade Alternative Options, Honolulu City Council (Nov. 6, 2019), https://www.cnic.navy.mil/content/dam/cnic/cnrh/pdfs/redhill/Navy%20DLA%20Testimony%20for%206%20NOV%202019%20City%20Council%20Resolution%2019-270.pdf (statement on behalf of Navy Region Hawaiʻi).

86.     While Plaintiff attempts to disclaim injury arising from acts occurring on federal lands, *see* Compl. ¶¶ 14, 16 n.9, 151 n.126, Plaintiff acknowledges that fossil fuel emissions cannot be traced to their source, *id.* ¶ 170, and thus there is no rational way for Plaintiff to distinguish between the harms alleged to have occurred as a result of conduct occurring on federal enclaves from those alleged to have resulted from conduct at any other location.

## VIII. THE ACTION IS REMOVABLE BECAUSE IT IS COMPLETELY PREEMPTED BY FEDERAL LAW

87.     Separate and distinct from the federal common law and *Grable* bases for removal addressed above, this Court also has original jurisdiction over this lawsuit for the independent and separate reason that Plaintiff requests relief that would alter

or amend the rules regarding interstate—and even international—regulation of greenhouse gas emissions. Accordingly, this action is completely preempted by federal law.

88.    The Supreme Court has held that a federal court will have jurisdiction over an action alleging only state law claims where the "extraordinary pre-emptive power [of federal law] converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).

89.    Applying state law to the inherently transnational activity challenged by the Complaint would inevitably intrude on the foreign affairs power of the federal government and is completely preempted. *See Garamendi*, 539 U.S. at 418 ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict."); *see also California v. Gen. Motors Corp.*, No. C06-cv-05755, 2007 WL 2726871,*14 (N.D. Cal. Sept. 17, 2007) (dismissing claims against automakers because the federal government "ha[s] made foreign policy determinations regarding the United States' role in the international concern about global warming," and a "global warming nuisance tort would have an inextricable effect on . . . foreign policy").

90.    In addition, Plaintiff's claims are completely preempted by the Clean Air Act.  A state law cause of action is preempted under this "complete preemption" doctrine where a federal statutory scheme "provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action."  *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003).  It also requires a determination that the state law cause of action falls within the scope of the federal cause of action, including where it "duplicates, supplements, or supplants" that cause of action.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

91.    Both requirements for complete preemption are present here.  Among other things, Plaintiff's Complaint seeks an "abatement" of a nuisance it alleges Defendants have caused—namely, global climate change resulting in a rise in sea levels, increase in the frequency and intensity of drought, increase in the frequency and intensity of precipitation events, increase in the frequency and intensity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes.  *See, e.g.*, Compl. ¶¶ 16, 160.  It is indisputable that Plaintiff's Complaint does not seek relief only as to Defendants' *intra*state activities in Hawaiʻi, but also Defendants' activities far beyond the borders of Hawaiʻi and even the borders of the United States.  Under Plaintiff's theory, their alleged injuries could have been avoided, and could be abated, only by a nationwide and global reduction in the emission of greenhouse gases.  Even assuming that relief could be

ordered against Defendants for the production, marketing and sale of fossil fuels, which are then combusted by others at a rate Plaintiff claims causes the alleged injuries, this claim must be decided in federal court because Congress has created a right of action by which a party can seek the creation or modification of nationwide emission standards by petitioning the EPA. That federal right of action was designed to provide the exclusive means for a party to seek nationwide emission regulations. Any state law claims to regulate emissions must be brought under the laws of the *source* state, which Plaintiff fails to do here. State common law causes of action based on the *interstate* emission of greenhouse gases are completely preempted by the Clean Air Act, which provides the exclusive remedy for regulation of nationwide emissions. Because Plaintiff's state law causes of action would "duplicate[], supplement[], or supplant[]" that exclusive federal cause of action, they are completely preempted.

92. The Clean Air Act provides the exclusive means for regulation of interstate emissions. The Act establishes a system that deploys federal and state resources to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). At the heart of this system are the emission standards set by the EPA. Specific Clean Air Act provisions authorize or require emission standards to be set if certain findings are made, and such standards must comport with the

statutory criteria set by Congress, consistent with the dual goals of the Act.  Under the Clean Air Act, "emissions have been extensively regulated nationwide." *Tenn. Valley Auth.*, 615 F.3d at 298.  Regulation of greenhouse gas emissions, including carbon dioxide, is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528-29, and the EPA has regulated these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(48), 52.21(b)(48) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and motor vehicles).

93.    Plaintiff's claims also seek to review the actions of the EPA outside of the judicial review provisions of the Clean Air Act and the Administrative Procedure Act, which place judicial review of EPA actions exclusively in the federal courts. Under Plaintiff's nuisance theories, a state court would in essence sit in review of the EPA's regulatory decisions on both stationary and mobile sources of greenhouse gas emissions.

