PAUL S. AOKI, 1286
Acting Corporation Counsel
**CITY AND COUNTY OF HONOLULU**
ROBERT M. KOHN, 6291
NICOLETTE WINTER, 9588
530 S. King Street, Room 110
Honolulu, Hawai'i 96813
Telephone:  (808) 768-5234
Facsimile:   (808) 768-5105
Email:      robert.kohn@honolulu.gov
             nwinter@honolulu.gov

**SHER EDLING LLP**
VICTOR M. SHER (*pro hac vice*)
MATTHEW K. EDLING (*pro hac vice*)
100 Montgomery St. Ste. 1410
San Francisco, CA 94104
Telephone:  (628) 231-2500
Facsimile:   (628) 231-2929
Email:      vic@sheredling.com
             matt@sheredling.com

Attorneys for Plaintiff CITY AND
COUNTY OF HONOLULU

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| CITY AND COUNTY OF HONOLULU<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SUNOCO LP, et al.,<br><br>　　　　　Defendants. | CASE NO. 20-CV-00163-DKW-RT<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF CITY AND COUNTY OF HONOLULU'S MOTION TO REMAND TO STATE COURT**<br><br>No Hearing Date Calendared<br><br>Action Filed: March 9, 2020<br>No Trial Date Set |

# TABLE OF CONTENTS

I.    INTRODUCTION .......................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...........................4

III.  LEGAL STANDARDS..............................................................7

IV.   THIS CASE SHOULD BE REMANDED BECAUSE THERE IS
      NO SUBJECT-MATTER JURISDICTION. ...........................................10

   A. The Ninth Circuit Has Conclusively Rejected Defendants'
      "Governed by Federal Common Law" Argument. .......................................10

   B. The City's Claims Do Not "Necessarily Raise" Any "Substantial
      Questions of Federal Law." ..............................................................14

      1. None of Defendants' Purported Federal Issues Is "Substantial."..........16

      2. The City's Claims Do Not "Necessarily Raise" Any Issue of
         Federal Law. ........................................................................17

      3. To the Extent Defendants' "Federal Common Law" Argument Is
         Cognizable Under *Grable*, It Fails.........................................20

   C. There Is No Outer Continental Shelf Lands Act ("OCSLA")
      Jurisdiction..............................................................................23

   D. There Is No Federal Officer Removal Jurisdiction Because No Federal
      Officer Directed the Defendants' Tortious Conduct. ...................................26

      1. Defendants Cannot Show They Were Acting Under a
         Federal Officer......................................................................28

      2. There Is No Causal Connection Between Defendants' Campaign
         of Deception and the Activities Described in the Notice
         of Removal............................................................................32

   E. There Is No Enclave Jurisdiction Because the City's Claims
      Did Not "Arise" Within Any Federal Enclave, Nor Do They Present
      Any Federal Question. ...................................................................36

1. The City's Injuries Occurred and Will Occur Exclusively on Non-Federal Lands..................................................................38

2. Each of the City's Claims Arose Only Once a Complete Tort Accrued, Which Occurred When and Where the City Suffered Injury—on Non-Federal Lands............................................40

3. Defendants Fail to Identify a Federal Question Arising on Enclaves in Hawai'i, Over Which the State Has Concurrent Jurisdiction. ...........................................................................42

F. Defendants' "Complete Preemption" Arguments Are Foreclosed. . ............44

G. The Case Is Not Removable Under the Bankruptcy Removal Provisions, 28 U.S.C. §§ 1452(a) and 1334. ...............................48

1. The City Brings This Action Pursuant to Its Police and Regulatory Powers. ................................................................48

2. The City's Action Is Not Related to Any Bankruptcy Case.................52

3. Equity Requires Remand. ......................................................55

H. Defendants' Assertion of Admiralty Jurisdiction Is Baseless. .....................57

1. Admiralty Jurisdiction Is Not a Basis for Removal..............................57

2. There Is No Admiralty Jurisdiction Here. ...........................................58

V. CONCLUSION .........................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Rogers*,
   780 F.3d 1229 (9th Cir. 2015) ..............................................................58

*Am. Elec. Power Co. v. Connecticut*,
   564 U.S. 410 (2011) .................................................................. 20, 21, 45

*Am. Ins. Assoc. v. Garamendi*,
   539 U.S. 396 (2003) ............................................................................48

*Anderson v. State*,
   88 Haw. 241 (Ct. App. 1998) ..............................................................18

*Babcock Servs., Inc. v. CH2M Hill Plateau Remediation Co.*,
   No. 13-CV-5093-TOR, 2013 WL 5724465 (E.D. Wash. Oct. 21, 2013) ...........12

*Baclaan v. Combustion Eng'g*,
   No. 03-00325 LEK-KSC, 2016 WL 6469257 (D. Haw. Oct. 31, 2016) .............56

*Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*,
   405 F. Supp. 3d 947 (D. Colo. 2019) .......................................... *passim*

*Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*,
   965 F.3d 792 (10th Cir. 2020)................................................... *passim*

*Bell v. Arvin Meritor, Inc.*,
   No. 12-00131-SC, 2012 WL 1110001 (N.D. Cal. Apr. 2, 2012).......................40

*Beneficial Nat'l Bank v. Anderson*,
   539 U.S. 1 (2003) .................................................................. 45, 46, 47

*Bordetsky v. Akima Logistics Servs., LLC*,
   No. CV 14-1786 (NLH/JS), 2016 WL 614408 (D.N.J. Feb. 16, 2016) ..............41

*Brooklyn Union Expl. Co. v. Tejas Power Corp.*,
  930 F. Supp. 289 (S.D. Tex. 1996).....................................................24

*Cabalce v. VSE Corp.*,
  922 F. Supp. 2d 1113 (D. Haw. 2013) ..............................................27

*California ex rel. Brown v. Villalobos*,
  453 B.R. 404 (D. Nev. 2011)..............................................................51

*California v. Gen. Motors Corp.*,
  No. C06-cv-05755, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) ...................48

*Caterpillar, Inc. v. Williams*,
  482 U.S. 386 (1987) ................................................................... *passim*

*Ching v. Aila*,
  No. CIV. 14-00253 JMS, 2014 WL 4216051
  (D. Haw. Aug. 22, 2014) ...................................................... 38, 43, 44

*City & Cty. of San Francisco v. PG&E Corp.*,
  433 F.3d 1115 (9th Cir. 2006) ...................................................... 49, 54

*City of Oakland v. BP PLC*,
  969 F.3d 895, 2020 WL 4678380 (Aug. 12, 2020)...................................... *passim*

*City of Oakland v. BP PLC*,
  960 F.3d 570 (9th Cir. 2020) ..............................................................2

*Cmty. Hous. P'ship v. Byrd*,
  No. 13-3031 JSC, 2013 WL 6087350 (N.D. Cal. Nov. 19, 2013) .....................43

*Coleman v. Trans Bay Cable, LLC*,
  *No*. 19-CV-02825-YGR, 2019 WL 3817822 (N.D. Cal. Aug. 14, 2019)..... 34, 41

*Collier v. District of Columbia*,
  46 F. Supp. 3d 6 (D.D.C. 2014)..........................................................40

*Collins v. Yosemite Park & Curry Co.*,
  304 U.S. 518 (1938) ..........................................................................38

*Coronel v. AK Victory*,
  1 F. Supp. 3d 1175 (W.D. Wash. 2014) ............................................................57

*County of San Mateo v. Chevron Corp.*,
  294 F. Supp. 3d 934 (N.D. Cal. 2018) ........................................................ *passim*

*County of San Mateo v. Chevron Corp.*,
  960 F.3d 586 (9th Cir. 2020) ...................................................................... *passim*

*Doe Parents No. 1 v. State, Dep't of Educ.*,
  100 Haw. 34 (2002) ...............................................................................................42

*Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.*,
  130 B.R. 405 (S.D.N.Y. 1991) ...............................................................................56

*Durham v. Lockheed Martin Corp.*,
  445 F.3d 1247 (9th Cir. 2006) ...............................................................................36

*Empire Healthchoice Assur., Inc. v. McVeigh*,
  547 U.S. 677 (2006) ...............................................................................................15

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
  26 F.3d 563 (5th Cir. 1994) ...................................................................................23

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008) ...............................................................................................51

*Faulk v. Owens-Corning Fiberglass Corp.*,
  48 F. Supp. 2d 653 (E.D. Tex. 1999) ....................................................................35

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
  463 U.S. 1 (1983) ............................................................................ 8, 10, 17, 18

*Gaus v. Miles, Inc.*,
  980 F.2d 564 (9th Cir. 1992) ............................................................................7, 44

*Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*,
  865 F.3d 1237 (9th Cir. 2017) ...............................................................................27

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing,*
    545 U.S. 308 (2005) ...................................................................... *passim*

*Gunn v. Minton,*
    568 U.S. 251 (2013) .............................................................. 12, 15, 44

*Herb's Welding, Inc. v. Gray,*
    470 U.S. 414 (1985) .............................................................................60

*Hobson v. Hansen,*
    265 F. Supp. 902 (D.D.C. 1967)...........................................................40

*Holliday v. Extex,*
    No. CIV. 05-00194SPKLEK, 2005 WL 2158488 (D. Haw. July 6, 2005).........41

*Humble Pipe Line Co. v. Waggonner,*
    376 U.S. 369 (1964) .............................................................................39

*In re Berg,*
    230 F.3d 1165 (9th Cir. 2000) ..............................................................51

*In re Deepwater Horizon,*
    745 F.3d 157 (5th Cir. 2014) ................................................................23

*In re Fietz,*
    852 F.2d 455 (9th Cir. 1988) ................................................................53

*In re First All. Mortg. Co.,*
    264 B.R. 634 (C.D. Cal. 2001) .............................................................50

*In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.,*
    428 F. Supp. 2d 1014 (D. Minn. 2006) ..................................................36

*In re McCarthy,*
    230 B.R. 414 (B.A.P. 9th Cir. 1999) .....................................................55

*In re Mission Bay Jet Sports, LLC,*
    570 F.3d 1124 (9th Cir. 2009)..............................................................58

*In re MTBE Prods. Liab. Litig.*,
  488 F.3d 112 (2d Cir. 2007) ................................................................35

*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*
  808 F. Supp. 2d 943 (E.D. La. 2011) ...................................................59

*In re Peabody Energy Corp.*,
  958 F.3d 717 (8th Cir. 2020) ................................................................55

*In re Pegasus Gold Corp.*,
  394 F.3d 1189 (9th Cir. 2005) ..............................................................53

*In re Ray*,
  624 F.3d 1124 (9th Cir. 2010) ..............................................................53

*In re Universal Life Church, Inc.*,
  128 F.3d 1294 (9th Cir. 1997) ........................................................ 50, 52

*Jacobsen v. U.S. Postal Service*,
  993 F.2d 649 (9th Cir. 1992) ................................................................40

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
  513 U.S. 527 (1995) ..................................................................... 58, 59, 60

*Johnson v. Raybestos-Manhattan, Inc.*,
  69 Haw. 287 (1987) .............................................................................42

*Kalaka Nui, Inc. v. Actus Lend Lease, LLC*,
  2009 WL 1227892 (D. Haw. May 5, 2009) .........................................43

*L'Garde, Inc. v. Raytheon Space & Airborne Sys.*,
  805 F. Supp. 2d 932 (C.D. Cal. 2011) .................................................13

*Littleton v. State*,
  66 Haw. 55 (1982) ........................................................................ 18, 42

*LLOG Expl. Co. v. Certain Underwriters at Lloyd's of London*,
  No. CIVA 06-11248, 2007 WL 854307 (E.D. La. Mar. 16, 2007).......24

*Lockyer v. Mirant Corp.*,
   398 F.3d 1098 (9th Cir. 2005) ..............................................................50

*Massachusetts v. Exxon Mobil Corp.*, __ F. Supp. 3d __,
   No. CV 19-12430-WGY, 2020 WL 2769681
   (D. Mass. May 28, 2020)............................................................. *passim*

*Mater v. Holley*,
   200 F.2d 123 (5th Cir. 1952) ..............................................................37

*Matheson v. Progressive Specialty Ins. Co.*,
   319 F.3d 1089 (9th Cir. 2003) .......................................................7, 44

*Mayor & City Council of Baltimore v. BP P.L.C.*,
   388 F. Supp. 3d 538 (D. Md. 2019) ............................................ *passim*

*Merrick v. Diageo Ams. Supply, Inc.*,
   805 F.3d 685 (6th Cir. 2015) ..............................................................46

*Metro. Life Ins. Co. v. Taylor*,
   481 U.S. 58 (1987) ................................................................. 9, 45, 47

*Meyers v. Chesterton*,
No. CIV.A,15-292, 2015 WL 2452346 (E.D. La. May 20, 2015) .........................35

*Mississippi River Fuel Corp. v. Cocrehan*,
   390 F.2d 34 (5th Cir. 1968) ..............................................................39

*Morris v. Princess Cruises, Inc.*,
   236 F.3d 1061 (9th Cir. 2001) ..........................................................57

*Myhran v. Johns-Manville Corp.*,
   741 F.2d 1119 (9th Cir. 1984) ..........................................................60

*N.L.R.B. v. Cont'l Hagen Corp.*,
   932 F.2d 828 (9th Cir. 1991) ..............................................................50

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
   663 F. Supp. 2d 863 (N.D. Cal. 2009)...............................................22

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    696 F.3d 849 (9th Cir. 2012) ................................................................. 20, 21, 22

