**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr., *pro hac vice*
  tboutrous@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

**WATANABE ING LLP**
Melvyn M. Miyagi #1624-0
  mmiyagi@wik.com
Ross T. Shinyama #8830-0
  rshinyama@wik.com
Summer H. Kaiawe #9599-0
  skaiawe@wik.com
999 Bishop Street, Suite 1250
Honolulu, HI 96813
Telephone: 808.544.8300
Facsimile: 808.544.8399

Attorneys for Defendants
CHEVRON CORPORATION
and CHEVRON U.S.A., INC.

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CITY AND COUNTY OF HONOLULU,<br><br>       Plaintiff,<br><br>    v.<br><br>SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; SHELL OIL | CASE NO.: 20-cv-00163-DKW-RT<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF CITY AND COUNTY OF HONOLULU'S MOTION TO REMAND; MEMORANDUM OF MELVYN M. MIYAGI; EXHIBITS "1" – "94"; CERTIFICATE OF SERVICE** |

PRODUCTS COMPANY LLC;
CHEVRON CORP; CHEVRON USA
INC.; BHP GROUP LIMITED; BHP
GROUP PLC; BHP HAWAII INC.; BP
PLC; BP AMERICA INC.;
MARATHON PETROLEUM CORP.;
CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY;
PHILLIPS 66; PHILLIPS 66
COMPANY; AND DOES 1 through
100, inclusive,

       Defendants.

## TABLE OF CONTENTS

I.  INTRODUCTION ..........................................................................................1

II.  PROCEDURAL BACKGROUND ................................................................8

III.  LEGAL STANDARDS ................................................................................10

IV.  ARGUMENT...............................................................................................11

    A.  The Action Is Removable Because It Is Related to Defendants' Activities on the Outer Continental Shelf ...........................................11

    B.  The Action Is Removable Under the Federal Officer Removal Statute ...............................................................................................17

        1.  Securing an Adequate Supply of Oil and Gas Is an Essential Government Function................................................19

        2.  Defendants Acted Under Federal Officers................................23

        3.  Defendants Have Shown the Requisite Nexus and Colorable Federal Defense......................................................46

    C.  The Court Has Jurisdiction Because Plaintiff's Claims Arise on Federal Enclaves...................................................................................50

    D.  Plaintiff's "Misrepresentation" Allegations Are Irrelevant and Based on Demonstrably False Premises ...........................................52

V.  CONCLUSION............................................................................................60

# TABLE OF AUTHORITIES

## Cases

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011)........................................................................7, 52

*Amoco Prod. Co. v. Sea Robin Pipeline Co.*,
844 F.2d 1202 (5th Cir. 1988) ...........................................................16

*Azhocar v. Coastal Marine Servs., Inc.*,
2013 WL 2177784 (S.D. Cal. May 20, 2013) ....................................51

*Baker v. Atl. Richfield Co.*,
962 F.3d 937 (7th Cir. 2020) .................................... 2, 11, 18, 22, 29, 32, 39, 47

*Ballenger v. Agco Corp.*,
2007 WL 1813821 (N.D. Cal. June 22, 2007)....................................48

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988)............................................................................50

*BP p.l.c. v. Mayor & City Council of Baltimore*,
2020 WL 5847132 (U.S. Oct. 2, 2020)...............................................10

*California ex rel. Brown v. Watt*,
668 F.2d 1290 (D.C. Cir. 1981)..........................................................35

*California v. BP P.L.C.*,
2018 WL 1064293 (N.D. Cal. Feb. 27, 2018) ......................................9

*Campbell-Ewald v. Gomez*,
136 S. Ct. 663 (2016).........................................................................50

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992)............................................................................16

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981)..............................................................................7

*City of Oakland v. BP PLC*,
960 F.3d 570 (9th Cir. 2020) ......................................................2, 9, 22

# TABLE OF AUTHORITIES *(continued)*

Page(s)

*In re Commonwealth's Motion To Appoint Counsel Against Or
   Directed To Defender Ass'n Of Philadelphia*,
   790 F.3d 457 (3rd Cir. 2015) ...................................................................5, 18, 47

*Corley v. Long-Lewis, Inc.*,
   688 F. Supp. 2d 1315 (N.D. Ala. 2010) .........................................................51, 52

*County of San Mateo v. Chevron Corp.*,
   960 F.3d 586 (9th Cir. 2020) ...................................................2, 9, 23, 34, 39, 41

*Durham v. Lockheed Martin Corp.*,
   445 F.3d 1247 (9th Cir. 2006) ........................................................................50

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
   26 F.3d 563 (5th Cir. 1994) .......................................................................12, 16

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005) ........................................................................................10

*Exxon Mobil Corp. v. United States*,
   2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) .................................7, 24, 25, 28

*Gertz v. Boeing*,
   654 F.3d 852 (9th Cir. 2011) ..............................................................................50

*Goncalves by and through Goncalves v. Rady Children's Hosp. San
   Diego*,
   865 F.3d 1237 (9th Cir. 2017) ................................... 5, 18, 23, 28, 34, 40, 47, 50

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
   545 U.S. 308 (2005) ............................................................................................8

*Haynes v. Haas*,
   146 Haw. 452 (2020) ..........................................................................................4

*Humphries v. Elliott Co.*,
   760 F.3d 414 (5th Cir. 2014) ............................................................................39

*Illinois v. City of Milwaukee*,
   406 U.S. 91 (1972) ...............................................................................................7

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Isaacson v. Dow Chemical Co.,*
517 F.3d 129 (2d. Cir. 2008) ................................................................39

*Jefferson Cnty. v. Acker,*
527 U.S. 423 (1999)..................................................................... 11, 18

*Jones v. John Crane-Houdaille,*
2012 WL 1197391 (D. Md. Apr. 6, 2012).............................................50

*Juliana v. United States,*
947 F.3d 1159 (9th Cir. 2020) ..............................................................55

*K&D LLC v. Trump Old Post Office LLC,*
951 F.3d 503 (D.C. Cir. 2020)................................................... 2, 11, 18

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.,*
754 F.2d 1223 (5th Cir. 1985) ...................................................... 12, 17

*Latiolais v. Huntington Ingalls, Inc.,*
951 F.3d 286 (5th Cir. 2020) ..................................... 14, 17, 25, 47

*Legg v. Wyeth,*
428 F.3d 1317 (11th Cir. 2005) ...........................................................10

*Leite v. Crane Co.,*
749 F.3d 1117 (9th Cir. 2014) .......................................... 10, 11, 18, 47

*LLOG Exploration Co. v. Certain Underwriters at Lloyd's of London,*
2007 WL 854307 (E.D. La. Mar. 16, 2007) ..........................................16

*Native Village of Kivalina v. ExxonMobil Corp.,*
696 F.3d 849 (9th Cir. 2012) ................................................................52

*Parish of Plaquemines v. Total Petrochemical & Refining USA, Inc.,*
64 F. Supp. 3d 872 (E.D. La. 2014)......................................................16

*Reaser v. Allis Chambers Corp.,*
2008 WL 8911521 (C.D. Cal. June 23, 2008)......................................48

*Reed v. Fina Oil & Chem. Co.,*
995 F. Supp. 705 (E.D. Tex. 1998).........................................................7

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*San Diego Unions v. Garmon*,
359 U.S. 236 (1959)............................................................................16

*Sawyer v. Foster Wheeler LLC*,
860 F.3d 249 (4th Cir. 2017) .......................................................40, 47

*Schmitt v. War Emergency Pipelines, Inc.*,
175 F.2d 335 (8th Cir. 1949) ..............................................................27

*Schmitt v. War Emergency Pipelines, Inc.*,
72 F. Supp. 156 (E.D. Ark. 1947)........................................................27

*Shell Oil Co. v. United States*,
751 F.3d 1282 (Fed. Cir. 2014) ..........................................................24

*Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*,
87 F.3d 150 (5th Cir. 1996) ................................................................14

*The Taxpayer Citizens Grp. v. Cape Wind Assocs., LLC*,
373 F.3d 183 (1st Cir. 2004)..............................................................11

*Totah v. Bies*,
2011 WL 1324471 (N.D. Cal. Apr. 6, 2011).....................................50

*United States v. Bestfoods*,
524 U.S. 51 (1998)..............................................................................24

*United States v. Little Lake Misere Land Co.*,
412 U.S. 580 (1973)............................................................................40

*United States v. Shell Oil Co.*,
294 F.3d 1045 (9th Cir. 2002) ............................................................24

*United States v. Standard Oil Co. of Cal.*,
332 U.S. 301 (1947)............................................................................52

*United States v. Standard Oil Co. of California*,
545 F.2d 624 (9th Cir. 1976) ..............................................................41

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ..............................................................54

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Waterfowl Liab. Co. v. United States*,
    473 F.3d 135 (5th Cir. 2006) ...................................................................40

*Watson v. Philip Morris Cos., Inc.*,
    551 U.S. 142 (2007).............................................6, 18, 23, 33, 43, 46

*Willingham v. Morgan*,
    395 U.S. 402 (1969).............................................................................50

*Winters v. Diamond Shamrock Chem. Co.*,
    149 F.3d 387 (5th Cir. 1998) ...........................................................32

*Wright v. A.W. Chesterton Co.*,
    2008 WL 512728 (N.D. Cal. Feb. 25, 2008) .....................................48

**Statutes**

28 U.S.C. § 1331 .................................................................................10, 50

28 U.S.C. § 1441 ......................................................................................10

28 U.S.C. § 1442....................................................................5, 17, 50

42 U.S.C. § 6241 ......................................................................................46

43 U.S.C. §1332 ....................................................................................6, 34

43 U.S.C. §§ 1332 ......................................................................................6

43 U.S.C. § 1344 ......................................................................................36

43 U.S.C. § 1349(b)(1)...........................................................2, 3, 5, 12, 14

43 U.S.C. § 1802(1)–(2) ................................................................6, 16, 35

Defense Production Act of 1950, Pub. L. 81–774, 64 Stat. 798...............28

Federal Energy Administration Act of 1974, Pub. L. 93-275,
    88 Stat. 96 ...........................................................................................21

Haw. Rev. Stat. Ann. § 125C-1 (1975)...................................................58

OCSLA and the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.*................33

## TABLE OF AUTHORITIES *(continued)*

<u>Page(s)</u>

SPR in the 1975 Energy Policy Conservation Act, Pub. L. 94-163,
89 Stat. 871 ........................................................................................44

Supplemental Appropriation Act of 1974, Pub. L. 93–245,
87 Stat. 1071 ......................................................................................44

**Regulations**

30 C.F.R. § 250.106 ...............................................................................38

30 C.F.R. § 250.1150 .............................................................................37

30 C.F.R. § 250.1151-52 ........................................................................38

30 C.F.R. §250.1159 ..............................................................................38

30 C.F.R. § 250.1160-64 ........................................................................38

30 C.F.R. § 250.1165 .............................................................................38

30 C.F.R. § 1202.100 .............................................................................38

8 Fed. Reg. 1068 ...................................................................................27

8 Fed. Reg. 13343 .................................................................................28

38 Fed. Reg. 30572, ..............................................................................28

83 Fed. Reg. 23295, 96 .........................................................................22

85 Fed. Reg. 51556 ...............................................................................49

85 Fed. Reg. 51562 ...............................................................................49

## I.    INTRODUCTION

This lawsuit is one of more than a dozen similar actions filed in state courts around the country.  These coordinated cases seek to pin liability for global climate change on a select group of energy companies allegedly responsible in the aggregate for a small fraction of the world's oil and gas supplies.  But United States federal policy has, for many decades, expressly recognized the fundamental strategic importance of oil and gas to the nation's economic well-being and national security. By targeting oil and gas producers, the Complaint threatens to interfere with longstanding federal policies over matters of uniquely national importance.  Plaintiff seeks to evade federal jurisdiction—and thereby disadvantage core federal interests—by pleading nominally state-law claims.  Congress provided for removal to prevent precisely this type of prejudice, and Plaintiff cannot use artful pleading and strategic omissions to avoid the central role federal law plays in the Complaint's core allegations.  This case belongs in federal court.

