PAUL S. AOKI, 1286
Corporation Counsel
**CITY AND COUNTY OF HONOLULU**
ROBERT M. KOHN, 6291
NICOLETTE WINTER, 9588
530 S. King Street, Room 110
Honolulu, Hawai'i 96813
Telephone:  (808) 768-5234
Facsimile:  (808) 768-5105
Email:      robert.kohn@honolulu.gov
            nwinter@honolulu.gov

**SHER EDLING LLP**
VICTOR M. SHER (*pro hac vice*)
MATTHEW K. EDLING (*pro hac vice*)
100 Montgomery St. Ste. 1410
San Francisco, CA 94104
Telephone:  (628) 231-2500
Facsimile:  (628) 231-2929
Email:      vic@sheredling.com
            matt@sheredling.com

Attorneys for Plaintiff CITY AND
COUNTY OF HONOLULU

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| CITY AND COUNTY OF HONOLULU<br><br>           Plaintiff,<br><br>    v.<br><br>SUNOCO LP, et al.,<br><br>           Defendants. | CASE NO. 20-CV-00163-DKW-RT<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND (ECF NO. 116)**<br><br>No Hearing Date Calendared<br><br>Action Filed: March 9, 2020<br>No Trial Date Set |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................1

II.   DEFENDANTS' NEW JURISDICTIONAL FACTS ARE
      IMPERMISSIBLE AND UNTIMELY. ......................................................2

III.  THIS CASE SHOULD BE REMANDED BECAUSE THERE IS
      NO SUBJECT-MATTER JURISDICTION. ............................................4

      A. There Is No Outer Continental Shelf Lands Act Jurisdiction. ...................4

      B. There Is No Federal Officer Removal Jurisdiction. ...................................9

            1.  There is No Causal Connection Between Defendants' Acts
                and the Claims Here. ...........................................................10

            2.  Defendants Were Not "Acting Under" a Federal Officer. .................14

                  a.  A Purported General Federal Policy Interest in Supporting
                      the Fossil Fuel Industry Cannot Satisfy the "Acting Under"
                      Requirement. ..........................................................14

                  b.  Defendants' Mineral Leases Provide No Basis for Federal
                      Officer Removal. ......................................................17

                  c.  Defendants' Evidence of Dealings with the Military Does Not
                      Establish They Engaged in Their Deception Campaign at the
                      Direction of Federal Officers. ......................................20

                  d.  Chevron's Business at the Elk Hills Reserve Does Not Give
                      Rise to Federal Officer Removal. ...................................25

                  e.  Defendants' Contributions into the Strategic Petroleum
                      Reserve Were Not Made at Government Direction. ...................29

      C. There Is No Enclave Jurisdiction Because the City's Claims
         Did Not "Arise" Within Any Federal Enclave. .....................................31

      D. Defendants' Attacks on the Merits of the City's Claims Are
         Misguided. ..............................................................................34

IV.   CONCLUSION ....................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Atl. Richfield Co.*,
   962 F.3d 937 (7th Cir. 2020) ................................................................. 12, 13, 25

*Barrow Dev. Co. v. Fulton Ins. Co.*,
   418 F.2d 316 (9th Cir. 1969) .......................................................................2, 4

*Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*,
   405 F. Supp. 3d 947 (D. Colo. 2019) ........................................................ *passim*

*Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*,
   965 F.3d 792 (10th Cir. 2020) ......................................................... 2, 14, 17, 19

*Chevron U.S.A., Inc. v. United States*,
   110 Fed. Cl. 747 (2013) ...............................................................................27

*City of Oakland v. BP PLC*,
   969 F.3d 895 (9th Cir. 2020) ........................................................................34

*Coleman v. Trans Bay Cable, LLC*,
   No. 19-CV-02825-YGR, 2019 WL 3817822 (N.D. Cal. Aug. 14, 2019)...........32

*ConAgra Grocery Prod. Co.*,
   17 Cal. App. 5th 51 (Cal. Ct. App. 2017)........................................................35

*Corley v. Long-Lewis, Inc.*,
   688 F. Supp. 2d 1315 (N.D. Ala. 2010) ..........................................................33

*Cty. of San Mateo v. Chevron Corp.*,
   294 F. Supp. 3d 934 (N.D. Cal. 2018)........................................................ *passim*

*Cty. San Mateo v. Chevron Corp.*,
   960 F.3d 586 (9th Cir. 2020) .................................................................. *passim*

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
   26 F.3d 563 (5th Cir. 1994) .......................................................................6, 8

*Exxon Mobil Corp. v. United States*,
   No. CV H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) .................21

*Fidelitad, Inc. v. Insitu, Inc.*,
   904 F.3d 1095 (9th Cir. 2018) .......................................................................17

*Fisher v. Asbestos Corp.*,
   No. 2:14-CV-02338-WGY, 2014 WL 3752020 (C.D. Cal. July 30, 2014).........11

*Ford v. Foster Wheeler USA Corp.*,
   No. 15-CV-05426-JSW, 2016 WL 551234 (N.D. Cal. Feb. 12, 2016)...............11

*Freedom Holdings, Inc. v. Spitzer,*
  357 F.3d 205 (2d Cir. 2004) ...................................................................8

*Gilstrap v. United Air Lines, Inc.,*
  709 F.3d 995 (9th Cir. 2013) ..................................................................8

*Goto v. Whelan,*
  No. 20-cv-01114 (HSG), 2020 WL 4590596 (N.D. Cal. Aug. 11, 2020)............32

*Hammond v. Phillips 66 Co.,*
  No. 2:14CV119-KS-MTP, 2015 WL 630918 (S.D. Miss. Feb. 12, 2015) ............7

*Haynes v. Haas,*
  146 Haw. 452 (2020) ..............................................................................7

*Hemphill v. Transfresh Corp.,*
  No. C-98-0899-VRW, 1998 WL 320840 (N.D. Cal. June 11, 1998) ...............3, 4

*Hester v. Horowitz,*
  No. CV 17-00014 LEK-KSC, 2017 WL 1536401 (D. Haw. Apr. 28, 2017) .......3

*In re Deepwater Horizon,*
  745 F.3d 157 (5th Cir. 2014) .................................................................5, 7

*In re MTBE Prods. Liab. Litig.,*
  488 F.3d 112 (2d Cir. 2007) ..................................................................10

*Keeney v. A.W. Chesterton Co.,*
  No. CV 11-6192 PA (AGRX), 2011 WL 13220926
  (C.D. Cal. Aug. 9, 2011) .......................................................................11

*Kelly v. Monsanto Co.,*
  No. 4:15 CV 1825 JMB, 2016 WL 3543050 (E.D. Mo. June 29, 2016) ...... 22, 23

*Latiolais v. Huntington Ingalls, Inc.,*
  951 F.3d 286 (5th Cir. 2020) ................................................................12

*Leite v. Crane Co.,*
  749 F.3d 1117 (9th Cir. 2014) ............................................... 13, 25, 34

*Luehrs v. Utah Home Fire Ins. Co.,*
  450 F.2d 452 (9th Cir. 1971) ..................................................................3

*Maracich v. Spears,*
  570 U.S. 48 (2013) ................................................................................6

*Massachusetts v. Exxon Mobil Corp.,* ___ F. Supp. 3d ___,
  No. CV 19-12430-WGY, 2020 WL 2769681 (D. Mass. May 28, 2020) ....... 2, 11

*Mayor & City Council of Baltimore v. BP P.L.C.,*
  388 F. Supp. 3d 538 (D. Md. 2019) ........................................... *passim*

*Mayor & City Council of Baltimore v. BP P.L.C.,*
  952 F.3d 452 (4th Cir. 2020) .................................................... *passim*

*New Mexico ex rel. Balderas v. Monsanto Co.*,
    454 F. Supp. 3d 1132 (D.N.M. 2020)................................................................23

*Newman–Green, Inc. v. Alfonzo–Larrain*,
    490 U.S. 826 (1989) ..........................................................................................2

*Oklahoma v. Purdue Pharma L.P.*,
    No. CJ-2017-816, 2019 WL 9241510 (Okl. Dist. Ct. Nov. 15, 2019)................35

*Pharm. Research & Mfrs. of Am. v. Concannon*,
    249 F.3d 66 (1st Cir. 2001) ................................................................................8

*Pioneer Asset Inv. Ltd. v. Arlie & Co.*,
    No. CV 15-00387 ACK-KSC, 2015 WL 9665667 (D. Haw. Dec. 14, 2015)........3

*Plains Gas Sols., LLC v. Tennessee Gas Pipeline Co., LLC*,
    46 F. Supp. 3d 701 (S.D. Tex. 2014)................................................................5, 6

*Ramirez v. Ghilotti Bros. Inc.*,
    941 F. Supp. 2d 1197 (N.D. Cal. 2013).............................................................32

*Recar v. CNG Producing Co.*,
    853 F.2d 367 (5th Cir. 1988) ...............................................................................6

