IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| CITY AND COUNTY OF HONOLULU,<br><br>          Plaintiff,<br><br>     vs.<br><br>SUNOCO LP, *et al.*,<br><br>          Defendants. | Case No. 20-cv-00163-DKW-RT<br><br>**ORDER (1) GRANTING MOTION TO REMAND AND (2) REMANDING ACTION TO STATE CIRCUIT COURT** |
| COUNTY OF MAUI,<br><br>          Plaintiff,<br><br>     vs.<br><br>CHEVRON U.S.A. INC., *et al.*,<br><br>          Defendants. | Case No. 20-cv-00470-DKW-KJM<br><br>**ORDER (1) GRANTING MOTION TO REMAND AND (2) REMANDING ACTION TO STATE CIRCUIT COURT** |

In these cases, Plaintiffs seek to have their claims remanded to State Court, arguing that this Court lacks subject matter jurisdiction over the same.   For their part, Defendants, a roll call of "energy" companies, removed those same claims to this Court, arguing that subject matter jurisdiction exists here on numerous grounds. Since the first of these actions, No. 20-cv-163, was removed, some of those grounds have become less persuasive due to binding Ninth Circuit Court of Appeals

precedent.   Nonetheless, in their oppositions to Plaintiffs' motions to remand, Defendants continue to advance three principal reasons for why these cases should remain in federal court: (1) Plaintiffs' claims are related to Defendants' activities on the Outer Continental Shelf; (2) Defendants acted under the direction of federal officers for decades while engaging in activities related to Plaintiffs' claims; and (3) Plaintiffs' claims arise on federal enclaves.[1]

While, at first-blush, these cases, which allegedly involve "Defendants' exacerbation of global warming…," may seem to include subject matter appropriate for this federal forum, upon closer inspection, the claims Plaintiffs have elected to pursue in these cases reveal that federal jurisdiction is lacking on the grounds advanced by Defendants.   The principal problem with Defendants' arguments is that they misconstrue Plaintiffs' claims.   More specifically, contrary to Defendants' contentions, Plaintiffs have chosen to pursue claims that target Defendants' alleged concealment of the dangers of fossil fuels, rather than the acts of extracting, processing, and delivering those fuels.   When viewed in this light, Plaintiffs' claims simply do not relate to Defendants' activities on the Outer Continental Shelf, under the direction of federal officers, or on federal enclaves because there is no contention that Defendants' alleged acts of concealment implicate those spheres.   As a result, with no basis for federal jurisdiction existing over the claims Plaintiffs have chosen

---

[1] As mentioned with further specificity below, the Court acknowledges that Defendants persist in raising three other grounds for removal in order to preserve those grounds for appellate review.

to pursue, the Court GRANTS Plaintiffs' motions to remand and REMANDS these cases to the State Courts from which they came.[2]

## **RELEVANT PROCEDURAL BACKGROUND**

On April 15, 2020, in No. 20-cv-163 (Honolulu Action), Defendants Chevron Corporation and Chevron U.S.A., Inc. (collectively, Chevron) removed Plaintiff City and County of Honolulu's (Honolulu) Complaint from the First Circuit Court of the State of Hawaiʻi (First Circuit).   In the notice of removal, Chevron asserted eight grounds for federal jurisdiction: (1) the Outer Continental Shelf Lands Act (OCSLA); (2) federal officer jurisdiction; (3) federal enclave jurisdiction; (4) federal common law; (5) *Grable*[3] jurisdiction; (6) federal preemption; (7) bankruptcy jurisdiction; and (8) admiralty jurisdiction.   On September 11, 2020, Honolulu filed a motion to remand its case to the First Circuit.   Dkt. No. 116.[4]   On October 9, 2020, Defendants[5] filed a consolidated opposition to the motion to

---

[2]Although Defendants request oral argument on the motions to remand, *see, e.g.*, Dkt. No. 117 at 10, the Court finds that resolution of these matters would not be advanced by oral argument, given the more than adequate written record on file.   Therefore, pursuant to Local Rule 7.1(c), the Court elects to decide the motions to remand without a hearing.

[3]*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).