94.    Congress manifested a clear intent that judicial review of Clean Air Act matters must take place in federal court.  42 U.S.C. § 7607(b).  Thus, the federal courts review EPA regulation of greenhouse gases under the Administrative

Procedures Act. That jurisdiction is exclusive and a state court cannot sit in judgment of EPA policy decisions.

95.     Thus, irrespective of the savings clauses applicable to some other types of claims, the congressionally mandated statutory and regulatory scheme is the "exclusive" means for seeking the *nationwide* regulation of greenhouse gas emissions and "set[s] forth procedures and remedies" for that relief. *Beneficial Nat'l Bank*, 539 U.S. at 8.

96.     As noted above, Plaintiff asks the Court to order Defendants to "abate nuisances" alleged to have caused "rising sea levels, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, [and] restricted availability of fresh drinking water." Compl. ¶¶ 16, 160; *see also id.* at 113 (Prayer for Relief requesting "[e]quitable relief, including abatement of the nuisances complained of herein").

97.     According to Plaintiff's own allegations, the alleged nuisances can be abated only by an interstate—in fact international—reduction in greenhouse gas emissions. *See* Compl. ¶ 170 ("[I]t is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gases quickly diffuse and comingle in the atmosphere."); *id.* ¶ 2 (describing "global" greenhouse gas emissions

relating to fossil fuel products).  Indeed, Plaintiff's allegations purport to show that Defendants "undertook a momentous effort to evade *international* and *national* regulation of greenhouse gas emissions"—*not* state or local regulations.  *Id.* ¶ 115 (emphases added); *see also id.* ¶ 91 ("Defendants embarked on a decades-long campaign designed to . . . undermine national and international efforts to rein in greenhouse gas emissions."); *id.* ¶ 89 (acknowledging, *inter alia*, federal legislative efforts to regulate $CO_2$ and other greenhouse gases that allegedly "prompted Defendants to change their tactics . . . to a public campaign aimed at evading regulation"); *id.* ¶¶ 105, 107 (describing alleged efforts to encourage the United States to reject the international Kyoto Protocol).

98.   Plaintiff's putative state law tort claims are an end-run around a petition for a rulemaking regarding greenhouse gas emissions because they seek to regulate nationwide emissions that Plaintiff does not dispute conform to EPA's emission standards.  *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) ("Even the State's salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme.").  The claims would require precisely the cost-benefit analysis of emissions that the EPA is charged with undertaking and would directly interfere with the EPA's determinations.  *See supra* ¶¶ 30–31.  Federal agencies are the exclusive regulators and their action can only be

compelled or reviewed in federal court.  Because Congress has established a clear and detailed process by which a party can petition the EPA to establish stricter nationwide emissions standards, Plaintiff's claims are completely preempted by the Clean Air Act.

## IX.   THE   ACTION   IS   REMOVABLE   UNDER   THE BANKRUPTCY REMOVAL STATUTE

99.   The Bankruptcy Removal Statute allows removal of "any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."[8]  28 U.S.C. § 1452(a).  Section 1334, in turn, provides that

---

[8]   Removal is also sought under the numerous other statutes and theories set forth herein that make removal to this Court appropriate.  Indeed, this Court has "original but not exclusive jurisdiction of all civil proceedings, arising under title 11, or arising in or related to cases under title 11" of the United States Code.  28 U.S.C. § 1334(b).  Nonetheless, the Chevron Parties recognize that LR1070.1(c) states that removals under 28 U.S.C. § 1452(a) or § 1412 in cases related to bankruptcy cases may be filed with the clerk of the bankruptcy court and that, pursuant to LR1070.1(a) (incorporating 28 U.S.C. § 157(a)), "all civil proceedings arising under title 11 or arising in or related to a case under Title 11 are referred to the bankruptcy judges of this district."  However, in light of the numerous other grounds for removal to this Court, as noted above, removal is properly sought in this Court, and it is appropriate for the Court to withdraw any applicable reference to the bankruptcy court and require this matter to proceed solely in this Court.  *See, e.g., Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 481 (4th Cir. 2015) (noting that "in conferring . . . adjudicatory authority" to bankruptcy courts, Congress, did not mean to "give a bankruptcy court jurisdiction *to the exclusion* of a district court").