*Nevada v. Bank of Am. Corp.*,
    672 F.3d 661 (9th Cir. 2012) ...................................................................7

*New SD, Inc. v. Rockwell International Corp.*,
    79 F.3d 953 (9th Cir. 1996) ...................................................................12

*O'Brien v. Fischel*,
    74 B.R. 546 (D. Haw. 1987)...................................................................51

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984) ...................................................................53

*Parish of Plaquemines v. Total Petrochem. & Refining USA, Inc.*,
    64 F. Supp. 3d 872 (E.D. La. 2014) .......................................................24

*Phillips v. Osborne*,
    403 F.2d 826 (9th Cir. 1968) ...................................................................7

*Raytheon Co. v. Alliant Techsystems, Inc.*,
    No. CIV 13-1048-TUC-CKJ, 2014 WL 29106 (D. Ariz. Jan. 3, 2014)...............13

*Rhode Island v. Chevron Corp.*,
    393 F. Supp. 3d 142 (D.R.I. 2019) ............................................. *passim*

*Rivet v. Regions Bank of La.*,
    522 U.S. 470 (1998) ...................................................................8

*Ryan v. Dow Chem. Co.*,
    781 F. Supp. 934 (E.D.N.Y. 1992).......................................................34

*Spittler v. Charbonneau*,
    145 Haw. 204 (Ct. App. 2019) .............................................................42

*Tabieros v. Clark Equip. Co.*,
    85 Haw. 336 (1997)...................................................................18

*Theriot v. Bay Drilling Corp.*,
783 F.2d 527 (5th Cir. 1986) ...............................................................60

*United States v. Swiss Am. Bank, Ltd.*,
191 F.3d 30 (1st Cir. 1999) ........................................................ 11, 12

*Vaden v. Discover Bank*,
556 U.S. 49 (2009) .................................................................................8

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007) .................................................................... 26, 28

**Statutes**

28 U.S.C. § 362(b)(4)..............................................................................49

28 U.S.C. § 1331 ............................................................................ *passim*

28 U.S.C. § 1333 ...............................................................................4, 57

28 U.S.C. § 1334 ............................................................................ *passim*

28 U.S.C. § 1441 ...............................................................................7, 57

28 U.S.C. § 1442 ........................................................... 2, 9, 26, 28

28 U.S.C. § 1452 ............................................................................ *passim*

33 U.S.C. § 2701 .....................................................................................59

42 U.S.C. § 1983 .....................................................................................40

42 U.S.C. § 7401 ......................................................................................4

42 U.S.C. § 7416 .....................................................................................46

43 U.S.C. § 1349(b) .......................................................................4, 9, 23

46 App. U.S.C. § 740 ..............................................................................58

46 U.S.C. § 30101(a) ........................................................................... 57, 58

Pub. L. No. 86-3 ................................................................................... 38, 42

Pub. L. No. 94–258, § 201(11)(d), 90 Stat. 303, 309–10 (1976) ............................29

Haw. Rev. Stat. § 663-1 .............................................................................18

**Rules**

Fed. R. Civ. P. 4(k)(2) ................................................................................12

**Constitutions**

U.S. Const. Art. III, § 2 ..............................................................................57

U.S. Const. Art. I, § 8, Clause 17 .................................................................37

**Other Authorities**

Restatement (Second) Torts §§ 158, 161 .......................................................42

## I.      INTRODUCTION

The City and County of Honolulu (the "City") brought this action in Hawaiʻi state court, asserting common law claims under the laws of Hawaiʻi for public nuisance, private nuisance, strict liability failure to warn, negligent failure to warn, and trespass. The City seeks to vindicate the local injuries within its jurisdiction caused by Defendants' decades-long campaign to discredit the science of global warming, to conceal the catastrophic dangers posed by their fossil-fuel products, and to misrepresent their role in combatting the climate crisis. Defendants removed, asserting a litany of arguments that misrepresent both the contents of the City's Complaint and the controlling law. All of Defendants' arguments are meritless, and this Court lacks subject-matter jurisdiction. This case should be returned to state court, where it was filed more than six months ago and where it belongs.

Since Defendants filed their Notice of Removal, *see* Dkt. 1 (Apr. 15, 2020) ("NOR"), the Ninth Circuit has squarely rejected the bulk of their arguments for federal jurisdiction in factually analogous cases where local governments asserted state-law claims against fossil-fuel companies based on harms suffered from climate change. Defendants argue here that the City's claims are removable because they "necessarily arise under federal common law," NOR ¶¶ 5, 14–25; "because the action necessarily raises disputed and substantial federal questions," *id.* ¶¶ 6, 26–42; and because the City's "claims are completely preempted by the Clean Air Act," *id.*

1

¶¶ 10, 87–98. The Ninth Circuit disposed of the same arguments in the materially identical case of *City of Oakland v. BP PLC*, 960 F.3d 570 (9th Cir. 2020) (vacating order denying motion to remand), *opinion amended and superseded on denial of reh'g sub nom.* 969 F.3d 895, 2020 WL 4678380 (Aug. 12, 2020) ("*Oakland*"). All of the defendants in *Oakland* are parties here, and their nearly identical arguments are foreclosed by the Ninth Circuit opinion.

The "federal common law" argument fails because "[e]ven assuming that the [City's] allegations could give rise to a cognizable claim . . . under federal common law," there is no federal question jurisdiction because "the state-law claim for public nuisance fails to raise a substantial federal question." *Oakland*, 2020 WL 4678380, at *6. Defendants' "substantial federal question" argument likewise fails because, in fact, *none* of the City's allegations "raise a substantial question of federal law for the purpose of determining whether there is jurisdiction" based on a federal question. *Id.* at *7. Finally, Defendants' complete preemption argument based on the Clean Air Act ("CAA") fails because the CAA does not "meet either of the two requirements for complete preemption," and cannot completely preempt the City's claims in this case or any other. *Id.* at *7–8.

The Ninth Circuit also rejected federal officer removal under 28 U.S.C. § 1442, in *County of San Mateo v. Chevron Corp.*, 960 F.3d 586 (9th Cir. 2020) ("*San Mateo II*"). Like *Oakland*, many of the defendants in *San Mateo* are parties

here, and their virtually identical arguments, roundly rejected by the Ninth Circuit, have no more merit here than they did there. Defendants allege they "were 'acting under' a federal officer" when they engaged in the alleged bad acts, "and the claims against them relate to acts under color of federal office." NOR ¶ 8. But just as in *San Mateo*, Defendants "have not carried their burden of proving by a preponderance of the evidence that they were 'acting under' a federal officer" with respect to the conduct they assert in support of removal. *See* 960 F.3d at 603. The new factual federal officer allegations Defendants assert are irrelevant to the City's claims, and do not call for a different result.

Defendants resist well-established law. In total, five district courts in four circuits have rejected Defendants' attempts to remove substantially similar cases, and three of those decisions have been affirmed in relevant part on appeal.[1] Those cases considered and rejected *every* ground for removal Defendants assert here, both

---

[1] *See Cty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 937 (N.D. Cal. 2018) ("*San Mateo I*") (granting remand), *aff'd in part, appeal dismissed in part in San Mateo II*, 960 F.3d 586 (9th Cir. 2020); *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019) ("*Baltimore I*") (granting remand), *as amended* (June 20, 2019), *aff'd in part, appeal dismissed in part*, 952 F.3d 452 (4th Cir. 2020) ("*Baltimore II*"); *Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947 (D. Colo. 2019) ("*Boulder I*") (granting remand), *aff'd in part, appeal dismissed in part*, 965 F.3d 792 (10th Cir. 2020) ("*Boulder II*"); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142 (D.R.I. 2019) (granting remand), *appeal docketed*, No. 19-1818 (1st Cir. Aug. 20, 2019); *Massachusetts v. Exxon Mobil Corp.*, __ F. Supp. 3d __, No. CV 19-12430-WGY, 2020 WL 2769681 (D. Mass. May 28, 2020) (granting remand).

on the grounds reached by the Ninth Circuit and for other reasons: (1) federal common law; (2) *Grable* jurisdiction; (3) federal enclave jurisdiction; (4) federal officer removal; (5) complete preemption by the Clean Air Act, 42 U.S.C. § 7401, *et seq.*; (6) jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1); (7) the bankruptcy removal statute, 28 U.S.C. § 1452; and (8) admiralty jurisdiction under 28 U.S.C. § 1333. The only decision by any court accepting any of Defendants' arguments was vacated on appeal in *Oakland*. *See* 2020 WL 4678380, at *11. Defendants' arguments are without merit, and this case should be remanded.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The City's state-law complaint alleges injuries caused by Defendants' decades-long campaign to discredit the science of global warming, to conceal the catastrophic dangers posed by their fossil-fuel products, and to misrepresent their role in combatting the climate crisis. Complaint, ECF No. 1-2 ¶¶ 1–15 ("Compl."). For more than half a century, Defendants have known that their oil, gas, and coal products create greenhouse gas pollution that changes the climate, warms the oceans, and causes sea levels to rise. *Id.* ¶¶ 1, 5, 48–86. Starting as early as the 1970s, Defendants researched the link between fossil-fuel consumption and global warming, amassing a remarkably comprehensive and nuanced understanding of the adverse climate impacts caused by their fossil-fuel products. *Id.* ¶¶ 48–86. In widely

4

circulated internal reports and communications, their own scientists predicted that the unabated consumption of fossil fuels would cause "dramatic environmental effects," warning that the world had only a narrow window of time to curb emissions and stave off "catastrophic" climate change. *Id.* ¶¶ 61, 138; *see also, e.g.*, *id.* ¶¶ 59, 67, 79, 80. Defendants took these warnings seriously: they began evaluating impacts of climate change on their fossil-fuel infrastructure, investing heavily to protect assets from rising seas and more extreme storms, and developing technologies that would allow them to profit in a warmer world. *See id.* ¶¶ 81, 84, 117–22.

But when the United States and other countries started to treat climate change as a grave threat that required government regulation, Defendants embarked on a decades-long campaign of denial and disinformation about the existence, cause, and adverse effects of global warming. *See id.* ¶¶ 87–116. Among other tactics, Defendants (1) bankrolled contrarian climate scientists whose views conflicted not only with the overwhelming scientific consensus, but also with Defendants' internal understanding of global warming; (2) funded think tanks, front groups, and dark money foundations that peddled in climate change denialism; and (3) spent millions of dollars on newspaper adds, radio commercials, and mailers that casted doubt on the science of climate change. *See, e.g.*, *id.* ¶¶ 96–97, 103, 107, 108, 111–13.

When public awareness finally started catching up to Defendants' own knowledge of the serious dangers posed by their fossil-fuel products, Defendants

pivoted to a new deceptive strategy: "greenwashing." *Id.* ¶¶ 136–46. They advertise, for example, that certain fossil-fuel products are "green" or "clean," while failing to warn that the very production and use of those products is the leading cause of climate change. *Id.* ¶¶ 136–48. They falsely portray themselves as environmentally conscious companies that invest heavily in renewable energy sources, even though they devote negligible investments to low-carbon energy and continue to develop new fossil-fuel resources and ramp up production. *Id.* ¶¶ 136, 141–42,

Now and in the years to come, the City—and other local communities like it—must bear the costs of Defendants' decades of deception and disinformation. *See id.* ¶¶ 147–53. Air temperatures in Honolulu, for instance, are warming at alarming rates, leading to more heatwaves, less precipitation, and deadlier wildfires. *See id.* ¶ 149. Meanwhile, rising sea levels and increasingly frequent storm surges threaten billions of dollars of infrastructure and property along the City's highly developed coastline. *See id.* And the City's tourism and fishing industries will suffer as the warming and acidification of its local waters kills coral reefs, reduces fish catch, and pushes various marine organisms towards extinction. *See id.*

To redress these local harms, the City filed suit against Defendants in the First Circuit Court, State of Hawaiʻi, pleading state-law claims for public nuisance, private nuisance, strict liability failure to warn, negligent failure to warn, and trespass. *See id.* ¶¶ 154–205. Contrary to Defendants' reimagining of the Complaint,

this lawsuit does not seek to limit the extraction of fossil fuels or otherwise regulate greenhouse gas emissions. *See* NOR ¶¶ 6, 24, 27, 31, 36. Rather, the City requests damages for the harms that it has already incurred—and costs of abating and mitigating the harms that it will suffer—as a result of Defendants' tortious campaign to mislead and conceal the dangers of their fossil-fuel products. *See* Compl. ¶ 205.

Defendants filed their Notice of Removal five months ago, purporting to identify eight grounds for federal court jurisdiction. *See* NOR at 9–14.

## III.   LEGAL STANDARDS

Federal courts are necessarily courts of limited jurisdiction, and "statutes extending federal jurisdiction . . . are narrowly construed so as not to reach beyond the limits intended by Congress." *Oakland*, 2020 WL 4678380, at *4 (quoting *Phillips v. Osborne*, 403 F.2d 826, 828 (9th Cir. 1968)). Removal statutes in particular are "strictly construed against federal court jurisdiction." *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 667 (9th Cir. 2012). "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992); *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003) (same).

Removal of claims under 28 U.S.C. § 1441 is controlled by the "well-pleaded complaint" rule, whereby "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc.*

*v. Williams*, 482 U.S. 386, 391–92 (1987). The rule "makes the plaintiff the master of the claim," because, in drafting the complaint, the plaintiff may choose to "avoid federal jurisdiction by exclusive reliance on state law." *Id.* at 392. It is a "powerful doctrine" that "severely limits the number of cases in which state law 'creates the cause of action' that may be initiated in or removed to federal district court." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9–10 (1983). A close corollary of the well-pleaded complaint rule is that "[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense" based in federal law. *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009).