As this Court knows, this is not the first litigation of a climate change removal notice.  Defendants' removal notice and remand opposition in this case, however, contain important additional facts and arguments that have not been part of previous lawsuits, and were not, for example, before the Ninth Circuit when it made its recent rulings.  While the parties may disagree about the degree to which Plaintiff's claims depend on Defendants' production of oil and gas, the law provides that, for federal

officer removal, a federal court must "'credit [the defendant's] theory of the case for purposes . . . of' the removal inquiry." *K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020).  And *Defendants* are to receive "the benefit of all reasonable inferences from the facts alleged." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020).  Despite Plaintiff's efforts to evade the federal questions embedded in its Complaint, its claims and theory of causation necessarily depend on decades' worth of fossil fuel production that Defendants conducted under the direction of, and with encouragement from, the federal government.  Given the national and international aspects of Plaintiff's claims and the relief sought, Defendants properly removed this action.

*First*, **this Court has jurisdiction because Plaintiff's claims are connected to Defendants' activities on the Outer Continental Shelf ("OCS")**.  Under the Outer Continental Shelf Lands Act ("OCSLA"), state-law claims are removable if they "aris[e] out of, or in connection with . . . any operation conducted on the OCS." 43 U.S.C. § 1349(b).  The Ninth Circuit's decisions in *County of San Mateo v. Chevron Corp.*, 960 F.3d 586 (9th Cir. 2020) ("*San Mateo*"), and *City of Oakland v. BP PLC*, 960 F.3d 570 (9th Cir. 2020) ("*Oakland*"), did not reach the issue of whether removal was proper under OCSLA.  It clearly is.

Defendants' operations conducted on the OCS have comprised a major component of total U.S. oil and gas production for decades.  In fact, during relevant

periods, oil produced from the OCS accounted for approximately *30% of all domestic production*.   The Complaint contains specific allegations involving Defendants' OCS activities.   *See, e.g.*, Compl. ¶ 24(b) (noting BP's oil and gas projects in the Gulf of Mexico).   In addition, the Complaint expressly alleges that the cumulative impact of Defendants' overall extraction and production activities over the past several decades—which necessarily include their substantial operations on the OCS—contributed to the global greenhouse gas emissions that Plaintiff claims caused the alleged injuries.   *See, e.g.*, Compl. ¶ 22(b).   Further, even assuming that Plaintiff's claims did not arise out of Defendants' activities on the OCS (they do), OCSLA jurisdiction would still apply because the relief Plaintiff seeks would affect the viability of the federal OCS leasing program.   43 U.S.C. § 1349(b)(1).

Plaintiff attempts to evade OCSLA's straightforward jurisdictional analysis by claiming its lawsuit seeks redress for Defendants' alleged efforts to conceal and misrepresent the alleged dangers of fossil fuel products.   Mot. at 1, 7; Compl. ¶¶ 1–15.   But Plaintiff makes no attempt to limit its claims or pleaded relief to any purported misrepresentation or concealment.   The Complaint confirms this fact by failing to assert a claim for fraud or even negligent misrepresentation.

Instead, the Complaint seeks relief for harms allegedly caused by *worldwide production and sales activities*, including emissions that Plaintiff does not (and cannot) attribute to Defendants' alleged misrepresentations.   Plaintiff seeks:

3

- Compensatory damages for all injuries suffered as a result of global climate change;

- Disgorgement of profits made by Defendants' production and sale of oil and gas; and

- An order compelling Defendants to abate the alleged nuisance caused by global climate change.

Compl. at 113.  Under Hawaiʻi law, a request for abatement is functionally the same as seeking to *enjoin* Defendants' production of oil and gas.  *See Haynes v. Haas*, 146 Haw. 452, 460-61 (2020).  If Plaintiff's claims were based exclusively on alleged concealment and misrepresentations, its pleaded relief in this case would necessarily be limited to—at most—any harms allegedly caused by the purported marginal increase in fossil fuel consumption caused by the purported concealment and misrepresentations.  But the Complaint contains no such limit and in fact seeks far broader relief.

Further, Plaintiff's "misrepresentation" and "concealment" claims are based on implausible—indeed, demonstrably false—premises.  The potential link between greenhouse gas emissions and global climate change has been widely studied, reported, and discussed for decades—across the nation, in Hawaiʻi, and within Honolulu itself.  The Complaint expressly notes that in 1965—over 50 years ago, and well before Plaintiff alleges any Defendant "concealment"—"the highest levels of the United States' scientific community" publicly acknowledged that the burning of fossil fuels "could cause significant global warming."  Compl. ¶ 52.

Even a cursory review of the Complaint demonstrates that Plaintiff seeks to hold Defendants liable for their *global* conduct, which necessarily includes Defendants' substantial operations conducted on federal lands, including the OCS. Plaintiff's claims without question "aris[e] out of, or in connection with" "operation[s]" conducted on the OCS. 43 U.S.C. § 1349(b). Jurisdiction, therefore, is proper.

**Second**, **this case is removable under the federal officer removal statute**. Federal law provides for removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Removal under § 1442 must be liberally construed. *See Goncalves by and through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017). The Court must "construe the facts in the removal notice in the light most favorable to" Defendants. *In re Commonwealth's Motion To Appoint Counsel Against Or Directed To Defender Ass'n Of Philadelphia*, 790 F.3d 457, 466 (3rd Cir. 2015).

Although the Ninth Circuit addressed federal officer removal arguments in *San Mateo*, the record here includes additional, substantial categories of evidence showing that Defendants have:  performed critical and necessary functions for the U.S. military and to meet national security needs; engaged in activities related to Plaintiff's claims pursuant to government mandates, leases, and contracts; and

produced oil and gas on federal lands under federal direction, supervision, and control. These are all activities that, "in the absence of [] contract[s] with [] private firm[s], the Government itself would have had to perform," which by itself satisfies the criteria for removal. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 154 (2007). Indeed, in response to the 1973–74 Arab Oil Embargo, the federal government had considered creating a *national oil company* (the mechanism by which many countries extract hydrocarbons) to facilitate the production of oil and gas on the OCS in order to carry out the statutory objectives. Ultimately, the federal government instead chose to contract with private energy companies, including many Defendants, through a federally directed leasing program that allowed the government to exert control over Defendants' operations and production for the express purpose of protecting U.S. national interests by reducing dependence on foreign oil and developing resources on federal lands. *See* 43 U.S.C. §§ 1332(3), 1802(1) & (2); Miyagi Decl., Ex. 1 (Cong. Rec. S903-11).

Defendants also provide additional evidence not in the *San Mateo* record regarding the Strategic Petroleum Reserve ("SPR"), which Congress created to fulfill its treaty obligations and to blunt the use of petroleum as a weapon by foreign countries. Several Defendants "acted under" federal officers by supplying oil for the SPR and managing it for the government.

Defendants also provide additional evidence not in the *San Mateo* record

showing that they have produced and continue to produce highly specialized petroleum products, including aviation fuel ("avgas"), for the U.S. military, and that the government has "exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor." *Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *1 (S.D. Tex. Sept. 16, 2020). These facts, which were not before the Ninth Circuit in *San Mateo*, demonstrate removal was appropriate.

**Third**, **this case is removable because there is federal enclave jurisdiction**. Defendants produced and sold oil and gas on federal enclaves, including military bases, which establishes federal question jurisdiction. *See, e.g.*, *Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705, 713 (E.D. Tex. 1998).

**Finally**, **Plaintiff's claims arise under federal law because federal law exclusively governs claims for interstate and international pollution, as well as claims implicating the navigable waters of the United States**. *See, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972); *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981); *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421–23 (2011) ("*AEP*"). Plaintiff's claims necessarily arise under federal common law and raise and depend on the resolution of disputed, substantial federal questions relating to the federal government's exclusive control over the navigable waters of the United States, issues of treaty interpretation involving international climate accords, and the

federal government's exclusive authority over foreign relations. Thus, they are properly removable. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005) ("*Grable*"). Plaintiff's claims are also completely preempted by the Clean Air Act ("CAA") and other federal statutes.[1]

*          *          *

In sum, the Complaint challenges the production, sale, and use of oil and gas products used daily by virtually every person on the planet. A substantial portion of these products were produced on federal lands and under the direction and control of federal officers. The Complaint seeks to upend longstanding national and international policies developed by the political branches of our federal government to balance protecting our national economy and security with preserving the environment and climate. This case belongs in federal court and removal is proper.[2]

## II.   PROCEDURAL BACKGROUND

On March 9, 2020, Plaintiff filed its Complaint in the Circuit Court of the First Circuit of the State of Hawai'i. The Complaint alleges that "production and use of [Defendants'] fossil fuel products create greenhouse gas pollution that warms the

---

[1] Although the Ninth Circuit rejected similar arguments regarding these grounds in *Oakland*, Defendants raise them here to preserve them for appellate review.

[2] Several Defendants contend that they are not subject to personal jurisdiction in Hawai'i. Defendants submit this remand opposition subject to, and without waiver of, these jurisdictional objections.

planet and changes our climate." Compl. ¶ 1.  According to the Complaint, "[t]his dramatic increase in atmospheric $CO_2$ and other greenhouse gases is the main driver of the gravely dangerous changes occurring to the global climate." *Id.* ¶ 4.  Plaintiff alleges that it "has suffered and will continue to suffer severe injuries" "[a]s a direct result of those and other climate crisis-caused environmental changes." *Id.* ¶ 11.

On April 15, 2020, Defendants timely removed this action.  On May 26, the Ninth Circuit issued opinions that addressed and rejected some of Defendants' removal arguments in similar actions.

In *Oakland*, the district court denied plaintiffs' motion to remand, holding that their "nuisance claims—which address the national and international geophysical phenomenon of global warming—are necessarily governed by federal common law." *California v. BP P.L.C.*, 2018 WL 1064293, *2 (N.D. Cal. Feb. 27, 2018). The Ninth Circuit vacated the district court's decision, concluding that "neither exception [*Grable* or complete preemption] to the well-pleaded-complaint rule applies to the Cities' original complaints." *Oakland*, 969 F.3d at 908.

In *San Mateo*, the same Ninth Circuit panel found that federal officer removal was lacking based on the record in that case. *San Mateo*, 960 F.3d at 603.  The panel considered a far more limited set of evidence and materials and concluded only that the defendants were not "acting under a federal officer." *Id.*  The panel held that it did not have jurisdiction to consider any other removal grounds asserted.

Defendants also intend to seek Supreme Court review of this decision, and note that, on October 2, 2020, the Supreme Court granted review in a similar case presenting the same question on the scope of appellate review. *BP p.l.c. v. Mayor & City Council of Baltimore*, No. 19-1189, 2020 WL 5847132 (U.S. Oct. 2, 2020).

The Ninth Circuit's opinions in *Oakland* and *San Mateo* do not address all bases for federal jurisdiction asserted here. Neither *Oakland* nor *San Mateo* addressed arguments pertaining to OCSLA jurisdiction or federal enclave jurisdiction. Further, the Notice of Removal presents additional facts and authorities supporting federal officer jurisdiction that were not raised in *Oakland* or *San Mateo*. For these reasons, and those set forth herein, Defendants request oral argument.

## III.   LEGAL STANDARDS

Removal from state court is proper if the federal court would have had original jurisdiction of the action. 28 U.S.C. § 1441(a). Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "The removal process was created by Congress to protect defendants." *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005). When invoking removal jurisdiction, a defendant's "factual allegations will ordinarily be accepted as true unless challenged by the [plaintiff]." *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014). The removing party need show only that there is federal jurisdiction over a single claim. *See Exxon Mobil Corp. v. Allapattah Servs.*,

*Inc.*, 545 U.S. 546, 563 (2005).

Courts construe broadly the right to remove under OCSLA, the federal officer removal statute, and the federal enclave doctrine. *See, e.g.*, *The Taxpayer Citizens Grp. v. Cape Wind Assocs., LLC*, 373 F.3d 183, 188 (1st Cir. 2004) (OCSLA is "a sweeping assertion of federal supremacy over the submerged lands."). In particular, the Supreme Court has "rejected a narrow, grudging interpretation" of the federal officer removal statute. *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999) (internal quotation omitted). "[D]efendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute." *Leite*, 749 F.3d at 1122. A defendant's allegations "in support of removal" need only be "facially plausible" and the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Baker*, 962 F.3d at 941, 945. The court must "'credit [Defendants'] theory of the case for purposes of . . .' the removal inquiry." *K&D LLC*, 951 F.3d at 506.