*Rhode Island v. Chevron Corp.*,
    393 F. Supp. 3d 142 (D.R.I. 2019) ............................................................. *passim*

*Rhode Island v. Chevron Corp.*,
    No. 19-1818, 2020 WL 6336000 (1st Cir. Oct. 29, 2020) ........................ *passim*

*Riggs v. Airbus Helicopters*,
    939 F.3d 981 (9th Cir. 2019).......................................................................16, 17

*Ross v. Hawaii Nurses' Ass'n Office & Prof'l Employees Int'l Union Local 50*,
    290 F. Supp. 3d 1136 (D. Haw. 2018) .................................................................3

*Ryan v. Dow Chem. Co.*,
    781 F. Supp. 934 (E.D.N.Y. 1992).....................................................................13

*Sawyer v. Foster Wheeler LLC*,
    860 F.3d 249 (4th Cir. 2017)..............................................................................25

*Schmitt v. War Emergency Pipelines*,
    175 F.2d 335 (8th Cir. 1949)..............................................................................22

*Shell Oil Co. v. United States*,
    751 F.3d 1282 (Fed. Cir. 2014) ..........................................................................21

*State v. Monsanto Co.*,
    274 F. Supp. 3d 1125 (W.D. Wash. 2017) ...................................................10, 32

*Totah v. Bies*,
    No. C 10-05956 CW, 2011 WL 1324471 (N.D. Cal. Apr. 6, 2011)...................32

*United States v. Philip Morris USA, Inc.*,
  449 F. Supp. 2d 1 (D.D.C. 2006) ........................................................35

*United States v. Shell Oil Co.*,
  294 F.3d 1045 (9th Cir. 2002) ...........................................................21

*Vaden v. Discover Bank*,
  556 U.S. 49 (2009) .............................................................................9

*Watson v. Philip Morris Companies, Inc.*,
  551 U.S. 142 (2007) ..................................................................... *passim*

*Winters v. Diamond Shamrock Chem. Co.*,
  149 F.3d 387 (5th Cir. 1998) .............................................................25

**Statutes**

10 U.S.C. § 7430 ..................................................................................28

28 U.S.C. § 1442 ......................................................................... *passim*

28 U.S.C. § 1446 ............................................................................ 2, 3, 4

28 U.S.C. § 1653 ...............................................................................2, 4

42 U.S.C. § 6241 ..................................................................................31

42 U.S.C. § 9601 ..................................................................................21

43 U.S.C. § 1341 ..................................................................................31

43 U.S.C. § 1349 ....................................................................................6

49 U.S.C. § 40101 ................................................................................17

**Other Authorities**

10 C.F.R. § 626.4 .................................................................................30

## TABLE OF EXHIBITS REFERENCED IN THIS BRIEF

Unless otherwise indicated, all citations below to "Ex." refer to exhibits to the Declaration of Melvin M. Miyagi in Support of Defendants' Opposition, ECF No. 117-1.  The below table identifying each exhibit in numerical order is provided for the Court's convenience.

- <u>Ex. 1</u>: Statement of Sen. Hollings on the Outer Continental Shelf Lands Act Amendments of 1975, 94 Cong. Rec. S903 (daily ed. Jan. 27, 1975).

- <u>Ex. 20</u>: John W. Frey, et al., *A History of the Petroleum Administration for War: 1941–1945* (1946).

- <u>Ex. 21</u>: Speech by Secretary Harold Ickes to the Conference of Petroleum Industry Chairmen (Aug. 11, 1941).

- <u>Ex. 22</u>: Letter from P.M. Robinson to R.K. Davies, *Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams* (Aug. 12, 1942).

- <u>Ex. 23</u>: W. J. Sweeney et al., *Aircraft Fuels and Propellants: A Report of the [Army Air Force] Scientific Advisory Group* (May 1946).

- <u>Ex. 27</u>: Certificate of Dissolution of War Emergency Pipelines, Inc. (Aug. 28, 1947).

- <u>Ex. 30</u>: *Fourth Annual Report of the Activities of the Joint Committee on Defense Production*, H.R. Rep. No. 84-1 (Jan. 5, 1955).

- <u>Ex. 32</u>: News Release on Companies Directed to Supply the Needs of Defense Department, *reprinted in* S.J. Res. 176: To Authorize the Production of Petroleum from Naval Petroleum Reserve Numbered 1, Hearing Before the Subcomm. on Nat'l Stockpile and Naval Petrol. Reserve of the S. Comm. on Armed Svcs., 93d Cong. (1973).

- <u>Ex. 33</u>: John W. Finney, *Fuel is Diverted for the Military*, N.Y. Times (Nov. 28, 1972).

- <u>Ex. 36</u>: Negotiated Contract No. AF33(657)-8577 with Shell Oil Company (Aug. 14, 1962).

- <u>Ex. 37</u>: Letter re: Contract Amendment No. 2 to Contract No. AF33(657)-8577 with Shell Oil Company (Aug. 26, 1963).

- <u>Ex. 38</u>: Memo re: Recommendation for Concurrence in Contract with Shell Oil Company, Project OXCART (Sept. 20, 1963).

- <u>Ex. 39</u>: Negotiated Contract No. AF33(657)-13272 with Shell Oil Company (June 30, 1964).

- <u>Ex. 40</u>: Negotiated Contract No. AF33(657)-12525 with Shell Oil Company (Oct. 7, 1963).

- <u>Ex. 41</u>: Memo re: Recommendation for Concurrence in Contract with Shell Oil Company (June 28, 1963).

- <u>Ex. 42</u>: Negotiated Contract No. AF33(657)-10449 with Shell Oil Company (Feb. 25, 1963).

- <u>Ex. 43</u>: Negotiated Contract No. AF33(657)-8582 with Shell Oil Company (Sept. 13, 1962).

- <u>Ex. 44</u>: Tesoro Corporation: Exemplar Contracts for Highly Specialized Military Jet Fuel (table drafted by counsel followed by exhibits of federal solicitations/contracts).

- <u>Ex. 45</u>: Department of Defense, *Handbook: Aerospace Fuels Certification* (Aug. 2014).

- <u>Ex. 47</u>: Detail Specification: Turbine Fuels, Aviation, Kerosene Types (Apr. 1, 1999).

- <u>Ex. 48</u>: Detail Specification: Inhibitor, Icing, Fuel System, High Flash (June 15, 1999).

- <u>Ex. 49</u>: Performance Specification: Inhibitor, Corrosion / Lubricity Improver, Fuel Soluble (Aug. 4, 2011).

- <u>Ex. 51</u>: *Report by the Ad Hoc Select Committee on the Outer Continental Shelf*, H.R. Rep. 95-590 (Aug. 29, 1977).

- <u>Ex. 54</u>: Government Accountability Office, *Report on Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve* (July 1988).

- <u>Ex. 57</u>: Systematic Management Services, Inc., *History of Naval Petroleum Reserve No. 1 (Elk Hills) 1912–1987* (May 15, 1989).

- <u>Ex. 59</u>: U.S. Dept. of Energy, *Strategic Petroleum Reserve Annual Report for Calendar Year 2010* (Nov. 2011).

- <u>Ex. 60</u>: Letter to Operator from L. Denett, Associate Director for Royalty Management, Minerals Management Service (Dec. 14, 1999).

- <u>Ex. 61</u>: Report by the Minority Staff of the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs: *U.S. Strategic*

*Petroleum Reserve: Recent Policy Has Increased Costs to Consumers But Not Overall U.S. Energy Security* (Mar. 5, 2003).

- <u>Ex. 62</u>: U.S. Dept. of Energy, *Strategic Petroleum Reserve Annual Report for Calendar Year 2018* (Jan. 2020).

## I.     INTRODUCTION

Defendants' Opposition ("Opp.") to the City's Motion ("Mot.") rehashes arguments repeatedly rejected by district and circuit courts alike. Removal on federal officer grounds under 28 U.S.C. § 1442 is squarely foreclosed by *San Mateo v. Chevron Corp.*, 960 F.3d 586 (9th Cir. 2020) ("*San Mateo II*"). Defendants concede, moreover, that their three original lead arguments—removal based on federal common law, substantial federal questions, and complete preemption—were "rejected" by the Ninth Circuit and are raised here only "to preserve them for appellate review." *See* Opp. 7–8 & n.1; *compare* Not. of Rem. 14–40, 81–88. The Opposition does not mention bankruptcy or admiralty removal jurisdiction at all. *Compare* Not. of Rem. at 88–93. Having abandoned five theories of removal, Defendants fare no better under their remaining grounds—the Outer Continental Shelf Lands Act ("OCSLA"), federal officer jurisdiction, and federal enclave jurisdiction—despite their attempt to impermissibly introduce new evidence. Defendants cannot escape *San Mateo II*'s on-point rejection of federal officer jurisdiction, nor the rejection of OCSLA and enclave jurisdiction by every other court.[1] The Notice of Removal is materially identical to those unanimously rejected in analogous cases, and this Court should likewise reject it and remand.