[4]References to Dkt. No. __ shall be to filings in No. 20-cv-163.   References to Dkt. No. __* shall be to filings in No. 20-cv-470.

[5]Defendants in the Honolulu Action are: Sunoco LP; Aloha Petroleum, Ltd.; Aloha Petroleum LLC; Exxon Mobil Corporation; Exxonmobil Oil Corporation; Royal Dutch Shell PLC; Shell Oil Company; Shell Oil Products Company LLC; Chevron Corporation; Chevron U.S.A., Inc.; BHP Group Limited; BHP Group PLC; BHP Hawaii Inc.; BP PLC; BP America Inc.; Marathon Petroleum Corporation; ConocoPhillips; ConocoPhillips Company; Phillips 66; and Phillips 66 Company (collectively, Defendants).

remand, Dkt. No. 117, to which Honolulu replied on October 30, 2020.   Dkt. No. 121.[6]

Also on October 30, 2020, in No. 20-cv-470 (Maui Action), Chevron removed Plaintiff County of Maui's (Maui and, with Honolulu, Plaintiffs) Complaint from the Second Circuit Court of the State of Hawaiʻi (Second Circuit). In the notice of removal, Chevron asserted six grounds for federal jurisdiction: (1) OCSLA; (2) federal officer jurisdiction; (3) federal enclave jurisdiction; (4) federal common law; (5) *Grable* jurisdiction; and (6) federal preemption.   With the filing of the notice of removal in the Maui Action, the Court stayed the Honolulu Action, pending anticipated remand briefing in the former.   On November 25, 2020, Maui filed a motion to remand its case to the Second Circuit.   Dkt. No. 74*.   On December 22, 2020, Defendants[7] filed a consolidated opposition to the motion to remand.   Dkt. No. 96*.   And on January 20, 2021, Maui filed a reply in support of its motion to remand.   Dkt. No. 98*.

## <u>RELEVANT LEGAL PRINCIPLES</u>

Pursuant to Section 1441(a) of Title 28, any civil action brought in a State court may be removed to federal court by a defendant provided that the federal court

---

[6]Although mentioned in the notice of removal filed in the Honolulu Action, Defendants do not again argue the applicability of bankruptcy or admiralty jurisdiction in their brief opposing the motion to remand.   Therefore, the Court finds those grounds to have been abandoned, and does not further address them herein.

[7]Defendants in the Maui Action are the same as those in the Honolulu Action and, thus, are also collectively referred to herein as Defendants.

would have original jurisdiction over the action.   Original jurisdiction can be obtained in various ways.   As argued in the briefing before the Court, three ways are relevant here.

First, in pertinent part, OCSLA provides federal courts with jurisdiction over any case "arising out of, or in connection with … any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals…."   43 U.S.C. § 1349(b)(1).

Second, the removal statute allows cases commenced in State court to be removed by, among others, "[t]he United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or any agency thereof, in an official or individual capacity, for or relating to any act under color of such office…."   28 U.S.C. § 1442(a)(1) (emphasis added).

> In order to invoke § 1442(a)(1), a private person must establish: (a) it is a person within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and the plaintiff's claims; and (c) it can assert a colorable federal defense. To demonstrate a causal nexus, the private person must show: (1) that the person was acting under a federal officer in performing some act under color of federal office, and (2) that such action is causally connected with the plaintiffs' claims.

*Cty. of San Mateo v. Chevron Corp.*, 960 F.3d 586, 598 (9th Cir. 2020) (quotations, citations, and alteration omitted).

Third, "[f]ederal courts have federal question jurisdiction over tort claims that

arise on federal enclaves." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (quotation omitted).

Finally, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). The burden of establishing this Court's subject matter jurisdiction "rests upon the party asserting jurisdiction[,]" *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), which, here, means Defendants, *Corral v. Select Portfolio Servicing, Inc.*, 878 F.3d 770, 773 (9th Cir. 2017). "[A]ny doubt about the right of removal requires resolution in favor of remand." *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1244 (9th Cir. 2009).