"the district courts shall have original but not exclusive jurisdiction of all civil proceedings, arising under Title 11, or arising in or related to cases under title 11" of the United States Code. 28 U.S.C. § 1334(b). The Ninth Circuit has emphasized that "'related to' jurisdiction is very broad, including nearly every matter directly or indirectly related to the bankruptcy." *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 868 (9th Cir. 2005) (internal quotations and citations omitted). An action is thus "related to" a bankruptcy case if it "could conceivably have any effect on the estate being administered in bankruptcy." *PDG Arcos, LLC*, 436 F. App'x at 742 (quoting *In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988)). Where a Chapter 11 plan has been confirmed, there must be a "close nexus" between the post-confirmation case and the bankruptcy plan for related-to jurisdiction to exist. *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166-67 (3d Cir. 2004)). "[A] close nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when the matter 'affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan.'" *In re Wilshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013) (quoting *Pegasus Gold*, 394 F.3d at 1194).

100. Plaintiff's claims are purportedly predicated on historical activities of Defendants, including predecessor companies, subsidiaries, and companies that Defendants may have acquired or with which they may have merged, as well as

numerous unnamed but now bankrupt entities. Indeed, Plaintiff explicitly premises its theories of liability on the actions of Defendants' subsidiaries. *See, e.g.*, Compl ¶¶ 66, 96, 122.[9] Because there are hundreds of non-joined necessary and indispensable parties, there are many other title 11 cases that may be related. Indeed, the related climate-change cases that Plaintiff's counsel recently filed on behalf of other cities and counties already generated bankruptcy court proceedings. *See, e.g.*, *In re Peabody Energy Corp.*, No. 16-42529-399, 2017 WL 4843724 (Bankr. E.D. Mo. Oct. 24, 2017) (holding that the plaintiffs' state law claims were discharged when Peabody emerged from bankruptcy in March 2017); *In re Arch Coal, Inc.*, No. 16-40120 (Bankr. E.D. Mo. Nov. 21 2017), Dkt. 1615 (stipulation providing that any action in the Peabody bankruptcy proceedings that results in dismissal of any of the plaintiffs' claims against Peabody will require dismissal of claims against Arch). Accordingly, Plaintiff's broad claim has the required close nexus with Chapter 11 plans to support federal jurisdiction. *Celotex*, 124 F.3d at 625; *see also In re Dow Corning Corp.*, 86 F.3d 482, 493-94 (6th Cir. 1996).

101. As one example of how Plaintiff's historical allegations have created a "close nexus" with a Chapter 11 plan, one of Chevron's current subsidiaries, Texaco

---

[9]     To the extent Plaintiff seeks to hold Defendants liable for the conduct of their subsidiaries, affiliates, or other related entities, such attempts are improper. *See, e.g.*, *Gustavson v. Wrigley Sales Co.*, 961 F. Supp. 2d 1100, 1132-33 (N.D. Cal. 2013) (holding that "the parent-subsidiary relationship . . . is an insufficient basis, standing alone, for holding [parent] liable for [subsidiary's] conduct").

Inc., filed for bankruptcy in 1987. *In re Texaco Inc.*, 87 B 20142 (Bankr. S.D.N.Y. 1987). The Chapter 11 plan, confirmed in 1988, bars certain claims against Texaco arising prior to March 15, 1988. *Id.* Dkt. 3743. Plaintiff's Complaint alleges that Texaco, as well as unnamed Chevron "predecessors" and "subsidiaries," engaged in culpable conduct prior to March 15, 1988, and it attributes this conduct to defendant "Chevron." *See* Compl. ¶¶ 22, 28, 58, 63, 65, 120. Plaintiff's claims against Chevron thus are at least partially barred by Texaco's confirmed Chapter 11 plan to the extent that the claims relate to Texaco's conduct prior to 1988. Accordingly, Plaintiff's claim has a "close nexus" to the plan and supports federal jurisdiction. *See Wilshire Courtyard*, 729 F.3d at 1292-93 (federal court had "'related to' subject matter jurisdiction . . . despite the fact that the Plan transactions ha[d] been long since consummated").

102. Finally, Plaintiff's action is primarily one to protect its "pecuniary interest." *See City & Cty. of S.F. v. PG&E Corp.*, 433 F.3d 1115, 1123-24 (9th Cir. 2006). As demonstrated by Plaintiff's request for billions of dollars in compensatory damages, "punitive damages," and "disgorgement of profits" (*see, e.g.*, Compl. ¶¶ 162, 183, 195, 204, Prayer for Relief), this action is primarily pecuniary in nature. *See also id.* ¶¶ 151(e) (alleging that "[t]he City has planned and is planning, at significant expense, adaptation and mitigation strategies to address climate change related impacts," and that "the City has incurred and will incur significant expense in

educating and engaging the public on climate change issues, and to promote and implement policies to mitigate and adapt to climate change impacts, including promoting energy and water efficiency and renewable energy"), 151(f) (alleging that "[t]he City, at significant expense, has initiated adaptation measures at many of its public resources to mitigate, and to the extent possible, prevent further injury to its property and facilities."). These allegations make clear that Plaintiff's action is primarily brought for financial gain.