There are two relevant exceptions to the well-pleaded complaint rule. *See Oakland*, 2020 WL 4678380, at \*5–6; *San Mateo II*, 960 F.3d at 598. The first was formalized in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005). Under *Grable*, federal-question jurisdiction over state-law claims is "confined . . . to those that 'really and substantially involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law.'" *Id.* at 313. The second exception, referred to as "complete preemption" or the "artful pleading" doctrine,[2] permits federal-question removal in the rare

---

[2] Although courts have at times expressed confusion over whether the "artful pleading" and "complete preemption" doctrines as synonymous, the Supreme Court and Ninth Circuit have treated them as coextensive. *See, e.g.*, *Rivet v. Regions Bank of La.*, 522 U.S. 470, 471 (1998) ("The artful pleading doctrine allows removal

circumstance where "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)). Neither exception applies here.

Other statutes provide specialized bases for removal. The federal officer removal statute, codified at 28 U.S.C. § 1442(a)(1), permits removal by "any officer (or any person acting under that officer) of the United States or of any agency thereof," who has been sued "for or relating to any act under color of such office." To remove a case under § 1442(a)(1), a private defendant must show: "(a) it is a person within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and [the] plaintiff's claims; and (c) it can assert a colorable federal defense." *San Mateo II*, 960 F.3d at 598 (quotations omitted). Certain state-law cases are also removable if they "aris[e] in or relat[e] to" a federal bankruptcy proceeding. 28 U.S.C. §§ 1334(b), 1452(a). Finally, state-law claims are removable if they arise out of or relate to activities on the Outer Continental Shelf. S*ee* 43 U.S.C. § 1349(b). None of these exceptions apply here, either.

---

where federal law completely preempts an asserted state-law claim . . . ."); *Oakland*, 2020 WL 4678380, at *6 (same).

## IV.   THIS CASE SHOULD BE REMANDED BECAUSE THERE IS NO SUBJECT-MATTER JURISDICTION.

### A.   The Ninth Circuit Has Conclusively Rejected Defendants' "Governed by Federal Common Law" Argument.

Defendants' argument that the City's claims arise under federal law because federal common law supposedly "governs" them is foreclosed by *Oakland*. The positions Defendants advance here are materially identical to those rejected by the Ninth Circuit. In light of *Oakland*, Defendants' continued reliance on federal common law as an independent basis for removal would, at this point, be frivolous.

The *Oakland* plaintiffs brought public nuisance claims under California law against five fossil-fuel companies, all of whom are Defendants here. 2020 WL 4678380, at *3. The district court denied the plaintiffs' motion to remand, adopting the defendants' argument "that it had federal-question jurisdiction under 28 U.S.C. § 1331 because the [public nuisance] claim was 'necessarily governed by federal common law.'" *Id*. The Ninth Circuit reversed, holding that "the district court lacked federal-question jurisdiction unless one of the two exceptions to the well-pleaded-complaint rule [*Grable* or complete preemption] applies." *See id.* at *4–8. After a careful analysis, the court held that "because neither exception to the well-pleaded-complaint rule applies to the Cities' original complaints, the district court erred in holding that it had jurisdiction under 28 U.S.C. § 1331 at the time of removal." *Id.* at *8. Addressing federal common law specifically, the court held that "[e]ven

assuming that the [plaintiffs'] allegations could give rise to a cognizable claim for public nuisance under federal common law, the district court did not have jurisdiction under § 1331 because the state-law claim for public nuisance fails to raise a substantial federal question" under *Grable*. *Id.* at *6 (citations omitted).

*Oakland* did not separately analyze the complaints under a third exception for state-law claims "governed by" federal common law because there simply is no such exception. Defendants' insistence that federal common law "governs," "applies," "necessarily governs," or "control[s]," *see* NOR ¶¶ 5, 14, 16, 21, 22, 25, is just euphemism for what they dare not say: they believe federal common law *preempts* the City's claims. But the law is unambiguous: "federal jurisdiction depends solely on the plaintiff's claims for relief," and "a case may *not* be removed to federal court on the basis of a federal defense, including the defense of preemption." *Oakland*, 2020 WL 4678380, at *4 (quotations omitted). Defendants' argument that the Court must apply "federal choice-of-law principles that determine whether a particular claim is controlled by federal common law rather than state law," NOR ¶ 19, is irrelevant to the jurisdictional inquiry. The opposite is true: "the plaintiff can generally 'avoid federal jurisdiction by exclusive reliance on state law.'" *Oakland*, 2020 WL 4678380, at *4 (quoting *Caterpillar*, 482 U.S. at 392).[3]

---

[3] *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30 (1st Cir. 1999), on which Defendants principally rely, does not support their position. There, the United States

*New SD, Inc. v. Rockwell International Corp.*, 79 F.3d 953 (9th Cir. 1996), cited by Defendants, NOR ¶ 21, is inapposite here. That case involved a breach of contract claim between two military contractors, arising out of an agreement with the Air Force "to develop a space-based anti-ballistic missile," in which the subcontract at issue incorporated terms from the federal government's procurement regulations. *Id.* at 954. The court held that removal was proper based on the narrow rule that "the construction of subcontracts, let under prime contracts connected with the national security, should be regulated by a uniform federal law," and "on government contract matters having to do with national security, state law is totally displaced by federal common law." *Id.* at 955 (quotation omitted). The opinion appears to mix concepts from the complete preemption doctrine and substantial federal question test, and is of tenuous validity after *Grable*.[4] Moreover, its holding

---

sued several foreign banks in federal court to recover assets subject to a criminal forfeiture order. *Id.* at 34. The government argued personal jurisdiction existed over the banks under Fed. R. Civ. P. 4(k)(2), because its conversion claims against them were governed by federal common law. 191 F.3d at 38–39; 43. The court narrowly held that "when the United States sues . . . to recoup assets . . . forfeited to it, the rights that it has acquired find their roots in, and must be adjudicated in accordance with, a federal source." *Id.* at 45. The opinion has nothing to do with removal, or even subject-matter jurisdiction.

[4] The Supreme Court's express purpose in the *Grable* line of cases was "to bring some order to this unruly doctrine" represented by cases like *New SD*. *See Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see also id.* ("In outlining the contours of this slim category, we do not paint on a blank canvas. Unfortunately, the canvas looks like one that Jackson Pollock got to first."). District courts in this circuit have understandably questioned whether *New SD* remains good law. *See Babcock Servs.,*

is narrowly directed at "contract matters having to do with national security," *see id.*, which are irrelevant to the types of common law tort claims the City has alleged—likely why the *Oakland* decision did not cite *New SD* at all. *See also L'Garde, Inc. v. Raytheon Space & Airborne Sys.*, 805 F. Supp. 2d 932, 942 (C.D. Cal. 2011) (finding no federal question jurisdiction and distinguishing *New SD* in part because it "concern[ed] matters of national security that are simply not present here").

Defendants "fail to cite any Supreme Court or other controlling authority authorizing removal based on state law claims implicating federal common law," *Boulder I*, 405 F. Supp. 3d at 963, because none exists. In addition to *Oakland*, five district courts have rejected federal common law arguments identical to those Defendants make here in substantially similar cases involving climate change asserting state-law tort and consumer protection claims.[5]

---

*Inc. v. CH2M Hill Plateau Remediation Co.*, No. 13-CV-5093-TOR, 2013 WL 5724465, at *5 (E.D. Wash. Oct. 21, 2013) (*New SD*'s "premise is no longer sound" after *Grable*); *Raytheon Co. v. Alliant Techsystems, Inc.*, No. CIV 13-1048-TUC-CKJ, 2014 WL 29106, at *5 (D. Ariz. Jan. 3, 2014) (same).

[5] *See San Mateo I*, 294 F. Supp. 3d at 937 ("Removal based on federal common law was not warranted."); *Baltimore I*, 388 F. Supp. 3d at 555 ("Defendants' assertion that the City's public nuisance claim under Maryland law is in fact 'governed by federal common law' is a cleverly veiled preemption argument."); *Boulder I*, 405 F. Supp. 3d at 963 ("Defendants' argument that Plaintiffs' state law claims are governed by federal common law appears to be a matter of ordinary preemption which . . . would not provide a basis for federal jurisdiction."); *Rhode Island*, 393 F. Supp. 3d at 149 ("[E]nvironmental federal common law does not—absent congressional say-so—completely preempt the State's public-nuisance claim, and therefore provides no basis for removal."); *Massachusetts*, 2020 WL 2769681, at *6

The Ninth Circuit has squarely rejected Defendants' shaky theory of removal based on federal common law, and the theory finds no support in any other body of law. Removal jurisdiction on this ground must be rejected.

### B. The City's Claims Do Not "Necessarily Raise" Any "Substantial Questions of Federal Law."

*Oakland* also confirms that Defendants' arguments under *Grable* lack merit.[6] Just as in *Oakland*, Defendants identify no substantial federal question that is necessarily raised in the City's complaint, but rather "suggest that the . . . state-law claim implicates a variety of 'federal interests'" that "d[o] not raise a substantial question of federal law for the purpose of determining whether there is jurisdiction under § 1331." *Oakland*, 2020 WL 4678380, at *7. The City's claims, moreover, simply do not "necessarily raise" any issue of regulatory "balanc[ing] between energy extraction and production and environmental protections," NOR ¶¶ 31, 33; fraud on a federal agency, *id.* ¶¶ 35–36; foreign policy, *id.* at ¶¶ 37–39; the

---

n.6 ("[R]emovability on the basis of federal common law, if it exists at all, must rest on the same theory of 'complete preemption' articulated by the Supreme Court.").

[6] The holding in *Oakland* represents the nationwide consensus. "Every court to consider the question has rejected the oil-industry defendants' arguments for *Grable* jurisdiction." *Massachusetts*, 2020 WL 2769681, at *10. Five district courts in four circuits have also considered Defendants' *Grable* arguments in state-law cases alleging that fossil-fuel-industry defendants misrepresented their products' dangers, and all five granted remand. *See Baltimore I*, 388 F. Supp. 3d at 558–61; *Boulder I*, 405 F. Supp. 3d at 964–68; *San Mateo I*, 294 F. Supp. 3d at 938; *Rhode Island*, 393 F. Supp. 3d at 150–51; *Massachusetts*, 2020 WL 2769681, at *10. Defendants offer no reason to deviate from the consensus here, and none exists.

"navigable waters of the United States," *id.* ¶¶ 40; or the seven topics to which Defendants dedicate one sentence each, *id.* ¶ 36. There is no *Grable* jurisdiction.

In the *Grable* line of cases, "the Supreme Court has recognized a 'special and small category' of state-law claims that arise under federal law for purposes of § 1331 'because federal law is a necessary element of the claim for relief,'" and are thus removable. *Oakland*, 2020 WL 4678380, at *5 (quoting *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)) (some punctuation omitted). *Grable*'s limited exception to the well-pleaded complaint rule arises only where an issue of federal law is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314); *Oakland*, 2020 WL 4678380, at *5. "Only a few cases have fallen into this 'slim category,'" and the Supreme Court has found jurisdiction lacking over state-law causes of action "even when the claims were premised on violations of federal law, . . . required remedies 'contemplated by a federal statute,' . . . or required the interpretation and application of a federal statute . . . ." *See Oakland*, 2020 WL 4678380, at *5 (collecting cases). Defendants cannot satisfy any elements of the *Grable* test, but the Court need only consider the first (necessarily raised) and third (substantial).

### 1.    None of Defendants' Purported Federal Issues Is "Substantial."

Removal under *Grable* was improper because none of the issues Defendants claim this case implicates are "substantial." *Oakland* is dispositive. The court explained in detail which federal issues are "substantial" under *Grable*:

> This inquiry focuses on the importance of a federal issue to the federal system as a whole. An issue has such importance when it raises substantial questions as to the interpretation or validity of a federal statute, or when it challenges the functioning of a federal agency or program. Moreover, an issue may qualify as substantial when it is a pure issue of law that directly draws into question the constitutional validity of an act of Congress, or challenges the actions of a federal agency, and a ruling on the issue is both dispositive of the case and would be controlling in numerous other cases. By contrast, a federal issue is not substantial if it is fact-bound and situation-specific, or raises only a hypothetical question unlikely to affect interpretations of federal law in the future. A federal issue is not substantial merely because of its novelty, or because it will further a uniform interpretation of a federal statute.

2020 WL 4678380, at *5 (cleaned up).

Defendants have not attempted to show that *any* of the considerations discussed in *Oakland* are satisfied here. As in *Oakland*, the City's case "neither requires an interpretation of a federal statute, nor challenges a federal statute's constitutionality," and Defendants "do not identify a legal issue necessarily raised by the claim that, if decided, will be controlling in numerous other cases." *See id.* at *6 (citations and quotations omitted). Just as in *Oakland*, "evaluation of the [City's] claim that the [Defendants'] activities amount to a public nuisance [or another

alleged tort] would require factual determinations, and a state-law claim that is 'fact-bound and situation-specific' is not the type of claim for which federal-question jurisdiction lies." *See id.* at *7. As in *Oakland*, Defendants' gesturing toward "energy policy, national security, and foreign policy" may invoke "important policy question[s], but it does not raise a substantial question of federal law for the purpose of determining whether there is jurisdiction under § 1331." *See id.*

This case is materially indistinguishable from *Oakland*. Defendants fail to satisfy the "substantial" element of the test for jurisdiction under *Grable*, and subject-matter jurisdiction on that basis must be rejected.