## IV.   ARGUMENT

### A.   The Action Is Removable Because It Is Related to Defendants' Activities on the Outer Continental Shelf

This Court has jurisdiction over this action under OCSLA, which grants it original jurisdiction over actions "arising out of, or in connection with . . . *any operation* conducted on the [OCS] which *involves exploration, development, or production* of the minerals, of the subsoil and seabed of the [OCS], or which involves

11

rights to such minerals."  43 U.S.C. § 1349(b)(1) (emphases added).  OCSLA was enacted "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."  *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 566 (5th Cir. 1994).  In connection with this broad aim, Congress extended federal jurisdiction "to the entire range of legal disputes that it knew would arise relating to resource development on the [OCS]."  *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985).  Accordingly, the phrase "arising out of, or in connection with" is "undeniably broad in scope."  *EP Operating Ltd. P'ship*, 26 F.3d at 569.

Plaintiff does not dispute that Defendants have significant operations on the OCS.   In fact, Plaintiff specifically identifies some of those activities in its Complaint.  *See, e.g.*, Compl. ¶ 24(b).  Plaintiff further alleges that the cumulative impact of Defendants' *global* extraction and production activities over the past several decades—which necessarily include Defendants' significant production on the OCS—contributed to global greenhouse gas emissions that caused Plaintiff's alleged injuries.  *See, e.g.*, Compl. ¶ 22(b).  Both elements of OCSLA jurisdiction are therefore satisfied:  (1) Defendants engage in an "operation conducted on the [OCS]" that entails the "exploration" and "production" of "minerals," and (2) Plaintiff's action "aris[es] out of, or in connection with" the operation.  43 U.S.C. § 1349(b)(1); *see EP Operating Ltd. P'ship*, 26 F.3d at 569.

Defendants easily satisfy the first prong of OCSLA's jurisdictional test. Defendants and/or their affiliates operate a large share of the "more than 5,000 active oil and gas leases on nearly 27 million OCS acres" that the Department of the Interior administers under OCSLA.  NOR ¶ 43.  Oil produced from the OCS accounts for approximately *30% of all domestic production*, and the U.S. Treasury takes in more than $10 billion in average annual revenues from OCS lease bonuses, rental payments, and royalties.  Miyagi Decl. Ex. 2, 1–4.  According to data published by the Department of Interior for the period 1947 to 1995, sixteen of the twenty largest—including the five largest—OCS operators in the Gulf of Mexico, measured by oil volume, were a Defendant (or predecessor of a Defendant) or one of their subsidiaries.  Miyagi Decl. Ex. 3.  Also according to the Department of the Interior, in every subsequent year, from 1996 to the present, at least three of the top five OCS operators in this area have been a Defendant (or a predecessor) or one of their subsidiaries.  Miyagi Decl. Ex. 4; *see also* NOR ¶ 48.[3]

Defendants also satisfy the second prong of OCSLA's jurisdictional test because Plaintiff's claims arise out of or in connection with Defendants' operations

---

[3] The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of removal only, Defendants describe the conduct of certain predecessors, subsidiaries, or affiliates of certain Defendants to show that Plaintiff's Complaint, as pleaded, was properly removed to federal court.

on the OCS.  Plaintiff argues that the Court should deny federal jurisdiction because Defendants' "claims are only tangentially related to mineral exploration and production on the OCS."  Mot. at 24.  But Plaintiff's Complaint does not distinguish between fossil fuels by location of extraction or production; indeed, Plaintiff contends that Defendants' cumulative fossil fuel production activities contribute to *undifferentiated* greenhouse gas emissions that caused the alleged injuries.  Compl. ¶ 170.  Plaintiff's injuries unquestionably "aris[e] out of, or *in connection with*" Defendants' operations on the OCS.  43 U.S.C. § 1349(b)(1) (emphasis added).[4]

Plaintiff tries to avoid federal jurisdiction by asserting that its "claims are based on Defendants' failure to warn consumers and the public of known dangers associated with fossil fuel products."  Mot. at 25.  As an initial matter, Plaintiff's allegations are wholly unfounded and implausible—and they are also demonstrably false.  The federal government, the public, and even Plaintiff have had growing

---

[4] Plaintiff suggests that "but for" causation is required.  Mot. at 24 n.11.  Those words do not appear in the statute.  In fact, the actual language—"or in connection with"—means there is no causal requirement at all.  In the context of federal officer removal, multiple circuit courts have held that when Congress added the words "related to" into the statute, it "broadened . . . removal to actions, not just *causally* connected, but alternatively *connected or associated*."  *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (emphases in original).  Accordingly, a requirement that conduct "relate to" or be "in connection with" does not require causation, let alone "but for" causation.  *Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996) (finding that plaintiff's claims "aris[e] out" of operations on OCS so long as those operations contribute to the injuries alleged).

awareness of the potential links between fossil fuel consumption, greenhouse gases, and global climate change beginning as early as the 1950s. *See infra* Section IV.D.

In any event, production and consumption are still critical links in Plaintiff's causal chain: Plaintiff claims that Defendants' alleged misrepresentations led to sustained or increased demand, production, and consumption of oil and gas, which led to increased emissions, which led to global climate change, causing Plaintiff's alleged injuries. Plaintiff itself places *production* of oil and gas in the (tenuous) causal chain between Defendants' alleged misrepresentations and Plaintiff's alleged harm. Far from "tangentially relat[ing] to mineral exploration and production on the OCS," Mot. at 24, Plaintiff's own allegations demonstrate that the essential factor in its claimed injuries is not any alleged misstatements or omissions, but the greenhouse gas emissions resulting from the production and consumption of petroleum products. *See, e.g.*, Compl. ¶¶ 2, 4, 5, 11. As explained above, Plaintiff seeks sweeping relief—including compensatory damages, disgorgement of profits, and *injunctive relief*—based not only on Defendant's alleged misrepresentations, but also on global production and consumption of oil and gas over several decades.

Moreover, OCSLA jurisdiction is also proper here because the relief Plaintiff seeks would affect the future viability of the federal OCS leasing program. Congress intended § 1349 to cover "any dispute that alters the progress of production activities on the OCS and thus threatens to impair the total recovery of the federally-owned

minerals." *EP Operating Ltd. P'ship*, 26 F.3d at 570. Plaintiff seeks potentially billions of dollars in damages and disgorgement of profits, together with an order of abatement to enjoin Defendants' production of oil and gas. *See,* Compl., Prayer for Relief. Such relief would force Defendants to reduce production to some "acceptable" or "reasonable" cap imposed by a court. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief."); *San Diego Unions v. Garmon*, 359 U.S. 236, 247 (1959) (same). This would also substantially interfere with OCSLA's congressionally mandated goal of obtaining the largest "total recovery of the federally-owned minerals" underlying the OCS. *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988); *see* 43 U.S.C. §§ 1802(1), (2). Plaintiff's contention that "granting relief would have no effect on [OCS] operations" is not plausible and must be rejected. Mot. at 24.[5] For this reason as well, this action falls squarely within the "legal disputes . . . relating to resource development on the [OCS]" that Congress intended to be heard in the federal courts. *Laredo Offshore*, 754 F.2d at 1228.

---

[5] The cases Plaintiff relies on are inapposite. For example, *LLOG Exploration Co. v. Certain Underwriters at Lloyd's of London*, 2007 WL 854307, *5 (E.D. La. Mar. 16, 2007), involved an insurance coverage dispute that would "not affect or alter the progress of production activities on the OCS." Similarly, *Parish of Plaquemines v. Total Petrochemical & Refining USA, Inc.*, 64 F. Supp. 3d 872, 895 (E.D. La. 2014), found no "operation conducted on the OCS" was at issue.

**B.      The Action Is Removable Under the Federal Officer Removal Statute**

Defendants may also remove this action because the federal government directed Defendants to engage in activities relating to Plaintiff's claims and alleged injuries.  *See* 28 U.S.C. § 1442(a)(1).  The federal officer removal statute authorizes removal of claims (1) against a "person"; (2) "for or relating to"—*i.e.*, "connected or associated with"—an "act under" color of federal officer; (3) for which a defendant raises a colorable federal defense.  *Latiolais*, 951 F.3d at 291–92.

The only element in dispute here is the second.  Plaintiff argues removal is not proper because Defendants have not shown that they "acted under" federal officers and that Defendants' assertions regarding how those activities relate to Plaintiff's claims are somehow deficient.  *See* Mot. at 26–36.  Plaintiff's motion relies heavily on the claim that "[m]any of Defendants' arguments concerning federal officer jurisdiction were rejected by the Ninth Circuit in *San Mateo*."  *Id.* at 26.  That reliance is misplaced because in *San Mateo* the Ninth Circuit's analysis of the "acting under" prong was limited to the record before it, and the court did not address whether the acts at issue were "connected or associated with" those plaintiffs' claims.  Defendants' Notice of Removal in this action provides substantial additional evidence—beyond that presented in *San Mateo* or in the record on appeal to the Ninth Circuit—that demonstrates they acted under federal officers for decades.

The Supreme Court has emphasized that "[t]he words 'acting under' are

broad," and are satisfied where, "in the absence of [] contract[s] with [] private firm[s], the Government itself would have had to perform" such tasks. *Watson*, 551 U.S. at 147, 154. "[D]efendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute." *Leite*, 749 F.3d at 1122. As the Ninth Circuit has explained, the statute is "interpret[ed] . . . broadly in favor of removal." *Goncalves*, 865 F.3d at 1244 (citation omitted). A defendant's allegations "in support of removal" need only be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Baker*, 962 F.3d at 941, 945; *In re Commonwealth's Motion*, 790 F.3d at 466, 474 ("[W]e construe the facts in the removal notice in the light most favorable to the [defendant]" and "we must accept the [Defendant's] theory of the case at this juncture"). Critically, the Supreme Court has held that a federal court must "credit [the defendant's] theory of the case for purposes of [removal]." *Acker*, 527 U.S. at 432; *accord K&D LLC*, 951 F.3d at 506; *Baker*, 962 F.3d at 947.

As explained above, Defendants' theory of the case is that Plaintiff's alleged harms resulted from decades of greenhouse gas emissions caused by billions of consumers' use of fossil fuels that were produced, in part, for the federal government and/or under federal government directives and control. Far beyond being a "theory," however, Defendants have provided substantial *facts* demonstrating that they have performed critical tasks at the direction of the federal government with

which this action is "connected or associated."

### 1. Securing an Adequate Supply of Oil and Gas Is an Essential Government Function

Defendants' grounds for federal officer removal span more than a century, and include actions under federal officers in connection with numerous federal programs and federal contracts, all of which relate to the U.S. government's vital interest in ensuring adequate energy sources for national defense and economic security.  President Taft first recognized the national interest in ensuring domestic supplies of oil in a 1910 address to Congress that led to the creation in 1912 of the Naval Petroleum Reserve at Elk Hills, which preserved oil in the ground for national emergencies.  Miyagi Decl. Ex. 5; *see infra* Section IV.B.2.b.2.

During World War II, the United States' need for high-octane avgas, lubricants, and synthetic rubber far outstripped the nation's capacity.  The government pursued full production of its oil reserves and created agencies to *control* the petroleum industry, including Defendants' predecessors and affiliates; it built refineries and directed the production of certain products; and it managed scarce resources for the war effort.  *See* Miyagi Decl. Ex. 6 at 1 (Statement of Senator O'Mahoney, Chairman, Special Committee Investigating Petroleum Resources, S. Res. 36 (Nov. 28, 1945)) ("No one who knows even the slightest bit about what the petroleum industry contributed to the war can fail to understand that it was, without the slightest doubt, one of the most effective *arms* of this Government . . . in bringing

about a victory." (emphasis added)).  *See infra* Section IV.B.2.a.1.