---

[1] *See* cases granting remand: *Cty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 937 (N.D. Cal. 2018) ("*San Mateo I*"), *aff'd in part, appeal dismissed in part*

1

## II.   DEFENDANTS' NEW JURISDICTIONAL FACTS ARE IMPERMISSIBLE AND UNTIMELY.

The ninety-four exhibits accompanying Defendants' Opposition, comprising 1,629 pages of material, are an improper, untimely attempt to amend their Notice of Removal in violation of 28 U.S.C. §§ 1446(b)(1) and 1653. Section 1446(b)(1) allows a removing defendant to submit new bases for jurisdiction, including new jurisdictional facts—but only within thirty days of receiving the initial pleading. Thereafter, a notice of removal may only be amended "to clarify 'defective' allegations of jurisdiction previously made," *Barrow Dev. Co. v. Fulton Ins. Co.*, 418 F.2d 316, 317 (9th Cir. 1969), and even then, only with leave of court, 28 U.S.C. § 1653. Defendants' surfeit of new purported evidentiary materials goes far beyond clarifying or elaborating "defective" allegations of jurisdiction, and instead impermissibly introduces new theories and facts not previously disclosed.

Amendment pursuant to § 1653 is strictly limited to "remedy[ing] inadequate jurisdictional allegations, but not defective jurisdictional facts." *Newman–Green,*

---

*in San Mateo II*, 960 F.3d 586 (9th Cir. 2020); *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019) ("*Baltimore I*"), *as amended* (June 20, 2019), *aff'd in part, appeal dismissed in part*, 952 F.3d 452 (4th Cir. 2020) ("*Baltimore II*"); *Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947 (D. Colo. 2019) ("*Boulder I*"), *aff'd in part, appeal dismissed in part*, 965 F.3d 792 (10th Cir. 2020) ("*Boulder II*"); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142 (D.R.I. 2019) ("*Rhode Island I*"), *aff'd in part, appeal dismissed in part*, No. 19-1818, 2020 WL 6336000 (1st Cir. Oct. 29, 2020) ("*Rhode Island II*"); *Massachusetts v. Exxon Mobil Corp.*, __ F. Supp. 3d __, No. CV 19-12430-WGY, 2020 WL 2769681 (D. Mass. May 28, 2020).

*Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 832 (1989). Courts in this District thus routinely deny attempts to substantively amend a notice of removal on opposition to a motion to remand. *See, e.g.*, *Ross v. Hawaii Nurses' Ass'n Office & Prof'l Employees Int'l Union Local 50*, 290 F. Supp. 3d 1136, 1147 (D. Haw. 2018) (Seabright, C.J.) (denying consideration of complete preemption argument based on Labor Management Relations Act, first raised on opposition to motion to remand, where notice of removal alleged complete preemption by Labor-Management Reporting and Disclosure Act).[2] As one court presciently observed, any other rule

> would create a perverse incentive for removing parties and could undermine the various notice interests served by the removal petition requirement. . . . [of § 1446, because] removing parties could wait for their opponents to file a motion to remand and then torpedo their opponents by loading the opposition memorandum with previously undisclosed and stronger bases for jurisdiction.

*Hemphill v. Transfresh Corp.*, No. C-98-0899-VRW, 1998 WL 320840, at *4–5 (N.D. Cal. June 11, 1998) (denying amendment to assert removal jurisdiction on basis not stated in removal notice).

---

[2] *See also Hester v. Horowitz*, No. CV 17-00014 LEK-KSC, 2017 WL 1536401, at *3 (D. Haw. Apr. 28, 2017) (declining to consider diversity jurisdiction argument on motion for reconsideration where defendant's notice cited only federal question jurisdiction); *Pioneer Asset Inv. Ltd. v. Arlie & Co.*, No. CV 15-00387 ACK-KSC, 2015 WL 9665667, at *4 (D. Haw. Dec. 14, 2015) (denying late amendment to cure defendant's failure to join in diversity removal); *compare Luehrs v. Utah Home Fire Ins. Co.*, 450 F.2d 452, 454 (9th Cir. 1971) (allowing amendment to correct defective diversity allegation to allege that plaintiff was "citizen" rather than "resident" of foreign state).

Defendants' conduct here violates §§ 1446 and 1653. They have flooded the City and the Court with "additional, substantial categories of evidence," Opp. 5, in an explicit attempt to distinguish their Notice from the virtually identical one rejected by the district court and Ninth Circuit in *San Mateo I* and *San Mateo II*. *See id.* at 6, 9, 23–24. The Ninth Circuit issued its decision in *San Mateo II* on May 26, 2020, yet Defendants never sought leave to amend their Notice, and instead "load[ed] the opposition memorandum with previously undisclosed" jurisdictional facts. *See Hemphill*, 1998 WL 320840, at *4.

The new documents "add allegations of substance," do not "solely . . . clarify 'defective' allegations of jurisdiction previously made," and are thus improper. *See Barrow Dev. Co.*, 418 F.2d at 317. Even if the new exhibits and arguments arising therefrom could be characterized as "clarifying" "defective" jurisdictional allegations, the Court should exercise its discretion pursuant to § 1653 and deny Defendants' attempt to force the City "to use [its] reply memorand[um] to oppose the entirely new bases for jurisdiction." *Hemphill*, 1998 WL 320840, at *4. In short, the Court should disregard all the exhibits attached to Defendants' opposition brief.

## III.   THIS CASE SHOULD BE REMANDED BECAUSE THERE IS NO SUBJECT-MATTER JURISDICTION.

### A.   There Is No Outer Continental Shelf Lands Act Jurisdiction.

On the merits, none of Defendants' remaining bases for removal survive scrutiny. First, there is no OCSLA jurisdiction because the tortious activity here does

not involve "operations" or physical injuries on the outer continental shelf ("OCS") and the City's claims did not "arise out of" and are not "connected with" Defendants' offshore activities within the meaning of OCSLA's removal provision. *See* Mot. 23–24; *Boulder I*, 405 F. Supp. 3d at 978 (collecting cases); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). Every court to consider Defendants' argument in an analogous case has rejected it.[3] This Court should do the same.

Although the Ninth Circuit has not ruled on the outer limits of OCSLA jurisdiction, Defendants' arguments fail even under a maximally broad reading of Fifth Circuit law. Defendants cannot show that the "activities that caused the [City's alleged] injuries . . . constituted an 'operation' 'conducted on the OCS.'" *See id.*; *Plains Gas Sols., LLC v. Tennessee Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 704–05 (S.D. Tex. 2014). Despite Defendants' protestations, and as the court found in *Baltimore II* (a case almost identical to this one), the relevant activity here "is the concealment and misrepresentation of the products' known dangers—and simultaneous promotion of their unrestrained use—that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change." 952 F.3d at 467; *see also Rhode Island II*, 2020 WL 6336000 at *7; *see, e.g.*, Compl. ¶ 12. Defendants' deception is not an "operation" conducted on the OCS. *See Boulder I*,

---

[3] *See Boulder I*, 405 F. Supp. 3d at 978–79; *Rhode Island I*, 393 F. Supp. 3d at 151–52; *Baltimore I*, 388 F. Supp. 3d at 566–67; *San Mateo I*, 294 F. Supp. 3d at 938–39.

405 F. Supp. 3d at 978–79; *Baltimore I*, 388 F. Supp. 3d at 566–67; *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 567 (5th Cir. 1994) ("[T]he term 'operation' contemplate[s] the doing of some physical act on the [OCS]."). "[F]or jurisdiction to lie, a case must arise directly out of OCS operations," and here as in *Boulder*, "[t]he fact that some of [Defendants'] oil was apparently sourced from the OCS does not create the required direct connection" between the City's claims and an operation on the OCS. *Boulder I*, 405 F. Supp. 3d at 978.

Nor does this case "arise[] out of, or in connection with" an OCS operation, which occurs when (1) the plaintiff "would not have been injured 'but for'" the operation, *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988), and (2) granting relief "threatens to impair the total recovery of the federally-owned minerals" from the OCS, *EP Operating Ltd. P'ship*, 26 F.3d at 570. Although Fifth Circuit courts have treated the OCSLA jurisdictional grant as broad, "the 'but-for' test . . . is not limitless" and must be applied in light of the OCSLA's overall goals. *Plains Gas Sols.*, 46 F. Supp. 3d at 704–05.[4] "[A] 'mere connection' between the

---

[4] Defendants claim that the phrase "or in connection with" as used in 43 U.S.C. § 1349(b)(1) "means there is no causal requirement at all." *See* Opp. 14 n.4. This argument is absurd. Congress did not intend OCSLA to confer federal jurisdiction over every state-law complaint involving fossil fuel companies, and reading it so broadly is improper. *See, e.g., Maracich v. Spears*, 570 U.S. 48, 59–60 (2013) (finding "a limiting principle consistent with the structure of the statute and its other provisions" is necessary because "[t]he phrase 'in connection with' is essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere.'").

cause of action and the OCS operation" that is "too remote" will not "establish federal jurisdiction." *Deepwater Horizon*, 745 F.3d at 163.