## DISCUSSION

The Court addresses, in turn, the three principal grounds for removal at issue here: (1) jurisdiction under the OCSLA; (2) federal officer removal; and (3) federal enclave jurisdiction.[8]

## 1.    OCSLA

As mentioned, in pertinent part, jurisdiction rests under the OCSLA over any

---

[8]As an initial matter, the Court acknowledges that, in both notices of removal and in their opposition briefs, Defendants assert that jurisdiction is proper in federal court under (1) federal common law, (2) federal preemption, and (3) *Grable*.   The Court also observes, however, that, in both opposition briefs, Defendants themselves acknowledge that these bases for federal jurisdiction have been recently rejected by the Ninth Circuit.   *See, e.g.*, Dkt. No. 117 at 8 n.1. Thus, while acknowledging that these bases have been raised in both the Honolulu and Maui Actions, the Court does not discuss them further beyond rejecting them in light of binding Ninth Circuit authority.   *See City of Oakland v. BP PLC*, 969 F.3d 895, 906-908 (9th Cir. 2020).

case "arising out of, or in connection with … any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals…."   43 U.S.C. § 1349(b)(1).   Thus, for jurisdiction to lie, (1) an "operation" involving "exploration, development, or production" must be conducted on the outer Continental Shelf, and (2) the case must arise out of or in connection with that operation.   *Id*.   While OCSLA does not define the term "operation," the terms "exploration, development, or production" are defined as follows.   "Exploration" "means the process of searching for minerals," such as surveys and drilling.   43 U.S.C. § 1331(k).   "Development" is described as "those activities which take place following discovery of minerals in paying quantities," such as drilling, platform construction, and onshore support facilities.   *Id*. § 1331(l). "Production" "means those activities which take place after the successful completion of any means for the removal of minerals," such as the transfer of minerals to shore, monitoring, and work-over drilling.   *Id*. § 1331(m).

Here, the parties do not dispute that Defendants, at least to some extent, engage in operations of exploration, development, or production on the outer Continental Shelf.   The real dispute between them, instead, is whether this case arises out of or in connection with that operation.   While the Ninth Circuit has not clarified the scope of the jurisdictional reach of the OCSLA, the Court finds that this

case does not arise out of or in connection with Defendants' operations on the outer Continental Shelf.

The reason is the nature of the cases Plaintiffs bring here--in particular, the alleged conduct of Defendants targeted in the Complaints.   Specifically, the essence of those Complaints is that Defendants have allegedly created a public nuisance. The important part for this analysis is *how* the Defendants allegedly created that nuisance.   Contrary to Defendants' assertions, it is *not* through their "fossil fuel production activities," *see* Dkt. No. 117 at 14, but through their alleged *failure to warn* about the hazards of using their fossil fuel products and *disseminating* misleading information about the same, *see* Dkt. No. 1-2 at ¶ 157; Dkt. No. 1-2* at ¶ 207.[9]   When viewed in this light, these cases simply have nothing to do with the "exploration, development, or production" of minerals from the outer Continental Shelf, as those terms are defined in the statute.   Notably, each of those defined terms involve examples of activities requiring either some direct act on the outer Continental Shelf, such as drilling, or acts in support of an act thereon, such as platform construction.   As alleged in the Complaints, failing to warn and disseminating information about the use of fossil fuels have nothing to do with such

---

[9]Defendants' citation to the Complaints here reveals the fault in their argument.   The relevant paragraph alleges that "Defendants' acts and omissions as alleged herein are indivisible causes of the City's injuries and damages…."   Dkt. No. 117 at 14 (citing Dkt. No. 1-2 at ¶ 170).   The important phrase is "as alleged herein…[,]" which, as discussed, is the alleged failure to warn and dissemination of misleading information, *not* fossil fuel production.

direct acts or acts in support.

Therefore, while the Court acknowledges that the Ninth Circuit has not clarified the jurisdictional reach of OCSLA, based upon this Court's reading of the statute, these cases do not arise out of or in connection with "any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals…."   *See* 43 U.S.C. § 1349(b)(1).[10]

## 2.   <u>Section 1442(a)(1)/Federal Officer Removal</u>

As mentioned, Section 1442(a)(1) permits removal when, among other things, (1) there is a causal nexus between a defendant's actions, taken pursuant to a federal officer's direction, and the plaintiff's claims, and (2) there is a colorable federal defense.   *San Mateo*, 960 F.3d at 598.   For there to be a causal nexus, a defendant must show that (A) it was acting under a federal officer in performing some act under color of federal office, and (B) such action is causally connected to the plaintiff's claims.   *Id*.