## X.  THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS FALL WITHIN THE COURT'S ADMIRALTY JURISDICTION

103. Finally, Plaintiff's claims are removable because they fall within the Court's original admiralty jurisdiction. The Constitution extends the federal judicial power "to all Cases of admiralty and maritime Jurisdiction." U.S. Const. Art. III, § 2. "Congress has embodied that power in a statute giving federal district courts 'original jurisdiction [over] . . . [a]ny civil case of admiralty or maritime jurisdiction[.]'" *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995) (alterations in original). "The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, *even though the injury or damage is done or consummated on land*." 46 U.S.C. § 30101(a) (emphasis added).

104.   The alleged injuries have occurred on the navigable waters.  Plaintiff alleges that several Defendants' production and sale of fossil fuels occur on and/or over the navigable waters of the United States.  *See, e.g.*, Compl. ¶ 22(b) ("Chevron Corporation [sic] and its subsidiaries' operations consist of . . . transporting crude oil and refined products by . . . marine vessel . . . .").  Beyond that, Plaintiff alleges that the tort arises from production of fossil fuels, including worldwide extraction, a significant portion of which takes place on "mobile offshore drilling unit[s]" that operate in navigable waters.  *See In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 949 (E.D. La. 2011).  "Under clearly established law," a floating drilling platform is "a vessel, not a fixed platform," *id.*, and "[o]il and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce," *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538-39 (5th Cir. 1986).  Moreover, all crude oil that is refined in Hawaiʻi—which ultimately becomes the gasoline and other petroleum products that are used by consumers in Hawaiʻi, including the government of Honolulu—must be transported to Hawaiʻi on vessels that cross navigable waters.  Because Plaintiff's claims fall within the Court's admiralty jurisdiction, they are removable under 28 U.S.C. §§ 1441 and 1333.

## XI.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

105.   Based on the foregoing allegations from the Complaint, and others not specifically described herein, this Court has original jurisdiction over this action under 28 U.S.C. § 1331.   Accordingly, removal of this action is proper under 28 U.S.C. §§ 1331, 1334, 1441(a), 1442, 1446, and 1367(a), as well as 43 U.S.C. § 1349(b).

106.   The United States District Court for the District of Hawaii is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff originally filed this case, in the Circuit Court of the First Circuit, State of Hawaiʻi.   *See* 28 U.S.C. § 91; 28 U.S.C. § 1441(a).

107.   All defendants that have been properly joined and served (or purported to be served) have consented to the removal of the action, *see* Miyagi Decl., ¶ 4, and there is no requirement that any party not properly joined and served consent.   *See* 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and served"); *Pressman v. Meridian Mortg. Co., Inc.*, 334 F. Supp. 2d 1236, 1241-42 (D. Haw. 2004) (citing *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1193 n.1 (9th Cir. 1988), for the proposition that the "general rule" requiring consent of all defendants "applies . . . only to defendants properly joined and served

in the action").[10]   Copies of all process, pleadings, and orders from the state-court action being removed to this Court that the Chevron Parties have been able to obtain from the Circuit Court and which are in the possession of the Chevron Parties are attached hereto as Exhibit A to the Miyagi Declaration.   Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by the Chevron Parties in the action.

108.   Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Circuit Court of the First Circuit, State of Hawaiʻi, pursuant to 28 U.S.C. § 1446(d).

Accordingly, Defendants remove to this Court the above action pending against them in the Circuit Court of the First Circuit, State of Hawaiʻi.

//

//

//

//

(Signature on next page.)

---

[10]      In addition, the consent of all defendants is not required for bankruptcy removal under 28 U.S.C. § 1452 or federal officer removal under 28 U.S.C. § 1442. *See Creasy v. Coleman Furniture Corp.*, 763 F.2d 656, 660 (4th Cir. 1985) ("Under the bankruptcy removal statute, … any one party has the right to remove the state court action without the consent of the other parties."); *Durham*, 445 F.3d at 1253 ("Whereas all defendants must consent to removal under section 1441, . . . a federal officer or agency defendant can unilaterally remove a case under section 1442.") (citation omitted).

Respectfully submitted,

DATED:  Honolulu, Hawaiʻi, April 15, 2020.


/s/ Melvyn M. Miyagi
**MELVYN M. MIYAGI**
**ROSS T. SHINYAMA**
**JOYCE W.Y. TAM-SUGIYAMA**
**THEODORE J. BOUTROUS, JR.**
*Attorneys for Defendants*
CHEVRON CORPORATION
and CHEVRON U.S.A., INC.