### 2. The City's Claims Do Not "Necessarily Raise" Any Issue of Federal Law.

The *Oakland* decision resolves Defendants' *Grable* arguments because it found that there are no substantial federal issues present in these cases. Even if it did not, removal under *Grable* would still fail because no federal issue is "necessarily raised" here at all. A federal question is "necessarily raised" under *Grable* only when "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd.*, 463 U.S. at 28. Removal jurisdiction is "unavailable unless it appears that some substantial, disputed question of federal law is a *necessary element* of one of the well-pleaded state claims." *Id.* at 13 (emphasis added); *see also Oakland*, 2020 WL 4678380, at *5 (*Grable* available only where "federal law is a necessary element of the claim for relief" (citation omitted)).

17

The City alleges public nuisance, private nuisance, strict liability failure to warn, negligent failure to warn, and trespass. Compl. ¶¶ 154–205. The rights the City seeks to vindicate, and the relief the City seeks, all stem entirely from state law.[7] Defendants do not identify any element of any of the City's claims that "depends on resolution of a substantial question of federal law," because there is none. *See Franchise Tax Bd.*, 463 U.S. at 28.

The closest Defendants come to a coherent argument under *Grable*'s first element is that the City's nuisance claims will require proof Defendants' conduct is unreasonable. This, they assert, will require the Court to determine "whether the federal agencies charged by Congress to balance energy and environmental needs for the entire Nation have struck an appropriate balance." *See* NOR ¶ 32. But as the district court held in *San Mateo I*, "the mere existence of a federal regulatory regime" does not bring a case under *Grable*. 294 F. Supp. 3d at 938. The court continued:

> Moreover, even if deciding the nuisance claims were to involve a weighing of costs and benefits, and even if the weighing were to implicate the defendants' dual obligations under federal and state law, that would not be enough to invoke *Grable* jurisdiction. On the defendants' theory, many (if not all) state tort claims that involve the

---

[7] *See, e.g.*, *Littleton v. State*, 66 Haw. 55, 67 (1982) (defining elements of public and private nuisance); *Tabieros v. Clark Equip. Co.*, 85 Haw. 336, 364–68 (1997) (defining elements of failure-to-warn product defect); *Anderson v. State*, 88 Haw. 241, 247 (Ct. App. 1998) (defining elements of continuing trespass); Haw. Rev. Stat. § 663-1 ("Except as otherwise provided, all persons residing or being in the State shall be personally responsible in damages, for trespass or injury, whether direct or consequential, to the person or property of others, . . . and the party aggrieved may prosecute therefor in the proper courts.").

18

balancing of interests and are brought against federally regulated entities would be removable. *Grable* does not sweep so broadly.

*Id.* Defendants' "balancing" argument does not satisfy *Grable*'s first element.

Defendants' other theories, which inject issues ranging from Defendants' federal disclosure obligations, certain undefined contracts with the federal government, to the First Amendment, the Due Process Clause, the Commerce Clause, and the foreign policy decisions of the Eisenhower administration, are all irrelevant. *See* NOR at ¶¶ 34–42. No prima facie element of any of the City's claims requires proof on those topics, which have been rejected by every court that has considered them, including the Ninth Circuit in *Oakland*.[8] The Complaint does not necessarily raise any federal issues.

---

[8] *See Oakland*, 2020 WL 4678380, at \*6–7, 10 n.12 (rejecting reliance on federal issues "including energy policy, national security, and foreign policy," and argument that navigable waters are the "instrumentality of the alleged harm"); *San Mateo I*, 294 F. Supp. 3d at 938 ("The mere potential for foreign policy implications . . . does not raise the kind of actually disputed, substantial federal issue necessary for *Grable* jurisdiction."); *Rhode Island*, 393 F. Supp. 3d at 151 ("By mentioning foreign affairs, federal regulations, and the navigable waters of the United States, Defendants seek to raise issues . . . that are not perforce presented by the State's claims."); *Baltimore I*, 388 F. Supp. 3d at 559–61 (foreign affairs, regulatory balancing, navigable waters, disclosure obligations); *Boulder I*, 405 F. Supp. 3d at 965–67 (foreign affairs, regulatory balancing); *Massachusetts*, 2020 WL 2769681, at \*10 ("Contrary to ExxonMobil's caricature of the complaint, the Commonwealth's allegations do not require any forays into foreign relations or national energy policy.").

### 3. To the Extent Defendants' "Federal Common Law" Argument Is Cognizable Under *Grable*, It Fails.

As discussed above, Defendants' argument that federal common law "governs" the City's claims is not an independent basis for removal. To the extent that argument could be interpreted under *Grable*, it is meritless. *See Oakland*, 2020 WL 4678380, at *6. (federal common law does not provide a substantial federal question necessarily raised by state law nuisance claim).

Contrary to Defendants' assertions, "the Supreme Court has not yet determined that there is a federal common law of public nuisance relating to interstate pollution," and the Ninth Circuit has "held that federal public-nuisance claims aimed at imposing liability on energy producers for 'acting in concert to create, contribute to, and maintain global warming' and 'conspiring to mislead the public about the science of global warming,' . . . are displaced by the Clean Air Act." *Id.* (citing *Am. Elec. Power Co. v. Connecticut* ("*AEP*"), 564 U.S. 410, 423 (2011) & *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 854 (9th Cir. 2012)). Any federal common law that might have supplied a "substantial federal issue" to satisfy *Grable* in this case, "no longer exists." *San Mateo I*, 294 F. Supp. 3d at 937.

In *AEP*, public entity plaintiffs sued electric power companies in federal court, alleging that the companies' greenhouse-gas emissions violated the federal common law of interstate nuisance or, in the alternative, state tort law. 564 U.S. at 418. A unanimous Supreme Court held that "the Clean Air Act and the EPA actions it

authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants" because it was "plain that the Act 'speaks directly' to emissions of carbon dioxide from the defendants' plants." 564 U.S. at 424. It was thus an "academic question whether, in the absence of the [CAA], the plaintiffs could state a federal common-law claim for curtailment of greenhouse gas emissions because of their contribution to global warming"; if ever such a cause of action existed, it did not survive the Clean Air Act. *Id.* at 423. The Court expressly reserved the question of whether the plaintiffs' *state* nuisance claims remained viable. *Id.* at 429.[9]

The Ninth Circuit reinforced *AEP*'s holding in *Kivalina*. There, the plaintiff municipality brought both federal and state nuisance claims in federal court against fossil fuel and utility companies. 696 F.3d at 853–56. The district court had granted

---

[9] Defendants misstate the Supreme Court's unanimous holding in asserting that *AEP* "found that interstate and international pollution and emission torts arise under federal common law." NOR ¶ 16. The district court in *San Mateo I* succinctly disposed of Defendants' misleading gloss:

> Far from holding (as the defendants bravely assert) that state law claims relating to global warming are superseded by federal common law, the Supreme Court noted that the question of whether such state law claims survived would depend on whether they are preempted by the federal statute that had displaced federal common law (a question the Court did not resolve). . . . This seems to reflect the Court's view that once federal common law is displaced by a federal statute, there is no longer a possibility that state law claims could be superseded by the previously-operative federal common law.

294 F. Supp. 3d at 937.

the defendants' motion to dismiss the federal claims, separately stating that it "decline[d] to assert supplemental jurisdiction over the remaining state law claims." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 882–83 (N.D. Cal. 2009). Because the plaintiff did not appeal the discretionary dismissal of the supplemental state law claims, the Ninth Circuit had no occasion to address federal jurisdiction over them, much less their removability had they been filed originally in state court. Rather, the Court of Appeals applied *AEP*'s holding that the CAA addresses "domestic greenhouse gas emissions from stationary sources and has therefore displaced *federal* common law." 696 F.3d at 856 (emphasis added).

Likewise, the Ninth Circuit held in *Oakland* that the plaintiffs' claims did not arise under federal common law, in part because "the Supreme Court has not yet determined that there *is* a federal common law of public nuisance relating to interstate pollution," and because, "*federal* public-nuisance claims aimed at imposing liability on energy producers" for climate crisis injuries "are displaced by the Clean Air Act." *Oakland*, 2020 WL 4678380 at *6 (emphasis added).

The federal common law of "transboundary air pollution" that Defendants say "governs" here is not relevant to the City's tort claims. To the extent such common law ever existed, it was displaced by the CAA, and therefore cannot provide a basis for removal under *Grable* or otherwise. "Simply put, th[is] cas[e] should not have

been removed to federal court on the basis of federal common law that no longer exists." *San Mateo I*, 294 F. Supp. 3d at 937.

### C. There Is No Outer Continental Shelf Lands Act ("OCSLA") Jurisdiction.

Nor is the City's case subject to federal jurisdiction pursuant to OCSLA, 43 U.S.C. § 1349(b)(1). That statute provides subject-matter jurisdiction over disputes involving physical injuries on the Outer Continental Shelf ("OCS"), or where the dispute actually and directly involves OCS drilling and exploration activities, such as contract disputes between OCS contractors. Contrary to Defendants' assertions, the method and location of Defendants' production of fossil-fuel products is immaterial here, and does not create a basis for OCSLA jurisdiction.

OCSLA grants district courts jurisdiction over cases "arising out of, or in connection with . . . any operation conducted on the [OCS] which involves exploration, development, or production of the minerals" held in certain regions of the OCS. 43 U.S.C. § 1349(b)(1). The Fifth Circuit has held:

> Courts typically assess jurisdiction under [§ 1349] in terms of whether (1) the activities that caused the injury constituted an "operation" "conducted on the Outer Continental Shelf" ("OCS") that involved the exploration and production of minerals, and (2) the case "arises out of, or in connection with" the operation.

*In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). "[T]he term 'operation' contemplate[s] the doing of some physical act on the [OCS]." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 567 (5th Cir. 1994). Courts routinely refuse

23

to exercise jurisdiction over cases like this one, where the claims are only tangentially related to mineral exploration and production on the OCS, and where granting relief would have no effect on those operations.[10]

Given OCSLA's limited jurisdiction, every court to consider Defendants' argument in analogous cases involving climate change has rejected it.[11] Just as in those cases, the City's injuries here were not caused by, do not arise from, and do

---

[10] *See, e.g.*, *LLOG Expl. Co. v. Certain Underwriters at Lloyd's of London*, No. CIVA 06-11248, 2007 WL 854307, at *5 (E.D. La. Mar. 16, 2007) (no OCSLA jurisdiction over insurance dispute "regarding damages to production facilities that have already occurred" because suit "does not affect or alter the progress of production activities on the OCS, nor does it threaten to impair the total recovery of federally owned minerals from the OCS"); *Parish of Plaquemines v. Total Petrochem. & Refining USA, Inc.*, 64 F. Supp. 3d 872, 895 (E.D. La. 2014) (no OCSLA jurisdiction where injurious conduct occurred in state waters, even though it "involved pipelines that ultimately stretch to the OCS"); *Brooklyn Union Expl. Co. v. Tejas Power Corp.*, 930 F. Supp. 289, 292 (S.D. Tex. 1996) ("A controversy exclusively over the price of gas which has already been produced, as in the instant case, simply does not implicate the interest expressed by Congress in the efficient exploitation of natural resources on the OCS.").

[11] *See, e.g.*, *Boulder I*, 405 F. Supp. 3d at 978 ("[F]or jurisdiction to lie, a case must arise directly out of OCS operations. . . . The fact that some of ExxonMobil's oil was apparently sourced from the OCS does not create the required direct connection."); *Rhode Island*, 393 F. Supp. 3d at 151–52 (no OCSLA jurisdiction even where "Defendants' operations on the [OCS] may have contributed to the State's injuries," because "Defendants have not shown that these injuries would not have occurred but for those operations"); *Baltimore I*, 388 F. Supp. 3d at 566 ("Even under a 'broad' reading of the OCSLA jurisdictional grant endorsed by the Fifth Circuit, defendants fail to demonstrate that OCSLA jurisdiction exists."); *San Mateo I*, 294 F. Supp. 3d at 938–39 ("Removal under the [OCLSA] was not warranted because even if some of the activities that caused the alleged injuries stemmed from operations on the [OCS], the defendants have not shown that the plaintiffs' causes of action would not have accrued *but for* the defendants' activities on the shelf.").

not interfere with physical "operations" on the OCS.[12] Rather, the City's claims are based on Defendants' failure to warn consumers and the public of known dangers associated with fossil fuel products, and Defendants' campaign to deceive the public regarding those dangers—no matter where or by what operations some products' constituent elements were originally extracted. *See, e.g.*, Compl. ¶ 12. Defendants' assertion that OCSLA jurisdiction attaches because "a substantial quantum" of oil and natural gas production arise from OCS operations, NOR ¶ 49, amounts to an "argument that there is federal jurisdiction if any oil *sourced* from the OCS is some *part* of the conduct that creates the injury," which would "dramatically expand the statute's scope." *See Boulder I*, 405 F. Supp. 3d at 979. Defendants' claim that jurisdiction exists because their campaign to deceive policy makers "would have had the effect of convincing policy makers to continue production on the OCS," *id.* ¶ 50, is even more untethered from the scope of the statute, and the claim that the relief the City seeks "would inevitably affect exploration and production on the OCS," NOR ¶ 51 is highly speculative, at best.