In the early 1970s, the United States faced a precarious shortage of oil, which in turn, threatened domestic stability.  By April 1973, President Nixon was sounding the alarm to Congress:  "If recent trends continue unchecked, we could face a genuine energy crisis."  Miyagi Decl. Ex. 7.  One of President Nixon's immediate suggestions to avert a national energy crisis was to dramatically increase production on the OCS.  The situation was soon exacerbated by the OPEC oil embargos during the Arab-Israeli War, which created serious oil shocks to the economy.  In response to these threats to the security of America's energy supply, President Nixon announced "a series of plans and goals set to insure that by the end of [the 1970s], Americans will not have to rely on any source of energy beyond on our own," which was dubbed "Project Independence."  *Address to the Nation about National Energy Policy*, 1 Pub. Papers 973, 976 (Nov. 25, 1973), https://quod.lib.umich.edu/p/ppotpus/4731942.1973.001/1030?rgn=full+text;view=image.  Among other things, President Nixon ordered the Secretary of the Interior "to increase the acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally been planned."  Miyagi Decl. Ex. 8 (President Nixon, Special Message to the Congress on the Energy Crisis (Jan. 23, 1974)).

In 1974, Congress established the Federal Energy Administration ("FEA") "to promote the expansion of readily usable energy sources, and to assist in developing

policies and plans to meet the energy needs of the nation," as well as to "assure a co[o]rdinated and effective approach to overcoming energy shortages." *See* Federal Energy Administration Act of 1974, Pub. L. 93-275, 88 Stat. 96. The FEA proposed that "leasing of the Federal OCS be accelerated" in an effort to provide "strategic foreign policy and national security advantages in having energy sources which are not susceptible to interruption by a foreign power." Miyagi Decl. Ex. 9 at 1012 (H.R. Doc. No. 93-406 (1974)). Around the same time, Congress initiated a multi-year effort "to establish a modern national policy for the development of OCS oil and gas resources," which culminated in amendments to OCSLA in 1978, spurring oil and gas production from the OCS. Miyagi Dec. Ex. 10, at 27262 (124 Cong. Rec. S13994-99 (daily ed. Aug. 22, 1978)). *See infra* Section IV.B.2.b.1.

The federal government supervised and encouraged the domestic production of oil and gas to meet this goal, long *after* the potential link between greenhouse gas emissions and climate change was common knowledge. *See* Compl. ¶ 89. Indeed, presidential administrations over the past several decades have continued to supervise and encourage oil production. Miyagi Decl. Exs. 11–17. As President Obama stated in 2010, "the bottom line is this: given our energy needs, in order to sustain economic growth, produce jobs, and keep our businesses competitive, we're going to need to harness traditional sources of fuel even as we ramp up production of new sources of renewable, homegrown energy." *Id.* Ex. 94. The United States

recently explained, "federal law and policy has long declared that fossil fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports." Brief of the United States as Amicus Curiae at 10, *Oakland v. BP PLC*, 960 F.3d 570 (2020) (No. 18-16663), ECF No. 198 (quoting 42 U.S.C. § 15927(b)(1)); *see* 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) ("fossil fuels" are "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production").

Recent administrations have continued the push to develop the nation's oil production to advance national and economic security. These efforts were successful: U.S. energy exports exceeded imports in 2019, and the United States became a net energy exporter for the first time since 1952. Miyagi Decl. Ex. 18, at 1 (EIA, *U.S. Energy Facts Explained* (last updated Apr. 27, 2020)).

Defendants also acted under federal officers in meeting the military's needs for petroleum products. Those needs remain strong today. The Department of Defense annually is the single largest consumer of energy in the United States, and one of the world's largest users of petroleum fuel. In 2019 alone, the Department of Defense procured 94.2 million barrels of fuel products in compliance with military specifications, totaling $12.1 billion. Miyagi Decl. Ex. 19, at 27 (Defense Logistics Agency Energy FY 2019 Fact Book).

Plaintiff's claims are necessarily based on this decades-long special relationship between Defendants and the federal government, and should be heard in federal court. *Baker*, 962 F.3d at 941–42 ("The crux of the ['acting under'] inquiry . . . is whether there was a special relationship between the defendant and the federal government," which exists where an entity "provide[s] the federal government with materials that it need[s]").

### 2.   Defendants Acted Under Federal Officers

"The words 'acting under' are broad." *Watson*, 551 U.S. at 147. A "person" can "act under" federal officers when it is in "an unusually close [relationship] involving detailed regulation, monitoring, or supervision" by the government, *San Mateo*, 960 F.3d at 599; when federal officers have "delegated th[eir] responsibility" to make something or provide a service "on . . . behalf" of the government, *Goncalves*, 865 F.3d at 1247; or when it is undertaking an activity "so closely related to the government's implementation of its federal duties that the private person faces 'a significant risk of state-court prejudice,' . . . and may have difficulty in raising an immunity defense in state court," *San Mateo*, 960 F.3d at 600. In the examples below, Defendants "acted under" federal officers to supply oil and gas for the government to advance federal interests.

### a.   Defendants Acted Under Federal Officers to Produce and Supply Specialized Fuels for the Military

Many of the Defendants have developed and provided specialized fuels to the

military under government contracts and as directed by the government. This evidence was not presented to or considered by the Ninth Circuit in *San Mateo*.

### 1) Defendants Acted Under Federal Officers During World War II and the Korean War

Multiple courts have found that the federal government exerted extraordinary control over Defendants during World War II and the Korean War to guarantee the supply of oil and gas for wartime efforts, such as high-octane avgas. *See*, *e.g.*, *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002) ("Because avgas was critical to the war effort, the United States government exercised significant control over the means of its production during World War II."); NOR ¶ 59.

These cases highlight the nature and extent of the control exerted by the federal government through agencies such as the Petroleum Administration for War ("PAW"). PAW directed construction of new oil and gas facilities and allocation of raw materials, issued production orders, entered into contracts giving extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies." *See* NOR ¶ 59; *Shell Oil Co. v. United States*, 751 F.3d 1282, 1286 (Fed. Cir. 2014) ("PAW told the refiners what to make, how much of it to make, and what quality"); *Exxon Mobil*, 2020 WL 5573048, at *11 (rejecting argument that private refiners "voluntarily cooperated"; instead

finding they had "no choice" but to comply with the federal officers' direction).[6]

During World War II alone "[a]lmost seven billion barrels of [oil] had to be brought from the ground between December 1941 and August 1945 … [t]hat is *one-fifth of all the oil that had been produced in this country since the birth of the industry in 1859*."  Miyagi Decl. Ex. 20, at 1.  The government dictated where and how to drill, rationed essential materials, and set state-wide quotas for production.  *Id.* at 28, 171, 177–79, 184 & n.18.  "The government [] used [its] authority to control many aspects of the refining process and operations."  *Exxon Mobil Corp. v. United States*, No. H-10-2386, No. H-11-1814, 2020 WL 5573048, at *14 (September 16, 2020).

Controlling production of petroleum products by setting production quotas, dictating where and how to explore for petroleum, micromanaging operations, and rationing materials in order to help conduct a war are not the stuff of mere "regulation."  They are instead indicative of the kind of special relationship that the Supreme Court described in *Watson*.

---

[6] It is irrelevant that the *Exxon Mobil* court elsewhere held that the federal government was not an "operator" of ExxonMobil's refineries under CERCLA. CERCLA's "operator" standard demands a significantly tighter nexus than the federal officer removal statute.  *Compare United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998) (an "operator" must "manage, direct, or conduct operations *specifically related* to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations" (emphasis added)), *with Latiolais*, 951 F.3d at 296 ("[A]ny civil action that is *connected or associated with* an act under color of federal office may be removed." (emphasis added)).

PAW's directives to Defendants were often coercive.  PAW's message to the oil and gas industry was clear: the government would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way." Miyagi Decl. Ex. 21, at 8 (Secretary Harold Ickes, Conference of Petroleum Industry Chairmen (Aug. 11, 1941)).  PAW also maintained "disciplinary measures" for non-compliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance."   Miyagi Decl. Ex. 22 (Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, *Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams* (Aug. 12, 1942)).  In sum, the federal government deployed an array of threats and sanctions to ensure Defendants assented to PAW's production directives.

In addition, the government's need for highly specific fuels necessitated changes to Defendants' refining equipment and operations. *See* Miyagi Decl. Ex. 23, at 40 (W. J. Sweeney et al., Aircraft Fuels and Propellants, Report for the Army Air Force Scientific Advisory Group (1946)).  And the impacts of the government's particular fuel specifications on Defendants' operations were typically long lasting. *See* Miyagi Decl. Ex. 24 (I. Waitz, S. Lukachko, & J. Lee, Military Aviation and the Environment: Historical Trends and Comparison to Civil Aviation, 42 J. of Aircraft 2 (2005)).  For example, JP-4 was developed in 1951 and was the most heavily used Air Force fuel until it was phased out around 1998. *See* Miyagi Decl. Ex. 25, at 1-

39, 1-40 (Coordinating Research Council, Handbook of Aviation Fuel Properties, CRC Report No. 635 (2004)).

Defendants also acted under the federal government as its agents by building and operating pipelines transporting oil during World War II. "To insure adequate supplies of petroleum through the east during . . . World War II, the Government caused to be constructed, between the Texas oilfields and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively" (together, the "Inch Lines"). *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*"). The Inch Lines "were built for a single purpose, to meet a great war emergency. . . . [T]hey helped to win a war that would have taken much longer to win without them." Miyagi Decl., Ex. 26. *See* Miyagi Decl. Ex. 20, at 104–05, 108 (John W. Frey & Chandler Ide, *A history of the Petroleum Administration for War: 1941-1945* (1946)). War Emergency Pipelines, Inc. ("WEP"), an entity that included predecessors or affiliates of Defendants,[7] constructed and operated the Inch Lines "under contracts" and "*as agent*" for the federal government "without fee or profit." *Schmitt*, 175 F.2d at 335–36 (emphasis added); *see Schmitt v. War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 157 (E.D. Ark. 1947) ("*WEP I*") (detailing contracts and explaining the government

---

[7] *See* Miyagi Decl., Ex. 27 (Certificate of Dissolution of War Emergency Pipelines, Inc. 1-2 (Aug. 28, 1947)); *id.* Ex. 8.

"delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement'"). Defendants who participated in the construction and delivery of oil by WEP "acted under" federal directives. Miyagi Decl. Ex. 28 (8 Fed. Reg. 1068 (Petroleum Directive 63)); *Id.* Ex. 29 (8 Fed. Reg. 13343 (Petroleum Directive 73)). They were thus "serving as the government's agent." *Goncalves*, 865 F.3d at 1246.

At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. 81–774, 64 Stat. 798 ("DPA"). PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use. *See* Miyagi Decl. Ex. 30 (Fourth Annual Report of the Activities of the Joint Committee on Defense Production, H. Rep. No. 84-1, at 122 (Jan. 5, 1955, 1st Sess.)). *See Exxon Mobil*, 2020 WL 5573048, at *15 (detailing government's use of DPA "to force" petroleum industry to "increase their production of wartime . . . petroleum products").

The government also invoked DPA after the 1973 Oil Embargo to address "immediate and critical" petroleum shortages suffered by the military. Miyagi Decl., Ex. 31, Pt. 1, at 442 (Twenty-Fourth Annual Report of the Activities of the Joint Committee on Defense Production, S. Rep. No. 94-1 (Jan. 17, 1975, 1st Sess.)). Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the Department of Defense" and provided

companies that complied with immunity from "damages or penalties."  Petroleum

Products Under Military Supply Contracts, 38 Fed. Reg. 30572, 30572, §§ 1, 3 (Nov.

6, 1973).  The Interior Department subsequently "issued directives to 22 companies

[including Defendants] to supply a total of 19.7 million barrels of petroleum during

the two-month period from November 1, 1973, through December 31, 1973, for use

by DOD."  Miyagi Decl., Ex. 32 at 73–74 (*Hearing Before the Subcomm. on Nat'l*

*Stockpile and Naval Petroleum Reserve, U.S. Senate*, 93d Cong. (1st Sess.) (Dec.