Defendants have not met their burden to show that the City would not have suffered its injuries but for Defendants' operations on the OCS—even assuming some quantum of fossil fuels originating from the OCS contributed to them.[5]

Nor will granting relief here threaten to impair recovery from the OCS. Defendants' argument that the City's "request for abatement is functionally the same as seeking to *enjoin* Defendants' production of oil and gas," Opp. 4, mischaracterizes the law and the Complaint. On the law, contrary to Defendants' suggestion, *Haynes v. Haas*, 146 Haw. 452, 460–61 (2020), does not require an injunction preventing fossil fuel production as the prescribed abatement remedy. Rather, the *Haynes* Court adopted a rule that allows an individual plaintiff to sue for damages under a public nuisance theory. *Id.* at 461. The Court did not hold that a prohibitory injunction is the only available abatement remedy, as Defendants imply. *See id.* (noting "[i]t may be reasonable to continue an important activity if payment is made for the harm it is

---

[5] Defendants have argued in every similar case that the sheer volume of their production on the OCS means their OCS operations must be a but-for cause of the plaintiff's injuries, therefore satisfying OCSLA jurisdiction. Every court has rejected that argument. *See Boulder I*, 405 F. Supp. 3d at 979; *Rhode Island I*, 393 F. Supp. 3d at 151–52; *Baltimore I*, 388 F. Supp. 3d at 566–67; *San Mateo I*, 294 F. Supp. 3d at 938–39; *see also Hammond v. Phillips 66 Co.*, No. 2:14CV119-KS-MTP, 2015 WL 630918, at *4 (S.D. Miss. Feb. 12, 2015) (remanding where defendant failed to show plaintiff's asbestosis would not have occurred "but for" his nine-month exposure on OCS rigs given his 10 years of employment on land-based oil rigs).

causing but unreasonable to continue it without paying"). On the facts, the City seeks only to abate hazardous climate change-related impacts existing "in and near the City," Compl. Part VII, through local measures such as mitigating flooding. No such relief could "threate[n] to impair the total recovery of the federally-owned minerals" from the OCS. *EP Operating Ltd. P'ship*, 26 F.3d at 570.

There is no basis to find that requiring Defendants to pay for local injuries in Honolulu would impermissibly interfere with overall recovery of OCS minerals, or with Defendants' business generally. *See Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1008 (9th Cir. 2013) ("It is certainly not impossible for an airline both to comply with federal regulations and to pay damages in state tort suits."). Defendants' theory goes too far; if adopted, it would confer OCSLA jurisdiction for *any* claim that imposes damages on fossil fuel companies that operate on the OCS, no matter how remote those operations are from that plaintiff's injury. The remedies the City seeks here would not regulate activities on the OCS, s*ee, e.g.*, *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 82 (1st Cir. 2001); *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 220 (2d Cir. 2004), nor pose an obstacle to the achievement of OCSLA's objectives, because the statute is not intended to maximize the profits of companies that violate state laws.[6]

---

[6] Defendants' arguments concerning the effect of damages awards, though couched in relation to OCSLA jurisdiction, raise federal defenses that cannot provide grounds

In sum, "Defendants' argument that there is federal jurisdiction if any oil *sourced* from the OCS is some *part* of the conduct that creates the injury would . . . dramatically expand the statute's scope," arguably leading to "the removal of state claims that are only 'tangentially related' to the OCS." *Boulder I*, 405 F. Supp. 3d at 979. The argument must be rejected, as it has been in every other similar case.

## B.     There Is No Federal Officer Removal Jurisdiction.

Defendants' federal officer removal arguments under 28 U.S.C. § 1442 are meritless. The Ninth Circuit in *San Mateo II* already squarely rejected them, and nothing in Defendants' removal notice alters that outcome. *See* Mot. 26–36. To the extent the Court considers the jurisdictional facts improperly included in Defendants' Opposition, those facts change nothing.

To invoke § 1442(a)(1), Defendants must establish, among other things, that "there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and [the] plaintiff's claims." *San Mateo II*, 960 F.3d at 598. "To demonstrate a causal nexus, the private person must show: (1) that the person was 'acting under' a federal officer in performing some 'act under color of federal office,' and (2) that such action is causally connected with the plaintiffs' claims." *Id.*

---

for removal—namely, claims of extraterritorial regulation in violation of the dormant Commerce Clause and conflict preemption. *See Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009) ("[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense" based in federal law); Mot. 11.

Defendants fail on both points.

### 1.    There is No Causal Connection Between Defendants' Acts and the Claims Here.

Federal officer jurisdiction fails here, because while Defendants' proffer "may have the flavor of federal officer involvement in the [their] business, . . . that mirage only lasts until one remembers what [the City] is alleging in its lawsuit:" that Defendants failed to warn of the known risks of fossil fuel combustion on a massive scale, misled the public regarding those risks, promoted their products' unlimited use, and engaged in a multi-decadal disinformation campaign to support the ever-increasing production, sale, and combustion of fossil fuel products—as every court to consider the issue has held.[7] *Rhode Island II*, 2020 WL 6336000 at \*7. "[The City's] claim is simple: the oil companies knew what fossil fuels were doing to the environment and continued to sell them anyway, all while misleading consumers about the true impact of the products." *Id.*

Moreover, where a party disclaims injuries arising from federal activities, as the City has done here, Compl. ¶ 14, "remand clearly is appropriate, because [the

---

[7] *See* Mot. 32–36; *Baltimore II*, 952 F.3d at 466–67; *Boulder I*, 405 F. Supp. 3d at 976–77; *Rhode Island I*, 393 F. Supp. 3d at 152; *San Mateo I*, 294 F. Supp. 3d at 939; *see also State v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1131 (W.D. Wash. 2017), *aff'd*, 738 F. App'x 554 (9th Cir. 2018); *In re MTBE Prods. Liab. Litig.*, 488 F.3d 112, 131 (2d Cir. 2007) (federal officer removal improper in case involving heavily regulated fuel additive where federal regulations "say nothing" about deceptive marketing and other tortious conduct).

defendant] cannot prove a causal nexus between its government contracts and [plaintiff's] claims." *Fisher v. Asbestos Corp.*, No. 2:14-CV-02338-WGY, 2014 WL 3752020, at *3 (C.D. Cal. July 30, 2014) (collecting cases). Indeed, to "deny remand [in such a] case would affirm [defendant's] right to assert a defense against a claim that does not exist, an absurd result." *Id.* The City's disclaimer here is effective.[8]

Defendants' nexus showing falls short even under the "for or relating to" standard adopted in some circuits. *See, e.g.*, *Baltimore II*, 952 F.3d at 466–67 (discussing "relaxed reading" of nexus prong). In *Baltimore II*, the court recognized that a similar complaint "clearly [sought] to challenge the promotion and sale of fossil fuel products without warning and abetted by a sophisticated disinformation campaign." *Id.* at 467. Thus, "the relationship between Baltimore's claims and any federal authority over a portion of certain Defendants' production and sale of fossil fuel products [wa]s too tenuous to support removal under § 1442." *Id.* at 468. *See also Massachusetts*, 2020 WL 2769681, at *11–12 ("ExxonMobil's marketing and sale tactics were not plausibly 'relat[ed] to' the drilling and production activities

---

[8] Defendants' argument that the City's waiver is ineffective, Opp. 48 n.15, fails because, like many of Defendants' arguments, it mischaracterizes the City's injuries. Defendants' cited cases are also inapposite, because they address narrower waivers or waivers contradicted by a plaintiff's allegations—neither of which apply here. *See Ford v. Foster Wheeler USA Corp.*, No. 15-CV-05426-JSW, 2016 WL 551234, at *3 (N.D. Cal. Feb. 12, 2016); *Fisher*, 2014 WL 3752020 at *4; *compare Keeney v. A.W. Chesterton Co.*, No. CV 11-6192 PA (AGRX), 2011 WL 13220926, at *3 (C.D. Cal. Aug. 9, 2011) (distinguishing Defendants' cited cases and upholding waiver).

supposedly done under the direction of the federal government.").