To begin, the Court observes that this case hardly operates on a clean slate on the topic presented: whether Defendants, including the ones here, acted under a

---

[10]The Court notes that both parties cite various non-binding cases that discuss the jurisdictional reach of the OCSLA.   *See* Dkt. No. 116-1 at 23-24 & nn.10-11; Dkt. No. 117 at 11-12.   Only Plaintiffs, however, cite cases that have considered the specific issue of OCSLA jurisdiction in the context of an action like this one, and every one of those cases has found that jurisdiction does not lie.   *See* Dkt. No. 116-1 at 24 n.11.

federal officer's direction.   This is because the Ninth Circuit recently addressed that exact same issue in a similar lawsuit.   *See id.* at 598-603.   Put succinctly, the Ninth Circuit did not answer the question in Defendants' favor, *i.e.*, it affirmed a district court's finding that Section 1442(a)(1) did not provide jurisdiction over a dispute very similar to the one here.

Undaunted, Defendants again press the same argument.   In doing so, Defendants contend that, in these cases, they have provided "substantial additional evidence" that they acted under federal officers, which they, for whatever reason, did not present to the district court or to the Ninth Circuit in *San Mateo*.   Dkt. No. 117 at 17; *see also* Dkt. No. 96* at 18 n.10.   Bearing in mind the tinged canvas upon which the Court writes, the Court first addresses whether Defendants acted under a federal officer, then whether any such action is causally connected to Plaintiffs' claims, and, finally, whether a colorable federal defense has been stated.

A.   **Acting Under**

In determining whether a private person acted under a federal officer, a court should consider at least four factors.   *San Mateo*, 960 F.3d at 599.   First, whether the person is acting in a manner akin to an agency relationship.   Second, whether the person is subject to an officer's "close direction" or in an "unusually close" relationship involving detailed regulation, monitoring, or supervision.   *Id.* (quotation omitted).   Third, whether the person is assisting in fulfilling "basic

10

government tasks that the Government itself would have had to perform if it had not contracted with a private firm." *Id*. (quotation omitted). And finally, whether the person's activity is "so closely related to the government's implementation of its federal duties that the private person faces a significant risk of state-court prejudice" and may have difficulty in raising an immunity defense. *Id*. (quotation and internal quotation omitted).

In their opposition briefs, Defendants first contend that "securing an adequate supply of oil and gas is an essential government function." Dkt. No. 117 at 19-23; Dkt. No. 96* at 22-27. Defendants argue that the federal government created agencies to "control" the petroleum industry, directed the production of certain products, supervised and encouraged the domestic production of oil and gas, and procured millions of barrels of fuel products for the military. Defendants assert that, in this light, they have a "special relationship" with the federal government, justifying jurisdiction here.

The Court is unmoved. Among other deficiencies, Defendants fail to explain how the matters they address in this argument satisfy any of the factors that the Ninth Circuit only recently determined should be considered when addressing whether a private person acted under a federal officer for purposes of Section 1442(a)(1). Instead, Defendants rely on broad policy goals and announcements of various political administrations, interlaced with occasional reference to

"supervis[ion][,]" "control[,]" and "military specifications[.]"   No explanation is made, though, as to why any of this constitutes an agency-type relationship, close direction, the fulfillment of basic government tasks, or the risk of state-court prejudice.   Therefore, the Court rejects that the alleged "special relationship" between the federal government and Defendants results in Defendants acting under a federal officer for purposes of Section 1442(a)(1).