   To find that OCSLA grants jurisdiction here would mean that any spill of gasoline sourced from some fraction of OCS oil, and any claims for nuisance

---

[12] Defendants' assertion that "Plaintiff alleges that emissions have risen due to increased OCS extraction technologies," NOR ¶ 49, citing to ¶¶ 117–18 of the Complaint, is a purposeful mischaracterization. Those paragraphs refer to actions by Defendants that belied their climate denialist communications to the public, such as "raising offshore oil platforms to protect against sea level rise." *See* Compl. ¶ 117.

abatement or monetary damages against fossil-fuel companies for any reason could be removed to federal court. Neither the OCSLA statute nor any case law permits such an absurd result.[13] *See Boulder I*, 405 F. Supp. 3d at 979.

### D. There Is No Federal Officer Removal Jurisdiction Because No Federal Officer Directed the Defendants' Tortious Conduct.

Defendants' invocation of the federal officer removal statute, 28 U.S.C. § 1442, does not support federal jurisdiction because (1) Defendants have not shown they "acted under" federal officers; and (2) there is no plausible connection between the City's claims and the activities described in the Notice of Removal. Many of Defendants' arguments concerning federal officer jurisdiction were rejected by the Ninth Circuit in *San Mateo II*, 960 F.3d at 600–03, and the remainder are meritless under the same analysis.

The federal officer removal statute permits removal only if the defendant, "in carrying out the 'act[s]' that are the subject of the petitioners' complaint, was 'acting under' any 'agency' or 'officer' of 'the United States.'" *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007). A private defendant must establish the following to invoke removal under § 1442: "(a) it is a person within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's

---

[13] Defendants' cited cases are inapposite. They each involve injuries caused by physical activity on the OCS related to fossil fuel extraction, or contract disputes directly concerning those activities. *See* NOR ¶¶ 43–53 (citing cases).

directions, and [the] plaintiff's claims; and (c) it can assert a colorable federal defense." *San Mateo II*, 960 F.3d at 598.

"To demonstrate a causal nexus, the private person must show: (1) that the person was 'acting under' a federal officer in performing some 'act under color of federal office,' and (2) that such action is causally connected with the plaintiffs' claims." *Id.* (citing *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017)). The defendant's challenged acts must have "occurred *because of* what they were asked to do by the Government." *Goncalves*, 865 F.3d at 1245. "It is not enough to prove only that the relevant acts occurred under the general auspices of a federal office or officer. The official must have direct and detailed control over the defendant." *Cabalce v. VSE Corp.*, 922 F. Supp. 2d 1113, 1122 (D. Haw. 2013), *aff'd* 797 F.3d 720 (9th Cir. 2015) (citation and quotations omitted).

Defendants assert that they acted under federal officers by: (1) producing special fuel for the military from World War II until at least 2009, NOR ¶¶ 59–62; (2) executing a unit agreement with the Navy for petroleum reserves at Elk Hills, NOR ¶¶ 63–65; (3) developing oil and gas under federal leases governed by OCSLA, NOR ¶¶ 66–70; (4) producing oil and operating infrastructure for the Strategic Petroleum Reserve ("SPR"), NOR ¶¶ 71–73; and (5) because the federal government purportedly promotes fossil fuels through various (unidentified) lease programs,

grants, guarantees, and contracts, NOR ¶ 74. The Ninth Circuit has already flatly rejected the first three arguments. *See San Mateo II*, 960 F.3d at 600–03; *accord Baltimore II*, 952 F.3d at 463–71 (rejecting arguments (1), (2) and (3)); *Boulder County II* 965 F.3d at 820–27 (rejecting argument (3)). The fourth and fifth arguments fare no better. Defendants cannot meet their burden of showing that they were acting under the control of federal officers when they carried out any of their listed activities. Nor can Defendants show even a tenuous connection, much less a causal one, between any of their activities and the City's Complaint.

### 1. Defendants Cannot Show They Were Acting Under a Federal Officer.

Defendants have failed to establish that they were "acting under" a federal officer. To meet this burden, defendants must show both that they were "involve[d in] an effort to *assist*, or to help *carry out*, the duties or tasks of [a] federal superior" and that their relationship with the federal superior "involve[d] 'subjection, guidance, or control.'" *Watson*, 551 U.S. at 151–52.

Defendants' assertions that Standard Oil (a Chevron predecessor) was acting under a federal officer at the Elk Hills Reserves, based on a Unit Plan Contract executed in the 1940s, has already been rejected by the Ninth Circuit in:

> Standard's activities under the unit agreement did not give rise to a relationship where Standard was "acting under" a federal officer for purposes of § 1442. Standard was not acting on behalf of the federal government in order to assist the government perform a basic government function. Rather, Standard and the government reached an

agreement that allowed them to coordinate their use of the oil reserve in a way that would benefit both parties: the government maintained oil reserves for emergencies, and Standard ensured its ability to produce oil for sale. When Standard extracted oil from the reserve, Standard was acting independently, not as the Navy's "agent." And Standard's arm's-length business arrangement with the Navy does not involve conduct so closely related to the government's implementation of federal law that the Energy Companies would face "a significant risk of state-court 'prejudice.'"

*San Mateo II*, 960 F.3d at 602 (cleaned up).[14] Faced with identical allegations, the

Fourth Circuit reached the same conclusion. *Baltimore II*, 952 F.3d at 471.

---

[14] Defendants' own citations refute their characterization of the Elk Hills reserve as an operation by Standard Oil and later Chevron to assist the federal government. For example, the field was "mostly undeveloped until the 1970s," and the Naval Petroleum Reserves Production Act of 1976 ("NPRPA") authorized "full *commercial* development of the" reserve. *See* DEPARTMENT OF ENERGY, *Naval Petroleum Reserves*, https://www.energy.gov/fe/services/petroleum-reserves/naval-petroleum-reserves (emphasis added). After the 1976 Act, "[t]he Department of Energy (DOE) operate[d] the field, but Chevron and the government share[d] production, revenues, and expenses in proportion to their ownership shares." GAO Fact Sheet, Naval Petroleum Reserves – Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (Jan. 1987), https://www.gao.gov/assets/90/87497.pdf. Chevron was permitted to dispose of its share of oil from the field as it pleased, and the NPRPA directed the United States to sell oil from the field on terms "so structured as to give full and equal opportunity for the acquisition of petroleum by all interested parties, including major and independent oil producers and refiners alike." Pub. L. No. 94–258, § 201(11)(d), 90 Stat. 303, 309–10 (1976). Operation of the field under the NPRPA was a commercial enterprise, confirmed by the fact that the Act itself requires the Secretary of the Interior to submit all contracts to operate the reserve to the Attorney General, and states that "if . . . the Attorney General advises the Secretary that a contract or operating agreement may create or maintain a situation inconsistent with the antitrust laws, then the Secretary may not make, issue, or execute that contract or operating agreement." *Id.* § 201(11)(g)(2), 90 Stat. at 310.

The Ninth Circuit in *San Mateo II* also refused to find that defendants were acting under a federal officer based on substantially identical allegations regarding OCS leases. 960 F.3d at 602–03. *See* NOR ¶¶ 66–70. The Ninth Circuit explained that the OCS leases "do not require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties. Nor are lessees engaged in an activity so closely related to the government's function that the lessee faces a significant risk of state-court prejudice." *Id.* (quotations omitted). The Fourth and Tenth Circuits also found that the OCS leases Defendants rely on do not support federal officer removal, for the same reasons. *Baltimore II*, 952 F.3d at 465–66 ("[W]e are not convinced that the supervision and control to which OCSLA lessees are subject connote the sort of 'unusually close' relationship that courts have previously recognized as supporting federal officer removal."); *Boulder II*, 965 F.3d at 823 ("ExxonMobil's OCS leases do not contemplate the 'close supervision of the private entity by the Government' needed to bring a federal contractor relationship within these strict parameters." (citation omitted)).

This same reasoning precludes a finding that Defendants were acting under a federal officer when they produced oil and operated infrastructure for the SPR. NOR ¶¶ 71–73. The SPR constitutes the United States' supply of emergency crude oil and is principally filled through royalty-in-kind transfers from some Defendants and others, which accrue to the United States pursuant to oil and gas leases on the OCS.

NOR ¶ 71. But these royalty payments are nothing more than the type of commercial transactions that the Ninth, Fourth, and Tenth Circuits have already found to be insufficient to support federal officer removal, as compliance with federal law is not enough. *San Mateo II*, 960 F.3d at 602–03; *Baltimore II*, 952 F.3d at 465–66; *Boulder II*, 965 F.3d at 823. "'[T]he willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, without more' cannot be 'characterized as the type of assistance that is required' to show that the private entity is 'acting under' a federal officer," and the fact that lessees pay royalties in kind which the United States then directs into the SPR does not change the result. *See San Mateo II*, 960 F.3d at 603 (quoting *Baltimore II*, 952 F.3d at 465).

Even if Defendants' fuel sales to the military, *see* NOR ¶¶ 59–62, could be considered (they cannot, as Plaintiff has disclaimed injuries arising from such sales, *see* Compl. ¶ 14), Defendants' sales during the relevant period constitute arms-length commercial transactions for off-the-shelf products that cannot possibly give rise to jurisdiction. *See Baltimore II*, 952 F.3d at 465 ("arms-length commercial transactions" insufficient to satisfy "acting under" element of federal officer removal) (quoting *Boulder I*, 405 F. Supp. 3d at 977). Defendants assert that they sold jet fuel to the military pursuant to military specifications. NOR ¶ 62. But they provide no evidence that those specifications prevented Defendants from complying with any of the state-law duties at issue in this lawsuit, including their duty to warn.

Finally, Defendants' assertion that removal is proper under § 1442 because the federal government has implemented programs to promote and support domestic production of fossil fuels, NOR ¶ 74, is meritless. Nothing in Defendants' vague description of these unidentified programs suggests that they require Defendants to assist or help carry out the duty of a federal superior, or that these programs subject Defendants to close federal control. To the contrary, it appears those programs merely incentivize or encourage fossil fuel production in the private sector. *Id.*

### 2. There Is No Causal Connection Between Defendants' Campaign of Deception and the Activities Described in the Notice of Removal.

Defendants cannot show a causal connection between the disinformation campaign at the heart of this case and any of the individual fossil fuel production and sales activities they rely on. Instead, they distort the Complaint as seeking to end all fossil fuel production worldwide, and then posit that their leasing of federal mineral rights, plus certain contracts with the federal government, entitles them to federal jurisdiction. NOR ¶ 59–74. But this case does *not* seek to limit Defendants' production of fossil fuel, and the Complaint disclaims any injuries "ar[ising] from Defendants' provision of fossil fuel products to the federal government for military and national defense purposes." Compl. ¶14. None of Defendants' tortious conduct is connected, causally or otherwise, with the duties of a federal superior.

Multiple courts have rejected Defendants' warping of analogous complaints.

In *Baltimore II*, the Fourth Circuit explained the errors in Defendants' position:

> When read as a whole, the Complaint clearly seeks to challenge the promotion and sale of fossil fuel products without warning and abetted by a sophisticated disinformation campaign. Of course, there are many references to fossil fuel production in the Complaint, which spans 132 pages. But, by and large, these references . . . [are] not the source of tort liability. Put differently, Baltimore does not merely allege that Defendants contributed to climate change and its attendant harms by producing and selling fossil fuel products; it is the concealment and misrepresentation of the products' known dangers—and simultaneous promotion of their unrestrained use—that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change.

952 F.3d at 467; *accord San Mateo II*, 960 F.3d at 601–03; *Boulder II*, 965 F.3d at 819–27. Faced with similar arguments, the *Rhode Island* and *Massachusetts* courts reached the same result. *Rhode Island*, 393 F. Supp. 3d at 151–52 ("Defendants cannot show the alleged promotion and sale of fossil fuels abetted by a sophisticated misinformation campaign were 'justified by [their] federal duty.'"); *Massachusetts*, 2020 WL 2769681, at *12 (ExxonMobil's deceptive marketing and sales tactics "were not plausibly 'relat[ed]' to the drilling and production activities supposedly done under the direction of the federal government.").

The result is the same here. First, Defendants' assertions regarding the sale of fuel to the military, NOR ¶¶ 59–62, fail because the City has expressly disclaimed injuries arising from this conduct, Compl. ¶ 14. In any event, most of the military fuel sales described in the Notice of Removal occurred during World War II and the

Korean War, NOR ¶¶ 59–60, and the City has not alleged any misconduct during this period. Compl. ¶¶ 87–92. *See Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 946 (E.D.N.Y. 1992) ("Critical under the [federal officer removal] statute is 'to what extent defendants acted under federal direction' at the time they were engaged in the conduct now being sued upon."); *cf. Coleman v. Trans Bay Cable, LLC, No*. 19-CV-02825-YGR, 2019 WL 3817822, at *4 (N.D. Cal. Aug. 14, 2019) (in federal enclave context, "jurisdictional inquiry . . . must focus on this same period of time").

Second, Defendants' assertion that Standard Oil, a predecessor of one of the defendants, was acting under the Navy when it produced oil from the Elk Hills Reserve, NOR ¶¶ 63–65, was rejected by the Fourth Circuit in *Baltimore II* because those activities were "not sufficiently 'related'" to claims substantially similar to those at issue here. 952 F.3d at 471.[15] The City's Complaint does not challenge Defendants' drilling activities or their development of oil and gas on federal lands, and Standard Oil's operations at Elk Hills have no bearing here.