10-11, 1973)); *see also id.* Ex. 31, at 443 (describing directives); *id.* Ex. 33 (reporting

on directives).

> **2)   Defendants Have Continued to Produce and Supply Large Quantities of Specialized Jet Fuel to the Military**

To this day Defendants continue to produce and supply large quantities of

specialized fuel to meet the needs of the U.S. military—all occurring well after the

federal government was indisputably aware of the potential link between fossil fuel

use and climate change (*see infra* Section IV.D).  "[I]n the absence of . . . [these]

contract[s] with [the Defendants], the Government itself would have had to perform"

these essential tasks to meet the critical DOD fuel demands.  *Baker*, 962 F.3d at 942

(quoting *Watson*, 551 U.S. at 154).

During the Cold War, Shell Oil Company developed and produced specialized

jet fuel for the federal government to meet the unique performance requirements of

the U-2 spy plane and later the OXCART and SR-71 Blackbird programs.  For the U-2, Shell Oil Company produced fuel known as JP-7, which required special processes and a high boiling point to ensure the fuel could perform at very high altitudes and speeds.  Manufacturing this special fuel required petroleum byproducts. *See* Miyagi Decl., Ex. 34, at 61–62 (Gregory W. Pedlow & Donald E. Welzenbach, *The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954-1974* (1992)).  "The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . .  A new fuel and a chemical lubricant had to be developed to meet the temperature requirements."  Miyagi Decl. Ex. 35, at 23 (CIA Doc. No. CIA-RDP90B00170R000100080001-5, Clarence L. Johnson, Development of the Lockheed SR-71 Blackbird (Aug. 3, 1981)).  For OXCART, Shell Oil Company produced millions of gallons of secret fuel under government contracts with specific testing and inspection requirements.  Miyagi Decl. Ex. 36 (CIA Doc No. CIA-RDP67B00074R000500400016-2, Contract No. AF33(657)-8577 (SH-511) (Aug. 14, 1962)).  It also constructed "special fuel facilities" for handling and storage, including a hangar, pipelines, and storage tanks at air force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program. Miyagi Decl. Ex. 37–43 (attaching CIA Contracts).

DOD continues to procure from Defendants highly-specialized fuels to power planes, ships, and other vehicles, and to satisfy national defense requirements. For example, between 1983 and 2011, Marathon subsidiary Tesoro Corporation entered into at least 15 contracts with the DOD Defense Logistics Agency ("DLA") to supply highly-specialized military jet fuels, such as JP-4, JP-5, and JP-8. *See* Miyagi Decl., Ex. 44; NOR ¶ 62. DOD exerted *significant control* over Tesoro's actions in fulfilling the contracts with DOD seeking to ensure that the unique jet fuels ignite, but do not freeze, at low temperatures from high altitudes, rapidly dissipate accumulated static charge so as not to produce sparks or fires during rapid refueling (such as on an aircraft carrier where such a fire would be devastating), efficiently combust to allow for longer flights on less fuel, and maintain the integrity of the fuel handling systems over a long period of time. Miyagi Decl. Ex. 45, at § 1.2.2 (MIL-HDBK-510A (Aug. 2014)); *id.* Ex. 46, at Table 1, 2-9 (Air Force Wright Aeronautical Lab., *Military Jet Fuels, 1944-1987*). To meet its unique operational needs, DOD required that Tesoro supply each fuel in accordance with highly specialized DOD specifications,[8] such as:

I. Static dissipator additive, a conductivity improver, to dissipate static charge created during military jet distribution and refueling. If the charge is not dissipated, refueling could result (and has resulted) in a fire, especially when rapid

---

[8] *See* Miyagi Decl. Ex. 47, at 5, 7, 10 (DLA, Detail Specifications, Turbine Fuels, Aviation Kerosene Types, NATO F-34(JP-8), NATO F-35, AND JP-8+100, MIL-DTL-83133E (Apr. 1, 1999)).

refueling is necessary during combat with hot military engines.[9]

II. Fuel system icing inhibitor ("FSII") to depress the freezing point of military jet fuels and ensure that the fuels' natural water content does not freeze at low temperatures encountered by military jets at high altitudes.[10]

III. Corrosion inhibitor/lubricity improver to (1) improve lubricity, which reduces friction and ensures that the military engines do not seize during operation; and (2) prevent corrosion in military fuel handling, transportation, and storage equipment, primarily constructed of uncoated steel.[11]

Additionally, the DOD specifications required Tesoro to conform the fuels to specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, thermal stability, and freezing point, specifications which are essential to performance of the military function.  Miyagi Decl. Ex. 47, at 6 (MIL-DTL-83133E); *id.* Ex. 46, at 17–35.  The DOD's detailed specifications for the makeup of the military jet fuels and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Tesoro and the government.  *Baker*, 962 F.3d at 943.  These unique jet fuels are designed specifically for military use and thus fall into the

---

[9]  Miyagi Decl. Ex. 45, at 28, 35 (MIL-HDBK-510A at § 1.4.1.2; Air Force Lab, *Military Jet Fuels*); *id.* Ex. 46, at 1 (Air Force Wright Aeronautical Laboratories, Effect of Corrosion Inhibitors on Conductivity of Avian Turbine Fuel, ARWAL-TR-85-2076) ("The Air Force and Navy have reported numerous incidents in the [1980s] solely related to electrostatic discharge.").

[10]  Miyagi Decl. Ex. 48 (Dep't of Defense, FSII Specifications, MIL-DTL-85470B (June 1999)); *id.* at Ex. 46, at 30, 41–44.

[11]  Miyagi Decl. Ex. 49 (Dep't of Defense, Performance Specification, Inhibitor, Corrosion / Lubricity Improver Fuel Soluble, MIL-PRF-25017H (Aug. 2011)); *id.* at Ex. 47, at 28, 30, 38–39.

category of specialized military products that support federal officer jurisdiction, *see Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998); *Baker*, 962 F.3d at 943, and not the category of heavily regulated civilian products such as those described by the Supreme Court in *Watson*.

### b.   Defendants Produced Oil and Gas at Federal Direction

Many of the Defendants have engaged in the exploration and production of oil and gas under agreements with federal agencies and under ongoing supervision of federal officers "to *assist*, or to help *carry out*, the [federal] duties or tasks" that are vital to national security. *Watson*, 551 U.S. at 152.

### 1)   Defendants Produced Oil and Gas Under Federal Mineral Leases

Defendants assisted the government to protect national security by reducing dependence on foreign oil by exploring for and producing oil, gas, and other minerals on federal lands, including pursuant to leases governed by OCSLA and the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq*. Defendants' Notice of Removal detailed specific lease and statutory provisions through which the federal government supervises and controls Defendants as federal mineral lessees. *See,* NOR ¶¶ 66–70, Exs. B, C, and E. Those paragraphs provide significantly more detail about government control over federal mineral lessees like Defendants than the factual record at issue in the cases upon which Plaintiff relies. For example, "[t]he federal government retains the right to control a lessee's rate of production

from its lease," including by setting the "Maximum Efficient Rate ('MER') for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir." *E.g.*, NOR at 63 ¶ 69. The government also maintains certain controls over the disposition of the leased oil and gas after it is removed from the ground. For example, the government can precondition a lease on a right of first refusal to purchase all materials "[i]n time of war or when the President of the United States shall so prescribe," NOR Ex. B § 14; Ex. C § 15(d), and can mandate that 20% of all crude and natural gas produced pursuant to drilling leases be offered "to small or independent refiners," NOR Ex. C § 15(c).

The Ninth Circuit found that the OCS leases, *by themselves*, did not require Defendants to fulfill basic government duties, and that "the willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, *without more*, cannot be characterized as the type of assistance that is required to show that the private entity is acting under a federal officer." *San Mateo*, 960 F.3d at 603 (emphasis added and internal quotations omitted). But Defendants here have demonstrated more—namely, that their performance under the leases fulfilled an essential governmental purpose. This evidence justifies removal under *Goncalves*. 865 F.3d at 1247.

In 1953, Congress passed OCSLA for the express purpose of making oil and gas on the OCS "available for expeditious and orderly development" in keeping with

"national needs."  43 U.S.C. §1332(3).  Two decades later, in the wake of OPEC oil embargoes, Congress responded to President Nixon's call to achieve energy independence from foreign oil by 1980, *see supra* Section IV.B.1, by amending OCSLA in 1978 to ensure more production on the OCS.  Congress mandated "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments," including by "mak[ing] such resources available to meet the Nation's energy needs as rapidly as possible."  43 U.S.C. § 1802(1)–(2); *see also California ex rel. Brown v. Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981).

During the debate over the 1978 amendments, Senator Fritz Hollings proposed that Congress create a national oil company to develop the OCS (as national oil companies do in many other countries).  *See* Miyagi Decl. Ex. 1 (121 Cong. Rec. S903-11 (Jan. 27, 1975)) ("My bill authorizes and directs the Secretary of the Interior to initiate a major program of offshore oil exploration—including deep drilling—in frontier areas of the [OCS]. . . . The Federal Government can conduct this program by using the same drilling and exploration firms that are usually hired by oil companies.").  The proposal was ultimately rejected; instead, the government decided to contract with private energy companies, including Defendants, to perform these essential tasks on its behalf with expanded federal

supervision and control.  The adopted amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national needs, and instructed the Secretary to create oil and gas leasing programs on a five-year review cycle that "will best meet national energy needs for the five-year period following its approval or reapproval."  43 U.S.C. § 1344(a)–(e).

Around this time, it was necessary to spur production of oil and gas on the OCS because alternatives were infeasible.  In the lead-up to the 1978 amendments, the Ad Hoc Select Committee on the OCS published a report stating that "alternative sources of energy will not be commercially practical for years to come," and thus, "a healthy economy remains dependent on supplies of oil and gas."  Miyagi Decl. Ex. 50, at 254 (H.R. Rep. No. 94-1084 (1976)).  However, on-shore oil and gas development would not be sufficient to meet the nation's energy needs.  Thus, the Ad Hoc Select Committee stated that "[d]evelopment of our OCS resources will afford us needed time—as much as a generation—within which to develop alternative sources of energy before the inevitable exhaustion of the world's traditional supply of fossil fuels."  Miyagi Decl. Ex. 51, at 1460 (H.R. Rep. 95-590, (1977)).  Indeed, the government at the time expressly viewed the development of the OCS as compatible with addressing climate change until alternatives became feasible; minority views from the Ad Hoc Select Committee's report recognized that "[r]ecent studies warning of possible adverse changes in the climate of the earth as

a result of greatly increased use of coal as an energy source place added emphasis on the need for maximizing petroleum production until sound alternative energy sources can be put into use." *Id.* at 1653.

Each five-year OCS leasing program requires the preparation of an Environmental Impact Statement ("EIS"), which analyzes national energy demands and whether the OCS leasing program is meeting those needs. *See,* Miyagi Decl. Ex. 2. The EISs confirm that the program exists to fulfill a national interest, not the commercial interests of the lessees: "Oil and gas reserves in the OCS represent significant sources that currently help meet U.S. energy demands and are expected to continue to do so in the future." *Id*. at 1–4.

Defendants holding leases *must* develop the OCS to meet these needs. *See* NOR, Ex. C (Lessees must "develop[] . . . the leased area" and "maximize the ultimate recovery of hydrocarbons from the leased area."); 30 C.F.R. § 250.1150 ("[Lessees] must produce wells and reservoirs at rates that provide for economic development while maximizing ultimate recovery and without adversely affecting correlative rights."); NOR at 67 (explaining "the lessee retains the lease for so long after the primary term as the lease produces oil and gas in paying quantities"). The Bureau of Ocean Energy Management ("BOEM") manages lessee operations. Lessees must prepare and comply with detailed exploration and development plans that are subject to comment and approval by the government. *See generally* Miyagi

Decl. Ex. 52, at 12-15 (CRS, *Offshore Oil and Gas Development: Legal Framework* (April 13, 2018)) (describing approval process for development plans and supervision procedures).  Lessees further agree to restrictions on the disposition of the developed oil and gas.  *See* NOR, Ex. C.  Lessees are also required to pay royalties "in-kind" (*i.e.*, as a percentage of the oil produced on the OCS) if the government orders such payment.  30 C.F.R. § 1202.100.