Neither *Baker v. Atl. Richfield Co*., 962 F.3d 937 (7th Cir. 2020), nor *Latiolais v. Huntington Ingalls, Inc*., 951 F.3d 286 (5th Cir. 2020) (en banc), suggests, much less compels, a different result. In *Latiolais*, the plaintiff alleged his former employer, a contractor hired "to build and refurbish naval vessels," "negligently failed to warn him about asbestos," and that he contracted mesothelioma as a result. 951 F.3d at 289–90. Most of the employer's contracts with the Navy in the relevant years "required asbestos," under detailed "government plans and specifications." *Id*. at 289. The court held that the nexus test for removal was satisfied because "the charged conduct" (*i.e.*, the employer's failure to warn about asbestos) was "connected with the installation of asbestos during the refurbishment" of naval ships, which it performed "pursuant to directions of the U.S. Navy." *Id.* at 296. That connection between the employer's misconduct and "an act pursuant to a federal officer's directions" is far more direct than the attenuated relationship between the charged conduct here (a massive disinformation campaign about climate science) and Defendants' various unrelated interactions with the government. *Id.*

In *Baker*, the plaintiffs alleged that the defendants' manufacturing operations polluted soil around their later-built residence with heavy metals. 962 F.3d at 939. During World War II, the government "required" one defendant's predecessor to refine lead and other metals at the site "according to detailed federal specifications,"

12

and "mandated" that it "prioritize its sales to rubber and paint companies holding defense contracts . . . which effectively prevented [it] from selling its products to distributors for civilian applications." *Id.* at 940. The court held that the predecessor's pollution of the site was "connected to or associated with" the government's explicit, coercive control over the predecessor's metal refining at the same site, which made up "a small, yet *significant*, portion of their relevant conduct." *Id.* at 945. Any relationship between general government direction and Defendants' overall production of fossil fuels is far more tenuous than the relationship in *Baker*; and as discussed above, there is no connection at all between government direction and Defendants' decades of deception and misrepresentations.

Finally, there can be no causal relationship between the City's claims and Defendants' activities allegedly done at federal behest during World War II and the Korean War, Opp. 24–29, because the tortious conduct here—Defendants' campaign of deception and misleading promotion—began after those conflicts ended. *See* Mot. 31; *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 946 (E.D.N.Y. 1992).[9]

"There is simply no nexus between anything for which [the City] seeks

---

[9] The Court also lacks jurisdiction because Defendants do not have a colorable federal defense. Defendants' vague reference to a litany of defenses, without any explanation as to why those defenses apply, Opp. 50, does not satisfy their burden. *See Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014) (Defendant "bears the burden of proving by a preponderance of the evidence that the colorable federal defense and causal nexus requirements for removal jurisdiction have been met.").

13

damages and anything the oil companies allegedly did at the behest of a federal officer." *Rhode Island II*, 2020 WL 6336000 at *7. Jurisdiction must be denied.

### 2.     Defendants Were Not "Acting Under" a Federal Officer.

*San Mateo II* forecloses Defendants' argument that they "acted under" any federal officer in a way that could confer removal jurisdiction here. Just as in *San Mateo II*, the facts alleged in the Notice show, at most, that certain Defendants entered "arm's-length business arrangement[s] with the federal government" that do not satisfy § 1442. *See* 960 F.3d at 600–02. Their new arguments and facts are untimely and impermissible. To the extent the Court considers them, they do not meaningfully distinguish *San Mateo II*, and remand is still required.

### a.     A Purported General Federal Policy Interest in Supporting the Fossil Fuel Industry Cannot Satisfy the "Acting Under" Requirement.

Defendants' argument that the federal government has a generalized economic and security interest in "supervis[ing] and encourag[ing] domestic production of oil and gas," Opp. 21, does not show that that the City's claims invade a supposed "special relationship between Defendants and the federal government," Opp. 23, that entitles them to removal. Even if such a "special relationship" could be said to exist, it would not satisfy Defendants' burden to show "a causal nexus between [their] *actions*, taken *pursuant to a federal officer's directions*, and [the City's] claims . . . ." *San Mateo II*, 960 F.3d at 598 (emphasis added); *see also*

14

*Boulder II*, 965 F.3d at 826 (OCS lessees do not "act[] under" federal officers simply because fossil-fuel production "implicates national energy needs.").

Defendants' excursion into the history of various laws and policy statements does not show that when they committed the alleged tortious acts here, they were "assisting the federal officer in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm." *San Mateo II*, 960 F.3d at 599 (quoting *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 153–54 (2007)). At most, Defendants show that some of their activities—but *not* their disinformation campaign at the heart of this case—are "highly supervised and monitored." *Watson*, 551 U.S. at 153. That is insufficient to confer federal officer removal jurisdiction, because it would "expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Id.*

Defendants cite various statements regarding the government's "vital interest in ensuring adequate energy sources for national defense and economic security," Opp. 19, including what Defendants inaccurately characterize as a proposal to "create a national oil company."[10] But private businesses are not entitled to federal

---

[10] *See* Opp. 35; Ex. 1 (Sen. Hollings introducing OCSLA Amendments bill of 1975). Under Senator Hollings' actual proposal, "[l]easing [OCS mineral rights] *to private companies* would await the availability of much-needed data on the size and location of oil and gas in new areas" gathered by the government, because "[w]ith better

officer removal simply because their industries are nationally important. In *Riggs v. Airbus Helicopters*, for example, a helicopter manufacturer removed a wrongful death and product defect action on federal officer grounds, arguing that it acted under a federal officer when it self-certified its helicopter's compliance with FAA safety regulations. 939 F.3d 981, 983–84 (9th Cir. 2019), *cert. denied*, No. 19-1158, 2020 WL 3492671 (U.S. June 29, 2020). The Ninth Circuit disagreed, holding that the language of the regulations governing the FAA's delegation of authority, and the defendant's own description of its participation, "suggest a relationship based on compliance rather than assistance to federal officers," insufficient to satisfy § 1442's "acting under" requirement. *Id.* at 988–89. It made no difference that Congress instructed the FAA Administrator to consider "assigning, maintaining, and enhancing safety and security as the highest priorities in air commerce," including

---

information, we can be sure that *bids for production rights* on federally explored tracts are truly representative of the value of the resources." Ex. 1 at S904. (emphasis added). The bill would not have created a "national oil company"; to the contrary, it would have simply enabled the government to extract higher royalties from *private lessees* developing the OCS. The legislative history of the law that actually passed, contained in Defendants' own exhibits, also shows that Congress's purpose in amending OCSLA was to permit private exploitation of OCS oil and gas. A select committee report stated that lessees would "face more and stricter regulation" from the House amendment bill, but would "also enjoy less red tape, [and] fewer delays" to ameliorate "industry complaints about 'overregulation.'" Ex. 51 at *48. The committee made clear that "[p]rivate energy companies will continue to be the major explorers for oil, and gas, and the developers and producers of these resources." *Id.* at *49. The law encourages private development and does not resemble Defendants' hypothetical nationalized oil company. *Id.* at *50.

when delegating certification authority. *See* 49 U.S.C. § 40101(d)(1). The actual conduct at issue involved "mere compliance" with federal regulations, 939 F.3d at 989, and the court thus affirmed remand. *See also Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099–1100 (9th Cir. 2018) (no federal officer jurisdiction where defendant delayed delivery of drone parts for end sale to foreign military, notwithstanding national security interest in international arms sales regulations).

Defendants' encomium to the national importance of the oil and gas sector is no different from the importance of aircraft safety in *Riggs*, or arms export regulation in *Fidelitad*. The outcome is also the same: Defendants' arguments that the government has a "vital interest in ensuring adequate energy sources," Opp. 19, does not mean Defendants' production of oil and gas was "assisting the federal officer in fulfilling 'basic governmental tasks' that 'the government itself would have had to perform' if it had not contracted with a private firm." *San Mateo II*, 960 F.3d at 599.

### b.     Defendants' Mineral Leases Provide No Basis for Federal Officer Removal.

The Ninth Circuit already determined in *San Mateo II* that fossil-fuel companies do not act under federal officers when they extract oil and gas from the OCS pursuant to federal mineral leases. *See* 960 F.3d at 602–03. *Accord Boulder II*, 965 F.3d at 826; *Baltimore II*, 952 F.3d at 465–66; *Rhode Island II*, 2020 WL 6336000 at *6. Nevertheless, Defendants urge this Court to depart from clear precedent based on two meritless arguments.

17

First, Defendants purportedly identify new evidence that "their performance under the leases fulfilled an essential governmental purpose." Opp. 34. The Ninth Circuit concluded the opposite in *San Mateo II*, holding that "[t]he leases do not require that lessees act on behalf of the federal government, under its close direction, or *to fulfill basic governmental duties*." 960 F.3d at 602–03 (emphasis added). This Court should decline the invitation to disregard precedent rejecting the same arguments, from many of the same parties, concerning the same leases.

Second, Defendants misleadingly claim that the record in this case contains "significantly more detail about government control over federal mineral lessees . . . than the factual record at issue in the cases upon which [the City] relies." Opp. 33. In reality, much of what Defendants call "important additional facts and arguments," Opp. 1, is simply recycled material rejected by the Ninth Circuit. For example, Defendants note that OCS "[l]essees must prepare and comply with detailed exploration and development plans that are subject to comment and approval by the government." Opp. 37. They also claim that the government's control extends "over the disposition of the leased oil and gas after it is removed from the ground," asserting that the government "can precondition a lease on a right of first refusal to purchase all materials in time of war or when the President of the United States shall so prescribe," and that the government "can [also] mandate 20% of all crude and natural gas produced pursuant to [OCS] drilling leases be offered to small or

independent refiners." Opp. 34 (cleaned up). But *San Mateo II* analyzed those exact lease terms, and found they "largely track legal requirements" in OCSLA itself, the mere compliance with which cannot, by itself, satisfy the "acting under" requirement. *See* 960 F.3d at 602–603.