Defendants next argue that they acted under federal officers in producing and supplying specialized fuels for the military.   Dkt. No. 117 at 23-33; Dkt. No. 96* at 27-36.   More specifically, Defendants point to the supply of specialized fuels during World War II, the Korean War, the Cold War, and between 1983 and 2011 to the Department of Defense.   For present purposes, the Court will assume Defendants acted under a federal officer in (1) suppling specialized fuels to, and constructing pipelines for, the federal government during World War II, (2) supplying specialized fuels for certain spy or reconnaissance planes during the Cold War, and (3) supplying specialized jet fuels for the Department of Defense between 1983 and 2011 (*see* Dkt. No. 117 at 31-32).   However, with respect to fuel supplied during the Korean War and the 1973 Oil Embargo, other than "directives" to increase or ensure the supply of oil, *see id*. at 28-29, Defendants provide no information as to why this constituted the sort of "unusually close" relationship required.   *See San Mateo*, 960 F.3d at 599, 601-602.

Defendants next argue that they produced oil on federal lands pursuant to leases governed by federal statutes, such as the OCSLA.   Dkt. No. 117 at 33-40; Dkt. No. 96* at 37-45.   As Plaintiffs point out, though, the Ninth Circuit has already addressed the question of whether leases to produce oil on the outer Continental Shelf cause entities the same as, or similar to, Defendants to act under a federal officer.   *See* Dkt. No. 121 at 17; Dkt. No. 98* at 13-14.   Like many other questions, that one was resolved *against* Defendants when the Ninth Circuit held that the leases "do not require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties."   *San Mateo*, 960 F.3d at 602-603.

Nonetheless, in their opposition briefs, Defendants attempt to explain why *San Mateo* does not control.   They argue that additional paragraphs in the leases, ones that presumably were there when the Ninth Circuit reviewed the same leases, "provide significantly more detail about government control over federal mineral lessees like Defendants than the factual record at issue in the cases upon which Plaintiff relies."   Dkt. No. 117 at 33.   Defendants further argue that "their performance under the leases fulfilled an essential governmental purpose" that the Ninth Circuit presumably ignored.   *Id*. at 34.   Defendants, at least in the Maui Action, also rely on the opinion of Richard Priest, an Associate Professor of History and Geographical and Sustainability Sciences at the University of Iowa, that the leases are "not merely commercial transactions between the federal government and

13

the oil companies. They reflect the creation of a valuable national security asset for the United States over time."   Dkt. No. 96* at 37 (citing Dkt. No. 96-1 at ¶ 7(1)).

This Court is unconvinced that any of the supposedly additional or new arguments presented here alter the Ninth Circuit's holding that the leases do not give rise to an unusually close relationship with the federal government for purposes of Section 1442(a)(1).   Principally, while Defendants appear to have taken a new approach in presenting the leases—describing them as securing an essential governmental purpose—ultimately, they have merely rearranged the deckchairs. The leases are the same leases the Ninth Circuit reviewed less than a year ago. Defendants may now be highlighting different provisions in those leases than what they brought to the court's attention in *San Mateo*, but that hardly means the Ninth Circuit ignored or did not appreciate Defendants' new focus.   Nothing has changed in the cited relationship with the government over the last year, and oil is still oil (whether or not Defendants now wish to describe it as a "valuable national security asset").   Still further, the newly cited lease provisions show nothing more than what the Ninth Circuit described as "largely track[ing] legal requirements" and evidencing a high degree of regulation.   *See San Mateo*, 960 F.3d at 603.   As such, in light of *San Mateo*, the Court does not agree that Defendants acted under a federal officer with respect to oil and gas leases with the government.

A similar result is true of Defendants' reliance on their operation for the

federal government of National Petroleum Reserve No. 1 in Elk Hills.   Dkt. No. 117 at 41-44; Dkt. No. 96* at 45-48.   Notably, this argument was also addressed by the Ninth Circuit in *San Mateo*, and it too was rejected as a basis for federal officer removal.   *See San Mateo*, 960 F.3d at 601-602.   Despite the Ninth Circuit's ruling, Defendants largely sidestep the same, asserting only that this case is different because an oil company, Standard Oil, was hired to "operate" Elk Hills and, in one of the operating agreements with the government, was stated as "in the employ" of the Navy.   Dkt. No. 117 at 41; Dkt. No. 96* at 46.   The Court is, again, unconvinced that the cited operating agreement rendered Standard Oil as acting under a federal officer.   While the agreement states, without explaining, that Standard Oil was "in the employ" of the Navy, nothing else in the agreement, and certainly nothing to which Defendants cite, sets forth the kind of "unusually close" relationship that is necessary.   Instead, the agreement provides only general direction regarding the operation of Elk Hills.   *See* Dkt. No. 119-11 at § 4 (at 189-190).[11]   Therefore, in light of *San Mateo*, the Court does not agree that Defendants' Elk Hills operations constituted "acting under" a federal officer.