The same holds true for Defendants' assertion regarding their production of fossil fuels on the OCS and for the SPR, their operation of SPR infrastructure, and the federal government's general efforts to promote domestic production of fossil fuels. Not. ¶¶ 66–74. The Fourth Circuit considered indistinguishable arguments

---

[15] In *San Mateo II* the Ninth Circuit held that Standard Oil was not "acting under" a federal officer at the Elk Hills Reserve, and therefore did not reach the question of whether there was a causal connection to the plaintiffs' claims. *See* 960 F.3d at 602.

regarding the OCS leases in *Baltimore II*, and concluded that "[a]ny connection between fossil fuel production on the OCS and the conduct alleged in the Complaint is simply too remote" to support removal under section 1442. 952 F.3d at 466; *see also Boulder I*, 405 F. Supp. 3d at 976 (defendants failed to show "there is a causal connection between the work performed under the leases and Plaintiffs' claims"). Defendants' arguments regarding the SPR and federal lease programs, grants, and loan guarantees are likewise unavailing because they once again relate to Defendant's production of fossil fuels, rather than Defendants' campaign of deception and failure to warn.

Courts also routinely reject federal jurisdiction in cases involving failure to warn or deceptive marketing, particularly where, as here, there is no assertion that the government exercised control over the challenged misrepresentations. *See, e.g.*, *In re MTBE Prods. Liab. Litig.*, 488 F.3d 112, 131 (2d Cir. 2007) (federal officer removal improper where federal regulations "say nothing" about marketing and other tortious conduct); *Meyers v. Chesterton*, No. CIV.A 15-292, 2015 WL 2452346, at *6 (E.D. La. May 20, 2015) (rejecting federal officer removal because "nothing about the Navy's oversight prevented the Defendants from complying with any state law duty to warn"), *vacated as moot sub nom. Meyers v. CBS Corp.*, No. 15-30528, 2015 WL 13504685 (5th Cir. Oct. 28, 2015); *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 662 (E.D. Tex. 1999) (remanding case where

defendant failed to "tether" production of avgas for military to plaintiff's failure to warn claims about asbestos); *In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, 428 F. Supp. 2d 1014, 1017–18 (D. Minn. 2006) (remanding design defect case where FDA did not exercise control over design, manufacture, or sale of the defibrillators at issue).

In sum, the Court should reject out of hand Defendants' thinly veiled attempt to repackage federal officer arguments that have already been considered and rejected by the Ninth Circuit, as well as the Fourth Circuit and Tenth Circuit.

### E.   There Is No Enclave Jurisdiction Because the City's Claims Did Not "Arise" Within Any Federal Enclave, Nor Do They Present Any Federal Question.

"Federal courts have federal question jurisdiction over tort claims that *arise on* 'federal enclaves.'" *See Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (emphasis added). Defendants' federal enclave argument fails for at least four reasons. First, the Complaint expressly disclaims injuries to any federal property within the City. Compl. ¶¶ 14, 16 n.9, 151(d) n.126. Second, Defendants' assertions "on information and belief" that some of their alleged bad acts occurred on federal land are not supported by the Complaint. Third, even if some portion of Defendants' tortious conduct did occur on federal land, the City's claims "arose" only once all the elements of the claim were complete, which occurred here when and where the City suffered injuries—i.e., on non-federal land. Finally, Defendants

have not shown any actual federal question with respect to claims that allegedly arose on enclaves in Hawaiʻi, where state law remains in force. Four other district courts, including the Northern District of California, have rejected similar arguments raised in other climate tort and consumer fraud cases against these defendants. *San Mateo I*, 294 F. Supp. 3d at 939; *Baltimore I*, 388 F. Supp. 3d at 565–66; *Rhode Island*, 393 F. Supp. 3d at 152; *Boulder I*, 405 F. Supp. 3d at 974.

Federal enclave jurisdiction arises from Article I, Section 8, Clause 17 of the U.S. Constitution, which provides:

> The Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia] . . ., and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. CONST. art. I, § 8, cl. 17.

Where there is *exclusive* federal enclave jurisdiction, courts have generally determined that the state law that would otherwise govern is assimilated as federal law, conferring federal question jurisdiction. *See Mater v. Holley*, 200 F.2d 123 (5th Cir. 1952); *see also Baltimore I*, 388 F. Supp. 3d at 564 ("Courts have held that federal question jurisdiction exists over claims that arise on federal enclaves . . . . because, quite simply, there is no other law." (citations omitted)).

A particular area's enclave status, however, does not always provide federal-question jurisdiction over all claims arising there. The federal government may

acquire enclave jurisdiction subject to a reservation of concurrent legislative jurisdiction to the state. *See Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 530 (1938) ("[J]urisdiction less than exclusive may be granted [to] the United States."). The United States did just that in the 1959 Act to Provide for the Admission of the State of Hawai'i into the Union ("Admission Act"). *See* Pub. L. No. 86-3, 73 Stat. 11–12 (1959). Where the state and federal government hold concurrent jurisdiction, the court looks to additional factors to determine whether they present federal questions. *See*, *e.g.*, *Ching v. Aila*, No. CIV. 14-00253 JMS, 2014 WL 4216051, at *4–8 (D. Haw. Aug. 22, 2014) (remanding claim that arose on federal enclave where Hawai'i retained concurrent jurisdiction).

### 1.    The City's Injuries Occurred and Will Occur Exclusively on Non-Federal Lands.

The Complaint seeks to abate the local nuisance injuries from sea level rise, extreme weather, drought, and ocean warming and acidification, among other climate crisis-related environmental changes, and "the cascading social, economic, and other consequences of those environmental changes . . . in the City." Compl. ¶ 10. The Complaint defines the scope of injury to exclude any federal territory. *Id.* ¶¶ 14, 16 n.9, 151(d) n.126. The only injuries occurred on non-federal land, and the

City's claims "arise" on non-federal land. The Court's inquiry should end there.[16]

There is no basis for enclave jurisdiction based on the location of City's injuries.[17]

Second, Defendants argue that "[o]n information and belief, Defendants maintain or maintained oil and gas operations on military bases or other federal enclaves," and that "the Complaint relies upon conduct occurring in the District of Columbia." NOR ¶¶ 80, 81. Neither assertion is supported by the Complaint, and the City does not seek remedies for injuries at such locations. *See, e.g.*, Compl. ¶ 14; *Boulder I*, 405 F. Supp. 3d at 974 (The fact that "the alleged climate alteration by Defendants may have caused similar injuries to federal property does not speak to the nature of Plaintiffs' alleged injuries for which they seek compensation, and does not provide a basis for removal."). Defendants further state that some portion of

---

[16] Every court that has considered these arguments has rejected them on these grounds. *See*, *e.g.*, *Baltimore I*, 388 F. Supp. 3d at 565 (no enclave jurisdiction where "[t]he Complaint . . . expressly define[d] the scope of injury to exclude any federal territory"); *Rhode Island*, 393 F. Supp. 3d at 152 ("There is no federal-enclave jurisdiction . . . especially since [the State's] complaint avoids seeking relief for damages to any federal lands."); *Boulder Cty. I*, 405 F. Supp. 3d at, 974 (same where plaintiffs did "not seek damages or abatement relief for injuries to or occurring to federal lands" (citations omitted)).

[17] Defendants' reliance on *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 372–74 (1964), and *Mississippi River Fuel Corp. v. Cocrehan*, 390 F.2d 34, 35 (5th Cir. 1968), is misplaced. *See* NOR ¶ 80. Both cases held that a state may not exercise its taxing power over oil and gas drilling and pipeline operations located entirely within the federal enclave. Neither analyzed where a state law tort cause of action arises for enclave jurisdiction purposes—let alone whether injuries sustained on exclusively non-federal land could be subject to enclave jurisdiction, as Defendants urge. Neither case can be read for that proposition.

some Defendants' fossil fuel extraction has occurred on federal land, but cite no allegation in the Complaint referring to those lands or conduct occurring there. *See* NOR ¶ 80. Defendants also refer to their trade association memberships and financing of think tanks and lobbyists. NOR ¶ 82; Compl. ¶¶ 112–16. Defendants have not shown how those facts provide any basis for enclave removal.[18]

### 2.  Each of the City's Claims Arose Only Once a Complete Tort Accrued, Which Occurred When and Where the City Suffered Injury—on Non-Federal Lands.

Even if Defendants' Notice of Removal accurately described the contents of the Complaint, federal enclave jurisdiction would still be improper because the

---

[18] The cases Defendants cite to support their District of Columbia ("D.C.") argument (NOR ¶¶ 81–82) have nothing to do with removal, and do not even discuss the Enclave Clause as a basis for jurisdiction. The court in *Jacobsen v. U.S. Postal Service*, 993 F.2d 649, 652 (9th Cir. 1992), considered whether "ingress-egress walkways" at federal post offices are public fora under the First Amendment. The opinion does not address any jurisdictional issue. *Id. Collier v. District of Columbia*, 46 F. Supp. 3d 6, 20 n.8 (D.D.C. 2014), was an excessive force action against a D.C. police officer, in which the court observed in dicta that "[b]ecause the District of Columbia is a federal enclave, it is subject to the Fifth Amendment, and not the Fourteenth, which applies to the States." The court did not otherwise discuss or cite the Enclave Clause, and jurisdiction existed because the plaintiff expressly brought claims under the Constitution and 42 U.S.C. § 1983. *Id.* at 14. *Hobson v. Hansen*, 265 F. Supp. 902, 906 (D.D.C. 1967), held in relevant part that a statute vesting power to appoint members of the D.C. Board of Education in D.C. district court judges was constitutional under the Enclave Clause. That case had nothing to do with removal jurisdiction over state law tort claims. Finally, D.C. was not at issue in *Bell v. Arvin Meritor, Inc.*, No. 12-00131-SC, 2012 WL 1110001 (N.D. Cal. Apr. 2, 2012), a case in which the plaintiff's claims were held to have arisen on various military bases.

City's claims "arose" only at the time and place where all the elements of the claims were complete. "[T]he key factor in determining whether federal enclave jurisdiction exists is the location of the plaintiff's injury." *Holliday v. Extex*, No. CIV. 05-00194SPKLEK, 2005 WL 2158488, at *4 (D. Haw. July 6, 2005), report and recommendation adopted, No. CIV05-00299SPK/LEK, 2005 WL 2179392 (D. Haw. Aug. 24, 2005) (denying motion to remand where injury was a helicopter crash in Volcanoes National Park, an undisputed federal enclave).

This construction is consistent with the weight of case law on federal enclave removal, which holds that a cause of action "arises," for enclave purposes, when and where "the 'substance and consummation' of events giving rise the claim occur." *Coleman v. Trans Bay Cable, LLC*, No. 19-CV-02825-YGR, 2019 WL 3817822, at *3 (N.D. Cal. Aug. 14, 2019) (a defendant "cannot manufacture federal jurisdiction simply by calling on executives to make decisions on a federal enclave, even if the facts giving rise to the claim occurred outside of the enclave"); *see also Bordetsky v. Akima Logistics Servs., LLC*, No. CV 14-1786 (NLH/JS), 2016 WL 614408, at *2 (D.N.J. Feb. 16, 2016) ("When dealing with a federal enclave, the focus is on where the tort occurred."); *Holliday*, 2005 WL 2158488, at *4 (collecting cases indicating that the site of injurious exposure is key to establishing enclave jurisdiction).

Each of the City's claims is defined under state law, and each cause of action has an "injury" or "physical intrusion" element.[19] Each claim thus arose only where the City suffered the injury or intrusion. Because the alleged injuries and intrusions occurred on non-federal land only, federal enclave jurisdiction is improper.

### 3. Defendants Fail to Identify a Federal Question Arising on Enclaves in Hawai'i Over Which the State Has Concurrent Jurisdiction.

Even if the City's claims could be construed as arising on enclave land in Hawai'i (which they cannot), Defendants have not shown a federal question exists, which is necessary to confer subject-matter jurisdiction here. State law controls the City's claims, such that Defendants' only path to federal question jurisdiction would be through *Grable*—which they plainly cannot satisfy. *See* Part IV.B, *supra*.

The Admission Act granted the United States enclave authority over certain land in Hawai'i, including land that was "immediately prior to the admission of said State [ ] controlled or owned by the United States and held for Defense or Coast Guard purposes." Pub.L. No. 86–3, 73 Stat. 11–12. The Admissions Act nonetheless preserved concurrent State jurisdiction over such enclaves:

---

[19] *See Littleton v. State*, 66 Haw. 55, 67 (1982) (elements of nuisance claim); *Johnson v. Raybestos-Manhattan, Inc.*, 69 Haw. 287, 288 (1987) (elements of a strict products liability claim); *Doe Parents No. 1 v. State, Dep't of Educ.*, 100 Haw. 34, 68 (2002), as amended (Dec. 5, 2002) (elements of negligence claim); *Spittler v. Charbonneau*, 145 Haw. 204, 210-211 (Ct. App. 2019) (citing Restatement (Second) Torts §§ 158, 161 for elements of trespass).

> [Section] 16(b)(ii) of the Admission Act provides that the reservation of authority "shall not operate . . . to prevent [Hawai'i] from exercising over or upon such land, concurrently with the United States, any jurisdiction whatsoever which it would have in the absence of such reservation of authority and which is consistent with the laws hereafter enacted by the Congress pursuant to such reservation of authority."