The U.S. government also controlled the means by which private oil companies produced oil and gas on the OCS.  The government promulgated standards to "regulate all operations under" OCS leases to "[p]romote orderly exploration, development, and production of mineral resources" and "[p]revent damage to or waste of any natural resource, property, or the environment."  30 C.F.R. § 250.106.  These regulations allowed the government to control nearly all material aspects of production on the OCS.  Federal regulations required private producers to "promptly initiate enhanced oil and gas recovery operations for all reservoirs where these operations would result in an increase in ultimate recovery of oil or gas under sound engineering and economic principles."  30 C.F.R. § 250.1165.  Federal regulations even controlled when *and how* these producers conducted well tests (30 C.F.R. § 250.1151-52) and flared or vented gas (30 C.F.R. § 250.1160-64), and allowed government supervisors to set "Maximum Production Rate[s]" and "Maximum Efficient Rate[s]" for wells (30 C.F.R. §250.1159).

This evidence confirms that the federal government uses OCS lessees to meet a "basic governmental task." *San Mateo*, 960 F.3d at 599.[12]  Rather than forming a national oil company to implement Congress's mandate to exploit these national resources, the government opted to use private parties under the direction of federal officers to provide for the economic and national security of the country.  As shown above, the government controls where production will occur, how much will be produced, where certain amounts of the product can be sold or directed, and how the production will occur.

The government's repeated directions to develop oil and gas from the OCS, along with the 1978 amendments, achieved their intended purpose of rapidly expanding oil production on the OCS.  From 1947 through 1972, 2,376,326,081 barrels were produced from the Gulf of Mexico Region of the OCS.  Miyagi Decl. Ex. 53.  From 1973 to 1995, 6,182,835,381 barrels—nearly triple the amount produced from 1947 through 1972—were produced from that region.  *Id.*  As discussed above in Section IV.A, data from the Department of Interior shows that

---

[12] Plaintiff suggests that removal is improper because Defendants' own commercial interests were benefitted.  Mot. at 30–31.  This misstates relevant law and would preclude federal contractors from ever asserting federal officer removal.  That makes no sense.  There is "no authority for the suggestion that a voluntary [contractual] relationship somehow voids the application of the removal statute." *Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 138 (2d. Cir. 2008).  To the contrary, it is well-settled that federal contractors, and even subcontractors, have a right to a federal forum and to assert a federal contract defense. *See, e.g.*, *Baker*, 962 F.3d 937; *Humphries v. Elliott Co.*, 760 F.3d 414, 417–18 (5th Cir. 2014).

Defendants (or their predecessors) and their subsidiaries have consistently been some of the largest OCS operators in this region from 1947 to the present.

The relationship formed between Defendant lessees and the government closely resembles the facts in *Goncalves*, where the Ninth Circuit approved removal by private contractors engaged to assist the federal government in healthcare operations. 865 F.3d at 1245. In that case, removal was proper because a federal agency "need[ed] someone to make reasonable efforts to pursue subrogation claims and decide when filing suit in federal court is a wise decision—and the government has delegated that responsibility to the carriers to act 'on the Government agency's behalf.'" *Id.* at 1247. The same is true here: the government uses private parties, under contracts with detailed specifications, "to fulfill a government need"— producing oil and gas from federal lands to further national energy security. *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) ("[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*.").[13]

### 2) Defendants Acted Under the U.S. Navy at Elk Hills National Petroleum Reserve No. 1

---

[13] Federal mineral contracts have always been interpreted and applied under federal, not state law. *United States v. Little Lake Misere Land Co.*, 412 U.S. 580 (1973) (discussing federal common law of mineral rights); *Waterfowl Liab. Co. v. United States*, 473 F.3d 135, 138 (5th Cir. 2006).

The OCSLA analysis above applies equally to Chevron predecessor Standard Oil of California's operation of the federal government's National Petroleum Reserve No. 1 in Elk Hills for the Navy. Again, Plaintiff relies on *San Mateo* and *Baltimore*, which concluded that the Unit Production Contract ("UPC"), standing alone, did not provide sufficient evidence that Chevron or its predecessor "acted under" federal officers. Mot. at 28–29. The Ninth Circuit viewed the UPC as merely an "arm's-length" agreement between co-owners, *San Mateo*, 960 F.3d at 602, and the Fourth Circuit could not determine "whether production authorized by Congress was carried out by Standard," *Mayor and City Council of Baltimore*, 952 F.3d 452, 471 (4th Cir. 2020). Defendants here, however, have provided additional evidence demonstrating the Navy separately hired Standard Oil to *operate* the field on its behalf for 31 years.

The history of Elk Hills is recounted in *United States v. Standard Oil Co. of California*, 545 F.2d 624 (9th Cir. 1976). Both the Navy and Standard Oil owned intermingled parts of Elk Hills, and Standard Oil agreed not to produce oil without notice to the federal government. *See id.* at 626. As a result of World War II, the need for oil dramatically increased, and the parties negotiated the UPC to govern production at Elk Hills. *See id.*; NOR, Ex. D. The UPC provided the government with the *absolute* right to establish the time and rate of Standard Oil's production and the *exclusive* right to carry out the actual operations at the site. *Id.*

As operator of Elk Hills, the Navy had to decide whether it wanted to produce oil on its own or hire a contractor for the job. "***The Navy chose to operate the reserve through a contractor rather than with its own personnel***. Standard Oil Company of California bid for the operator's contract in 1944, was awarded the contract, and continued to operate NPR-1 [for the Navy] for the next 31 years." Miyagi Decl. Ex. 54, at 15 (GAO, *Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve*, GAO/RCED-88-198 (July 1988)) (emphasis added).

The Navy decided to use a private contractor to operate Elk Hills on its behalf instead of doing so itself to maximize production as quickly as possible. This is reflected in declassified documents explaining the decision to hire Standard Oil:

> A substantial increase in production at the earliest possible date was urgently requested by the Joint Chiefs of Staff to meet the critical need for petroleum on the West Coast to supply the armed forces in the Pacific theatre . . . The Standard Oil Company of California was chosen as operator because it was the only large company capable of furnishing the facilities for such a development program and partially because it was the largest private owner of lands in the Reserve. The Navy has expressed its appreciation of the patriotism of the Standard Oil Company in undertaking such a project at cost with no profit to be received by the Company.

*See* NOR, Ex F at 1.

"Shortly after the unit plan contract was signed, the Congress, according to DOE, authorized the production at [the Elk Hills Reserve] at a level of 65,000 [barrels per day] to address fuel shortages and World War II military needs." Miyagi Decl. Ex. 54, at 15. Production reached the "peak of 65,000 barrels per day in 1945."

*Id*. Ex. 55 (GAO, Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, GAO/RCED-87-75FS (Jan. 1987)).

Standard Oil's production and operation of Elk Hills for the Navy were subject to substantial supervision and inspections by Navy officers.   The Operating Agreement between the Navy and Standard Oil provided that "OPERATOR [Standard Oil] is *in the employ of the Navy Department* and is *responsible to the Secretary thereof* through the Officer in Charge and Director, Naval Petroleum and Oil Shale Reserves."   *See* Miyagi Decl. Ex 56, at 188 (Contract No. Nod-9930) (emphases added).   Naval officers directed Standard Oil to conduct operations to further national policy.   For example, in November 1974, the Navy directed Standard Oil to determine whether it was possible to produce 400,000 barrels per day to meet the unfolding energy crisis, advising Standard Oil that "*since you are in the employ of the Navy* and *have been tasked with performing a function which is within the exclusive control of the Secretary of Navy* to order accomplished, the approval of the Operating Committee is not to be considered a prerequisite to the initiation of the above action on your part."   *Id.* (emphases added).

Standard Oil's operation of Elk Hills at the direction of the Navy is quintessential "acting under" because it was "an effort to assist, or to help carry out, the duties or tasks of the federal superior."   *Watson*, 551 U.S. at 152.   Standard Oil operated Elk Hills for decades on behalf of, and under the "subjection, guidance, or

43

control" of the Navy, a paradigmatic example of the "unusually close [relationship] involving detailed regulation, monitoring, or supervision." *Id.* at 151, 153.

After the OPEC oil embargo in 1973–74, Congress authorized preliminary activity to develop Elk Hills and other national reserves to their full economic potential. *See* Supplemental Appropriation Act of 1974, Pub. L. 93–245, 87 Stat. 1071. Standard Oil continued to operate portions of Elk Hills under government contracts to help increase production from the Reserve to meet the national need. *See* Miyagi Decl. Ex. 57, at 192 (describing June 13, 1978 contract between Chevron and Williams Brothers for 60 million cubic feet of gas to be processed by Chevron's 17Z McKittrick plant, and an agreement with Chevron and Atlantic Richfield to acquire pipeline capacity of 220,000 barrels per day.) By 1980, Elk Hills had become the second largest oil and gas field in the United States, *id.* at 190, and from 1976 to 1998 generated over $17 billion for the U.S. Treasury, *id.* Ex. 58 (DOE, *Naval Petroleum Reserves*). Thus, Defendants' activities under direction of federal officers far exceeded a role of co-owner under the UPC.

### 3) Defendants Supplied Oil Directly to the Government and Managed the Strategic Petroleum Reserve

In further response to the 1970s oil embargoes, Congress created the SPR in the 1975 Energy Policy Conservation Act, Pub. L. 94-163, 89 Stat. 871, to meet its treaty obligations and blunt the future use of petroleum as a weapon by foreign countries. NOR ¶ 38. Defendants "acted under" federal officers by supplying oil

for and managing the SPR for the government.

Defendants have acted at the direction of federal officers to supply oil and gas to the SPR.  From 1999 to December 2009, "the [SPR] received 162 million barrels of crude oil through the [royalty-in-kind ("RIK")] program" valued at over $6 billion.  Miyagi Decl. Ex. 59, at 18 (U.S. DOE, *Strategic Petroleum Reserve Annual Report to Congress for Calendar Year 2010* (2011)); *see id.* at 40 (Table 13).  *See, e.g.*, Miyagi Decl. Ex. 60 (Operator Letter from L. Denett (Dec. 14, 1999)) (invoking OCSLA and royalty provisions in leases "to use [RIK] to replenish the [SPR]").

The federal government also contracted with Defendants to assist in the physical delivery of these RIK payments to the SPR.  *See, e.g.*, Miyagi Decl. Ex. 61, at 19 (S. Rpt. 108–18, Minority Staff of the Perm. Subcomm. on Investigations of the Comm. on Gov't Affs., 108th Cong., Report on the U.S. Strategic Petroleum Reserve (Mar. 5, 2003)) (describing a government contract with a predecessor affiliate of Defendant Shell Oil Company to deliver nearly 19 million barrels of oil to the SPR as part of the RIK program).

Finally, some Defendants acted under federal officers as operators and lessees of the SPR infrastructure.  From 1997 to 2019, DOE leased to Defendant Shell Oil Company affiliates the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana.  Starting in January 2020, DOE leased those facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil

Oil Corporation (ExxonMobil Pipeline Company).  *See* Miyagi Decl. Ex. 62 (U.S. DOE, Strategic Petroleum Reserve Annual Report to Congress for Calendar Year 2018, at 15 (2020) ("*2018 SPR Report*")).

The SPR subjects Defendants to the federal government's supervision and control, including in the event that the President calls for an emergency drawdown. *See* Miyagi Decl. Ex. 59, at 16, 34 (U.S. DOE, *Strategic Petroleum Reserve Annual Report for Year 2010*) ("Under the lease agreement, Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s *required to support the [SPR] as a sales and distribution point in the event of a drawdown*." (emphasis added)); Miyagi Decl. Ex. 62, at 15 (*2018 SPR Report*); 42 U.S.C. § 6241(d)(1).  The United States exercised this emergency control after the President's orders to drawdown the reserve in response to Hurricane Katrina in 2005 and disruptions to oil supply in Libya in 2011.  *See* Miyagi Decl. Ex. 63 (DOE, *History of SPR Releases* (last accessed Apr. 6, 2020)).  The government has also exercised control by selling SPR oil to reduce the federal budget and providing loans of SPR oil to help refiners meet supply reductions.  *Id.*  Thus, the hundreds of millions of barrels of oil flowing through these facilities were subject to federal government control and supervision, and Defendants engaged in "an effort to *assist*, or to help *carry out*," the federal government's task in ensuring energy security.  *Watson*, 551 U.S. at 152.