The rest of Defendants' purported evidence of "government control," Opp. 33, fares no better. Defendants highlight, for instance, boilerplate language in OCS leases that require lessees to "exercise diligence in the development of the leased area" and to "conform to sound conservation practices to preserve, protect, and develop minerals resources and maximize the ultimate recovery of hydrocarbons from the leased area." Notice, Ex. C, at 2; *see also* Opp. 37. The Ninth and Fourth Circuits both rejected Defendants' reliance on analogous terms in other contracts with the federal government because they "'seem typical of any commercial contract' and are 'incidental to sale and sound in quality assurance.'" *San Mateo II*, 960 F.3d at 601 (quoting *Baltimore II*, 952 F.3d at 464). The lease terms "evince an arm's-length business relationship" between the government as lessor and Defendants as lessees. *Id*. They do not satisfy § 1442.[11]

---

[11] This conclusion does not change simply because those particular lease requirements concern fossil-fuel production, as opposed to other aspects of OCS exploration or development. *See Boulder II*, 965 F.3d at 821. Indeed, in *San Mateo II*, the Ninth Circuit concluded that contractual agreements which control the level of an oil company's production of fossil fuels do not necessarily "give rise to a relationship where [the oil company] was 'acting under' a federal officer for purposes of § 1442." 960 F.3d at 602.

Defendants also cite various federal regulations that require OCS lessees to conduct well tests, control the flaring and venting of gas, and allow the federal government to set "a cap on the production rate" from OCS wells. Opp. 34, 38. At most, those regulations suggest that "OCS resource development is highly regulated." *Baltimore II*, 952 F.3d at 465. And as the Fourth Circuit explained in rejecting nearly identical arguments, "differences in the degree of regulatory detail or supervision cannot by themselves transform . . . regulatory *compliance* into the kind of assistance' that triggers the 'acting under' relationship." *Baltimore II*, 952 F.3d at 465 (citation omitted).

*San Mateo II* unambiguously held that "the leases on which the defendants rely do not give rise to the 'unusually close' relationship where the lessee was 'acting under' a federal officer." *San Mateo II*, 960 F.3d at 603 (quoting *Watson*, 551 U.S. at 153). That conclusion binds this Court.

### c.  Defendants' Evidence of Dealings with the Military Does Not Establish They Engaged in Their Deception Campaign at the Direction of Federal Officers.

Defendants' newly introduced evidence involving the interactions with the military only supports arguments that were rejected in previous cases.[12] To the extent it presents the military-industrial relationship from a different angle, it still fails to

---

[12] *See San Mateo II*, 960 F.3d at 600–602; *Baltimore II*, 952 F.3d at 463–64; *Rhode Island II*, 2020 WL 6336000 at *6–7.

show that Defendants acted under federal officers in any way relevant to this case.

*World War II and the Korean War*: Defendants' new evidence does not support that they were "under the 'subjection, guidance, or control'" of a federal officer in providing fuel to the military during World War II and the Korean War (the "Wars").[13] *San Mateo II*, F.3d at 599 (citation omitted). Rather, that evidence speaks to a cooperative, mutually beneficial relationship between the military and the industry. For instance, the historical report cited by Defendants frames the Petroleum Administration for War's ("PAW") relationship with the industry as a "partnership" that was "dedicated to the proposition that cooperation, rather than coercion, was the formula by which the forces of Government and industry could best be joined." Ex. 20 at 1. "The functions and responsibilities of the two partners were quite separate and distinct," and PAW "did not find, produce, or refine, or

---

[13] Nor do Defendants' legal citations. *Shell Oil Co. v. United States*, 751 F.3d 1282 (Fed. Cir. 2014), and *Exxon Mobil Corp. v. United States*, No. CV H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020), both involved the government's role in hazardous waste releases at refineries for the purpose of allocating liability under CERCLA, 42 U.S.C. § 9601 *et seq*. Neither case considered whether the government's control over refining activities would have engendered undue "local prejudice" in state court warranting federal officer removal. *See San Mateo II*, 960 F.3d at 599. *United States v. Shell Oil Co.*, also a CERCLA case, underscores the cooperative relationship between industry and the military during WWII, noting that, despite its war powers, the military "relied almost exclusively on contractual agreements to ensure avgas production," and "the Oil Companies designed and built their facilities, maintained private ownership," "managed their own refinery operations," and "affirmatively sought contracts to sell avgas to the government," which "were profitable throughout the war." 294 F.3d 1045, 1049–50 (9th Cir. 2002).

21

transport a single barrel of oil." *Id*. Rather than exerting any subjection over the industry, the PAW instead "*stimulate[d]* exploration" and "*urged* the industry" to drill new wells. *Id*. at 178 (emphasis added). And infrastructure projects, including the "Big Inch" pipelines, were the product of "wartime teamwork" between the government and outgrowths of the industry.[14] *Id*. at 108.

Defendants offer no compelling evidence of actual coercion by the PAW over wartime production. *See* Opp. 26. Instead, they offer a speech and a threatening telegram, Exs. 21–22, which neither demonstrate actual instances of federal subjection, nor carry the weight of coercion necessary to establish the "acting under" element. *See, e.g.*, *Kelly v. Monsanto Co.*, No. 4:15 CV 1825 JMB, 2016 WL 3543050, at *9 (E.D. Mo. June 29, 2016) (granting remand where the defendants failed to show that a defendant "was compelled to produce the PCBs under threat of criminal sanction"). The record here is similarly devoid of actual directives requiring any "changes to Defendants' refining equipment and operations," Opp. 26, during the Wars. *See id.* (citing an advisory report, Ex. 23 at 40, for the unremarkable observation that a refiner cannot make a fuel until it knows the fuel composition).

*Compliance with Defense Production Act*: Defendants' proffered "directives"

---

[14] War Emergency Pipelines, Inc. ("WEP") built the "Big Inch" pipelines, not Defendants. *Schmitt v. War Emergency Pipelines*, 175 F.2d 335, 335 (8th Cir. 1949). While a handful of defendants held minority shares in WEP, *see* Ex. 27, WEP is the proper entity to evaluate "acting under" with respect to pipeline construction, and it dissolved in 1947, well before the unlawful conduct at issue here. *Id*. at 3–4.

under the Defense Production Act of 1950 ("DPA") similarly fall short of demonstrating federal control. *See* Opp. 28–29; Ex. 30 (House report referring to "refiners" generally, and no specific Defendant). And the cited "production orders," Opp. 28 (referring to Orders No. 3 and No. 4, *see* Ex. 30 at 122), did not demand any specific formulation or quantity of production for the military because they applied only to the use of certain fuel additives for non-avgas applications. *See id.* The suggestion that Defendants were directed to produce under the DPA for two months in 1973, *e.g.*, Exs. 32 (news release), 33 (article), is insufficient to establish that they "act[ed] under" federal authority. *See New Mexico ex rel. Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1141 (D.N.M. 2020) (compliance with DPA insufficient to establish "acting under" element under *Watson*). Any such production was a minute fraction of Defendants' total production and is irrelevant to the City's claims. *See*, *e.g.*, *Kelly*, 2016 WL 3543050 at *9 (rejecting federal officer jurisdiction where insignificant fraction of defendants' PCBs were sold to military).

*"Specialty Fuels" Sold to the Military*: Defendants' evidence is limited to aspects of their dealings related to jet fuel and illustrations of specific fuel standards, but again fails to demonstrate the relationship between any Defendant and the military that is critical to the "acting under" analysis. *See Watson*, 551 U.S. at 151–52 (emphasizing "relationship" between the federal officer and the defendant).

Defendants' commercial contracts with the military, Exs. 36–44, evidence

exactly the type of arms-length commercial relationship held not to support federal officer jurisdiction in *San Mateo II*, 960 F.3d at 600. To the extent the military may have controlled Defendants' performance under those contracts, it did so only by reserving the right to inspect goods and projects prior to delivery, *e.g.* Exs. 36 (Part III), 38 (¶ 2); or in requiring that Defendants maintain secrecy around their performance, *e.g.*, Ex. 39 (Part V). But none of those provisions establish that their fuel-related contract duties were "the duties or tasks of [a] federal superior" or that their relationship with any federal superior involved federal "subjection, guidance, or control" over conduct addressed by the City's claims. *Watson*, 551 U.S. at 152.

The more than 200 pages of federal solicitations and Tesoro contract excerpts do not give rise to federal officer jurisdiction. *See generally* Ex. 44. Instead, they confirm that the government did *not* solicit fossil fuel companies to engage in deception campaigns concerning military jet fuel, let alone compel such conduct. *Id*. Nor did the government force Tesoro to enter contracts or control Tesoro's sales, advertising, processing, or refining activities. *Id*.