Defendants final argument in this regard is that they acted under a federal

---

[11]For example, the agreement merely states that operating Elk Hills will include, among other things, "drilling of wells," "exploration and prospecting[,]" and the "maintenance" of facilities. *See* Dkt. No. 119-11 at § 4(e).   None of these tasks include anything close to the "detailed regulation, monitoring, or supervision" required.   *See San Mateo*, 960 F.3d at 599 (quotation omitted).

officer in supplying oil to, and managing, the strategic petroleum reserve (SPR).

Dkt. No. 117 at 44-46; Dkt. No. 96* at 48-50.   They argue that 162 million barrels

of crude oil have been supplied to the SPR through a royalty-in-kind program, those

barrels have been delivered to the SPR under contract with the government, they

have operated some of the SPR's infrastructure, and they are subject to government

control when the President calls for an emergency drawdown of the SPR.   The

Court disagrees that the foregoing represents a relationship sufficient under Section

1442(a)(1).   Defendants provide no explanation as to any type of control the

government may wield over them, instead only conclusorily stating that they "acted

at the direction of federal officers" when supplying oil or operating infrastructure.

At best, the relationship Defendants describe is a regular business one.[12]   Therefore,

the Court does not find that Defendants acted under a federal officer with respect to

the SPR.

### B.      Causal Connection

As mentioned, in order for federal officer removal to be appropriate,

Defendants must further show that "there is a causal nexus between [their] actions,

taken pursuant to a federal officer's directions, and the plaintiff's claims."   *San*

---

[12]Further, the Court agrees with Plaintiffs' argument regarding the applicability of *San Mateo* here.
*See* Dkt. No. 121 at 29; Dkt. No. 98* at 24-25.   Specifically, in *San Mateo*, the Ninth Circuit
observed that the oil and gas leases discussed earlier included terms for Defendants to pay royalties
to the government.   960 F.3d at 602.   As discussed, the Ninth Circuit did not find the leases
sufficient under Section 1442(a)(1).   Thus, if the leases *in toto* do not create a Section 1442(a)(1)
relationship, the Court cannot see how a part of those leases−royalties−could either.

*Mateo*, 960 F.3d at 598 (quotation and alteration omitted).

Here, Defendants argue that there is a causal connection between their acts under federal direction and Plaintiffs' claims because those claims relate to Defendants' production and supply of oil and gas to the federal government, something which Defendants go so far as to describe as the "core" of Plaintiffs' claims.   Dkt. No. 117 at 47; Dkt. No. 96* at 51.   This Court disagrees.   As discussed earlier, in their Complaints, Plaintiffs have chosen to target Defendants alleged failure to warn and/or disseminate accurate information about the use of fossil fuels.   While it does not take a geologist to know that fossil fuels must go through a process of production and supply before they can be used, this does not mean that Plaintiffs' claims rely on or even relate to Defendants' information-related activities.   The Court further disagrees that Plaintiffs' claims rest upon the "cumulative production of petroleum products…."   Dkt. No. 96* at 51 (emphasis omitted).   Instead, as stated in the Complaints, Plaintiffs' claims focus on Defendants' alleged "*exacerbation* of global warming…."   Dkt. No. 1-2 at ¶ 41; Dkt. No. 1-2* at ¶ 51 (emphasis added).   In other words, Plaintiffs do not claim that no petroleum products would have been used, only that Defendants made the use worse.   *See* Black's Law Dictionary 679 (10th ed. 2014) (defining "exacerbate" as "[t]o make worse").