*Ching v. Aila*, No. CIV. 14-00253 JMS, 2014 WL 4216051, at *4 (D. Haw. Aug. 22, 2014) (quoting Admission Act § 16(b)(ii)); *see also Kalaka Nui, Inc. v. Actus Lend Lease, LLC*, 2009 WL 1227892, at *5 (D. Haw. May 5, 2009) ("The Admission Act clearly provides that Hawai'i has concurrent jurisdiction over such military bases so long as state jurisdiction is consistent with" federal law.).

"[W]here there is broad concurrent enclave jurisdiction, there is no concern that the enclave will be left without laws regulating private rights—state law applies with no need to assimilate state law into federal law." *Ching*, 2014 WL 4216051, at *6; *see also Cmty. Hous. P'ship v. Byrd*, No. 13-3031 JSC, 2013 WL 6087350, at *7 (N.D. Cal. Nov. 19, 2013) (granting motion to remand in unlawful detainer action on enclave subject to concurrent jurisdiction where defendant failed to establish a federal question arose). In *Ching*, a breach of trust action by private plaintiffs against the State for failure to enforce the terms of a lease on enclave lands, the court explained that "[u]pon admission to the Union, Hawai'i adopted its own laws— which plainly apply to Plaintiffs' [state law] breach of trust claim." 2014 WL 4216051 at *7. While the plaintiffs' claim arose on that federal enclave, it raised only questions of state law and federal jurisdiction was improper. *Id.*

43

Defendants identify only one federal enclave in Hawaiʻi in their Notice of Removal: the Red Hill Bulk Fuel Storage Facility. NOR ¶¶ 84–85. Defendants concede, as they must, that the State retains concurrent jurisdiction over that enclave, *Id.*[20] They do not establish, however, that any claim arising at Red Hill fall into the "special and small category" of state law claims that necessarily raise federal issues. *See Gunn,* 133 S. Ct. at 1064; *see also* Part IV.B, *supra.* The Admission Act expressly reserves the State's sovereign right to have such claims adjudicated under its own laws in its own courts.

### F.   Defendants' "Complete Preemption" Arguments Are Foreclosed.

Defendants' complete preemption argument is entirely foreclosed by *Oakland*, 2020 WL 4678380, where the Ninth Circuit held that the plaintiffs' state law public nuisance claim was not completely preempted by the CAA.

Complete preemption only occurs in the narrow circumstance where "the preemptive force of a statute is so 'extraordinary' that it 'converts an ordinary state

---

[20] In fact, Defendants even fail to affirmatively establish that the federal enclaves they identify *outside* Hawaiʻi are subject to the United States' exclusive jurisdiction, raising the question whether those enclaves are actually subject to concurrent jurisdiction—and if so, whether claims arising there would raise any federal questions at all. Since there is a strong presumption against removal jurisdiction, *Gaus*, 980 F.2d at 566, and doubts as to removability are resolved in favor of remanding the case to state court, *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003), enclave jurisdiction cannot be grounds for removal unless Defendants affirmatively establish either that the claims actually arose on an enclave subject to *exclusive* federal jurisdiction, or that federal questions are present for claims that actually arose on an enclave subject to concurrent jurisdiction.

common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life*, 481 U.S. at 65). "To have this effect, a federal statute must [1] 'provide[ ] the exclusive cause of action for the claim asserted and also [2] set forth procedures and remedies governing that cause of action.'" *Oakland*, 2020 WL 4678380 at *5 (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003)). "The Supreme Court has identified only three statutes that meet this criteria." *Id.*

Defendants primarily argue that the CAA completely preempts the City's claims. *See* NOR at ¶¶ 90–98. But "[t]he Clean Air Act is not one of the three statutes that the Supreme Court has determined has extraordinary preemptive force." *Oakland*, 2020 WL 4678380 at *7. "Rather, the Supreme Court has left open the question whether the Clean Air Act preempts a state-law nuisance claim under ordinary preemption principles." *Id.* (citing *AEP*, 564 U.S. at 429).[21]

---

[21] The Ninth Circuit's decision in *Oakland* is in accord with the decisions of district courts in analogous cases, which have unanimously held that the CAA lacks complete preemptive force. *Boulder I*, 405 F. Supp. 3d at 970 ("[I]t is apparent that Congress did not intend the Act to provide exclusive remedies in these circumstances, or to be a basis for removal under the complete preemption doctrine."); *Rhode Island*, 393 F. Supp. 3d at 150 ("A statute that goes so far out of its way to preserve state prerogatives cannot be said to be an expression of Congress's 'extraordinary pre-emptive power' to convert state-law into federal-law claims. . . . . No court has so held, and neither will this one."); *Baltimore I*, 388 F. Supp. 3d at 563 ("The language of these provisions unequivocally demonstrates that 'Congress did not intend the federal causes of action under the [Clean Air Act] to be exclusive. . . . Accordingly, I conclude that the CAA does not completely preempt

In any event, the CAA does not satisfy either of the necessary elements for complete preemption. First, "the statutory language does not indicate that Congress intended to preempt 'every state law cause of action within the scope' of the [CAA]," but rather "indicates that Congress intended to preserve state-law causes of action pursuant to a saving clause" that permits states to "adopt or enforce" air quality standards stricter than those required by federal law. *Id.* (citing 42 U.S.C. § 7416); *see also Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 690, 691 (6th Cir. 2015) (savings clause "makes clear that states retain the right to 'adopt or enforce' common law standards that apply to emissions" and preserves "[s]tate common law standards . . . against preemption,"). "When a federal statute has a saving clause of this sort, Congress did not intend complete preemption, because there would be nothing to save if Congress intended to preempt every state cause of action within the scope of the statute." *Oakland*, 2020 WL 4678380, at *7 (citation and quotations omitted).

Second, "the Clean Air Act does not provide the Cities with a 'substitute' cause of action" for the nuisance, failure to warn, and trespass claims the City has alleged. *See id.* at *8. "While the Clean Air Act allows a plaintiff to file a petition to seek judicial review of certain actions taken by the [EPA], . . . it does not provide a federal claim or cause of action for nuisance caused by global warming," *id.*, nor for

---

the City's claims." (citations and quotations omitted)); *San Mateo*, 294 F. Supp. 3d at 938 ("Congress did not intend the federal causes of action under the Clean Air Act to be exclusive." (citation omitted)).

product defect or trespass claims. The CAA's "citizen suit" provision "permits actions for violations" of the CAA itself, but does not provide "a free-standing cause of action for nuisance that allows for compensatory damages." *Id.* The City here has not alleged violations of the CAA, and does not seek to challenge or modify any EPA conduct. The CAA does not have complete preemptive force.

Defendants' secondary argument, that the City's claims are completely preempted because they "would inevitably intrude on the foreign affairs power of the federal government," NOR ¶ 89, is unserious. The Supreme Court has only recognized complete preemption *by statute*, because the "extraordinary pre-emptive power . . . that converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule" should not be exercised "[i]n the absence of explicit direction from Congress . . . ." *See Metro. Life*, 481 U.S. at 64–65; *Beneficial Nat'l Bank*, 539 U.S. at 8 ("a state claim may be removed to federal court . . . when Congress so provides . . . or when a federal *statute* wholly displaces the state-law cause of action through complete pre-emption" (emphasis added)). There is no basis to believe Congress intended the foreign affairs doctrine to have complete preemptive force over any state law. *See Boulder I*, 405 F. Supp. 3d at 973 (defendants "have not shown that Congress expressly provided for complete preemption under the foreign-affairs doctrine"); *Rhode Island*, 393 F. Supp. 3d at 150, n. 3 ("Defendants toss in an argument that the foreign-affairs

doctrine completely preempts the State's claims. The Court finds this argument without a plausible legal basis."); *Baltimore I*, 388 F. Supp. 3d at 562 ("the 'foreign affairs doctrine' . . . is inapposite in the complete preemption context").[22]

### G. The Case Is Not Removable Under the Bankruptcy Removal Provisions, 28 U.S.C. §§ 1452(a) and 1334.

Jurisdiction under the bankruptcy removal statute is doubly improper. First, the City's claims arise under its police and regulatory authority, and such claims are not removable. Second, the City's claims are unrelated to any bankruptcy case.

### 1. The City Brings This Action Pursuant to Its Police and Regulatory Powers.

The Complaint presents an exercise of the City's police and regulatory powers—a type of action Congress expressly exempted from bankruptcy removal:

> A party may remove any claim or cause of action in a civil action *other than* a proceeding before the United State Tax Court or *a civil action by a governmental unit to enforce such unit's police or regulatory power*, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

---

[22] The two cases Defendants cite involved *ordinary* preemption of claims that were filed in federal court in the first instance, and do not involve or discuss complete preemption or even removal jurisdiction. *See Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396 (2003) (affirming injunction against unconstitutional state statute based on foreign affairs doctrine); *California v. Gen. Motors Corp.*, No. C06-cv-05755, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) (granting motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim).

28 U.S.C. § 1452(a) (emphases added). As in *San Mateo I*, this state law action addressing climate change impacts on municipal infrastructure and resources is an exercise of police power "aimed at protecting the public safety and welfare . . . on behalf of the public," and therefore is not subject to bankruptcy removal. *See* 294 F. Supp. 3d at 939. Three other district courts hearing analogous cases brought by public entities involving climate change have arrived at the same conclusion. *Baltimore I*, 388 F. Supp. 3d at 569 ("action on behalf of the public to remedy and prevent environmental damage, punish wrongdoers, and deter illegal activity" not subject to bankruptcy removal); *see also Boulder I*, 405 F. Supp. 3d at 981; *Rhode Island*, 393 F. Supp. 3d at 152.

The Ninth Circuit applies "two alternative tests to determine whether the actions of a governmental unit are in exercise of its police and regulatory power: the 'pecuniary purpose' test and the 'public policy' test."[23] *City & Cty. of San Francisco v. PG&E Corp.*, 433 F.3d 1115, 1123–24 (9th Cir. 2006). The purpose of each test is "to permit governmental units to pursue actions to protect the public health and safety," but restrain "actions by a governmental unit to protect a pecuniary interest

---

[23] The statutory language of the removal exception for police and regulatory functions is practically identical to language exempting government enforcement actions from the automatic stay in bankruptcy proceedings under 28 U.S.C. § 362(b)(4), and therefore courts look to cases interpreting § 362(b)(4) for guidance in interpreting § 1452(a). *See PG&E Corp.*, 433 F.3d at 1123 (holding that the two statutes were designed to work in tandem and should be interpreted consistently).

in property of the debtor or property of the estate." *In re First All. Mortg. Co.*, 264 B.R. 634, 646 (C.D. Cal. 2001) (quoting legislative history). Satisfying either test exempts the action from the reach of federal jurisdiction. *See Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1108 (9th Cir. 2005).

Under the pecuniary purpose test, "the court determines whether the action relates primarily to the protection of the government's pecuniary interest in the debtor's property or to matters of public safety and health." *N.L.R.B. v. Cont'l Hagen Corp.*, 932 F.2d 828, 833 (9th Cir. 1991). "If the government action is pursued solely to advance a pecuniary interest of the governmental unit, the stay will be imposed." *In re Universal Life Church, Inc.*, 128 F.3d 1294, 1297 (9th Cir. 1997), *as amended on denial of reh'g* (Dec. 30, 1997) (quotation omitted). "The public policy test distinguishes between government actions that effectuate public policy and those that adjudicate private rights." *Id.* (quotation omitted).

Applying either the "pecuniary purpose" or "public policy" test, the City's Complaint is not subject to removal under § 1452(a). The Complaint alleges that the City and its residents, public infrastructure, and natural resources have suffered and will suffer harms due to Defendants' conduct. *See, e.g.*, Compl. ¶¶ 3, 15, 125, 156, 159–62, 181, 193, 204. Among those consequences are injuries to numerous public facilities and infrastructure, such as beach parks, wastewater treatment facilities, roads, and native Hawaiian cultural sites, among others; as well as disruptions to

freshwater supplies, ecosystems, and other natural resources. *E.g.*, *id*. ¶¶ 149–51. The purpose of the Complaint is to "prevent and abate hazards to public health, safety, welfare, and the environment," and to address the physical, as well as "cascading social and economic impacts" attributable to Defendants' conduct that follow from the climate crisis impacts. *See, e.g.*, *id.* ¶¶ 16, 150.

Far from being "primarily brought for financial gain," NOR ¶ 102, the City's requested relief does not seek to protect any interest held by the City in any bankruptcy debtor's property, but rather to remediate public harm and protect the public well-being. Punitive damages serve not to enrich the City, but "are aimed . . . principally at retribution and deterring harmful conduct," and therefore do not abrogate the police power function. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 & n.9 (2008); *see also In re Berg*, 230 F.3d 1165, 1168 (9th Cir. 2000) (rejecting an "overly-literal" interpretation of the pecuniary purpose test and reasoning that the "deterrent effect of monetary penalties can be essential for the government to protect its regulatory interests"); *California ex rel. Brown v. Villalobos*, 453 B.R. 404, 413 (D. Nev. 2011) ("Disgorgement, civil penalties, and restitution all satisfy a public purpose and the seeking thereof does not convert the action into one that fails the pecuniary purpose test."); *O'Brien v. Fischel*, 74 B.R. 546, 551 (D. Haw. 1987) ("[A] proceeding resulting in a monetary penalty may be excepted from the automatic stay" because of the deterrent effect of such penalties.). The Ninth Circuit

has firmly rejected the notion that a government entity "must have no pecuniary motive at all" when exercising its police powers, noting that most actions falling within this exemption "have some pecuniary component" and that only if the action is pursued "solely" to advance the government's pecuniary interest will a pecuniary purpose be found. *See In re Universal Life Church*, 128 F.3d at 1298–99.