### 3.      Defendants Have Shown the Requisite Nexus and Colorable Federal Defense

Plaintiff's claims and alleged injuries clearly "relate to" Defendants' production and supply of oil and gas to the federal government.  Notably, the "for or relating to" prong does not set a high bar—rather, "the hurdle erected by [this] requirement is quite low." *Goncalves*, 865 F.3d at 1244 (citations omitted).  Indeed, when Congress inserted the words "or relating to" into the Removal Clarification Act of 2011, it "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais*, 951 F.3d at 292.[14]  "In assessing whether a causal nexus exists, we credit the defendant's theory of the case," *Leite*, 749 F.3d at 1124, and the test is satisfied even where a defendant acts under a federal officer for only part of the relevant timeframe and the wartime production was "small," *Baker*, 962 F.3d at 945.

The government's direction to produce significant amounts of oil and gas to fulfill national interests, and its direct supervision of these efforts, goes to the core of Plaintiff's claims.  As explained above, it is impossible to disentangle the production and consumption of fossil fuels that allegedly led to climate change from Plaintiff's theory of liability and injuries.  Indeed, the Complaint asserts that $CO_2$ emissions in the atmosphere, which have occurred throughout history, do "not dissipate for potentially thousands of years."  Compl. ¶ 123.  Many of Plaintiff's

---

[14] *Accord Baker* 962 F.3d at 943; *Sawyer*, 860 F.3d at 258; *In re Commonwealth's Motion*, 790 F.3d at 467.

causes of action depend upon the allegation that "Defendants are directly responsible for the substantial increase in *all* $CO_2$ emissions between 1965 and the present." *Id.* ¶ 9 (emphasis added).  Plaintiff's misinformation and failure to warn allegations, even if credited, further underscore the connection—Plaintiff alleges *that misinformation maintained or increased production and consumption of oil and gas*, *see, e.g.*, Compl. ¶¶ 136–42, and much of that alleged production occurred at the direction of the federal government in furtherance of federal objectives well after the government was aware of the potential link between fossil fuels and climate change. This satisfies the "low" nexus requirement for federal officer removal.[15]

Indeed, aviation fuel production for the U.S. military has a particularly strong nexus to Plaintiff's alleged climate change injuries.  *First*, the federal government consistently exempts military aviation fuel use from certain otherwise applicable emissions standards.  Department of Defense aircraft are exempt from the requirement to meet the EPA's 1982 hydrocarbon standard for aircraft.  *See* Miyagi

---

[15] Plaintiff's attempt to disclaim injuries arising from "Defendants' provision of fossil fuel products to the federal government for military and national defense purposes," Mot. 32, fails because its alleged injuries necessarily arise from the cumulative production, sale, and use of *all* fossil fuel products.  Courts frequently reject this type of disclaimer.  *See Ballenger v. Agco Corp.*, No. C 06-2271, 2007 WL 1813821, at *1 n.2, *4 (N.D. Cal. June 22, 2007) (finding disclaimer ineffective where plaintiff waived claims for exposure committed at the direction of federal officer and/or on federal enclaves but nonetheless sought relief for exposure aboard Navy vessels); *Wright v. A.W. Chesterton Co.*, No. C07-05403, 2008 WL 512728, *1, *7 (N.D. Cal. Feb. 25, 2008) (same); *Reaser v. Allis Chambers Corp.*, 2008 WL 8911521, at *6–7 (C.D. Cal. June 23, 2008) (same).

Decl. Ex. 64, at 10 (U.S. Gov't Accountability Off., GAO/RCED-92-72, Air Pollution: Global Pollution from Jet Aircraft Could Increase in the Future (1992)). As recently as August 2020, the EPA announced a proposed rule setting greenhouse gas emission standards for aircraft and aircraft engines, but excluded military aircraft. *See* Control of Air Pollution from Airplanes and Airplane Engines: GHG Emission Standards and Test Procedures, 85 Fed. Reg. 51556, 51562 (proposed Aug. 20, 2020). *Second*, the military is a particularly heavy user of aviation fuel. In 1973, "[t]he Air Force burn[ed] approximately 45 percent of the jet fuel used in this country (more than any other single agency)." Miyagi Decl. Ex. 65, at 1 (Dennis Naugle, *United States Air Force Aircraft Pollution Emissions*, AFWL-TR-73-199, Air Force Weapons Laboratory, Kirtland AFB, New Mexico (1973)). In 2017, the Department of Defense was responsible for "77% of the entire federal government's energy consumption." Miyagi Decl. Ex. 66 (Heather L. Greenley, Cong. Research Servs., Dep't of Defense Energy Mgmt.: Background and Issues for Congress (2019)). *Third*, "[j]et aircraft are the primary source of human emissions deposited directly into the upper atmosphere . . . some of these emissions have a greater warming effect than they would have if they were released in equal amounts at the surface." *See* Miyagi Decl. Ex. 67, at 16–17 (GAO, GAO/RCED-00-57, Aviation and the Environment: Aviation's Effects on the Global Atmosphere Are Potentially Significant and Expected to Grow (2000)).

Finally, because Defendants acted under federal officers to implement the government's decision to promote the production of oil and gas despite its full knowledge of the potential climate impact, they have several colorable federal defenses to raise, including the government contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Gertz v. Boeing*, 654 F.3d 852 (9th Cir. 2011); preemption, *see Goncalves*, 865 F.3d at 1249; and federal immunity, *see Campbell-Ewald v. Gomez*, 136 S. Ct. 663 (2016).  Additionally, Plaintiff's claims are barred by the U.S. Constitution, including the Interstate and Foreign Commerce Clauses and Due Process Clauses, as well as the First Amendment and the foreign affairs doctrine.  These and other federal defenses are more than colorable, and a defendant invoking § 1442(a)(1) "need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

## C.   The Court Has Jurisdiction Because Plaintiff's Claims Arise on Federal Enclaves

"Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'"  *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006).  "A suit based on events occurring in a federal enclave . . . necessarily arise[s] under federal law and implicates federal question jurisdiction under § 1331."  *Jones v. John Crane-Houdaille*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012); *see also Totah v. Bies*, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (denying motion to remand where defamation claim arose on a federal

enclave).

Plaintiff does not deny that a portion of Defendants' production and refining of oil and gas occurred on federal enclaves. Nor could it. Some Defendants maintained production operations on federal enclaves and sold fossil fuels on military bases and other federal enclaves. For example, as discussed above, Chevron's predecessor Standard Oil operated Elk Hills Naval Petroleum Reserve, a federal enclave, for most of the twentieth century. *See* Miyagi Decl., Exs. 68–70 (Executive Order and California statutes relating to federal jurisdiction); *Azhocar v. Coastal Marine Servs., Inc.*, 2013 WL 2177784, at *1 (S.D. Cal. May 20, 2013) ("[Federal] enclaves include . . . military bases, federal facilities, and . . . some national forests and parks.") (citation omitted). In addition, a Tesoro entity owned and operated one of the two refineries in Hawai'i. Compl. ¶ 25(g). Much of that fuel was transported via underground pipeline to the Red Hill Bulk Fuel Storage Facility, a federal enclave. NOR ¶¶ 84–86. This is sufficient because jurisdiction will lie where at least "*some of the events* alleged . . . occurred on a federal enclave." *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1336 (N.D. Ala. 2010) (emphasis added).

Plaintiff argues that only the place of *injury* determines federal enclave jurisdiction, Mot. at 40, and that here "the Complaint expressly disclaims injuries to any federal property within the City," Mot. at 36. But this approach would lead to

the absurd result that federal jurisdiction would not exist over claims where all the relevant conduct occurred on a federal enclave, but the plaintiff happened to be outside the enclave at the time of injury. Courts have rejected that strained interpretation. *See Corley*, 688 F. Supp. 2d at 1336.

### D.    Plaintiff's "Misrepresentation" Allegations Are Irrelevant and Based on Demonstrably False Premises

The Complaint necessarily implicates Defendants' production activities, including activities conducted on the OCS, under federal officers, and on federal enclaves. This action therefore belongs in federal court.

Plaintiff's contention that this case does not depend on Defendants' production but instead solely focuses on Defendants' alleged "concealment" and "misrepresentations" does not change the jurisdictional analysis, and should be recognized for what it is: a baseless and strained attempt to evade the jurisdiction of federal courts. Faced with insurmountable precedent foreclosing it from pursuing the precise type of policy-setting relief it seeks in federal court,[16] Plaintiff has *labeled* its claims as sounding in state common law under a theory purportedly focused on concealment and misrepresentation. But, as explained above, Plaintiff's claims do not and cannot rest solely on alleged misrepresentations, but instead rise and fall on

---

[16]   *See, e.g.*, *AEP*, 564 U.S. at 421–22; *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855–58 (9th Cir. 2012); *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 305–06 (1947).

a chain of causation linking all of Defendants' production and sale of oil to global climate change and the allegedly resulting harms for which Plaintiff seeks relief.

Moreover, Plaintiff's concealment and misrepresentation allegations ignore the vast public record establishing that the risks of climate change, including its potential impacts on Hawai'i and Honolulu, have been widely known and discussed publicly for decades.  Plaintiff falsely claims that oil companies knew something that the Plaintiff and the public did not "for more than half a century":  that the use of oil and gas could result in changes to the climate, and that oil companies "conceal[ed] the catastrophic dangers posed by their fossil fuel products."  Mot. at 4. The voluminous public record reflecting understanding about climate change demonstrates that these claims are implausible.

The potential link between fossil fuel use and climate change was publicly reported by the early 1950s.  For example, in 1953, popular media publications reported research concluding that "[t]he burning of about ***two billion tons of coal and oil a year keeps the average ground temperature somewhat higher*** than it would otherwise be."  Miyagi Decl. Ex. 71 (*How Industry May Change Climate*, N.Y. Times (May 24, 1953)) (emphasis added); *id.* Ex. 72 (*Growing Blanket of Carbon Dioxide Raises Earth's Temperature*, Popular Mechanics (Aug. 1953)); *id.* Ex. 73 (*Invisible Blanket*, Time Magazine (May 25, 1953)); *id.* Ex. 74 (*Industrial Gases Warming Up Earth, Physicist Notes Here*, Wash. Post (May 5, 1953)).  *Local*

*Honolulu media* reported on the link between carbon dioxide emissions and climate change at least as early as 1955.  *See, e.g.*, Miyagi Decl. Ex. 75 (*Warming up the World*, The Honolulu Advertiser, A4 (Sept. 29, 1955)) ("[T]he carbon dioxide content in the atmosphere is increasing, and this in turn **may well have a 'greenhouse' effect** on the temperature of the air around us."); *id.* Ex. 76 (*Carbon Dioxide May Vary Climate,* The Honolulu Advertiser, A2 (July 16, 1956)) ("'It has been estimated that during the next 50 years industrial burning of coal, oil and gas will produce 1,700 billion tons of new carbon dioxide.'").[17]

National and Honolulu newspapers similarly reported the potential risks of sea level rise from global warming as early as the 1950s.  *See, e.g.*, Miyagi Decl. Ex. 77 (*Scientist to See if Ice In Antarctic Is Melting*, Honolulu Star-Bulletin, 8 (Dec. 29, 1956)) ("Accelerated burning of coal and oil by man may be increasing the carbon dioxide content in the atmosphere and thereby melting snow in the polar region. . . .  Over a few generations, . . . **a melting polar region could also raise sea level all over the world 200 to 250 feet** and change the earth's gravity."); *id.* Ex. 78 (*Teller Sees World-Flooding Peril Due to Industrial Overheating*, Wash. Post, A1 (Dec. 8, 1957)) ("increase in carbon dioxide is the result of the ever mounting uses of fuel energy such as coal, oil and derivatives during the industrial age" and "**the**

---

[17]  "Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time.'"  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

*ice caps on the poles will begin to melt* and the amount of water on the earth will increase . . . [s]uch places as *New York and Holland would be inundated*"); *id.* Ex. 79 (*Will carbon dioxide buildup turn Oahu into an Atlantis?*, Honolulu Advertiser, A1 (May 5, 1980)); *id.* Ex. 80 ('*Greenhouse effect' could flood Waikiki*, Honolulu Star-Bulletin, A3 (Nov. 7, 1988)). In short, the risk of sea level rise from climate change—and its potential effects on Hawai'i—was widely discussed and regularly reported for decades.