The same is true of the proffered Military Specification sheets. *See* Exs. 45[15], 47–49. Defendants concede that, in addition to laying out "detailed specifications," they must also evidence the "'compulsion to provide the product to the government's

---

[15] Ex. 45 is a handbook for certifying fuels that by its own terms is "for guidance only"—not a fuel specification. Ex. 45 at 1.

specifications'" to establish the "acting under" element. Opp. 32 (citing *Baker*, 962 F.3d at 943). Defendants demonstrate no compulsion to produce specialized jet fuel, let alone a compulsion to misrepresent the consequences of using that fuel.[16] This evidence cannot satisfy the "acting under" test.

### d.   Chevron's Business at the Elk Hills Reserve Does Not Give Rise to Federal Officer Removal.

Defendants' assertion that Chevron and its predecessor Standard Oil were acting under federal officers at the Elk Hills Reserve is foreclosed by *San Mateo II*. Their "new" allegations, even if they were properly before the Court, add nothing to the analysis. First, Defendants continue to rely on the Unit Plan Contract ("UPC") executed between Standard Oil and the government in 1944, which the Ninth Circuit squarely rejected as a basis for removal. *See* Opp. 41–42. As the court held in

---

[16] Supplying a highly specialized product like jet fuel, without more, does not establish the "acting under" element. *Winters v. Diamond Shamrock Chem. Co.* is distinguishable for exactly that reason: there, in addition to maintaining "strict control" over the development and production of Agent Orange, a unique formulation unavailable commercially, the military also required defendants to "produce and provide" it under threat of criminal sanctions. 149 F.3d 387, 398–99 (5th Cir. 1998). There is no such compulsion to produce here; only mutually beneficial commercial contracts. Similarly, in *Leite*, the court found that removal was proper only because "the Navy issued detailed specifications governing the form and content of all warnings," was directly involved in preparing manuals which would have included warnings, and "prohibit[ed] other[] [warnings] without its express approval." 749 F.3d at 1123. This extensive evidence of control, directly giving rise to the failure to warn claim, supported federal officer jurisdiction—facts not present here. *Id*. at 1123–24; *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258–59 (4th Cir. 2017) (reaching same result in virtually identical case in which Navy "dictated" the warnings giving rise to the failure-to-warn claim).

*San Mateo II*:

> Because the Navy sought to limit oil production in order to ensure the availability of oil reserves in the event of a national emergency, the unit agreement required that both Standard and the Navy curtail their production . . . . [As compensation,] the unit agreement gave Standard the right to produce a specified amount of oil per day . . . . Both parties could dispose of the oil they extracted as they saw fit, and neither had a "preferential right to purchase any portion of the other's share of [the] production."

960 F.3d at 601–02. Simply put: "When Standard extracted oil from the reserve, Standard was acting independently . . . not as the Navy's 'agent,'" and conduct under the UPC therefore does not satisfy § 1442's "acting under" element. *See id.* at 602.

Second, Defendants' allegation that the Navy hired Standard Oil as a contractor to operate the reserve "do[es] not give rise to the 'unusually close' relationship" that satisfies the acting under requirement. *Id.* at 603 (quoting *Watson*, 551 U.S. at 153). Defendants' strongest evidence is a GAO report stating that Standard Oil "bid for the operator's contract in 1944, [and] was awarded the contract." Opp. 42 (citing Ex. 54 at 15). Defendants present no evidence, however, that the operator's contract was more than "an arm's-length business arrangement with the Navy," just as the Ninth Circuit held the UPC to be. *See San Mateo II*, 960 F.3d at 602. They also present no evidence that their operation of the field, as opposed to their participation in the UPC, "involve[d] conduct so closely related to the government's implementation of federal law that [they] would face 'a significant risk of state-court prejudice.'" *Id.* (quoting *Watson*, 551 U.S. at 152).

26

The GAO report on which Defendants rely shows that Standard Oil's operation of the reserve was "marked by the congressional intent to *retain the oil in the ground* except when it was needed for national defense or to avoid damage to the field and the irretrievable loss of oil." *See* Ex. 54 at 2 (emphasis added). For most of its life, production at the reserve was maintained at "minimum" levels to extract as little as possible, and Standard's operation entailed maintaining the field's integrity for use at some future date. *Id.* at 15. Critically, even if Standard's conduct in *not* producing oil at the field could satisfy the acting under requirement—and it is not clear that it could—it has no relation to the conduct at issue here.

Finally, the changes at the Elk Hills reserve in response to the oil crisis of the 1970s only confirm that private production at the reserve was not done at the behest of a federal superior. The 1974 congressional authorization Defendants refer to concerning development of the reserve culminated in the Naval Petroleum Reserve Production Act of 1976 ("NPRPA"). In the Act, "Congress determined that the Navy no longer needed to maintain a petroleum reserve for a national emergency," and the parties "executed an amendment to the UPC, removing any reference to the need for a petroleum reserve and substituting language emphasizing the new national policy to encourage *economic productivity*." *Chevron U.S.A., Inc. v. United States*, 110 Fed. Cl. 747, 754 (2013) (emphasis added). The NPRPA directed that reserve oil be sold "at public sale to the highest qualified bidder," on terms "so structured as

27

to give full and equal opportunity for the acquisition of petroleum by all interested persons, including major and independent oil producers and refiners alike," without "creat[ing] or maintain[ing] a situation inconsistent with the antitrust laws." 10 U.S.C. §§ 7430(b)(1), (d), (g)(2).

Ultimately, the government's role at Elk Hills became that of a market participant offering its oil for sale at public auction. The field has "generated over $17 billion for the U.S. Treasury," Opp. 44, precisely because the government sold oil on the open market; any role Chevron played as operator there was, once again, an "arm's-length business arrangement" to develop the reserve and bring the oil to market. *See San Mateo II*, 960 F.3d at 602. It did not involve the kind of subjection, guidance, and control necessary to satisfy § 1442.

Defendants' citation to a historical report describing a gas processing contract related to Elk Hills, Opp. 44 (citing Ex. 57), also fails. The government proposed constructing a three-part gas processing plant at the field, but Chevron "balked at sharing the costs . . . since it intended to process its share of gas at its plant" off-site. Ex. 57 at 192. Ultimately, "the Government and Chevron reached a compromise," under which two gas processing facilities would be constructed "instead of the three requested by the Government." *Id.* The relationship described is one between business partners operating on negotiated terms, not one of subjection, guidance, or control. Defendants have not shown that conduct by any private company at Elk

Hills satisfies § 1442's "acting under" requirement.

### e.   Defendants' Contributions into the Strategic Petroleum Reserve Were Not Made at Government Direction.

Defendants' in-kind royalty payments in the form of oil, which the government directed into the Strategic Petroleum Reserve ("SPR"), also do not satisfy § 1442. Defendants' contributions to the SPR between 1999 and 2009 were made through a program under which lessees of mineral rights on federal land, including especially leases on the OCS, paid royalties on those leases in kind, i.e., by giving the government a portion of their production. *See* Opp. 45; Exs. 59 (SPR annual report), 60 (letter re: royalties). *San Mateo II* rejected OCS leases as a basis for removal, because "'the willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, without more' cannot be 'characterized as the type of assistance that is required' to show that the private entity is 'acting under' a federal officer." 960 F.3d at 603 (quoting *Baltimore II*, 952 F.3d at 465). Defendants do not and cannot explain why making in-kind royalty payments pursuant to those leases would constitute "acting under" a federal superior, when making cash royalty payments does not. Indeed, under Defendants' reasoning, cash royalties would yield the same result if the government spent the funds to buy SPR oil somewhere else. *San Mateo II* has already foreclosed that reasoning.[17]

_____

[17] The 2002 contract "to deliver nearly 19 million barrels of oil to the SPR as part of

The royalty-in-kind program was largely phased out in 2009, and the SPR is now supplied primarily through purchases on the open market. The regulations governing the purchase and sale of SPR oil make clear that the government views its role as that of a market participant, not one of subjection, guidance, or control over entities like Defendants. "To reduce the potential for negative impacts from *market participation*," the Department of Energy must review certain factors "prior to commencing acquisition of petroleum for the SPR," including: "The outlook for international and domestic production levels;" "Existing or potential disruptions in supply or refining capability;" and "The level of market volatility." 10 C.F.R. § 626.4(a) (emphasis added). The Department of Energy must provide public notice before purchasing SPR oil, "usually in the form of a solicitation," and must "inform the public of its overall fill goals, so that they may be factored into market participants' plans and activities." *Id.* § 626.5(a)(1). Selling commodity oil to the government through a competitive bidding process, which the government then directs to the SPR, is simply not "an effort to *assist*, or to help *carry out*" the duties of a federal superior as required by § 1442. *See Watson*, 551 U.S. at 152.

---

the RIK program" on which Defendants rely provides a perfect example. Opp. 45. The Department of Energy "announced a solicitation for bids to exchange up to 22 million barrels of royalty oil for oil to fill the SPR," under which it would "negotiate contracts with the companies that offer the ratios most favorable for the U.S. Government." Ex. 61 (Senate report) at 18. The delivery Defendants describe under that program represents an arm's-length contractual relationship solicited by the government on the open market, and nothing more.