This is true even though Defendants rely upon the Ninth Circuit's statement

that a defendant's "theory of the case" should be credited in assessing causal

connection.   Dkt. No. 117 at 47 (citing *Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th

Cir. 2014)); Dkt. No. 96* at 51 (same).   Defendants' theory of the case is not a

theory for *this* case, like the one in *Leite*.   In *Leite*, the defendant was accused of

failing to warn the plaintiffs of the hazards posed by asbestos.   749 F.3d at 1119-20.

As a defense, the defendant argued that it provided warnings required by the federal

government.   *Id*. at 1123.   The Ninth Circuit concluded that the defendant had

established a causal connection because "the very act that forms the basis of

plaintiffs' claims−Crane's failure to warn about asbestos hazards−is an act that

[defendant] contends it performed under the direction of the [government]."   *Id*. at

1124.   Nothing remotely similar exists here.

Here, Defendants' assert their theory of the case as: "Plaintiff's alleged harms

resulted from decades of greenhouse gas emissions caused by billions of consumers'

use of fossil fuels that were produced, in part, for the federal government and/or

under federal government directives and control."   Dkt. No. 117 at 18; Dkt. No. 96*

at 21.   While that may be a perfectly good theory in the abstract or as part of some

other case, here, "the very act that forms the basis of plaintiffs' claims" is *not*

"billions of consumers' use of fossil fuels…."   Instead, it is Defendants' warnings

and information (or lack thereof) about the hazards of using fossil fuels−something

noticeably absent from Defendants' stated theory.   Put simply, if Defendants had it

their way, they could assert *any* theory of the case, however untethered to the claims of Plaintiffs, because this Court must "credit" that theory.   To do so, though, would completely ignore the requirement that there must be a causal connection *with the plaintiff's claims*.   *See San Mateo*, 960 F.3d at 598.

In this light, even if Defendants had done all of the acts discussed above at the direction of a federal officer, including those acknowledged as such by the Court, none of them are causally connected to Plaintiffs' claims.   Those claims concern the alleged failure to warn and/or to disseminate accurate information about the hazards of fossil fuels, and Defendants make no argument that they failed to warn or disseminate accurate information at the direction of a federal officer.   Therefore, the Court does not find that a causal connection exists between the claims here and any acts Defendants may have taken at the direction of a federal officer.[13]

## C.   <u>Colorable Federal Defense</u>

The Court also finds that Defendants have failed to show a colorable federal defense exists here.   In the Honolulu Action, in one paragraph, Defendants assert that a variety of federal defenses are colorable.   Dkt. No. 117 at 50.   Defendants appear to *assume* they are right since they never take the time to set forth the

---

[13]Even if the Court was willing to accept Defendants' strained "theory of the case," that theory has nothing to do with the supply of specialized fuels to, and constructing pipelines for, the federal government during World War II, the supply of specialized fuels for certain spy or reconnaissance planes during the Cold War, or the supply of specialized jet fuels for the Department of Defense between 1983 and 2011—the only bases for federal direction that the Court assumed may exist here.   As mentioned, Defendants' theory concerns "billions of *consumers'* use of fossil fuels…," something which has nothing to do with supplying specialized fuels to the *military*.

elements of any of the cited defenses, let alone attempt to explain why the defenses are colorable.   The Maui Action fares no better.   While Defendants expand the discussion from one paragraph to two, Dkt. No. 96* at 53-55, the additional space they devote only cites general propositions of law and once again omits any explanation of why any of the asserted defenses are colorable.   Conclusory assertions do not make it so.   *See id*. at 54 ("Here, Defendants produced oil and gas at the direction of the federal government, and thus have a colorable argument that they are immune from liability for any alleged injuries resulting therefrom.").

Thus, while the Court acknowledges that the meaning of "colorable" in this context is not precisely defined and the Supreme Court has instructed that courts should not be "grudging" in their interpretation, *see Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999), something more than simply asserting a defense and the word "colorable" in the same sentence must be required, *see Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 731-732 & n.6 (9th Cir. 2015) (holding that a defendant "did not demonstrate by a preponderance of the evidence a colorable government contractor defense" after failing to proffer any evidence supporting the defense).