The City's case falls squarely within the exception for exercises of police and regulatory power, as the courts have unanimously concluded in analogous cases. *see San Mateo I*, 294 F. Supp. 3d at 939 ("[B]ankruptcy removal did not apply because these suits are aimed at protecting the public safety and welfare and brought on behalf of the public."); *Baltimore I*, 388 F. Supp. 3d at 570–72; *Boulder I*, 405 F. Supp. 3d at 981; *Rhode Island*, 393 F. Supp. 3d at 152.

## 2.    The City's Action Is Not Related to Any Bankruptcy Case.

Even if the City were not a governmental unit exercising its police and regulatory powers, removal would still not be appropriate under 28 U.S.C. §§ 1452(a) and 1334 because the City's claims are not "relate[d] to" any bankruptcy case or estate. Section 1452(a) only allows for removal of claims arising "under section 1334 of this title." In turn, § 1334(b) vests district courts with "original but not exclusive jurisdiction" over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Defendants assert only the "related to" subclause applies here. *See* NOR ¶ 99.

Prior to confirmation of a Chapter 11 plan, "related to" jurisdiction encompasses matters that "could conceivably have any effect on the estate being administered in bankruptcy." *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). After a debtor's bankruptcy plan is confirmed, however, "related to" jurisdiction is substantially narrower. Post-confirmation, "related to" jurisdiction exists only if the claims have a "close nexus" to the bankruptcy, typically involving "interpretation, implementation, consummation, execution, or administration of the confirmed plan." *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005) (finding "related to" jurisdiction because the plaintiff alleged a breach of the confirmed plan and fraud in the inducement in connection with agreeing to the plan and an associated settlement). There is no "close nexus" where the matter at issue "could have existed entirely apart from the bankruptcy proceeding and did not necessarily depend upon resolution of a substantial question of bankruptcy law." *In re Ray*, 624 F.3d 1124, 1135 (9th Cir. 2010) (no "related to" jurisdiction over claims by would-be real estate purchaser against debtor and actual purchaser following confirmation, even though action involved interpretation of bankruptcy court's sale order).

Defendants assert "related to" jurisdiction based on the 30-year-old bankruptcy of a single Chevron subsidiary, Texaco Inc. ("Texaco"). There is no connection—let alone a "close nexus"—between the City's causes of action and

Texaco's Chapter 11 plan. *See* NOR ¶ 101. The trier of fact in this case will not be asked to answer a question of bankruptcy law or interpret, implement, consummate, execute, or administer the Texaco plan. The district court in *Baltimore I* found that the same Texaco bankruptcy lacked the requisite close nexus to Baltimore's state-law claims because, at most, the Texaco bankruptcy plan might someday preclude enforcement of a portion of a judgement against Chevron. *See* 388 F. Supp. 3d at 570. Such a "remote connection" to a bankruptcy is simply not enough to bring the case within the Court's "related to" jurisdiction. *See id.*; *see also Boulder I*, 405 F. Supp. 3d at 980–81 (no "related to" jurisdiction where the plaintiffs did "not seek any relief from a debtor in bankruptcy, advantage over creditors, or to protect any interest in the debtor's property" (citing *PG&E Corp.*, 433 F.3d at 1124–25)).

Defendants proffer the nebulous argument that the Complaint involves "historical activities of . . . predecessor companies, subsidiaries, and companies that Defendants may have acquired or with which they may have merged," and therefore "many other Title 11 cases . . . may be related." NOR ¶ 100. Any connection between this case and "unspecified [non-party] bankrupt entities" is "entirely speculative" and does not provide jurisdiction. *See Boulder I*, 405 F. Supp. 3d at 980.

Finally, Defendants assert that bankruptcy court proceedings engendered by the *San Mateo* cases (to determine whether Arch Coal, Inc. and Peabody Energy Corp.'s confirmed Chapter 11 plans discharged the *San Mateo* plaintiffs' claims

against those two defendants) establish the requisite "close nexus" *here*. NOR ¶ 100. This defies logic. Neither Arch nor Peabody are Defendants here, and the Eighth Circuit's decision affirming dismissal of the *San Mateo* plaintiffs' claims against Peabody does not shed light on the questions before this Court. The bankruptcy court there was "simply construing the terms of [Peabody's Chapter 11 bankruptcy] plan," and the court of appeals "review[ed] the bankruptcy court's holding for an abuse of discretion." *In re Peabody Energy Corp.*, 958 F.3d 717, 723 (8th Cir. 2020). The Eighth Circuit's affirmance stands at most for the proposition that the bankruptcy court did not abuse it's discretion in holding that a different set of claims, brought under a different state's laws, against a debtor that is not a party to this case, were discharged under the contractual terms of a confirmed bankruptcy plan that is not at issue here. *See, e.g.*, *id.* The *In re Peabody* case is irrelevant.

### 3. Equity Requires Remand.

Even if this action were "related to" a bankruptcy proceeding (which it is not), equity demands that this case be remanded to state court. A bankruptcy-related claim removed under Section 1452 may be remanded "on any equitable ground." 28 U.S.C. § 1452(b). This standard represents "an unusually broad grant of authority" that "subsumes and reaches beyond all of the reasons for remand under nonbankruptcy removal statutes." *In re McCarthy*, 230 B.R. 414, 417 (B.A.P. 9th Cir. 1999). Courts generally weigh a number of factors, including: (1) the effect of the action on the

administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty of applicable state law; (4) comity; (5) the relatedness or remoteness of the action to the bankruptcy estate; (6) the right to a jury trial; and (7) prejudice to the plaintiff from removal. *Baclaan v. Combustion Eng'g*, No. 03-00325 LEK-KSC, 2016 WL 6469257, at *11–13 (D. Haw. Oct. 31, 2016) (finding equitable factors warranted remand of case sounding in state law fraud and negligence) (citations omitted).

Every factor favors remand here. The Texaco bankruptcy Defendants was confirmed more than 30 years ago, and this action will not affect its the administration or implementation. The Complaint alleges only state law claims and raises complex issues of state law, including as to causation. Comity favors remand because it makes no sense for a federal court to adjudicate pure questions of state law. *See Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.*, 130 B.R. 405, 409 (S.D.N.Y. 1991) ("Congress has made it plain that, in respect to noncore proceedings such as this (i.e., cases which assert purely state law causes of action), the federal courts should not rush to usurp the traditional precincts of the state court." (quotation omitted)). The City will suffer prejudice if this Court denies remand, "because [it] would be denied [its] choice of forum." *See Baclaan*, 2016 WL 6469257, at *11. Equity compels this Court to remand this case to state court.

### H.   Defendants' Assertion of Admiralty Jurisdiction Is Baseless.

In their final grasp, Defendants argue that the City's claims "fall within the Court's original admiralty jurisdiction." NOR ¶ 103 (citing U.S. Const. Art. III, § 2; 46 U.S.C. § 30101(a)). This argument misstates the City's claims and admiralty law. Defendants' attempts to remove on this basis in analogous cases have been rejected. *See Baltimore I*, 388 F. Supp. 3d at 573; *Rhode Island*, 393 F. Supp. 3d at 152.

### 1.   Admiralty Jurisdiction Is Not a Basis for Removal.

Even if the City's claims arose in admiralty, which they do not, state law admiralty claims brought in state court are not removable absent some other jurisdictional basis, such as diversity or federal question jurisdiction. *See Coronel v. AK Victory*, 1 F. Supp. 3d 1175, 1178–89 (W.D. Wash. 2014); *Rhode Island*, 393 F. Supp. 3d at 152 ("[S]tate-law claims cannot be removed based solely on federal admiralty jurisdiction."). The rule arises from the "saving to suitors" clause in 28 U.S.C. § 1333(1), and has persisted "throughout the history of federal admiralty jurisdiction—from the Judiciary Act of 1789 . . . up to the present." *Coronel*, 1 F. Supp. 3d at 1187; *see also, e.g.*, *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1069 (9th Cir. 2001) (maritime claims "are not removable under 28 U.S.C. § 1441 absent some other jurisdictional basis"). The 2011 amendments to 28 U.S.C. § 1441 did not change this long-standing rule. *See Coronel*, 1 F. Supp. 3d. at 1179–80 &

n.1. Importantly, Defendants omit any reference to *Coronel* and cite no authority to the contrary. *See* NOR ¶¶ 103–04. Admiralty does not provide jurisdiction here.

### 2.      There Is No Admiralty Jurisdiction Here.

The court in *Baltimore I* held that regardless of whether admiralty jurisdiction provides an independent basis for removal, "this case is outside the Court's admiralty jurisdiction." 388 F. Supp. 3d at 573. This case is no different.

A tort claim only comes within admiralty jurisdiction when it satisfies both the so-called "location" and "connection to maritime activity" tests. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995); *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1126 (9th Cir. 2009). Where the injury suffered is on land, as here, the location test requires a showing that the alleged tort was caused by a vessel on navigable water. *See Grubart*, 513 U.S. at 534 (citing 46 U.S.C. § 30101(a) (formerly 46 App. U.S.C. § 740)); *Ali v. Rogers*, 780 F.3d 1229, 1235 (9th Cir. 2015). Even if Defendants could establish that some fossil fuel extraction occurs on vessels, NOR ¶ 104, such a finding does not satisfy the location test because there is no allegation in the Complaint that such "vessels" *caused* the City's injuries on land and Defendants have provided no evidence to that effect. The City alleges that the proximate cause of its injuries is the dangerous nature of the products themselves and from Defendants' wrongful and misleading promotion of

those products—not exploration, extraction, or production of fossil fuels on floating drilling platforms. *See Baltimore I*, 388 F. Supp. 3d at 573–74.[24]

The minimal authority Defendants provide is inapposite. They cite *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010* for the irrelevant proposition that the Deepwater Horizon mobile offshore drilling unit was a "vessel" under maritime law. 808 F. Supp. 2d 943, 949 (E.D. La. 2011). There, a defendant unsuccessfully sought to dismiss claims under the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.*, concerning the explosion and fire on the Deepwater Horizon drilling platform by arguing that the platform was not a "vessel," which the plaintiffs expressly alleged. *Id.* at 949–50. The City has no similar allegation, and whether certain unnamed floating drilling platforms are "vessels" under maritime law is irrelevant. *See Baltimore I*, 388 F. Supp. 3d at 573 ("That some unspecified portion of defendants' production occurred on these vessels, as defendants assert, does not mean that the vessels *themselves* caused the City's injuries . . . .").

Defendants also fail to meet the maritime connection test, which requires that "the general character of the activity giving rise to the [plaintiff's claims] shows a *substantial relationship* to traditional maritime activity." *Grubart*, 513 U.S. at 534

---

[24] Defendants' contention that the City's "injuries have occurred on the navigable waters" is nonsensical. *See NOR* ¶ 104. Defendants argue that their *production* of some fossil fuels "occur and/or over" navigable waters, while saying nothing about where they contend the City's *injuries* occur.

(emphasis added) (quotations omitted). For a tort to have a "substantial relationship" with traditional maritime activity, the activity must be "a proximate cause of the incident." *Id.* at 541. Oil and gas production—even from floating drilling platforms—is not a "traditional maritime activity." In *Herb's Welding, Inc. v. Gray*, the Supreme Court concluded that the "exploration and development of the Continental Shelf are not themselves maritime commerce." 470 U.S. 414, 425 (1985). The relevant inquiry is whether the specific injurious activity was related to a traditional subject of admiralty law, *e.g.*, navigation, which is not true here.

Defendants' citation to *Theriot v. Bay Drilling Corp*. is unhelpful. In *Theriot*, the Fifth Circuit engaged in a more nuanced approach than the blanket rule Defendants promote, holding maritime law governed because the contract at issue "did not merely touch incidentally on a vessel, but directly addressed the use and operation of" a drilling barge. 783 F.2d 527, 538 (5th Cir. 1986). Defendants' deceptive marketing and promotion of fossil fuels has nothing to do with navigable waters, and "does not require the special expertise of a court in admiralty." *Myhran v. Johns-Manville Corp.*, 741 F.2d 1119, 1122 (9th Cir. 1984).

## V.    CONCLUSION

For the foregoing reasons, the City and County of Honolulu requests that this Court remand the Complaint to state court.

DATED:  September 11, 2020      Respectfully Submitted,

**SHER EDLING LLP**

By: _/s/ Victor M. Sher_____
VICTOR M. SHER (pro hac vice)
MATTHEW K. EDLING (pro hac vice)
100 Montgomery St. Ste. 1410
San Francisco, CA 94104
Telephone:  (628) 231-2500
Facsimile:  (628) 231-2929
Email:      vic@sheredling.com
            matt@sheredling.com


**CORPORATION COUNSEL FOR THE CITY AND COUNTY OF HONOLULU**

PAUL S. AOKI
Acting Corporation Counsel

ROBERT M. KOHN
NICOLETTE WINTER
Deputies Corporation Counsel
530 S. King Street, Room 110
Honolulu, Hawaiʻi 96813
Telephone:  (808) 768-5234
Facsimile:  (808) 768-5105
Email:      robert.kohn@honolulu.gov
            nwinter@honolulu.gov


*Attorneys for the City the City and County of Honolulu*