The sheer volume of publication on climate change demonstrates the falsity of Plaintiff's claims of "concealment." Searches for the phrases "greenhouse effect" or "global warming" or "climate change" in the Newspapers.com archives for the *Honolulu Advertiser* and *Honolulu Star-Bulletin* between 1957 and 2000 alone identify more than 3,350 results.[18] The same search in all U.S. newspapers covered by Newspapers.com yields more than 350,000 articles.[19] The assertion that Defendants somehow prevented Plaintiff or the public from learning about potential climate change risks linked to fossil fuel use is belied by, and implausible given, the long and substantial public discussion of these issues for the past 60-plus years.

The U.S. government has been aware of a potential link between fossil fuel use and climate change since the 1950s. *See Juliana v. United States*, 947 F.3d 1159,

---

[18] Newspapers.com search run Sept. 16, 2020.

[19] Newspapers.com search run Sept. 16, 2020.

1164 (9th Cir. 2020) ("A substantial evidentiary record documents that the federal government has long promoted fossil fuel use despite knowing that it can cause catastrophic climate change, and that failure to change existing policy may hasten an environmental apocalypse.").  Congressional testimony in 1956 revealed that "[b]ased on figures given out by the United Nations . . . by the year 2010, we will have added something like 70 percent of the present atmospheric carbon dioxide to the atmosphere.  This is an enormous quantity . . . it may, in fact, ***cause a remarkable change in climate***."   Miyagi Decl. Ex. 81 (*Hearing on Appropriations for the International Geophysical Year, Independent Offices Subcommittee, House Committee on Appropriations*, 84th Cong. (Mar. 8, 1956)).  Also in 1956, a study funded by the Office of Naval Research found that "[t]he extra $CO_2$ released into the atmosphere by industrial processes and other human activities may have caused the temperature rise during the present century" and "***this warming trend will continue, at least for several centuries***."   Miyagi Decl. Ex. 82, 140 (Gilbert N. Plass, *The Carbon Dioxide Theory of Climatic Change*, 8 Tellus 140, 141 (1956)).

In 1965, President Johnson proclaimed to Congress that "[t]his generation has ***altered the composition of the atmosphere on a global scale*** through radioactive materials ***and a steady increase in carbon dioxide from the burning of fossil fuels***," Miyagi Decl. Ex. 83 (President Lyndon B. Johnson, Special Message to the Congress on Conservation and Restoration of Natural Beauty (Feb. 8, 1965)) (emphasis

added), and the President's Science Advisory Committee explained: "By the year 2000 the increase in atmospheric $CO_2$ will be close to 25%. This may be sufficient to **produce measurable and perhaps marked changes in climate**, and **will almost certainly cause significant changes in the temperature** and other properties of the stratosphere." Miyagi Decl. Ex. 84, 126 (President's Science Advisory Committee, *Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel*, 9 (Nov. 1965)) (emphasis added). Plaintiff recognizes as much. Compl. ¶ 52.

The Carter Administration also recognized the risks of climate change: A report requested by the Director of the Office of Science and Technology Policy concluded that there was "**no reason to doubt that climate change will result and no reason to believe that these changes will be negligible**." Miyagi Decl. Ex. 85, at viii (Climate Rsch. Bd., Carbon Dioxide and Climate: A Scientific Assessment (July 23–27, 1979)).

The federal government's understanding of, and warnings about, the potential link between fossil fuel use and global climate change continued into the Reagan Administration and beyond. For example, a 1983 EPA Report concluded that "[e]vidence continues to accumulate that **increases in atmospheric carbon dioxide ($CO_2$) and other 'greenhouse' gases will substantially raise global temperature**" and "[o]ur findings support the conclusion that a global greenhouse warming is neither trivial nor just a long-term problem." Miyagi Decl. Ex. 86 (U.S. EPA, *Can*

*We Delay a Greenhouse Warming?* (Sept. 1, 1983)) (emphasis added).  Another 1983 Report concluded that the "increase [in atmospheric CO$_2$] is ***primarily attributable to burning of coal, oil, and gas***."  Miyagi Decl. Ex. 87 (National Research Council, *Changing Climate*, 1983).  And in 1988, James Hansen of NASA testified before the Senate—which, according to the Complaint, "received front-page coverage in *The New York Times*" (Compl. ¶ 109)—that "[g]lobal warming is now large enough that we can ascribe with ***a high degree of confidence a cause and effect relationship***" between the greenhouse effect and the observed warming. Miyagi Decl. Ex. 88, at 39.

Hawaiʻi itself studied and reported the link between fossil fuels, climate change, and sea level rise *more than 35 years ago*—issuing a report in 1985 on the "Effects on Hawaii of a Worldwide Rise in Sea Level Induced by the 'Greenhouse Effect,'" which stated that "[t]he situation continues to be aggravated by the use of fossil fuels for energy generation."  Miyagi Decl. Ex. 89, at 4 (Hawaii Coastal Zone Management Program, *Effects on Hawaii of a Worldwide Rise in Sea Level Induced by the "Greenhouse Effect*," 1985).  Nevertheless, Hawaiʻi has maintained its view that oil and gas are "essential to the health, welfare, and safety of the people of Hawaii."  Haw. Rev. Stat. Ann. § 125C-1 (1975).

To be clear, this long history of public knowledge, study, and discussion about the potential risk of climate change from carbon dioxide emissions does not mean,

as Plaintiff suggests, that there did not continue to be scientific discussion and debate about the causes and potential impacts of climate change.  For example, the U.N. Intergovernmental Panel on Climate Change ("IPCC")—which, according to the Complaint, "provides governments at all levels with scientific information they can use to develop climate policies" (Compl. 23 n.1)—concluded in 1990 that there was insufficient data to determine that observed warming trends were due to human activities:  "Thus, it is not possible at this time to attribute all or even a large part of the observed global warming to the enhanced greenhouse effect on the basis of observational data currently available."  Miyagi Decl. Ex. 90, at 254 (IPCC 1990). By 1995, the IPCC still had not concluded with certainty that there was a human influence on the climate: "Our ability to quantify the human influence on global climate is currently limited because the expected signal is still emerging from the noise of natural variability, and because there are uncertainties in key factors." Miyagi Decl. Ex. 91, at 22 (IPCC (1995)).  Ultimately, the IPCC could conclude only that "the balance of evidence suggests" that there is a human influence on climate.  *Id.*  It was not until 2001 that the IPCC was willing to state that new evidence indicated that human activity was "likely" (meaning 66–90% probability) responsible for "most" of the warming observed: "There is new and stronger evidence that most of the warming observed over the last 50 years is attributable to human activities."  Miyagi Decl. Ex. 92, at 10 (IPCC (2001)).

In 2002, even after the IPCC's 2001 report, EPA's "Guide to Climate Change" noted: "The Earth's surface is becoming warmer, and evidence is mounting that human activities are likely contributing to the warming trend.  Still, *uncertainties exist* about exactly how much of the warming is due to human activities, whether recent temperature trends are truly outside the range of natural climate variability, and the effect that warming could have on our climate, lives, and habitat."  Miyagi Decl. Ex. 93, at 2 (USEPA, Guide to Climate Change (2002)) (emphasis added).

At bottom, Plaintiff's claims and alleged injuries are based upon a causal chain that necessarily depends on the cumulative production and use of oil and gas that release greenhouse gases.  Plaintiff's efforts to cast its claims as limited to concealment and misrepresentations are therefore irrelevant to the removal analysis. In any event, Plaintiff's claims are based on demonstrably implausible premises— the scientific and policy debate about the causes, timing, impacts, and responses to climate change was taking place through thousands of newspaper articles, scientific publications, and government reports.  Plaintiff's assertion that the scientific community and the public were somehow deceived simply ignores this vast public record, and should be rejected as implausible.

## V.    CONCLUSION

For the foregoing reasons, and those set forth in Defendants' Notice of Removal, the Court should deny Plaintiff's Motion to Remand.

DATED:  October 9, 2020

By: */s/ Crystal K. Rose*
Crystal K. Rose
Adrian L. Lavarias
David A. Morris
BAYS, LUNG, ROSE & HOLMA

Steven M. Bauer (pro hac vice)
Margaret A. Tough (pro hac vice)
Gabriella Kapp (*pro hac vice*)
LATHAM & WATKINS LLP

*Attorneys for Defendants ConocoPhillips,
ConocoPhillips Company, and Phillips 66*

Jameson R. Jones (*pro hac vice*)
Daniel R. Brody (*pro hac vice*)
Sean C. Grimsley (*pro hac vice*)
BARTLIT BECK LLP

*Attorneys for Defendants ConocoPhillips
and ConocoPhillips Company*

By: */s/ Joachim P. Cox*
Joachim P. Cox
Randall C. Whattoff
COX FRICKE LLP

David C. Frederick (*pro hac vice*)
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.

*Attorneys for Defendants
Royal Dutch Shell plc, Shell Oil Company,
and Shell Oil Products Company LLC*

Respectfully Submitted,

By: */s/ Melvyn M. Miyagi*
Melvyn M. Miyagi
Ross T. Shinyama
Summer H. Kiawe
WATANABE ING LLP

Theodore J Boutrous, Jr. (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Defendants Chevron
Corporation and Chevron U.S.A., Inc.*

By: */s/ C. Michael Heihre*
C. Michael Heihre
Michi Momose
Lisa K. Swartzfager
CADES SCHUTTE

J. Scott Janoe (*pro hac vice*)
Megan Berge (*pro hac vice*)
Sterling Marchand (*pro hac vice*)
BAKER BOTTS LLP

*Attorneys for Defendants
Sunoco LP, Aloha Petroleum, LTD., and
Aloha Petroleum LLC*

By: */s/ Lisa Woods Munger*
Lisa Woods Munger
Lisa A. Bail
David J. Hoftiezer
GOODSILL ANDERSON
    QUINN & STIFEL LLP

*Attorneys for Defendants
BP PLC and BP America Inc.*

By: */s/ Breon S. Peace*
Breon S. Peace (*pro hac vice*)
Victor L. Hou (*pro hac vice*)
Boaz S. Morag (*pro hac vice*)
CLEARY GOTTLIEB STEEN &
HAMILTON LLP

Margery S. Bronster
Rex Y. Fujichaku
Kevin A. Morris
BRONSTER FUJICHAKU ROBBINS

*Attorneys for Defendants BHP Group Ltd.,
BHP Group plc, and BHP Hawaii Inc.*


By: */s/ Paul Alston*
Paul Alston
Claire Wong Black
John-Anderson L. Meyer
Glenn T. Melchinger
DENTONS

Theodore V. Wells, Jr. (*pro hac vice*)
Daniel Toal (*pro hac vice*)
Yahonnes Cleary (*pro hac vice*)
Caitlin Grusauskas (*pro hac vice*)
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP

*Attorney for Defendants
Exxon Mobil Corporation and
ExxonMobil Oil Corporation*

By: */s/ Ted N. Pettit*
Ted N. Pettit
CASE LOMBARDI & PETTIT

Shannon S. Broome (*pro hac vice*)
Shawn Patrick Regan (*pro hac vice*)
HUNTON ANDREWS KURTH LLP

*Attorneys for Defendant
Marathon Petroleum Corp.*

---

City and County of Honolulu v. Sunoco LP, et al. : Case No. 20-CV-00163 DKW-RT –
United States District Court for the District of Hawai'i | DEFENDANTS' OPPOSITION TO
PLAINTIFF CITY AND COUNTY OF HONOLULU'S MOTION TO REMAND

62