Finally, lease provisions requiring certain lessees to participate "as a sales and distribution point in the event of an SPR drawdown," Ex. 62 at 15, is also insufficient. The Secretary of Energy may "drawdown and sell petroleum products in the Reserve" if the President makes certain findings, 42 U.S.C. § 6241(a), (d)(1), and certain Defendants' leases apparently contain provisions describing their role in the event a drawdown is ordered. Opp. 46. Those provisions are strikingly similar to OCSLA lease terms that the Ninth Circuit rejected as a basis for removal in *San Mateo II* because they merely "track[ed] legal requirements" imposed by statute. 960 F.3d at 603 (citing 43 U.S.C. § 1341(b)). The lease terms simply direct compliance with federal statutes, and "[m]ere compliance with the law, even if the laws are highly detailed, and thus leave an entity highly regulated, does not show that the entity is acting under a federal officer." *Id.* (citations omitted). None of Defendants' involvements with the SPR constitute "acting under" a federal officer.

### C.   There Is No Enclave Jurisdiction Because the City's Claims Did Not "Arise" Within Any Federal Enclave.

Defendants argue that enclave jurisdiction exists here because "a portion of Defendants' production and refining" occurred on enclaves—again relying on assertions not supported in the Complaint.[18] Opp. 51. The conduct at issue here did

---

[18] Defendants do not contest two of the City's arguments: the Complaint does not contain allegations that tortious acts occurred on enclaves, and enclave jurisdiction does not apply where, as here, concurrent state jurisdiction exists. *See* Mot. 30–31;

not "arise on" federal enclaves because the City's Complaint expressly disclaims relief for injuries to federal property. Mot. 33–34; Compl. ¶¶ 14, 16 n.9, 151(d) n.126. Such disclaimers routinely support remand.[19]

A claim "arises" for enclave removal purposes "where the 'substance and consummation' of events giving rise to claims occur." *Coleman v. Trans Bay Cable, LLC*, No. 19-CV-02825-YGR, 2019 WL 3817822, at *3 (N.D. Cal. Aug. 14, 2019) (quoting *Totah v. Bies*, No. C 10-05956 CW, 2011 WL 1324471, at *1 (N.D. Cal. Apr. 6, 2011)); *see* Mot. 36–37. Each of the City's claims arose where the City suffered an injury or intrusion—on non-federal land. As explained in *Boulder I*:

> It is not the defendant's conduct, but the injury, that matters. . . . Federal enclave jurisdiction thus does not exist here because Plaintiffs' claims and injuries are alleged to have arisen exclusively on non-federal land. That . . . Defendants may have caused similar injuries to federal property . . . does not provide a basis for removal.

405 Supp. 3d at 974. Defendants' own cases support this proposition. *See* Opp. 50 (citing *Totah*, 2011 WL 1324471, at *2 (finding enclave jurisdiction where publication of defamatory statement, "the last event necessary to render the tortfeasor liable," occurred in federal enclave)).

---

*Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197, 1210 n.7 (N.D. Cal. 2013) (collecting cases).

[19] *See, e.g.*, *Goto v. Whelan*, No. 20-cv-01114 (HSG), 2020 WL 4590596, at *4 (N.D. Cal. Aug. 11, 2020); *Boulder I*, 405 F. Supp. 3d at 974; *Rhode Island I*, 393 F. Supp. 3d at 152; *Baltimore I*, 388 F. Supp. 3d at 565; *Monsanto*, 274 F. Supp. 3d at 1132.

Defendants also mischaracterize the holding of *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315 (N.D. Ala. 2010), the lone authority cited in support of their argument that jurisdiction lies "where at least '*some of the events* alleged'" occurred on an enclave. Opp. 51. In *Corley*, the plaintiff was "continually exposed" to asbestos-containing products when he "performed a substantial amount of work" on naval bases over his 17 years in the Navy. *Id.* at 1317, 1328. The court concluded that enclave jurisdiction applied, rejecting plaintiff's argument that he was exposed to more asbestos outside the enclaves than in them, because "[t]he fact that the injury occurred [on a federal enclave] is sufficient." *Id.* at 1329. Thus, *Corley* actually supports the City's argument that the location of *injury*—here, on non-federal land—is a critical factor in determining enclave jurisdiction. *See also Baltimore I*, 388 F. Supp. 3d at 565 ("[C]ourts have only found that claims arise on federal enclaves . . . when all or most of the pertinent events occurred there.") (collecting cases).

It cannot be said that the City's claims "arose" on federal enclaves merely because a few Defendants allegedly conducted some operations there—especially since the City expressly defines the scope of injury to exclude any federal territory. *See* Compl. ¶¶ 14, 16 n.9.[20] Federal enclave jurisdiction is improper here.

---

[20] *See also Baltimore I*, 388 F. Supp. 3d at 565; *Boulder I*, 405 F. Supp. 3d at 974; *Rhode Island I*, 393 F. Supp. 3d at 152; *San Mateo I*, 294 F. Supp. 3d at 939.

### D.    Defendants' Attacks on the Merits of the City's Claims Are Misguided.

Defendants' long digression to attack the *merits* of the City's claims, *see* Opp. 52–60, would be premature at this early stage of the litigation even if the Court could consider Defendants' untimely challenge, which it cannot. *See* Part II, *supra.* On a motion to remand, the question before this Court is not whether the City's causes of action are meritorious; rather, it is whether the Court has subject-matter jurisdiction to adjudicate those causes of action. *See Leite*, 749 F.3d at 1121–22. In any event, Defendants' straw man argument is easily dismissed.

Consumer use of Defendants' fossil-fuel products is, of course, a link in the causal chain connecting Defendants' tortious conduct—a sophisticated disinformation campaigned aimed at inflating the market for fossil fuels—with the City's harms. But it is not the alleged tortious conduct itself. As the Fourth Circuit explained in rejecting similar mischaracterizations in *Baltimore II*, "references to fossil fuel production in the Complaint . . . serve to tell a broader story" concerning climate change, but are "not the source of tort liability." 952 F.3d at 467. Rather, the "concealment and misrepresentation of the products' known dangers—and simultaneous promotion of their unrestrained use" are the focus of the action. *Id.*[21]

---

[21] Defendants repeatedly insinuate that the City has incorrectly "*labeled* its claims as sounding in state common law," and that those claims in fact arise under federal law. Opp. 52 (emphasis in original). But as Defendants concede, *see* Opp. 8 n.1, the Ninth Circuit has already rejected identical arguments in *Oakland*, 969 F.3d at 908.

Similarly, Defendants' assertion that some people published truthful information about global warming, Opp. 53, does not eliminate or counteract "the source of tort liability" in this case: Defendants' decades-long campaign to conceal and affirmatively misrepresent the dangers of fossil fuels to the public writ large. *See Baltimore II*, 952 F.3d at 467.[22] Where companies have engaged in analogous campaigns of deception, courts have not hesitated to hold them liable—after a full factual record has been developed—for the harms caused by their products, notwithstanding evidence suggesting that those harms were known to scientists and some segments of the population.[23] That affirmative misconduct can and will render Defendants liable under Hawaiian law.

## IV.   CONCLUSION

This Court lacks jurisdiction here and should grant the Motion to Remand.

---

[22] Defendants purportedly identified thousands of articles containing the phrases "greenhouse effect," "global warming," or "climate change." Opp. 55. But because those search results do not reveal whether the articles provided accurate or misleading information, they lend no support to Defendants' arguments.

[23] *See, e.g.*, *ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 65, 93, 119 (Cal. Ct. App. 2017) (lead paint); *Oklahoma v. Purdue Pharma L.P.*, No. CJ-2017-816, 2019 WL 9241510, at *8–9, 12, 14 (Okl. Dist. Ct. Nov. 15, 2019) (opioids); *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 26, 35–36 (D.D.C. 2006) (tobacco).

DATED:  October 30, 2020          Respectfully Submitted,

**SHER EDLING LLP**

By:  _/s/ Victor M. Sher_____
VICTOR M. SHER (pro hac vice)
MATTHEW K. EDLING (pro hac vice)
100 Montgomery St. Ste. 1410
San Francisco, CA 94104
Telephone:  (628) 231-2500
Facsimile:  (628) 231-2929
Email:      vic@sheredling.com
            matt@sheredling.com


**CITY AND COUNTY OF HONOLULU**

PAUL S. AOKI
Corporation Counsel

ROBERT M. KOHN
NICOLETTE WINTER
Deputies Corporation Counsel
530 S. King Street, Room 110
Honolulu, Hawaiʻi 96813
Telephone:  (808) 768-5234
Facsimile:  (808) 768-5105
Email:      robert.kohn@honolulu.gov
            nwinter@honolulu.gov

*Attorneys for the City*
*and County of Honolulu*

36