## 3.   **Federal Enclave**

Defendants argue that jurisdiction exists here because Plaintiffs' claims arise on federal enclaves.   Dkt. No. 117 at 50-52; Dkt. No. 96* at 55-56.   More specifically, Defendants argue that they produced and refined oil and gas on federal

enclaves.

As mentioned, federal courts have jurisdiction over tort claims that "arise" on federal enclaves. *Durham*, 445 F.3d at 1250. It would require the most tortured reading of the Complaints to find that standard met here. As discussed, contrary to Defendants' assertions, the relevant conduct here, let alone "all" of it, is not the production or refining of oil and gas. *See* Dkt. No. 96* at 56. It is, instead, the warning and disseminating of information about the hazards of fossil fuels. It is from that conduct that Plaintiffs claims arise, and there is no dispute such conduct did not occur on a federal enclave. Moreover, as Plaintiffs explain, in their Complaints, they disavow relief for injuries to federal property. Dkt. No. 116-1 at 39-42; Dkt. No. 74-1 at 48-51; *see also* Dkt. No. 1-2 at ¶ 14; Dkt. No. 1-2* at ¶ 14. Therefore, like every other court to have addressed this issue, the Court finds that federal enclave jurisdiction does not exist over Plaintiffs' claims. *See, e.g.*, *Cty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 939 (N.D. Cal. 2018); *Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 974-975 (D. Colo. 2019); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142, 152 (D.R.I. 2019); *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538, 564-566 (D. Md. 2019).[14]

---

[14]In their opposition briefs, Defendants ask this Court to find "irrelevant" Plaintiffs' allegations about "misrepresentations" and "concealment[,]" arguing that "there can be no liability under Plaintiff's theory but for Defendants' production and sale of fossil fuels." Dkt. No. 117 at 52;

# CONCLUSION

Because Defendants have failed to carry their burden of establishing subject matter jurisdiction over these cases, the motions to remand (Dkt. No. 116 in Case No. 20-cv-163 and Dkt. No. 74 in Case No. 20-cv-470) are GRANTED.

Case No. 20-cv-163, *City & County of Honolulu v. Sunoco LP, et al.*, is hereby REMANDED to the First Circuit Court for the State of Hawaiʻi, pursuant to Section 1447(c) of Title 28.   The Clerk is instructed to mail a certified copy of this Order to the clerk of the First Circuit Court and then CLOSE the case.

Further, Case No. 20-cv-470, *County of Maui v. Chevron U.S.A. Inc., et al.*, is hereby REMANDED to the Second Circuit Court for the State of Hawaiʻi, pursuant to Section 1447(c) of Title 28.   The Clerk is instructed to mail a certified copy of this Order to the clerk of the Second Circuit Court and then CLOSE the case.

---

Dkt. No. 96* at 57-58.   There are many problems with this argument.   First, given that each of Plaintiffs' claims concern Defendants' alleged warning and information practices, Defendants essentially ask this Court to find the entire case "irrelevant[,]" which would seem an odd request to make at this procedural juncture.   Second, the Court does not see why Defendants can only be liable for producing and selling fossil fuels, as they appear to suggest.   That assumes Defendants have done nothing else worthy of liability−something which the Complaints allege is not the case. Third, Defendants' argument is simply an attempt to argue the *merits* of Plaintiffs' claims.   That is, however, not the purpose of this instant endeavor.   Finally, in a footnote at the end of their opposition brief in the Maui Action, Defendants argue, for the first time, that, even if Plaintiffs' claims rely on "alleged misrepresentations," this case is still removable because it involves First Amendment speech.   *See* Dkt. No. 96* at 57 n.19.   Putting aside that this is the only time in either of their opposition briefs that Defendants acknowledge the actual claims being brought in these cases, this argument does not appear to have been properly raised (or even preserved).   *See City of Oakland*, 969 F.3d at 911 n.12.   It also appears to be premised upon *Grable*, which, as explained, Defendants acknowledge has been rejected by the Ninth Circuit as a basis for removal.   *See id.* at 906-907; Dkt. No. 96* at 6 n.1.

IT IS SO ORDERED.

Dated: February 12, 2021 at Honolulu, Hawai'i.

Derrick K. Watson
United States District Judge